**NONCONFIDENTIAL**
**Nos. 2013-1150, -1182**

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

APPLE INC.,

*Plaintiff-Appellant*,

— v. —

MOTOROLA MOBILITY LLC,

*Defendant-Cross-Appellant*.

_____

Appeals from the United States District Court for the Western District
of Wisconsin in No. 11-CV-0178, Senior Judge Barbara B. Crabb

_____

**OPENING BRIEF AND ADDENDUM OF
PLAINTIFF-APPELLANT APPLE INC.**

_____

| | |
|---|---|
| Matthew D. Powers | E. Joshua Rosenkranz |
| Tensegrity Law Group LLC | Orrick, Herrington & Sutcliffe LLP |
| 555 Twin Dolphin Drive | 51 West 52nd Street |
| Suite 360 | New York, NY 10019 |
| Redwood Shores, CA 94065 | (212) 506-5000 |
| | |
| | Mark S. Davies |
| | Rachel M. McKenzie |
| | Rachel Wainer Apter |
| | Daniel Habib |
| | Orrick, Herrington & Sutcliffe LLP |
| | 1152 15th Street, NW |
| | Washington, DC 20005 |

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF INTEREST

Counsel for appellant certify the following:

1.     We represent APPLE INC.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented:  Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:  None.  Apple Inc. has no parent corporation.  According to Apple's Proxy Statement filed with the United States Securities and Exchange Commission in January 2013, there are no beneficial owners that hold more than 10% of Apple's outstanding common stock.

4.     The names of all law firms and the partners or associates that appeared for party or amicus now represented in trial court or agency or are expected to appear in this court are:

ORRICK, HERRINGTON & SUTCLIFFE LLP:

E. Joshua Rosenkranz
Mark S. Davies
Rachel M. McKenzie
Rachel Wainer Apter
Daniel Habib

WEIL GOTSHAL & MANGES LLP:

Carrie Anderson
Mark G. Davis
Penny Reid

COVINGTON & BURLING LLP:

Krzysztof Bebenek
Matthew John Connolly
Samuel F. Ernst (no longer with the firm)
Robert D. Fram
Deborah Ann Garza
Danielle Luce Goldstein
Christine Saunders Haskett
Robert T. Haslam
Cortlin Hall Lannin
Richard Anthony Lopez
Charlin Lu
Jason Raofield
Stephen William Rodger (no longer with the firm)
Nathan Evans Shafroth
Winslow B. Taub
Robert Joseph Williams

TENSEGRITY LAW GROUP LLP:

Steven S. Cherensky
Paul T. Ehrlich
Azra Hadzimehmedovic
Matthew D. Powers

GODFREY & KAHN, S.C.:

James D. Peterson
Bryan J. Cahill

CETRA LAW FIRM, LLC

Catherine Cetrangolo

Date: July 23, 2013                    Respectfully submitted,

                                       ORRICK, HERRINGTON &
                                       SUTCLIFFE LLP

                                       By: /s/ E. Joshua Rosenkranz
                                       *Attorney for Plaintiff-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................vii

TABLE OF ABBREVIATIONS ...............................................................xv

STATEMENT OF RELATED CASES.....................................................xvi

INTRODUCTION .....................................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS ........................................................................4

    Industry Standards Deliver Substantial Benefits So Long As
    FRAND Commitments Protect Against Patent Hold-up...............4

    Two Standard-Setting Organizations Develop Standards In
    Reliance On FRAND Commitments ............................................11

    Motorola Discloses SEPs After The Adoption Of The
    Relevant Standards .......................................................................13

    Apple Launches The iPhone, Containing A Module That The
    Supplier Has Licensed From Motorola .........................................14

    Motorola Attempts To Hold Apple Up For An Exorbitant
    License ..........................................................................................15

    Motorola Seeks An Exclusion Order From The ITC And
    Apple Counterclaims .....................................................................19

    The District Court Grants Apple Partial Summary
    Judgment But Ultimately Dismisses Its Claims..........................21

SUMMARY OF THE ARGUMENT ........................................................25

STANDARD OF REVIEW......................................................................28

ARGUMENT...........................................................................................29

iv

I.  THE *NOERR-PENNINGTON* DOCTRINE DOES NOT
    SHIELD MOTOROLA'S DECEPTION OF STANDARD-
    SETTING ORGANIZATIONS TO ABUSE ITS RESULTING
    MARKET POWER .......................................................................29

    A.  The Antitrust Violation Was Motorola's Acquiring And
        Maintaining An Unlawful Monopoly By Deceiving Two
        Industry Standard-Setting Organizations ...........................30

    B.  The *Noerr-Pennington* Doctrine Does Not Immunize
        Motorola's Deceptive Conduct Before Standard-Setting
        Organizations .....................................................................36

II. THE DISTRICT COURT ABUSED ITS DISCRETION IN
    DISMISSING APPLE'S BREACH OF CONTRACT CLAIMS .....44

    A.  Motorola Breached Its Contractual Obligations To
        Offer Apple A FRAND License Rate ..................................45

    B.  As The District Court Recognized, Specific
        Performance Was An Appropriate Remedy For
        Motorola's Breach ..............................................................47

    C.  Apple's Refusal To Pre-Commit To Accept A Court-
        Ordered Offer Without Knowing The Rate Did Not
        Justify The Last-Minute Dismissal ....................................53

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN
     DISMISSING APPLE'S DECLARATORY JUDGMENT
     CLAIMS ................................................................................61

    A.  The Declaration Of A FRAND Rate Would Resolve
        Uncertainty In Apple's Ongoing Licensing Dispute
        With Motorola .....................................................................63

    B.  A Declaration That Motorola Has Not Offered Apple A
        FRAND Rate Would Resolve Uncertainty In The
        Parties' Ongoing Licensing Dispute ...................................66

    C.  A Declaration That The '898 Patent Is Unenforceable
        Due To Patent Misuse Would Resolve The Litigation
        Over That Patent .................................................................69

IV.   THIS COURT HAS EXCLUSIVE APPELLATE
      JURISDICTION BECAUSE APPLE'S DECLARATORY
      JUDGMENT CLAIMS ARISE UNDER FEDERAL PATENT
      LAW ............................................................................ 72

CONCLUSION ................................................................... 75

## ADDENDUM

Order, Dated June 7, 2011 (DKT 93) ............................................. A22-59

Opinion and Order, Dated August 10, 2012 (DKT 194) ............... A60-107

Opinion and Order, Dated October 29, 2012 (DKT 424) .............. A108-64

Final Pretrial Conference Order,
Dated November 2, 2012 (DKT 485) ............................................ A165-69

Opinion and Order, Dated November 2, 2012 (DKT 487) ............ A170-76

Opinion and Order, Dated November 8, 2012 (DKT 503) ............ A177-89

Opinion and Order, Dated November 28, 2012 (DKT 509) .......... A190-95

Judgment, Dated December 5, 2012 (DKT 510) ................................ A196

Material has been deleted from pages 14-19 and 32 of the
nonconfidential Brief and Addendum of Plaintiffs-Appellants.
This material is deemed confidential information pursuant to the
Protective Order entered in *In re Certain Wireless Commc'n
Devices, Portable Music and Data Processing Devices, Computers
and Components Thereof*, ITC Inv. No. 337-TA-745, Dated
November 3, 2010, and the sealing orders entered in the district
court action below. *See* ECF Nos. 12, 18, 46, 58, 66, 78 and 84.
The omitted material contains confidential deposition testimony,
confidential business information, and confidential licensing
information.

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*ABB Inc. v. Cooper Indus., LLC,*
635 F.3d 1345 (Fed. Cir. 2011) ..........................................................73

*Allied Tube & Conduit Corp. v. United States,*
486 U.S. 492 (1988) ..................................................................5, 36

*Apple Inc. v. Motorola, Inc.,*
No. 11-CV-08540, 2012 WL 2362630 (N.D. Ill. June 7, 2012) ...........71

*Apple, Inc. v. Motorola, Inc.,*
869 F. Supp. 2d 901 (N.D. Ill. 2012) ..............................................7, 63

*Apple Inc. v. Samsung Elecs. Co.,*
No. 11-01846, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ..............41

*B. Braun Med., Inc. v. Abbott Labs.,*
124 F.3d 1419 (Fed. Cir. 1997) .......................................................71

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.,*
402 U.S. 313 (1971) ...................................................................56, 57

*Broadcom Corp. v. Qualcomm, Inc.,*
501 F.3d 297 (3d Cir. 2007).....................................................*passim*

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
157 F.3d 1340 (Fed. Cir. 1998) .......................................................71

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
404 U.S. 508 (1972) .......................................................................30

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
479 U.S. 104 (1986) ...................................................................26, 42

*Chi-Mil Corp. v. W.T. Grant Co.,*
422 F. Supp. 46 (E.D. Wis. 1976)...................................................59, 60

vii

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
690 F.2d 1240 (9th Cir. 1982) ......................................................42, 43

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ...................................................................29, 71

*eBay, Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ..........................................................................59

*EMC Corp. v. Norand Corp.,*
89 F.3d 807 (Fed. Cir. 1996) .............................................................65

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.,*
824 F.2d 953 (Fed. Cir. 1987) ...........................................................62

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.,*
535 U.S. 826 (2002) .............................................................72, 73, 74

*Hologic, Inc. v. SenoRx, Inc.,*
639 F.3d 1329 (Fed. Cir. 2011) .....................................................28, 29

*Hynix Semiconductor, Inc. v. Rambus, Inc.,*
527 F. Supp. 2d 1084 (N.D. Cal. 2007) ..........................................42, 43

*Imation Corp. v. Koninklijke Philips Elecs. N.V.,*
586 F.3d 980 (Fed. Cir. 2009) ...........................................................73

*Indian Head, Inc. v. Allied Tube & Conduit Corp.,*
817 F.2d 938 (2d Cir. 1987) .........................................................29, 30

*Koon v. United States,*
518 U.S. 81 (1996) ...........................................................................61

*Matthews v. Wis. Energy Corp.,*
534 F.3d 547 (7th Cir. 2008) .............................................................45

*Med. Assurance Co., Inc. v. Hellman,*
610 F.3d 371 (7th Cir. 2010) .............................................................72

*Micron Tech., Inc. v. Mosaid Techs., Inc.,*
518 F.3d 897 (Fed. Cir. 2008) .......................................................29, 62

viii

*Microsoft Corp. v. Motorola, Inc.*,
 696 F.3d 872 (9th Cir. 2012) ........................................................7, 46

*Microsoft Corp. v. Motorola, Inc.*,
 No. C10-1823JLR, 2012 WL 4827743
 (W.D. Wash. Oct. 10, 2012) ..............................................................65

*Microsoft Corp. v. Motorola, Inc.*,
 __ F. Supp. 2d __, 2013 WL 2111217
 (W.D. Wash. April 25, 2013) ...............................................9, 18, 61

*Miller v. Lesea Broad.*,
 87 F.3d 224 (7th Cir. 1996) ...............................................................51

*Minn. Mining & Mfg. Co. v. Norton Co.*,
 929 F.2d 670 (Fed. Cir. 1991) ...............................................28, 63, 64

*Princo Corp. v. ITC*,
 616 F.3d 1318 (Fed. Cir. 2010) (en banc).........................................69

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
 360 F.3d 1295 (Fed. Cir. 2004) .........................................................37

*Qualcomm Inc. v. Broadcom Corp.*,
 548 F.3d 1004 (Fed. Cir. 2008) ...........................................................6

*Rambus, Inc. v. FTC*,
 522 F.3d 456 (D.C. Cir. 2008) .............................................................6

*Realtek Semiconductor Corp. v. LSI Corp.*,
 No. CV-12-03451, 2012 WL 4845628
 (N.D. Cal. Oct. 10, 2012) ............................................................54, 66

*Realtek Semiconductor Corp. v. LSI Corp.*,
 __ F. Supp. 2d __, 2013 WL 2181717
 (N.D. Cal. May 20, 2013)...................................................................56

*Research in Motion Ltd. v. Motorola, Inc.*,
 644 F. Supp. 2d 788 (N.D. Tex. 2008)................................................41

*SanDisk Corp. v. STMicroelectronics, Inc.*,
    480 F.3d 1372 (Fed. Cir. 2007) ....................................28, 62

*Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*,
    497 F.3d 1271 (Fed. Cir. 2007) ..............................65, 66, 68

*TAS Distrib. Co. v. Cummins Engine Co.*,
    491 F.3d 625 (7th Cir. 2007) ......................................29

*Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*,
    329 U.S. 637 (1947) ................................................69

*Union Labor Life Ins. Co. v. Pireno*,
    458 U.S. 119 (1982) ................................................30

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965) ................................................29

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................31, 33

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed Cir. 1986) ..................................69, 70

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ................................................39

## STATE CASES

*Anderson v. Onsager*,
    455 N.W.2d 885 (Wis. 1990)................................49, 60, 61

*Ash Park, LLC v. Alexander & Bishop, Ltd.*,
    783 N.W.2d 294, 2010 WI 44 ....................................48

*Edlin v. Soderstrom*,
    264 N.W.2d 275 (Wis. 1978)........................................29

*Gaugert v. Duve*,
    628 N.W.2d 861, 2001 WI 83 ....................................50

*Heins v. Thompson & Flieth Lumber Co.,*
    163 N.W. 173 (Wis. 1917)................................................................48, 49

*Krause v. Holland,*
    147 N.W.2d 333 (Wis. 1967).............................................................49

*Kurth v. Hauser,*
    55 N.W.2d 367 (Wis. 1952)..........................................................50, 60

*Nw. Motor Car, Inc. v. Pope,*
    187 N.W.2d 200 (Wis. 1971).............................................................45

*State v. Conway,*
    148 N.W.2d 721 (Wis. 1967).............................................................55

*Taft v. Reddy,*
    210 N.W. 364 (Wis. 1926)................................................................48

*Valley Iron Works Mfg. Co. v. Goodrick,*
    78 N.W. 1096 (Wis. 1899)................................................................50

*Welch v. Chippewa Sales Co.,*
    31 N.W.2d 170 (Wis. 1948)......................................................49, 50, 60

*Yee v. Giuffre,*
    499 N.W.2d 926 (Wis. Ct. App. 1993) .................................................49

## FEDERAL STATUTES AND RULES

15 U.S.C. § 4 ................................................................................2

15 U.S.C. § 15 ...........................................................................2, 34

15 U.S.C. § 26 .....................................................................2, 33, 39

19 U.S.C. § 1337 ...........................................................xv, 2, 4, 20

28 U.S.C. § 1295 ............................................................2, 28, 72, 74

28 U.S.C. §§ 1332..........................................................................2

28 U.S.C. § 1338 .....................................................................2, 72

28 U.S.C. § 1659 ..................................................................xvi

28 U.S.C. § 2201 ...................................................................62

19 C.F.R. § 201.14........................................................ xv, 4, 20

ADMINISTRATIVE AGENCY DECISIONS AND MATERIALS

Notice of Final Determination,
   *In re Certain Elec. Devices, Including Wireless Commc'n Devices,*
   *Portable Music and Data Processing Devices, and Tablet Computers,*
   ITC Inv. No. 337-TA-794 (June 4, 2013) ............................52

Comm'n Op.,
   *In re Certain Wireless Commc'n Devices, Portable Music and Data*
   *Processing Devices, Computers and Components Thereof,*
   ITC Inv. No. 337-TA-745 (Sept. 17, 2012) ....................57, 58

Complaint, *In re Google, Inc.,*
   FTC File No. 121-0120 (Jan. 3, 2013)................................10

Statement of the FTC , *In re Google, Inc.,*
   FTC File No. 121-0120 (Jan. 3, 2013)................................10

LEGISLATIVE MATERIALS

*Oversight of the Impact on Competition of Exclusion Orders To Enforce*
   *Standard-Essential Patents: Hearing Before the S. Comm. on the*
   *Judiciary,* 112th Cong. 7 (2012) (statement of FTC Comm'r Edith
   Ramirez) ...............................................................................9

FEDERAL CASE MATERIALS

Resp. and Reply Br. of Apple Inc., *Apple Inc. v. Motorola, Inc.,*
   Fed. Cir. Nos. 12-1548, -1549 (Fed. Cir. Apr. 25, 2013),
   ECF No. 177 .........................................................................52

Brief for IEEE as Amicus Curiae, *Apple Inc. v. Motorola, Inc.,*
   Nos. 2012-1548, -1549 (Fed. Cir. Dec. 19, 2012), ECF No. 13 ...........12

## MISCELLANEOUS

2 Contract Law in Wisconsin (3d ed. 2007) ...............................26, 27, 50

2A Phillip E. Areeda & Herbert Hovenkamp,
   Antitrust Law (3d ed. 2007)...............................................................40

8 Chisum on Patents §21.02[1][d][i](2012) ...........................................74

Larry Dignan, *Google's Motorola purchase: Was it worth it?* ZDNet
   (Jan. 4, 2013), http://zd.net/Vzztbl......................................................68

Joseph Farrell et al., *Standard Setting, Patents, and Hold-Up*,
   74 Antitrust L.J. 603 (2007) .................................................................6

Herbert Hovenkamp et al.,
   IP and Antitrust (2d ed. Supp. 2012) .........................................35, 43

Mark A. Lemley, *Intellectual Property Rights and Standard-Setting
   Organizations*, 90 Cal. L. Rev. 1889 (2002)..........................................5

Matt Richtel, *Motorola Scrambles to Restore Its Lost Cellphone Glory*,
   N.Y. Times, May 1, 2009, *available at* http://nyti.ms/13cRW2R .......15

Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses,
   Patent Pools, and Standard Setting*,
   in Innovation Policy and the Economy
   (Adam B. Jaffe et al. eds., 2000) ...........................................................7

19 Wright, Miller & Cooper,
   Fed. Practice and Procedure (2d ed. 1996) .........................................59

Press Release, Antitrust: Commission Sends Statement of Objections to
   Motorola Mobility on Potential Misuse of Mobile Phone
   Standard-Essential Patents (May 6, 2013), *available at*
   http://europa.eu/rapid/press-release_IP-13-406_en.htm...................10

Restatement (2d) of Contracts (1981) ............................27, 48, 49, 50, 54

Statement of DOJ Antitrust Division on Its Decision To Close Its
    Investigations of Google, Inc.'s Acquisition of Motorola Mobility
    Holdings, Inc. (Feb. 13, 2012) *available at*
    http://www.justice.gov/atr/public/closing/.............................................8

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| A_____ | Cited page(s) of the Joint Appendix |
| Apple | Apple Inc. |
| FTC | Federal Trade Commission |
| FRAND | Fair, reasonable, and non-discriminatory |
| ITC | International Trade Commission |
| Motorola | Motorola Mobility LLC |
| SEP | Standard-essential patent |
| SSO | Standard-setting organization |
| '193 patent | U.S. Patent No. 5,572,193 |
| '223 patent | U.S. Patent No. 5,636,223 |
| '230 patent | U.S. Patent No. 5,490,230 |
| '559 patent | U.S. Patent No. 6,175,559 |
| '697 patent | U.S. Patent No. 6,246,697 |
| '712 patent | U.S. Patent No. 5,319,712 |
| '898 patent | U.S. Patent No. 6,359,898 |

## STATEMENT OF RELATED CASES

On October 6, 2010, Motorola filed a complaint before the ITC alleging that Apple imported and sold products that infringed several Motorola patents, including two declared-essential patents: the '223 and '697 patents. *See* A28, 475 (*In re Certain Wireless Commc'n Devices, Portable Music and Data Processing Devices, Computers and Components Thereof*, ITC Inv. No. 337-TA-745). This Court is currently considering Motorola's appeals of the ITC's determinations in that investigation regarding two other patents. *Motorola Mobility LLC v. ITC*, Fed. Cir. No. 12-1666; *Motorola Mobility LLC v. ITC*, Fed Cir. No. 13-1417.

On March 11, 2011, Apple filed 13 counterclaims in the ITC action alleging, among other things, antitrust violations, breach of contract, and entitlement to declaratory judgments based on Motorola's failure to satisfy its FRAND licensing commitment on its declared-essential patents, including the '223 and '697 patents, as well as the '712, '230, '559, '898, and '193 patents. A288-89, 295, 331-47. Apple removed its counterclaims to the United States District Court for the Western District of Wisconsin pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R.

§ 201.14(e).  A288-89, 331-47 (*Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC (filed Mar. 11, 2011)).  The district court dismissed Apple's claims, resulting in this appeal.  No other appeal from this proceeding was previously before the Court or any other appellate court.

In October 2010, Apple filed a complaint in the Western District of Wisconsin alleging that Motorola is infringing numerous Apple patents. Motorola filed counterclaims alleging that Apple infringes six Motorola patents, including the '712, '559, and '898 patents.  In December 2011, the case was transferred to the Northern District of Illinois and assigned to Hon. Richard A. Posner of the Seventh Circuit, sitting by designation.  This Court is currently considering the parties' cross-appeals of Judge Posner's judgment.  *See Apple Inc. v. Motorola, Inc.*, Fed. Cir. Nos. 12-1548, 12-1549.

Motorola also filed a complaint in the Western District of Wisconsin alleging that Apple is infringing numerous Motorola patents. *See Apple Inc. v. Motorola Inc.*, Case No. 10-CV-00661-BBC (W.D. Wis. filed Oct. 29, 2010).  That action is stayed pending resolution of ITC proceedings pursuant to 28 U.S.C. § 1659.

# INTRODUCTION

This case is about whether courts are powerless to remedy misconduct before standard-setting organizations, or "SSOs," the industry groups that negotiate and agree upon technical specifications to ensure that different manufacturers' products are compatible. Motorola promised two SSOs that it would offer patent licenses on "fair, reasonable, and non-discriminatory" terms—a/k/a "FRAND" or "RAND" terms. Exploiting their reliance on those contractual obligations, Motorola persuaded the SSOs to adopt solutions that it now claims read on Motorola patents. Motorola then broke its FRAND commitment, demanding that Apple take a license at a rate that was more than 12 times what Motorola was charging other licensees for the same technology—a rate that was unfair, unreasonable, and decidedly discriminatory.

Apple's complaint charged that Motorola's deceptive conduct violated the antitrust laws, breached Motorola's contractual obligations to the SSOs, and warranted declaratory relief that Motorola's "offer" violated its FRAND obligations. The district court agreed with almost every legal position Apple took and ordered a trial on most of Apple's

key claims—only to reverse course and cancel the trial at the 11th hour.
So Apple is in the incongruous position, as an appellant, of agreeing
with almost everything the district court did, but appealing only the U-
turns.

Numerous courts, regulators, and commentators have recognized
that deceptive conduct before SSOs intolerably undermines innovation
and competition.  Deception will persist unless courts are willing to end
it.  This Court should direct the district court to finish the job it started.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 15 U.S.C. §§ 4, 15, and
26; 19 U.S.C. § 1337(c); and 28 U.S.C. §§ 1332(a) and 1338(a).  The
district court entered final judgment dismissing the case on
December 5, 2012.   This timely appeal was filed on January 4, 2013.
This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Apple provided evidence that Motorola violated § 2 of the
Sherman Act by making deceptive FRAND commitments and by failing
to timely disclose its intellectual property.  The *Noerr-Pennington*
doctrine immunizes a party from antitrust liability only where the

2

challenged conduct is the petitioning of a government entity. Did the district court err in holding that Apple's antitrust claim was barred by the *Noerr-Pennington* doctrine?

2.     Apple would not commit to accept a license offer from Motorola without knowing the price. Did the district court err by dismissing Apple's contract claims on that basis, where Apple had no contractual obligation to accept any offer from Motorola?

3.     Apple asserted three declaratory judgment claims that would have settled uncertainty regarding Motorola's patent rights and obligations. Did the district court err in refusing to adjudicate those claims?

4.     Does this Court have exclusive appellate jurisdiction over this appeal because the suit encompasses declaratory judgment claims relating to Motorola's patent suit?

## STATEMENT OF THE CASE

On October 6, 2010, Motorola filed a complaint before the ITC. A28, 475. On March 11, 2011, Apple filed 13 counterclaims, alleging antitrust violations, breach of contract, and entitlement to declaratory judgments based on Motorola's breach of its FRAND licensing

3

commitments.  A288-89, 331-47.  Apple removed those counterclaims to the United States District Court for the Western District of Wisconsin pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R. § 201.14(e).  A288-89, 331-47.

The district court granted Apple partial summary judgment, holding that Motorola's commitments to two SSOs are contractually binding and that Apple has a right to enforce those contracts as a third-party beneficiary.  A96-104.  The district court granted Motorola summary judgment on Apple's antitrust claim, A61-62, dismissing that claim with prejudice, A195.  On November 28, 2012, the district court dismissed Apple's remaining claims without prejudice.  A195.  It subsequently entered final judgment.  A196.

## STATEMENT OF FACTS

### Industry Standards Deliver Substantial Benefits So Long As FRAND Commitments Protect Against Patent Hold-up

From the adoption of uniform-gauge rails in the 19th century to the creation of mobile communications networks today, standards—technical specifications that ensure that "all compliant products will work together," A63—have encouraged innovation and driven economic growth.  "Telephones talk to each other, the Internet works, and

hairdryers plug into electrical sockets because private groups have set 'interface' standards, allowing compatibility between products made by different manufacturers."  Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1889, 1893 (2002).

Standards "can have significant procompetitive advantages." *Allied Tube & Conduit Corp. v. United States*, 486 U.S. 492, 501 (1988). As the district court noted, "[s]tandards lower costs by increasing product manufacturing volume and increase price competition by eliminating the costs for consumers to switch between products manufactured by different firms."  A63; *see Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 308-09 (3d Cir. 2007).

Industry participants typically adopt standards under the auspices of private voluntary SSOs.  A63.  SSOs choose the technology to incorporate in standards from among the available options through member consensus.  Thus, those choices often reflect "reasons other than the technical merits of a proposal ….  When pieces of a standard are set from a collection of equally viable technical choices, issues involving compromise and 'horse trading' are often a deciding factor." A11,861.

"Some technological standards incorporate patented technology." A63. Before a standard is adopted, competition from alternative technologies constrains the royalty a patent holder can earn from licensing its intellectual property. *Broadcom*, 501 F.3d at 314; *see* A7689. But once an SSO adopts a standard, businesses make heavy standard-specific investments. *See, e.g.*, Joseph Farrell et al., *Standard Setting, Patents, and Hold-Up*, 74 Antitrust L.J. 603, 612-15 (2007). In many cases, compliance with the standard is essential to a firm's ability to participate in the industry. A7692-94. Thus, businesses sink money into equipment needed to manufacture compliant products and invest in complementary technologies. Farrell et al., *supra*, at 612-15.

Even if an alternative to the standard is available, once firms make such standard-specific investments, the costs of switching away from the standard can become prohibitively high, and the entire industry may be locked into practicing the patented technology. A7693-94; *see Rambus, Inc. v. FTC*, 522 F.3d 456, 459 (D.C. Cir. 2008); *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1010 (Fed. Cir. 2008); *Broadcom*, 501 F.3d at 310, 314.

6

This phenomenon can lead to the pernicious downside of standardization: "Patent hold-up." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 876 (9th Cir. 2012). Patentees who declare their patents essential to a standard may attain disproportionate market power as a result of the standard's adoption, rather than the intrinsic technical value of the patent. "[O]nce a standard has gained such widespread acceptance that compliance is essentially required to compete in a particular market, anyone holding a standard-essential patent could extract unreasonably high royalties from suppliers of standard-compliant products and services." *Id.*; *see Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913 (N.D. Ill. 2012) (Posner, J.) (post-standardization, "the patentee's bargaining power surges because a prospective licensee has no alternative to licensing the patent").

The phenomenon of royalty stacking compounds the problem: Dozens of companies may have declared thousands of patents essential to a single standard. *See, e.g.*, Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting*, in *Innovation Policy and the Economy* 119 (Adam B. Jaffe et al. eds., 2000). The aggregate royalties they demand could make

7

implementation of the standard economically infeasible. *See infra* at 17-18.

Consequently, federal antitrust regulators have warned that patent hold-up undermines competition and harms consumers. The Department of Justice has sounded the alarm that holders of standard-essential patents could "prevent[] or inhibit[] innovation and competition … by demanding supracompetitive licensing rates [from rivals]." A7690. The consequence is to "distort innovation and raise prices to consumers." Statement of DOJ Antitrust Division on Its Decision To Close Its Investigations of Google, Inc.'s Acquisition of Motorola Mobility Holdings, Inc. (Feb. 13, 2012), *available at* http://www.justice.gov/atr/public/closing/.

And the FTC admonishes that patent hold-up "restricts competition and distorts incentives to invest in standardized products and complementary technologies," leading to "higher prices, fewer choices, and inferior product quality." *Oversight of the Impact on Competition of Exclusion Orders To Enforce Standard-Essential Patents: Hearing Before the S. Comm. on the Judiciary*, 112th Cong. 7 (2012) (statement of FTC Comm'r Edith Ramirez).

8

Many SSOs have acted "to insure that standards do not allow the owners of essential patents to abuse their market power to extort competitors or prevent them from entering the marketplace." A63. The key is a set of rules that "require or encourage members of the organization to identify patents that are essential to a proposed standard and to agree to license their patents on fair, reasonable and nondiscriminatory"—FRAND—"terms to anyone who requests a license." *Id*. FRAND attempts to capture "the contribution of the patented technology apart from the value of the patent as the result of its incorporation into the standard." *Microsoft Corp. v. Motorola, Inc.*, __ F. Supp. 2d __, 2013 WL 2111217, at *19 (W.D. Wash. April 25, 2013). It is an intricate balance: Implementers know they will not be excluded from the market, and patentees enjoy royalties commensurate with the inventive value of their intellectual property.

But FRAND promises do not protect competition or consumers unless patentees honor their obligations and appropriate action is taken against those who do not. Motorola has a history of breaking its FRAND promises. The FTC recently concluded that Google, Inc., through its subsidiary Motorola, "violated its FRAND commitments by

9

seeking to enjoin and exclude willing licensees of its FRAND-encumbered SEPs," and thereby "engaged in unfair methods of competition." Complaint at 1, *In re Google, Inc.*, FTC File No. 121-0120 (Jan. 3, 2013). To settle the investigation, Google agreed "to withdraw its claims for injunctive relief on FRAND-encumbered SEPs around the world, and to offer a FRAND license to any company that wants to license Google's SEPs in the future." Statement of the FTC at 1, *In re Google, Inc.* (Jan. 3, 2013). Similarly, the European Commission has expressed its preliminary view that Motorola's "seeking and enforcing of an injunction against Apple in Germany on the basis of its mobile phone [SEPs] amounts to an abuse of a dominant position prohibited by EU antitrust rules." Press Release, Antitrust: Commission Sends Statement of Objections to Motorola Mobility on Potential Misuse of Mobile Phone Standard-Essential Patents (May 6, 2013), *available at* http://europa.eu/rapid/press-release_IP-13-406_en.htm.

This case is about a similar form of FRAND abuse—Motorola's breach of its obligation to offer FRAND licensing terms.

**Two Standard-Setting Organizations Develop Standards In Reliance On FRAND Commitments**

"Two standards-setting organizations are relevant" to this case: "The European Telecommunications Standards Institute, known as ETSI; and the Institute of Electrical and Electronics Engineers, known as IEEE." A64.

"ETSI is a standards-setting organization … that creates technological standards for the telecommunications industry." *Id*. "Since 1997, ETSI's [Intellectual Property Rights, or IPR] policy has required members to disclose intellectual property that may be essential to standards." *Id*. Specifically, members submitting technical proposals for inclusion in a standard must "draw the attention of ETSI to any of that Member's IPR which might be essential if [the] proposal is adopted." A4406; *see* A64-65, 4433. When a member declares that a patent is essential, ETSI immediately seeks "an undertaking in writing that [it is] prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms." A4407; *see* A65-66.

11

"IEEE is a standards-setting organization responsible for the standardization of wireless information exchange among systems and networks." A67. Like ETSI, "IEEE requested owners of intellectual property rights that are [declared] essential to … standards to submit a letter of assurance that was either a general disclaimer of their right to enforce patent claims against anyone practicing the standards or an agreement to license patent rights 'without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.'" A67 (quoting IEEE policy); *see, e.g.,* A4526.

Both ETSI and IEEE steer their standards away from any technology that is not subject to a FRAND commitment. A66; Brief for IEEE as Amicus Curiae at 14, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548, -1549 (Fed. Cir. Dec. 19, 2012), ECF No. 113. For example, if an SEP owner notifies ETSI "that it is not prepared to license one of its patents" on FRAND terms, ETSI looks for a viable alternative that is not patent-encumbered. A66. If "no such viable alternative technology exists, ETSI 'shall cease' work on the standard." *Id*. (quoting ETSI policy); *see, e.g.,* A4407-08.

12

**Motorola Discloses SEPs After The Adoption Of The Relevant Standards**

In declaring the '559, '898, and '697 patents, among others, essential to ETSI standards, Motorola undertook both disclosure and FRAND commitments. A68-69; *see* A4115, 5346. In declaring the '223, '516, '193, and '712 patents, among others, essential to IEEE standards, Motorola likewise undertook the FRAND commitment. A68; *see* A4243, 4302-39, 4343, 4401-04, 4638. But Motorola breached its obligations by failing to disclose its patents until years after the relevant standards were adopted (and, in time, broke its FRAND commitments as well). Motorola encouraged adoption of certain solutions without disclosing that it considered those solutions covered by its patents or patent applications. A69-70, 104. The district court catalogued the following abuses (at A69-70):

- Motorola filed the application that lead to the '559 patent in 1999, A5188, and proposed including the '559 technology in ETSI's Universal Mobile Telecommunications System ("UMTS") standard later that year, A5157-82. But it did not disclose the patent as essential to that standard until 2002, A5272, after the standard had been adopted, A5245.

- Motorola filed a provisional, unpublished application that led to the '898 patent in 1997, A4790-95, 4802-21, and submitted the '898 technology for inclusion in ETSI's Global Packet Radio Service (GPRS) standard later that year, A4797-800. But Motorola did not disclose the patent as essential to that

13

Confidential
Material Omitted

standard until 2003, A4006-11, after the standard had been
adopted, A4823-34.

- Motorola filed the application that led to the '697 patent in
  1998, A5290, and submitted the '697 technology to a working
  group developing a portion of the 3rd Generation Partnership
  Project ("3GPP") standard, which included ETSI, a few months
  later, A5306-11.  However, Motorola did not disclose the '697
  patent as essential to 3GPP until 2002, A5272, after the
  standard had been adopted, A5319-44.

**Apple Launches The iPhone, Containing A Module That The
Supplier Has Licensed From Motorola**

Apple announced in 2007 that it would enter the cell phone sector

with its new iPhone.  A13,586-87.  Relying on Motorola's FRAND

promises, Apple spent millions of dollars developing its standards-

supporting phone.  A13,587.

A8346,

20,868.

A20,868.

A5680-81, 8346-49, 20,868.

14

**Confidential Material Omitted**

█████████████████████████████████████████████████████████

██████ A8346-48.  ████████████████████████████████████

██████████████████████████████████████████████████████

████████████ A8346, 8356-57, 8366, 20,868-69.

Similarly, when Apple released an iPhone capable of communicating over the Verizon network, it purchased cellular chipsets from Qualcomm.  A387; *see* A71-72.  ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████ A387.  "[A] portion of the price [Apple paid] to Qualcomm" was "attributable to the value of the intellectual property rights that Qualcomm … acquired and pass[ed] on to Apple and other similarly situated customers."  *Id.*

**Motorola Attempts To Hold Apple Up For An Exorbitant License**

The iPhone cut deeply into Motorola's market share, launching Motorola into a "handset death spiral."  Matt Richtel, *Motorola Scrambles to Restore Its Lost Cellphone Glory*, N.Y. Times, May 1, 2009, at B1, *available at* http://nyti.ms/13cRW2R.  Unable to beat Apple in the marketplace, Motorola tried to tilt the playing field instead.

15

Confidential
Material Omitted

████████████████████████████████████████████████████

████████████████████████████████████████ A8357,

20,869.  Motorola's chief IP counsel has acknowledged that ███████

████████████████████████████████████████████████████

A5682.  Motorola would later take the same step with Qualcomm, on

the very "day Apple announced the Verizon iPhone 4."  A72.

Two days after purporting to terminate the Chi Mei license,

Motorola wrote to Apple ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ A12,986.

Motorola then "offered Apple a license to its essential patents."  A71.

But its demand was exorbitant: ████████████████████████

████████████████████████████, Motorola demanded from

Apple 2.25% of the *entire sale price of Apple's devices*, A6908, or about

$12 per iPhone, A17,019, 23,182.  That was more than 12 times what

Apple was already paying to license Motorola's SEPs.

Apple informed Motorola that the offer ██████████████████

████████████████████████████████████████████████████

16

Confidential
Material Omitted

███████████████████████████████████████████████████████

████████  A6908.

Apple also █████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████  A6908; *see* A6910.  Indeed, Motorola owns only a small

percentage of the thousands of patents declared essential to the

relevant standards.  In 2007 and 2008, when the parties began licensing

negotiations, ████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████  A17,194-95.  Applying that percentage to the $36.21

value of Chi Mei's cellular module yields a royalty of ██████████████

██████  A17,194-95.  Similarly, regarding the WiFi-related SEPs,

Motorola's demand for 2.25% of the end-product price in exchange for a

license to its 802.11-essential portfolio "raises significant stacking

concerns" in light of the many other entities that own 802.11 SEPs and

the fact that Motorola's portfolio "provides only minimal contribution to

**Confidential
Material Omitted**

the 802.11 standard." *Microsoft Corp. v. Motorola, Inc.*, 2013 WL

2111217, at *73.

Apple ████████████████████████████████████████

████████████████████████████████████████ anything like

the $12 per unit that Motorola sought from Apple.  A6908.  And indeed,

in 2005, ████████████████████████████████████

████████████████████████████████████████████

████████████  A17,018, 17,026, 17,029-36, 24,664-65.  That is 1/13th

the rate Motorola demanded from Apple.

Apple accordingly protested that ████████████████████

████████████████████ A6908.  It informed Motorola that it

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

A6908.  Even so, Apple did express a willingness to discuss ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  *Id.*

Confidential
Material Omitted

The parties agreed to have ███████████████████ *Id.*  Indeed,

as the district court found, they "continued to engage in license

negotiations … for approximately three years." A71; *see* A6931-34,

6938-39.  But Motorola never budged from its opening demand of 2.25%

of the price of the entire iPhone—████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ A6928-29, 6938-39.  The

parties did not reach an agreement.

## Motorola Seeks An Exclusion Order From The ITC And Apple Counterclaims

Instead of offering Apple a rate consistent with its FRAND

obligations, Motorola filed a complaint before the ITC.  It alleged that

Apple's products (including the iPhone, iPod touch, iMac, MacBook, and

iPad) infringed several Motorola patents.  A72; *see* A475.  Among them

were the '223 and '697 patents, which Motorola had declared essential.

A475.  Motorola sought an exclusion order to prevent Apple from selling

its allegedly infringing products in the United States.  A72; *see* A477.

Apple filed 13 counterclaims related to Motorola's breach of its

FRAND commitments regarding its SEPs (including those asserted in

the ITC and other actions).  A288-89, 331-47.  Apple removed its counterclaims to the United States District Court for the Western District of Wisconsin pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R. § 201.14(e).  A288-89.

Apple asserted that Motorola breached the contractual commitments it made to SSOs to timely disclose its purportedly essential patents and to grant patent licenses on FRAND terms. A3248.

Apple also asserted that Motorola's manipulation of the standard-setting process constituted "a pattern of deliberate, deceptive, and anticompetitive conduct." A3247-48.  Apple alleged that Motorola illegally monopolized the relevant markets by inducing SSOs to standardize technology it now claims is covered by its declared-essential patents, where that inducement was based on false FRAND commitments.   Apple also alleged that Motorola then misused its monopoly power by making licensing demands "far in excess of what could [have been] demanded without inclusion of its technology" into the standards.  A3248.

As relief for Motorola's antitrust violation, Apple sought treble damages and orders permanently enjoining Motorola from "carrying out unfair methods of competition in connection with its participation in SSOs" and from "licensing or attempting to license its purported Essential IPR … on non-FRAND terms." A3295. On the contract claims, Apple mainly sought specific performance of Motorola's obligation to offer Apple a license on FRAND terms (with a damages claim that it later voluntarily reduced to nominal damages). A114, 3296, 9859-61. And because the parties continued to dispute, in various actions, whether the license terms Motorola had offered Apple were FRAND, and whether Motorola's asserted SEPs were even enforceable, Apple also sought declaratory judgments that Motorola's offer of 2.25% of the entire price of the iPhone was not FRAND and that Motorola's SEPs were unenforceable due to patent misuse. A3292-94.

**The District Court Grants Apple Partial Summary Judgment But Ultimately Dismisses Its Claims**

The parties filed cross-motions for summary judgment. As relevant, the district court dismissed only one of Apple's claims on summary judgment: the antitrust claim. The district court reasoned that Apple's only proof of money damages was its litigation expenses,

and, therefore, the "antitrust claim is necessarily based on Motorola's patent litigation." A82. The court held that the claim was barred by the *Noerr-Pennington* doctrine, A82, and dismissed it with prejudice, A195.

But the court granted Apple's motion for partial summary judgment on several key issues. It found that there was no material dispute that:

- Motorola entered into binding contracts with ETSI and IEEE to license its SEPs on FRAND terms;

- Apple is entitled to enforce those contracts as a third-party beneficiary;

- Motorola was required to make a bona fide effort to disclose to ETSI any patents or patent applications purportedly essential to a standard *before* the standard was adopted; and

- Motorola disclosed the '697, '559, and '898 patents *after* ETSI and 3GPP adopted the standards to which Motorola claimed the patents were essential.

A106-07.

After these rulings, Apple's remaining claims proceeded to trial. The district court ruled that if Apple prevailed on its breach of contract claims, the court could order specific performance of Motorola's contractual obligations, set a FRAND rate for Motorola's patents, and order Motorola to offer Apple a license on those terms. A112-18.

Indeed, the court stated, specific performance "may be the only appropriate remedy." A115.

Nevertheless, the district court changed course and canceled the trial the very day it was scheduled to start. Motorola precipitated the about-face with a motion for "clarification." A23,933. Motorola argued for the first time in two years of litigation that the district court should not determine the FRAND rate Motorola was obliged to offer without also ordering Apple to accept a license and pay that rate for all accused devices. A23,933. Apple objected to Motorola's 11th-hour, unpleaded request for affirmative relief. It argued that Motorola's contracts with the SSOs required that Motorola *offer* a FRAND license. A24,626-27. Apple had no obligation to *accept* any offer, and certainly not to pre-commit to a license without knowing the price. *Id.* If the price was too rich, Apple still had the right to challenge Motorola's declared-essential patents as invalid, as not infringed, or as exhausted. *Id.* In support of its position, Apple recounted Motorola's dismal record in establishing liability for "what are presumably its best patents." A24,634; *see infra* at 57-58. Nevertheless, consistent with the licensing evidence it had presented, Apple was "willing to pay a Court-ordered FRAND rate of

less than or equal to $1 per covered product on [a] going-forward basis."
A24,633.

At that point, the district court concluded that it was no longer
appropriate to determine a FRAND rate because setting the rate was
not guaranteed to provide a global resolution to the parties' dispute.
A181-82.  Largely on that basis, the court rejected Apple's request for
specific performance; its request to set a FRAND rate by way of
declaratory relief (which Apple had requested as an alternative to
specific performance, A90,172); and its request for a declaration that
Motorola's offer of 2.25% of the price of the entire iPhone was not
FRAND.  A171-74, 181-82, 191-92.   The district court reached a similar
conclusion as to Apple's request for a declaration of unenforceability due
to patent misuse, which by that time applied only to the '898 patent.
A187.

The district court accordingly dismissed Apple's breach of contract
and declaratory judgment claims without prejudice.  A191-95.  This
appeal followed.

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in concluding that the *Noerr-Pennington* doctrine shields Motorola's unlawful acquisition and maintenance of monopoly power through its misconduct before the SSOs. As the district court held (and Motorola does not appear to dispute), the conduct described in Apple's complaint, if proven, satisfied all the elements of an antitrust violation. A44-49. And Apple submitted evidence sufficient to create a triable issue on its claim, including evidence that Motorola's deceitful conduct before the SSOs caused Apple actual and threatened antitrust injury.

The district court concluded that Motorola was immune from antitrust liability under the *Noerr-Pennington* doctrine, but its analysis failed to focus on the deceptive conduct before the SSOs—the only conduct Apple actually challenged. To avoid *Noerr-Pennington*, the district court demanded Apple provide a particular sort of evidence on summary judgment: "evidence or argument suggesting that Motorola's licensing demand caused Apple to change its product, delay the release of the iPhone, suffer from increased costs or lose any customers or market share." A83. There is no statutory requirement to prove a

25

particular type of injury. The actual and threatened injury Apple did provide "evidence and argument" about—"the threat of being forced to pay exorbitant royalties" and "the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license," A49—is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109 (1986).

**II.** The court ruled specific performance unavailable as a remedy because Apple would not pre-commit to accepting a license to Motorola's SEPs at an as-yet-unknown court-determined FRAND rate. That was error.

The district court correctly concluded that Motorola's commitments to disclose and license its SEPs were "binding contractual obligations" of which Apple was a third-party beneficiary. A106-07. Apple proved, or would have proved at trial, that Motorola breached those obligations.

Under Wisconsin law, specific performance is an available and appropriate remedy where, as here, a party "is not interested in money, preferring instead to have the contract fulfilled." 2 Contract Law in

Wisconsin § 13.53 (3d ed. 2007). Indeed, because "no suitable substitute" to the promised property—access to Motorola's SEPs on FRAND terms—"is obtainable," Restatement (2d) of Contracts § 360 cmt. c (1981), the district court correctly recognized at the beginning of this case that specific performance was possibly "the only appropriate remedy" for Motorola's breach. A115.

Specific performance was just as appropriate after Apple declined to pre-commit to accepting an offer from Motorola. Specific performance "is by definition limited to the enforcement of contract duties." Restatement (2d) of Contracts Chapter 16, Topic 3, Introductory Note. Motorola's contracts with the SSOs required it to offer implementers like Apple a FRAND license. But they place no corresponding obligation on Apple to accept that offer. Once Apple knew the FRAND rate, it would have had to make the difficult business judgment whether to accept the license or the litigation risk inherent in continuing to challenge the essentiality, validity, and exhaustion of Motorola's patents. But that is the choice that Motorola committed to give every business in Apple's position. The district court erred in denying Apple a trial because it would not abandon its right to make the choice.

27

**III.**  The district court likewise abused its discretion in dismissing Apple's declaratory judgment claims.  Where, as here, "a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal."  *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1383 (Fed. Cir. 2007).  Resolution of each of Apple's declaratory judgment claims would "serve a useful purpose in clarifying and settling the legal relations in issue."  *Minn. Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672-73 (Fed. Cir. 1991).  The district court erred in dismissing them simply because they would not result in a definitive peace treaty between the parties.

**IV.**  This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1) because Apple's declaratory judgment claims respond to Motorola's *actual* patent infringement complaint, which indisputably arises under federal patent law.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision on summary judgment *de novo*, reapplying the same standard applied by the district court."  *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1334 (Fed. Cir.

2011).  Under Wisconsin law, a court's denial of a request for specific performance is reviewed for abuse of discretion.  *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007); *Edlin v. Soderstrom*, 264 N.W.2d 275, 281 (Wis. 1978).  This Court also reviews a district court's decision to decline to adjudicate a declaratory judgment claim for abuse of discretion.  *See Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 905 (Fed. Cir. 2008).

## ARGUMENT

I.  **THE *NOERR-PENNINGTON* DOCTRINE DOES NOT SHIELD MOTOROLA'S DECEPTION OF STANDARD-SETTING ORGANIZATIONS TO ABUSE ITS RESULTING MARKET POWER**

The district court held that the conduct described in Apple's complaint, if proven, satisfied all the elements of an antitrust violation.  A44-49.  The court nevertheless dismissed Apple's antitrust claim on the ground that the conduct was immunized from antitrust liability under the *Noerr-Pennington* doctrine.  A80-84.  *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).  *Noerr-Pennington* immunity is an "'exemption[] from the antitrust laws [that] must be construed narrowly.'"  *Indian Head, Inc. v. Allied Tube &*

29

*Conduit Corp.*, 817 F.2d 938, 945 (2d Cir. 1987) (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982)), *aff'd*, 486 U.S. 492 (1988).  Under that doctrine, a party that petitions the government for redress—including one who files a lawsuit—is immune from antitrust liability *for that petitioning conduct*, because it is protected by the First Amendment.  *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972).

In immunizing Motorola's anticompetitve conduct here, the district court misunderstood both Apple's complaint and the governing legal principles.  Apple complained that Motorola deceived the SSOs with conduct that predated any Motorola lawsuit by several years and that would have harmed Apple and competition even if Motorola had never filed a lawsuit.  *See* Section I.A.  But the district court incorrectly immunized Motorola's anticompetitive conduct because Motorola *also* filed a lawsuit, years after the alleged conduct.  *See* Section I.B.

## A.  The Antitrust Violation Was Motorola's Acquiring And Maintaining An Unlawful Monopoly By Deceiving Two Industry Standard-Setting Organizations

Section 2 of the Sherman Act prohibits "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

maintenance of that power as distinguished from growth or
development as a consequence of a superior product, business acumen,
or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563,
570-71 (1966).  Under this provision, it is unlawful to deceive
competitors into granting you market power and then to use that
market power to stifle competition.

Taking the evidence Apple presented as true (as this Court must
at this summary judgment stage), that is exactly what Motorola did.  It
promised SSOs—here, both ETSI and IEEE—that it would offer
FRAND licenses for patents it considered essential to a standard.  A68-
69; *see supra* at 13.  Aware that the SSOs were relying on those FRAND
promises, Motorola encouraged them to standardize certain technology
that it now claims is covered by its patents.  *See supra* at 13-14.
Moreover, with regard to ETSI in particular, Motorola neglected even to
timely disclose that it had patent applications it considered essential,
despite its promise to do so.  A64-65, 106-07.  As the district court
found, Motorola withheld information about at least three patent
applications before ETSI adopted the standards to which Motorola has

Confidential
Material Omitted

now declared the resulting patents essential, A106-07; *see* A69-70;

*supra* at 13-14.

Having done all of that, the patent hold-up was easy to execute.
The moment a serious competitor came along, Motorola canceled the
license to its declared-essential patents and demanded an exorbitant
rate. *See supra* at 15-19. Apple had proof that Motorola's offer of
$12.35 was far outside any reasonable range. As Apple's expert
explained, Motorola's patents "represent, at best, small improvements
over alternatives that were available before the standard was set" and
thus ███████████████████████████████████████████
████████████████████████████████ A8082-83. The
offer was also "discriminatory relative to the rates Motorola has
charged other smart phone manufacturers." A8085. Meanwhile, as the
district court found, Motorola's only expert "did not offer any opinion
about what particular rate or range or rates would constitute a
[FRAND] royalty," and was therefore precluded from testifying about a
particular rate at trial. A156.

As the district court recognized when it denied Motorola's motion
to dismiss, Motorola's conduct is a textbook antitrust violation. Rather

than beating Apple with a "superior product" or "business acumen,"
*Grinnell Corp.*, 384 U.S. at 571, Motorola gained and maintained its
monopoly power by squelching competition. Had Motorola disclosed its
patent applications and not made its deceptive promise to license on
FRAND terms, the SSOs "would have adopted a different standard
based on alternative competing technologies, or not established the
standard at all." A3287. So Motorola's deceptive conduct "resulted in
SSOs incorporating Motorola's IPR into standards and firms
subsequently making sunk investments implementing those standards
in various devices." A8078. This, in turn, gave "Motorola market
power" it would not otherwise have had, "above and beyond that just
from its patents and creates the opportunity for Motorola to hold up
firms that use the standards." A8078.

To bring a private action to remedy that violation, Apple also must
make the requisite showing of antitrust injury, which varies according
to the relief sought. The primary objective of Apple's claim is to obtain
an injunction to stop Motorola's antitrust violation. A3295. For that,
Apple need only show "threatened loss or damage by a violation of the
antitrust laws." 15 U.S.C. § 26. To recover "damages," Apple has to

33

prove that it was "injured in [its] business or property by reason of anything forbidden in the antitrust laws." *Id.* § 15.

Apple's threatened and actual injuries are manifest—as the district court found in denying Motorola's motion to dismiss: "By making false commitments that led to the establishment of worldwide standards incorporating its own patents and eliminating competing alternative technologies, Motorola has become a gatekeeper, accruing the power to harm or eliminate competition in the relevant markets if it so desires." A48. "Apple has alleged injury to itself and the relevant market" in the form of (1) "the threat of being forced to pay exorbitant royalties" and (2) "the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license." A49.

In support of its conclusion that this sufficed, the district court cited the Third Circuit's *Broadcom* opinion, which validated an antitrust claim on almost identical facts. A46. The Third Circuit held that the following "is actionable anticompetitive conduct": "(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, (3) coupled with an [SSO's] reliance on

that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise." 501 F.3d at 314. In this scenario the owner of the patent obtained and maintained its market power not as a result of "superior product, business acumen, or historic accident," but through deceptive conduct before the SSO. *Id.* at 315; *see* 2 Herbert Hovenkamp et al., IP and Antitrust § 35.5b2 (2d ed. Supp. 2012) ("Where an [SSO's] policy requires licensing on reasonable and nondiscriminatory terms, a misrepresentation about a patentee's willingness to license on those terms can have anticompetitive consequences," so offering an exorbitant royalty rate "can properly constitute competitive harm.").

As the Third Circuit also found, 501 F.3d at 315-16, and various regulators have opined, *see supra* at 8, this injury and threatened injury qualify as *antitrust* injury: "Consumers … have been harmed in the form of fewer choices, higher prices, lower-quality products, and other competitive harms relating to products that rely on the standards." A3288-89.

**B.    The *Noerr-Pennington* Doctrine Does Not Immunize Motorola's Deceptive Conduct Before Standard-Setting Organizations**

The district court's sole rationale for dismissing the claim was

that "Motorola is immune from Apple's antitrust claim" under the

*Noerr-Pennington* doctrine.  A84.  The district court understood that the

*Noerr-Pennington* doctrine does not immunize Motorola from antitrust

liability that arises from deceiving the two SSOs.  A82.  Only

"[c]oncerted efforts to restrain or monopolize trade *by petitioning*

*government officials* are protected from antitrust liability under the

doctrine established by *Noerr*."  *Allied Tube*, 486 U.S. at 499 (emphasis

added).  A private industry standard-setting body is not a governmental

entity.  So, as the Supreme Court has held, anticompetitive conduct

directed at "the product standard-setting process of a private

association" is not "immune from antitrust liability under the *Noerr*

doctrine."  *Id.* at 495.

The district court's *Noerr-Pennington* analysis, therefore, did not

focus on the deceptive conduct before the SSOs—which is the only

conduct Apple actually challenged.  Rather, the district court concluded

that Motorola was immune from antitrust liability for that conduct,

36

because Apple's "allegations and arguments make clear that its antitrust claim is necessarily based on Motorola's patent litigation." A82.

To be sure, the *Noerr-Pennington* doctrine would be in play if Apple were challenging nothing but Motorola's decision to sue. A "patent owner who brings a suit for infringement, *without more*, is generally exempt from the antitrust laws *for that action.*" *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304-05 (Fed. Cir. 2004) (emphases added). But Apple is not challenging Motorola's lawsuits— certainly not the lawsuits alone. It is challenging Motorola's behavior years earlier before the SSOs and the abuse of the monopoly power it illegally obtained and maintained through that conduct.

Contrary to the district court's conclusion, nothing in the foregoing discussion of Apple's antitrust theory depends on Motorola filing a lawsuit. Lying to the SSOs to acquire market power did not depend upon the filing of lawsuits years later. Motorola did not need to file a lawsuit to break its promise to offer a FRAND rate or its promise to disclose its patents and patent applications. The harm to competition did not depend on a lawsuit. Nor did the specific injury to Apple that

the district court had already found—"the threat of being forced to pay exorbitant royalties" and "the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license." A49.

The district court overlooked all this. Instead, it fixated on a statement by Apple's damages expert identifying "litigation fees and expenses" as the *monetary damages* caused by Motorola's FRAND breaches." A83*; see* A9119, 9123. From that statement the district court incorrectly surmised that "the *only injury* Apple suffered as a result of Motorola's alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation initiated by Motorola," A83 (emphasis added), which, in turn, led the court to conclude that the whole antitrust claim was "necessarily based on Motorola's patent litigation." A82. In other words, the antitrust claim failed because the district court believed that Apple had not incurred the right *sort* of monetary damages. The district court was wrong.

The viability of Apple's antitrust claim did not depend on proof that it had *already* suffered a penny of monetary damages (much less monetary damages of a particular sort). Under the plain language of the Sherman Act and Supreme Court precedent, all Apple had to show

38

was what the district court had already found—that Apple was
operating under "the threat of being forced to pay exorbitant royalties"
and "the uncertainty created by Motorola's refusal to offer a fair,
reasonable and non-discriminatory license." A49.

That "threat" is enough. The relevant statute provides that "[a]ny
person, firm, corporation, or association shall be entitled to sue for and
have injunctive relief … against *threatened* loss or damage by a
violation of the antitrust laws." 15 U.S.C. § 26 (emphasis added).
Interpreting this statutory language, the Supreme Court has upheld an
injunction against anticompetitive behavior (there, anticompetitive
participation in foreign patent pools that refused to license the
plaintiff's sales abroad) even though the plaintiff had "fail[ed] to prove
the fact of injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395
U.S. 100, 130 (1969). An injunction, the Court held, "is
characteristically available *even though the plaintiff has not yet suffered
actual injury*; he need only demonstrate a *significant threat of injury*
from an impending violation of the antitrust laws or from a
contemporary violation likely to continue or recur." *Id.* (emphases
added; internal citation omitted). Thus, it is now hornbook law that an

injunction "is *not dependent* on the existence of actual or measurable injury." 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 326a (3d ed. 2007) (emphasis added).

In any event, this case presents not just a "threat" of future injury, but actual injury, both already suffered and ongoing—exactly the form of injury that can justify a damages claim *and* injunctive relief. The injury is "the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license." A49. *Broadcom* is again instructive. The Third Circuit's conclusion that Broadcom's (nearly identical) allegations had stated a valid antitrust claim had nothing to do with its litigation fees or costs. Instead, the Third Circuit characterized the antitrust injury caused by deceptive FRAND commitments in exactly the terms the district court used here: "Deception in a consensus-driven private standard-setting environment harms the competitive process by obscuring the costs of including proprietary technology in a standard and increasing the likelihood that patent rights will confer monopoly power on the patent holder." 501 F.3d at 314. Likewise, in circumstances virtually identical to this case, two district courts separately concluded that an antitrust injury

40

occurred without requiring any showing of actual monetary damages. *See Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 796 (N.D. Tex. 2008); *Apple Inc. v. Samsung Elecs. Co.,* No. 11-01846, 2011 WL 4948567, at *6 (N.D. Cal. Oct. 18, 2011).

Apple's theory of harm did not change between the time the district court embraced it (in denying the motion to dismiss) and the time the court rejected it on summary judgment. The theory was, and still is, about the harm from the unreasonable licensing demand. Nevertheless, the district court demanded that Apple provide a *different sort* of evidence on summary judgment to avoid *Noerr-Pennington*: "evidence or argument suggesting that Motorola's licensing demand caused Apple to change its product, delay the release of the iPhone, suffer from increased costs or lose any customers or market share." A82-83. But there is no statutory requirement to prove any of those particular types of injury. The actual and threatened injury Apple did provide "evidence" and "argument" about—"the threat of being forced to pay exorbitant royalties" and "the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license," A49—is "injury of the type the antitrust laws were intended to prevent

41

and that flows from that which makes the defendants' acts unlawful."
*Cargill, Inc.,* 479 U.S. at 109. That should have sufficed.

To hold otherwise is to declare that Apple cannot pursue a blatant antitrust violation because it so far has refused to capitulate to Motorola's anticompetitive threat. But § 2 does not protect only those that cave to the unlawful monopolist. Any such rule would subvert the very policies underlying the antitrust laws. Those who are too weak to resist the threat are also the least likely to challenge the anticompetitive conduct. The result would be a perverse "under-supply of challenges to patent hold ups." *Hynix Semiconductor, Inc. v. Rambus, Inc.,* 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007).

The district court's ruling accordingly is based exclusively on the fact that Motorola's course of anticompetitive conduct culminated in the filing of a lawsuit, which exacerbated the injury. That, alone, does not immunize Motorola's antitrust violation. "An antitrust violation does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1263 (9th Cir. 1982). Thus, "a patentee may incur antitrust liability for even the good

42

faith prosecution of a valid patent where it is shown that the
infringement suit was brought in furtherance and as an integral part of
a plan to violate the antitrust laws." *Id.* at 1264 (internal quotation
marks omitted).

Indeed, based on these principles the district court was also wrong
to conclude that Apple could not recover damages for its litigation
expenses. The *Noerr-Pennington* doctrine means that Apple "cannot
rely on protected petitioning conduct" such as the filing of a lawsuit "to
support an antitrust claim that would not have been viable without that
speech." 1 Hovenkamp et al., *supra*, § 11.4f. But once Apple "can prove
an antitrust violation *without the use of protected petitioning*"—as it
has—it "can recover damages caused by that petitioning." *Id.*
(emphasis added); *see Hynix*, 527 F. Supp. 2d at 1097. Thus, the
litigation costs Apple incurred as a result of Motorola's antitrust
violation are recoverable. But at a minimum, Motorola's litigation did
not immunize its anticompetitive scheme and defeat an antitrust claim
outright.

43

Because the district court misapplied the *Noerr-Pennington* doctrine, this Court should remand for a trial on Apple's antitrust claim.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN DISMISSING APPLE'S BREACH OF CONTRACT CLAIMS

Imagine Motorola had undertaken a contractual obligation to give Apple the right of first refusal to buy Motorola's corporate headquarters whenever Motorola was ready to sell—but instead, Motorola made an offer to another company for an undisclosed sum. Apple would be entitled to a court order compelling Motorola to make the offer to Apple. And Apple would not lose the right to that relief just because it declined to pre-commit to accept the offer until it learned the price.

So, too, here. Apple would have proved at trial that Motorola breached its contractual obligation to offer Apple a FRAND rate. *See* Section II.A. As the district court initially held, specific performance— an order compelling Motorola to make a FRAND offer—was an available and effective remedy for Motorola's breach. *See* Section II.B. The district court abused its discretion by switching gears on the day of trial and conditioning the availability of specific performance on Apple's willingness to accept Motorola's offer at whatever rate the district court

44

would determine, even though Apple had no contractual obligation to do so.  *See* Section II.C.

### A.  Motorola Breached Its Contractual Obligations To Offer Apple A FRAND License Rate

"The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show a valid contract that the defendant breached and damages flowing from that breach."  *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Nw. Motor Car, Inc. v. Pope*, 187 N.W.2d 200, 203 (Wis. 1971)).[1]  Apple proved, or would have proved at trial, all three elements.

Like the antitrust claim, this claim also begins with Motorola's contractual commitments to ETSI and IEEE that it would offer to all comers a license to its SEPs on FRAND terms as consideration for the opportunity to influence the choice of technology selected.  A98; *supra* at

---

[1] In litigating Motorola's motion in limine to preclude Apple from seeking specific performance, the parties applied Wisconsin law, A11,941-42 (Motorola motion in limine); A20,380-81 (Apple opposition), as did the district court, A114-18.  At summary judgment, the court had applied Wisconsin law to the claim arising from the Motorola-IEEE contracts, but French law to the claim arising from the Motorola-ETSI contracts.  A93-94, 97.  Early in this litigation, however, Apple demonstrated (without quarrel from Motorola) that Wisconsin and French law accorded in all relevant respects, including the availability of specific performance.  *See, e.g.*, A2425, 2853, 5705.

13-14. The district court correctly concluded that Motorola's commitments to make a FRAND offer on its SEPs were "binding contractual obligations" and that Apple was a third-party beneficiary of those contracts. A106-07; *see, e.g.*, *Microsoft Corp.*, 696 F.3d at 884 (holding that Motorola's FRAND commitments to IEEE and another SSO created binding contracts enforceable by Microsoft as a third-party beneficiary).

Here, again, Apple was prepared to prove at trial that Motorola breached its contractual obligations. As demonstrated above, Apple had developed abundant evidence that the price Motorola demanded for a license to its SEP portfolio—2.25% of the entire price of allegedly infringing Apple products, or about $12 per iPhone at 2007 prices—was unreasonable and discriminatory, and that the correct rate was $1 or less. *See supra* at 16-18. By contrast, as noted above (at 32), the district court precluded Motorola's only expert from testifying about a particular rate at trial.

Apple would also have been able to prove damage flowing from Motorola's failure to make a FRAND licensing offer. A business builds products around an industry standard that is subject to a FRAND

46

obligation because that brings certainty. Apple designed and
engineered standards-supporting products in reliance on the
commitment of those holding patents on declared-essential technology
that they would not accuse Apple of infringing their SEPs and would
not try to block Apple's products at the border. That certainty is
valuable, especially to a new entrant in the mobile market. The
moment a participant in the standard-setting process breaks that
commitment, it launches the targeted business into a destabilizing
uncertainty that undermines profits, scares away customers and
potential customers, undermines goodwill, and tarnishes product image.
A3284-87, 23,665.

Apple reduced its claim to only nominal monetary damages,
A9859-61, because it wanted performance of the contractual
commitment as a remedy for this harm, not a monetary recovery.

### B. As The District Court Recognized, Specific Performance Was An Appropriate Remedy For Motorola's Breach

With the elements of breach proved or readily provable at trial,
Apple sought an order requiring Motorola to do what it had committed
to do: Offer a license to its cellular portfolio on FRAND terms. A114,

3296, 25,798-802.  The district court was correct when it acknowledged
that this remedy was an available and appropriate response to a
FRAND violation.  A114-18.

Under Wisconsin law, specific performance "is an equitable
remedy that seeks to award performance of the contract as specifically
agreed." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 783 N.W.2d 294,
303, 2010 WI 44 ¶ 36.  The "purpose" of specific performance is to
deliver the benefit of the contract by requiring the breaching party "to
do that which it agreed to do in the contract." *Id.*

In some contexts, Wisconsin follows the general rule that "specific
performance is unavailable where legal damages are adequate to
remedy the breach." *Ash Park*, 783 N.W.2d at 304, 2010 WI 44 ¶ 41.
But Wisconsin law reflects the "tendency to liberalize the granting of
equitable relief" in two ways.  Restatement (2d) of Contracts § 359
cmt. a.  First, in some cases—for example, those involving contracts for
the sale of land—a plaintiff need not demonstrate the inadequacy of
damages as a prerequisite to obtaining specific performance.  *See, e.g.*,
*Ash Park*, 783 N.W.2d at 304-05, 2010 WI 44 ¶ 43; *Taft v. Reddy*, 210
N.W. 364, 366 (Wis. 1926); *Heins v. Thompson & Flieth Lumber Co.*,

48

163 N.W. 173, 177 (Wis. 1917); *Yee v. Giuffre*, 499 N.W.2d 926, 928 n.3 (Wis. Ct. App. 1993). Second, Wisconsin courts have taken a broad view of the circumstances in which damages will not make a contract plaintiff whole, and have awarded specific performance in a large class of other cases involving property "which has a peculiar or a unique … value." *Welch v. Chippewa Sales Co.*, 31 N.W.2d 170, 171 (Wis. 1948).

Through one of these routes or the other, Wisconsin courts have therefore followed the Restatement and granted specific performance in cases involving property that is not fungible, where "no suitable substitute" for the promised property "is obtainable." Restatement (2d) of Contracts § 360 cmt. c. The hornbook scenario is a contract to enforce the sale of a unique parcel of land. Under Wisconsin law, specific performance "should be ordered as a matter of course" for such contracts because the buyer generally cannot replace the particular parcel of land he has been promised through a substitute transaction. *See, e.g., Anderson v. Onsager*, 455 N.W.2d 885, 889 (Wis. 1990); *Krause v. Holland*, 147 N.W.2d 333, 335 (Wis. 1967); *Heins*, 163 N.W. at 177. But Wisconsin law extends that age-old principle to award specific performance for all sorts of non-fungible assets, including unique items

49

of personal property, *Welch*, 31 N.W.2d at 171, shares of stock not traded on a public exchange, *Kurth v. Hauser*, 55 N.W.2d 367, 368 (Wis. 1952), and, particularly relevant here, a promise to assign a specified patent, *Valley Iron Works Mfg. Co. v. Goodrick*, 78 N.W. 1096, 1098 (Wis. 1899). Wisconsin applies the same rule to a contractual agreement to grant an *option* to buy a non-fungible asset. *Gaugert v. Duve*, 628 N.W.2d 861, 863-64, 2001 WI 83 ¶ 1 (option contract to purchase land); *Kurth*, 55 N.W.2d at 368 (option to purchase stock). *The* authority on Wisconsin contract law summed up these cases as follows: Specific performance is available where a party to a contract "is not interested in money, preferring instead to have the contract fulfilled." 2 Contract Law in Wisconsin § 13.53.

That is the case here. Apple wants the FRAND offer Motorola committed to make. Period. There is "no suitable substitute" for a FRAND offer because the "[p]atents" are "unique." Restatement (2d) of Contracts § 360 cmt. c. To the extent that Motorola's patents actually read on the relevant standards, and are, moreover, necessary to build a product that supports these standards, an implementer such as Apple must practice them. Even more than the real estate purchaser who

50

wants to buy a particular lot or the partner who wants to buy shares of a nonpublic corporation, the standard implementer who wants to make a GSM- or WiFi-compatible smartphone will not be made whole by anything other than what has been promised. Thus, specific performance is available to enforce an option on this unique property right, without regard to whether damages could adequately compensate for the violation.

For similar reasons, damages could never be adequate. The most immediate harm attributable to Motorola's failure to make a FRAND offer—the impact of the marketplace uncertainty Motorola has generated on Apple's customers, investors, and profits, *supra* at 46-47— is real, but difficult to quantify. That, alone, is a standard rationale for awarding specific performance. *See, e.g.*, *Miller v. Lesea Broad.*, 87 F.3d 224, 230 (7th Cir. 1996) (applying Wisconsin law) (specific performance "comes into play when damages are an inadequate remedy … because of the difficulty of quantifying the injury to the victim of the breach").

Far worse, however, is the potentially disastrous consequence of Motorola succeeding in its current efforts to enjoin Apple from

51

importing or selling iPhones or other products that incorporate

technology Motorola claims to be industry standard. Courts and

regulatory agencies have denied the availability of injunctions on

patents subject to a FRAND commitment. *See, e.g.*, Resp. and Reply Br.

of Apple Inc. at 40-53, *Apple Inc. v. Motorola, Inc.*, Nos. 12-1548, -1549

(Fed. Cir. Apr. 25, 2013), ECF No. 177. But the ITC recently departed

from that consensus by issuing an exclusion order against certain Apple

products based on a Samsung SEP. *See* Notice of Final Determination,

*In re Certain Elec. Devices, Including Wireless Commc'n Devices,*

*Portable Music and Data Processing Devices, and Tablet Computers*,

ITC Inv. No. 337-TA-794 (June 4, 2013). And Motorola, also wielding

purported SEPs, is trying its level best to block Apple's products from

the U.S. market and enjoin their sale domestically. Damages would

never adequately compensate for the incalculable harm Apple would

suffer if Motorola's efforts somehow succeeded, in breach of its FRAND

commitments.

## C.    Apple's Refusal To Pre-Commit To Accept A Court-Ordered Offer Without Knowing The Rate Did Not Justify The Last-Minute Dismissal

The district court reversed course on specific performance merely because of Apple's response to Motorola's 11th-hour motion to bind Apple to accept any FRAND offer that might result from the trial. Apple responded that it would accept a license if the price were $1 per device or less, but could not commit to accept any higher offer without knowing how much higher that offer would be.  The district court declined to enforce Motorola's contractual obligation to make the offer without the assurance that Apple would accept *any* resulting offer. That last-minute shift was legally erroneous.

Specific performance was just as appropriate after Apple declined to accept an unspecified offer as it was before Motorola raised the issue. Motorola's contractual obligation was to make the FRAND offer. Apple's situation here is no different from the situation it would be in if Motorola had broken a promise to give Apple the right of first refusal on its headquarters.  What Apple was entitled to was the offer—and the right to *decide* whether to accept it.  The offer was valuable to Apple precisely because it allowed Apple to assess the alternatives.  Apple had

53

no corresponding obligation to accept any offer—FRAND or not.
Certainly, no such obligation appears in Motorola's contracts with the
SSOs.

Specific performance "is by definition limited to the enforcement of
contract duties." Restatement (2d) of Contracts Chapter 16, Topic 3,
Introductory Note. It "is intended to produce as nearly as is practicable
the same effect that the performance due under a contract would have
produced." *Id.* § 357 cmt. a. Had Motorola abided by its contractual
obligations, it would have made Apple a FRAND offer, which Apple
would then have had the option to accept or reject. The district court
far exceeded its equitable authority by imposing on Apple an extra-
contractual obligation as a condition of enforcing its own contractual
rights. *See Realtek Semiconductor Corp. v. LSI Corp.*, No. CV-12-03451,
2012 WL 4845628, at *5 (N.D. Cal. Oct. 10, 2012) ("[W]hile it is alleged
that defendants were contractually bound to offer RAND licenses
through their conduct in the IEEE standard-setting process, nothing in
the record suggests a parallel contractual obligation by Realtek to
accept a license, even on RAND terms.").

In fact, Wisconsin law grants specific performance to enforce option contracts without also requiring the plaintiff to exercise its options. *See, e.g.*, *State v. Conway*, 148 N.W.2d 721 (Wis. 1967). As its name suggests, an option contract on stock, for example, requires only that the seller give the grantee the *option* to buy stock at a particular price; it does not require the grantee to buy the stock at that price if, in light of market conditions, the stock is worth way less or the grantee otherwise considers the price too steep. Motorola's contracts with the SSOs are in the nature of option contracts. Their purpose is simply to ensure that the technology necessary to practice the standard is *available* to all comers. *See, e.g.*, A4454 (ETSI IPR Policy § 3.1). None of the cases about option contracts suggests that the right to enforce them depends on the plaintiff's reciprocal commitment to exercise the option once granted. To the contrary, the whole point of an option contract—like a right of first refusal or a right to receive a FRAND offer—is to give the grantee the choice whether to exercise the option or not, in light of the alternatives.

The district court reached the wrong conclusion based upon a legal error. It believed that it was somehow improper merely to award Apple

a "bargaining chip" or "negotiating tool," A171, and that specific

performance was unavailable without some assurance that the

resulting order would result in an actual license that ends the litigation,

A181-82, 192.  Nothing in Wisconsin law (or any other body of law, to

our knowledge) suggests that a party should lose its entitlement to a

remedy just because the legal battles might persist.  High-stakes

litigation often proceeds in stages or shifts to other forums after an

important legal issue is resolved.  As Judge Whyte recently held in a

similar breach of contract action, an implementer "can simultaneously

pursue a determination of the RAND royalty rate while denying

infringement or asserting invalidity, even though those issues may

ultimately obviate the need for a license." *Realtek Semiconductor Corp.*

*v. LSI Corp.*, __ F. Supp. 2d __, 2013 WL 2181717, at *7 (N.D. Cal. May

20, 2013).  "[T]here is no reason the RAND royalty rate cannot be

determined first." *Id.*  Indeed, if potential licensees were required to

renounce challenges to patent validity, infringement, or exhaustion as

the price of enforcement of a FRAND commitment, that would chill

their ability to assert those challenges and thus undermine critical

patent policy considerations.  *See, e.g., Blonder-Tongue Labs., Inc. v.*

*Univ. of Illinois Found.*, 402 U.S. 313, 349-50 (1971) ("[T]he holder of a patent should not be insulated from the assertion of defenses and thus allowed to exact royalties for the use of an idea that is not in fact patentable or that is beyond the scope of the patent monopoly.").

The district court appears to have been under the misimpression that once Motorola is ordered to offer a FRAND rate, there is nothing left for Apple to decide—as if the quest for a FRAND offer, and the work the court devotes to setting one, is an exercise in futility unless Apple knows up front it is prepared to accept it. That is not true of any option: Price is always a material—usually, *the* material—consideration. And it certainly is not true here.

Just because Motorola declares its patents both essential (and, therefore, infringed) and valid does not make them so. Motorola's dismal litigation record proves the point: Motorola has sued Apple in various forums for infringement of eight SEPs (presumably, its eight strongest SEPs) and is batting 0-for-8 in establishing liability in U.S. actions. Motorola asserted the '223 and '697 patents before the ITC, but the Commission determined that the '223 patent was obvious and that Apple did not infringe either patent. Comm'n Op. at 15, 23, 47, 96, *In re*

57

*Certain Wireless Commc'n Devices, Portable Music and Data Processing Devices, Computers and Components Thereof*, ITC Inv. No. 337-TA-745 (Sept. 17, 2012). Motorola asserted the '898, '559, '516, '712, '230, and '193 patents in *Apple, Inc. v. Motorola, Inc.*, No. 11-CV-8540 (N.D. Ill.). Motorola withdrew the '516 and the '230 patents from suit. On summary judgment, the district court found the '193 patent invalid and the '712 and '559 patents not infringed, and concluded that Motorola could not prove damages or entitlement to an injunction as to the '898 patent. A121-22.

This record vividly illustrates the stark choices that Apple would have confronted once the district court set the FRAND rate. If the rate was reasonable enough—say, lower than $1 per unit—Apple was prepared to buy litigation peace and move on. If, by some chance, the trial yielded a rate closer to Motorola's demanded $12 per unit, it would have been far more sensible for Apple to continue fending off Motorola's patent attacks and demonstrating why each patent was either not infringed (and therefore not essential) or not valid, or why Motorola's patent rights were exhausted. And if the rate was somewhere in the space between those two poles, Apple would have had to make the

58

difficult business judgment whether to accept the license or the risk.
That is the choice that Motorola committed to give every business in
Apple's position. That was the choice Motorola's breach took from
Apple and the choice Apple was entitled to vindicate through specific
performance. Thus, the district court was wrong to condition the
availability of specific performance on Apple's acceptance of an
obligation not specified in any contract.

The district court also committed legal error by requiring Apple to
satisfy, as a prerequisite to obtaining specific performance, the factors
necessary to demonstrate entitlement to injunctive relief under *eBay,
Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). *See* A172. Because
Apple's breach of contract claims arise under Wisconsin law, Wisconsin
law, not federal law, governs the availability of remedies. *See, e.g.*,
19 Wright, Miller & Cooper, Fed. Practice and Procedure § 4513 at 447-
48 (2d ed. 1996) ("[W]hen forum state law defines the underlying
substantive right, state law also governs the availability of such
equitable remedies as … *specific performance*.") (emphasis added). *See
also, e.g.*, *Chi-Mil Corp. v. W.T. Grant Co.*, 422 F. Supp. 46, 48-49

59

(E.D. Wis. 1976) (applying Wisconsin law to determine availability of specific performance).

That legal error prejudiced Apple.  The district court demanded that Apple demonstrate not only the inadequacy of damages, but also irreparable injury, a favorable hardship balance, and that specific performance would not disserve the public interest.  A172-74.  But Wisconsin law requires, at most, that a breach of contract plaintiff seeking specific performance show inadequacy of damages, and, as discussed above (at 48-50), even that showing is deemed made, or not required at all, in cases involving many classes of non-fungible property.  *See, e.g.*, *Anderson*, 455 N.W.2d at 889; *Kurth*, 55 N.W.2d at 368; *Welch*, 31 N.W.2d at 171.  Regardless, Apple demonstrated the inadequacy of damages here.  *See supra* at 51-52.  The district court should not have demanded more.

In any case, Apple has satisfied the *eBay* factors.  As just explained, damages do not adequately compensate Apple for Motorola's failure to make a FRAND offer.  Until Motorola makes such an offer, Apple must operate under a cloud of uncertainty that undermines its profits, customer base, and goodwill.  Contrary to the district court's

reasoning, A174, the public interest supports specific performance.

Determining a FRAND rate is within the court's competence, *see, e.g.,*

*Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, and would conserve

the judicial resources being expended in this and other litigation, *see*

*supra* at xv-xvi, 57-58, by facilitating settlement of the parties' licensing

dispute.  Finally, the hardship to Apple of continuing to do business

under the threat of an injunction is substantial, while an order

directing Motorola to do nothing more than perform its contractual

obligation would impose no hardship at all.

For all of these reasons, the district court abused its discretion by

ruling out specific performance and dismissing Apple's breach of

contract claims.  *See, e.g.*, *Koon v. United States*, 518 U.S. 81, 100 (1996)

(trial court "by definition abuses its discretion when it makes an error of

law"); *Anderson*, 455 N.W.2d at 891-92 (same, with respect to request

for specific performance).

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN DISMISSING APPLE'S DECLARATORY JUDGMENT CLAIMS

Apple sought a declaration of a FRAND rate for Motorola's SEPs,

a declaration that Motorola's $12-per-iPhone offer was not FRAND, and

a declaration that the '898 patent is unenforceable due to patent misuse. *See* A174, 3292-94, 3296, 90,172. Each was amenable to declaratory judgment.

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). No doubt, this statute gives the district court discretion to decide whether to entertain a declaratory judgment claim. *See Micron Tech.*, 518 F.3d at 903. But that discretion has limits. The question before the district court—and now this Court—was whether "the objectives for which the Declaratory Judgment Act was created" would be served by hearing the case. *Id.* at 902. "When these objectives are served, dismissal is rarely proper." *Id.*

"[T]he purpose of the Declaratory Judgment Act … in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987). Where, as here, "a declaratory judgment would settle the legal relations in dispute and

afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." *SanDisk*, 480 F.3d at 1383.  Under these principles, the district court abused its discretion in dismissing each of the three claims.

### A. The Declaration Of A FRAND Rate Would Resolve Uncertainty In Apple's Ongoing Licensing Dispute With Motorola

As an alternative to awarding specific performance, Apple proposed that the district court enter a declaratory judgment setting a FRAND rate.  A174, 90,172.  The district court agreed that a declaratory judgment offered a suitable vehicle for determining a rate. A174.  But the court concluded that it would be "inappropriate" to award declaratory relief "for the same reasons" that it was refusing to award specific performance—that declaring a FRAND rate "'would have no practical effect.'"  A174 (quoting *Apple*, 869 F. Supp. 2d at 924). Those reasons are as improper here as they were in the context of specific performance.

The rule governing whether a declaratory judgment is proper— focused on whether it "will serve a useful purpose in clarifying and settling the legal relations in issue," *Minn. Mining & Mfg.*, 929 F.2d at

63

672-73—does not depend on whether the judgment sought will bring about an immediate global settlement of a complex licensing dispute. Declaratory judgments routinely settle important questions about the "legal relations in issue"—thereby serving a "useful purpose"—without a definitive peace treaty.

This case is the perfect example of where resolving a hotly contested issue would have served exactly such a "useful purpose."  As explained above, *see supra* at 16-19, from the parties' first licensing discussion in 2007, Motorola's $12-per-iPhone demand has represented an insurmountable roadblock.  Even after Apple made valuable concessions, Motorola refused to budge.  Without judicial intervention, the parties are highly unlikely ever to reach a license agreement on their own.  By removing this roadblock, the district court would not merely have sent the parties "back to the negotiation table to hammer out the details of a license," A175, but would also have broken the "logjam" that was impeding any resolution of the license question, as Apple argued, A90,175-76.

Accordingly, a judicial determination of the FRAND rate, at a minimum, would have promoted extrajudicial settlement, a key

64

consideration relevant to the exercise of declaratory judgment jurisdiction. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 814 (Fed. Cir. 1996) (noting that "a court may take into account the pendency of serious negotiations to sell or license a patent in determining to exercise jurisdiction" and agreeing that such jurisdiction should be exercised in light of "the sound policy of promoting extrajudicial dispute resolution"). Indeed, this Court has observed that where, as here, "there is no real prospect of a non-judicial resolution of the dispute," the need for a judicial declaration of rights may be "compelling." *Id.*; *see Microsoft Corp. v. Motorola, Inc.*, No. CV-10-1823-JLR, 2012 WL 4827743, at *6 (W.D. Wash. Oct. 10, 2012) ("[A] forum must exist to resolve honest disputes between the patent holder and implementer as to what in fact constitutes a RAND license agreement.  Here, the courthouse may be the only such forum.").

In a similar vein, the district court was wrong to trivialize the judgment sought as nothing but a "bargaining chip."  A171.  Even if a declaratory judgment has "the effect of placing [the declaratory plaintiffs] in a more favorable negotiating position, that effect is not a sufficient reason to decline to hear the suit."  *Sony Elecs., Inc. v.*

*Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1289 (Fed. Cir. 2007). In any event, the order Apple sought was not some trivial "bargaining chip," but a game-changer. An order setting the FRAND rate Apple sought would have leveled the playing field by removing the shadow of a legally impermissible, but nonetheless threatening injunction, which necessarily places "the standard implementer … at a bargaining disadvantage." *Realtek*, 2012 WL 4845628, at *5.

## B. A Declaration That Motorola Has Not Offered Apple A FRAND Rate Would Resolve Uncertainty In The Parties' Ongoing Licensing Dispute

The district court committed the same legal error in refusing to take the more modest step of declaring whether or not Motorola's $12-per-iPhone licensing offer was FRAND. The district court acknowledged that that determination would have placed much less of a "burden on the judiciary's resources" than the request that the court determine the precise FRAND rate. A174, 180. The district court nevertheless refused to adjudicate Apple's claim. A175. The court incorrectly reasoned that such a declaration could have only two results, neither of which it deemed sufficient to justify the exercise of jurisdiction.

66

We have already addressed the first result, that "the parties would be sent back to the negotiation table to hammer out the details of a license." A175. Here, again, the district court erred in conditioning the availability of declaratory relief on proof that the relief would have definitively ended the litigation. Sending the parties "back to the negotiation table" with greater clarity of their rights and obligations is exactly what a declaratory judgment action is for, at least if the additional clarity makes it more likely that they would "hammer out the details of a license."

The district court's second scenario was that the declaration Apple sought "might be useful for Apple as a defense to a future patent infringement suit brought by Motorola." A175. The court wondered what "specific help" such a declaration would provide "other than a bargaining chip or an affirmative defense against infringement cases." A90,266. We have already addressed the fallacy in the "bargaining chip" characterization. Beyond that, the district court was also wrong to dismiss the value of "an affirmative defense" in future patent litigation. Further patent litigation was not some hypothetical possibility, but a virtual certainty. Three of Motorola's SEPs remain

live on appeal before this Court in *Apple, Inc. v. Motorola, Inc.*, Nos. 2012-1548, -1549. Moreover, Apple sought a declaratory judgment regarding the rate Motorola offered for its *entire* SEP portfolio, which includes hundreds of patents. Given that Google Inc. spent $12.5 billion to acquire Motorola, largely for its patent portfolio, it is reasonable to expect that Google will continue to try to monetize that portfolio through litigation. *See* Larry Dignan, *Google's Motorola purchase: Was it worth it?*, ZDNet (Jan. 4, 2013), http://zd.net/Vzztbl ("There's no question that the Motorola Mobility purchase was all about the patents.").

Even if the district court were correct that the declaration could prove useful only as a defense to a future patent infringement suit, that is not a sound basis for dismissing the claims. To the contrary, the Act "was intended to fix the problem that arises when the [patent holder] does not sue." *Sony Elecs.*, 497 F.3d at 1284. In other words, the point of the declaratory judgment procedure is to give Apple an opportunity to clarify its legal rights and obligations before litigation occurs.

## C.    A Declaration That The '898 Patent Is Unenforceable Due To Patent Misuse Would Resolve The Litigation Over That Patent

The district court also abused its discretion in dismissing Apple's request for a judgment declaring that the '898 patent is unenforceable due to patent misuse.  In declining to adjudicate Apple's claim, the court committed basic errors of law, misunderstanding the remedies available for patent misuse.

The central tenet of patent misuse, an equitable defense to infringement, is that "the patentee may exploit his patent but may not 'use it to acquire a monopoly not embraced in the patent.'"  *Princo Corp. v. ITC*, 616 F.3d 1318, 1327 (Fed. Cir. 2010) (en banc) (quoting *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 643 (1947)); *see id.* at 1333 (describing misuse as "leverag[ing] the power of a patent to exact concessions from a licensee that are not fairly within the ambit of the patent right").  To prove that a patent holder has committed misuse, an alleged infringer must show "that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect."  *Windsurfing Int'l, Inc. v.*

69

*AMF, Inc.*, 782 F.2d 995, 1001 (Fed Cir. 1986) (internal quotation marks omitted).

Apple's allegations satisfied these elements. As Apple explained below, Motorola's failure to disclose the '898 patent to ETSI before the GPRS standard was adopted, followed by its assertion that the '898 patent was essential to practicing the GPRS standard, enabled Motorola to "increase[] the scope of its patent rights beyond the narrow [technology] it allegedly patented and gain[] instead the ability to control cell phone manufacturers' ability to practice the entire required GPRS standard." A25,820. This went beyond the monopoly power conferred by the Patent Act. A25,823. Motorola then asserted its ill-gained monopoly power, to Apple's detriment, by refusing to offer Apple a FRAND license and suing Apple for patent infringement when Apple refused to surrender to its unreasonable licensing demands. A3293.

The district court identified two primary reasons for dismissing Apple's claim. Each was erroneous.

First, the district court stated that Apple had not shown why "monetary damages would be inadequate relief" for Motorola's patent misuse if Motorola sued for infringement and sought an exclusion order.

70

A186-87.  That was a contradiction in terms.  Apple did not need to prove that "monetary damages would be inadequate relief" on its patent misuse claim; monetary damages are entirely *unavailable* on a claim of patent misuse because misuse is a defense, not a cause of action.  *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1428 (Fed. Cir. 1997) ("[M]onetary damages may not be awarded under a declaratory judgment [claim] based on patent misuse, because patent misuse simply renders the patent unenforceable." (internal quotation marks omitted)).

Second, relying on Judge Posner's discussion regarding the availability of *injunctive* relief, the district court found that "the remedy that Apple is seeking (an order of unenforceability) is so far out of proportion to any harm that Apple has suffered or is likely to suffer in the future that it is unlikely that any court would impose such an order."  A187 (citing *Apple Inc. v. Motorola, Inc.*, No. 11-CV-08540, 2012 WL 2362630, at *1 (N.D. Ill. June 7, 2012)).  This, too, is a contradiction in terms.  The *only* remedy for patent misuse is to render the patent unenforceable until the misuse is purged.  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).  A remedy could not be

deemed "out of proportion" to the claimed harm when that remedy is, by definition, the only permissible remedy.[2]

## IV. THIS COURT HAS EXCLUSIVE APPELLATE JURISDICTION BECAUSE APPLE'S DECLARATORY JUDGMENT CLAIMS ARISE UNDER FEDERAL PATENT LAW

This Court has exclusive jurisdiction over "an appeal from a final decision of a district court of the United States, … if the jurisdiction of that court was based, in whole or in part, on [28 U.S.C. § 1338]." 28 U.S.C. § 1295(a)(1). Section 1338(a), in turn, provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents." The statutory phrase "arising under" invokes the well-pleaded complaint rule. *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 829-30

---

[2] The district court also found that a declaration of patent misuse would serve no purpose because "[t]here is no likelihood that Motorola will (or can) sue Apple on the '898 patent after Judge Posner dismissed Motorola's claims with prejudice when Motorola was unable to prove the damages it alleged had been caused by Apple." A187. Because Judge Posner's dismissal of Motorola's claim on the '898 patent is currently before this Court, *see supra* at xvi, it would be premature to assess the likelihood of further litigation on that patent or to affirm the dismissal of Apple's patent misuse claim on that speculative basis. *See Med. Assurance Co., Inc. v. Hellman*, 610 F.3d 371, 381-82 (7th Cir. 2010) (district court abused its discretion by staying declaratory judgment action in favor of pending state proceedings, where it was not certain that state proceedings would decide disputed issue).

(2002). To establish jurisdiction in this Court, "[t]he plaintiff's well-pleaded complaint must 'establish[] either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law.'" *Id.*

Where, as here, the plaintiff's complaint seeks a declaratory judgment, "the court examines the declaratory defendant's hypothetical well-pleaded complaint" to determine whether the case arises under federal patent law. *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1349 (Fed. Cir. 2011). Apple's complaint does. Apple seeks a declaratory judgment of, among other things, unenforceability of a patent due to patent misuse. Thus, Motorola's hypothetical coercive action is for patent infringement. *See ABB Inc.*, 635 F.3d at 1350 Indeed, here Motorola's *actual* complaint, filed before the ITC, alleged that Apple infringed several Motorola patents. A466-506.

Accordingly, the district court had subject matter jurisdiction and this Court has appellate jurisdiction. *See Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 984 (Fed. Cir. 2009) ("Because [plaintiff]'s declaratory judgment complaint includes claims for

noninfringement, invalidity, and unenforceability … , this court has jurisdiction pursuant to [§ 1295(a)(1)]."); 8 Chisum on Patents § 21.02[1][d][i] (2012) ("Because a suit by a declaratory plaintiff against a patent owner seeking a declaratory judgment that … the [patent's] claims are invalid or unenforceable is essentially one for patent infringement with the parties reversed, … the action arises under the patent laws.").

Moreover, Apple's declaratory claims depend on the resolution of substantive patent law questions.  Apple's claim for a declaration that Motorola's licensing offers were not FRAND requires a valuation of Motorola's patents.  And Apple's claim for a declaration of unenforceability requires application of this Court's misuse jurisprudence.  This is an independently sufficient basis for jurisdiction. *See Holmes Group*, 535 U.S. at 829-30.

# CONCLUSION

The Court should remand for a trial on Apple's antitrust, breach of

contract, and declaratory judgment claims.


Dated:  July 23, 2013                    Respectfully submitted,

                                         /s/ E. Joshua Rosenkranz
                                         Orrick, Herrington & Sutcliffe LLP
                                         51 West 52nd Street
                                         New York, NY  10019
                                         (212) 506-5000

                                         *Attorney for Plaintiff-Appellant*

# ADDENDUM

CASE PARTICIPANTS ONLY

# OPINION AND ORDER
# DATED JUNE 7, 2011 (DKT 93)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

OPINION and ORDER

Plaintiff,

11-cv-178-bbc

v.

MOTOROLA MOBILITY, INC.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case originated in the International Trade Commission, where defendant Motorola, Inc. filed an infringement action against plaintiff Apple, Inc. and is seeking an exclusion order that would prevent Apple from selling its allegedly infringing products in the United States. After the case had been pending for a few months in the Commission, Apple filed 13 counterclaims against Motorola and removed the case to this court under 19 U.S.C. § 1337(c). In its counterclaims, Apple alleges that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by failing to timely disclose ownership of patents that it now declares are essential to technological standards that have been adopted by the industry and by failing to offer licenses to those patents on fair, reasonable and nondiscriminatory terms.

Now before the court is Motorola's motion to dismiss Apple's claims for lack of

1

**A22**

ripeness and for failure to state claims upon which relief may be granted. Dkt. #33. Also before the court is Motorola's motion to sever the claims in this case and consolidate them with the claims in two other cases that are pending before this court. Dkt. #39.

I conclude that Apple's claims are ripe and that they are pleaded sufficiently. Thus, I will deny Motorola's motion to dismiss, with the exception of its motion to dismiss Apple's claim of waiver because waiver is an affirmative defense, not a cause of action. I also conclude that severing this case would create inordinate complications and would not promote judicial economy or efficiency. Accordingly, I will deny Motorola's motion to sever and consolidate the case.

I draw the following facts from plaintiff Apple's counterclaims. (Although Apple is named as the plaintiff in this action, Apple's claims are technically "counterclaims" because it was the respondent in the International Trade Commission where it first filed these counterclaims against Motorola.)

BACKGROUND

A.  Wireless Communication Industry and Standards Setting Organizations

Plaintiff Apple Inc. and defendant Motorola Mobility, Inc. are competitors in the wireless communication industry. Motorola is the owner of several patents that it has declared as being "essential patents" with respect to various technological standards set by international standards setting organizations relevant to wireless communication devices.

2

**A23**

Standards setting organizations play a significant role in the wireless technology market by allowing companies to agree on common technological standards so that all compliant products will work together. Standards lower costs by increasing product manufacturing volume and they increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one firm to those manufactured by another.

One complication with standards is that it may be necessary to use patented technology in order to practice them. If a patent claims technology selected by a standards setting organization, the patent is called an "essential patent." In order to reduce the likelihood that owners of essential patents will abuse their market power, many standards setting organizations have adopted rules related to the disclosure and licensing of essential patents. The policies often require or encourage members of the standards setting organization to identify patents that are essential to a proposed standard and to agree to license their standard essential patents on fair, reasonable and non-discriminatory terms to anyone who requests a license. (These terms are often referred to by the acronyms FRAND or RAND.) Such rules help to insure that standards do not allow essential patent owners to extort their competitors or prevent them from entering the marketplace.

There are four standards setting organizations relevant to this case: The European Telecommunications Standards Institute; the 3rd Generation Partnership Project, known as 3G; the Telecommunications Standards Institute; and the Institute of Electrical and

3

Electronics Engineers. As discussed in more detail below, each of these standards setting organizations have intellectual property rights policies that address disclosure and licensing of patents essential to standards being considered or being adopted by the organizations. At all relevant times, Motorola has been a member of several standards setting organizations, including those relevant to this case.

## B.  Motorola's Declarations of Essential Patents and Commitments to License those Patents

During the course of its participation in developing standards for the European Telecommunications Standards Institute and the 3G Project, Motorola submitted "declarations," declaring that the '697, '559, '230 and '898 patents were essential or potentially essential to the European Telecommunications Standards Institute's standards, including the Global System for Mobile Communications (known as the GSM standard), Universal Mobile Telecommunications System (known as the UMTS standard) and 3G Project standards. Motorola also declared that those four patents were essential to standards that had already been adopted by the Institute and 3G Project. Motorola represented to the Institute and the 3G Project that it would "grant irrevocable licences under the [intellectual property rights] on terms and conditions which are in accordance with . . . the [Institute's] [intellectual property rights] Policy." Apple's Cpt., dkt. #1, ¶¶ 71-75.

Additionally, Motorola declared the '223 patent essential to the 802.11 standard and

4

**A25**

submitted an Intellectual Property Statement to the Institute of Electrical and Electronics Engineers, stating that Motorola agreed to license any patents essential to the 802.11 standard on a non-discriminatory basis offering fair and commercially reasonable terms. In a Letter of Assurance for Essential Patent Claims dated June 14, 2007, Motorola declared that the '712 patent and the '193 patent were essential to the practice of the 802.16e standard. The 802.16e Letter of Assurance stated that Motorola was prepared to grant licenses to an "unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions." Id. at ¶ 88.

Finally, in a "Statement from the Patent Holder" to the Telecommunication Industry Association, Motorola declared that the '697, '712 and '193 patents were essential to the CDMA2000 standard. Motorola stated that it would make a license available for any declared-essential patent "under reasonable terms and conditions that are demonstrably free of any unfair discrimination" Id. at ¶ 99.

### C. Negotiations for Licensing between Apple and Motorola

Apple's original iPhone went on sale in June 2007. Apple's original iPhone contained an Infineon baseband chipset, which incorporated technology covered by patents that Motorola has declared as essential. Apple purchased the Infineon baseband chipset through a manufacturing agreement with Chi Mei Corporation, which manufactured the Infineon baseband chipset under a licensing agreement with Motorola. On August 4, 2007, Motorola

gave Chi Mei a 60-day suspension notice on its licensing agreement.

In September 2007, representatives of Apple and Motorola met to discuss a licensing agreement regarding Motorola's declared-essential patents. At the meeting, Motorola demanded a royalty rate based on the total revenue of the covered devices. Apple believes the rate is unreasonably high and that the value and contribution of the declared-essential patents is disproportionate to the revenue received by Apple for sales of its products. In addition, the demanded rate was higher than the rate Motorola has offered to other competitors. The parties have negotiated on and off for three years but have been unable to agree on licensing terms.

### D. Motorola's Termination of the Qualcomm License

On December 16, 2009, Apple and Qualcomm entered into a contract whereby Apple would purchase chipsets from Qualcomm that were compliant with the CDMA2000 standard. The chipsets incorporated technology that Qualcomm licensed from Motorola. On January 11, 2011, on the day Apple announced the Verizon iPhone 4, Motorola notified Qualcomm of its intent to terminate any and all license covenant rights with respect to Qualcomm's business with Apple, effective February 10, 2011.

### PROCEDURAL HISTORY

#### A. Related Cases

6

Three pending actions relate to the present case.  First, there is the investigation pending in the International Trade Commission that defendant Motorola initiated on October 6, 2010.  In the Matter of Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof, ITC Investigation No. 337-TA-745.  In that case, Motorola is seeking an exclusion order and a permanent cease and desist order as a result of plaintiff Apple's alleged infringement of United States Patent Nos. 6,272,333 (the '333 patent), 6,246,862 (the '862 patent), 5,359,317 (the '317 patent), 7,751,826 (the '826 patent), 6,246,697 (the '697 patent), and 5,636,223 (the '223 patent).  As an affirmative defense to infringement, Apple contends that Motorola's license terms for its essential patent portfolio are not fair, reasonable and non-discriminatory.  The case is scheduled for a hearing in July 2011.  The Commission has set a target date of March 8, 2012, at which time the Commission expects to complete its final review of the matter.

The other two related cases are pending in this court.  Plaintiff Apple filed case number 10-cv-661-bbc on October 29, 2010, asserting patent infringement claims against Motorola.  On November 9, 2010, Motorola filed counterclaims in the '661 action alleging infringement of the '317 patent, the '223 patent, the '697 patent, the '862 patent, the '333 patent and the '826 patent.  These are the same patents at issue in the International Trade Commission's 337-TA-745 investigation.  On December 2, 2010, this court granted the parties' joint motion to stay the '661 case in favor of the proceedings in the Commission.

Also on October 29, 2010, plaintiff Apple filed case number 10-cv-662-bbc, asserting

patent infringement claims against Motorola.  On November 9, 2010, Motorola filed counterclaims against Apple for infringement of United States patent Nos. 5,311,516 (the '516 patent), 5,319,712 (the '712 patent), 5,490,230 (the '230 patent), 5,572,193 (the '193 patent), 6,175,559 (the '559 patent) and 6,359,898 (the '898 patent), all of which Motorola has declared essential to certain standards.  In that case, Apple contests whether the patents are essential to standards it is practicing and contests the validity of the patents.  One of Apple's affirmative defenses in that case is that Motorola's license offer was not consistent with its obligations to license the patents on fair, reasonable and non-discriminatory terms.  The '662 case is not stayed.

B.  The Case at Issue (11-cv-178-bbc)

In this case, Apple alleges that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by failing to timely disclose ownership of patents that it now declares are essential to standards that have been adopted by the industry.  The patents that Motorola has declared essential are the '223, '697, '712, '230, '193, '559 and '898 patents.  Additionally, Apple contends that Motorola's refusal to negotiate a license in good faith with Apple for those declared-essential patents constitutes a breach of commitments Motorola made to several standards setting organizations to license essential patents on fair, reasonable and non-discriminatory terms.  Apple also asserts claims against Motorola under the theory of estoppel and waiver.  Apple contends that by making commitments to the standards

8

**A29**

setting organizations, Motorola promised potential licensees that it would license its essential patents on fair, reasonable and non-discriminatory terms. Because wireless device companies, like Apple, relied on its promise, Motorola is estopped to deny it.

Also, Apple brings causes of action for tortious interference with a contract, unfair competition and unlawful business practices and violation of Section 2 of the Sherman Act for Motorola's refusal to license fairly, its failure to disclose essential patents and its interference with the contract between Apple and Qualcomm. Finally, Apple brings three declaratory judgment claims, seeking declarations that (1) Motorola's offers have not been on fair, reasonable and non-discriminatory terms; (2) Motorola is not entitled to injunctive relief in the event it prevails on any of its patent infringement claims; and (3) Motorola has misused its patents.

Shortly after Apple removed this case to federal court, it moved for preliminary injunctive relief, seeking an order that would have enjoined Motorola from (1) proceeding as a party in the 337-TA-745 investigation in the International Trade Commission with respect to the '223 and '697 patents; (2) proceeding with its counterclaims filed in case number 10-cv-662-bbc in this court with respect to the '712, '230, '193, '559 and '898 patents; and (3) selectively terminating its patent license agreement with Qualcomm as to Apple. A hearing was held on the motion on April 26, 2011. At the conclusion of the hearing, I denied Apple's motion for a preliminary injunction because I did not see a likelihood of success on the merits of its claims, did not think it appropriate to interfere with

9

an International Trade Commission proceeding under the circumstances, did not think that Apple had shown any irreparable harm and found that the public interest would be served by allowing the International Trade Commission to proceed with its investigation and trial.

While the parties were briefing Apple's motion for a preliminary injunction, Motorola filed a motion to dismiss Apple's counterclaims, contending that certain of Apple's claims are not ripe and that all of Apple's claims suffer from pleading problems. Dkt. #33. Also, Motorola filed a motion to sever and consolidate the claims in this action with the '661 and '662 cases. Dkt. #39.

## OPINION

### A. Motion to Dismiss

1. Ripeness

With the exception of its tortious interference claim, all of Apple's counterclaims focus on Motorola's alleged commitments to license its essential patents to Apple on fair, reasonable and non-discriminatory terms and its failure to do so. Motorola contends that all of Apple's counterclaims should be dismissed under Fed. R. Civ. P. 12(b)(1) because they will not be ripe until the parties' patent infringement disputes are resolved.

Ripeness is essentially a question of timing, and depends on whether the plaintiff's threatened injury is sufficiently imminent to warrant judicial action. Regional Rail Reorganization Act Cases, 419 U.S. 102, 143 (1974). To establish ripeness, plaintiffs must

10

**A31**

demonstrate both (1) the fitness of the issues for judicial decision and (2) the "hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967); Metropolitan Milwaukee Association of Commerce v. Milwaukee County, 325 F.3d 879, 882 (7th Cir. 2003).

The fitness for judicial decision inquiry guards against judicial review of hypothetical or speculative disputes. Babbitt v. United Farm Workers National Union, 442 U.S. 289, 297 (1979). Legal issues that require little if any further factual development are fit for review. Wisconsin Central, Ltd. v. Shannon, 539 F.3d 751, 759 (7th Cir. 2008). Motorola argues that Apple's counterclaims are not fit for judicial decision because the policies and commitments to the standards setting organizations upon which Apple seeks relief require Motorola to license only those patents that are *actually* essential to the respective standards at issue in the commitments. Thus, Motorola's obligation to grant Apple a license will be triggered only if there is an agreement between the parties or a determination that Motorola's patents are "essential" to standards that Apple is implementing in its products. In other words, Motorola must prove in the patent infringement case, or Apple must concede in this case, that Apple has infringed Motorola's patents before Apple is entitled to a license from Motorola. Motorola reasons that because Apple denies that its products practice any of the asserted claims of the Motorola patents, Apple's Cpt., dkt. #1, ¶ 15, n.2, any opinion by the court regarding Motorola's licensing obligations would be an advisory one.

The problem with Motorola's ripeness argument is that Motorola points to nothing

in Apple's complaint, the relevant intellectual property rights policies at issue or any case law to support its argument that it had no obligation to make a reasonable offer unless and until infringement or essentiality is established. According to Apple's complaint, Motorola is obligated to offer a fair, reasonable and non-discriminatory license to its declared-essential patents regardless whether the patents have been proven in court to be essential *in fact* to the standards adopted by the standards setting organizations or applied in Apple's products.

In particular, Apple alleges in its complaint that Motorola declared certain patents as essential or potentially essential and stated that it would grant fair, reasonable and non-discriminatory licenses to those patents. Apple's Cpt., dkt. #1, ¶¶ 71, 89, 99. Neither the language of the intellectual property policies at issue nor Motorola's assurances under those policies suggest that Motorola's obligation to offer licenses to its patents was contingent upon the outcome of patent litigation. This makes sense. The policies of the standards setting organizations become far less useful or effective if a company who has declared its patents as essential, thereby encouraging the organization to adopt the standard, can then refuse a fair, reasonable and non-discriminatory license until essentiality is proven, either through patent infringement litigation or otherwise.

At least two courts to consider the issue have concluded that claims based on fair, reasonable and non-discriminatory licensing obligations are not contingent upon the results of patent infringement suits regarding the same patents. In Nokia Corp. v. Qualcomm, Inc., 2006 WL 2521328, *1-2 (D. Del. Aug. 29. 2006), the court granted the plaintiff's motion

12

**A33**

to remand a case seeking declaratory relief and specific performance of a fair, reasonable and non-discriminatory licensing obligation. The issue in the case was whether the plaintiff's suit presented a substantial question of federal patent law such that it could proceed in federal court. The court reviewed the allegations and concluded that the case presented no substantial question of federal patent law. In particular, the court concluded that it was not necessary "to determine whether the patents at issue are in fact 'essential' because Defendant has already voluntarily declared them essential. Rather, Plaintiff merely seeks an interpretation of Defendant's obligations arising after declaring certain patents essential." The court granted the motion to remand the case to state court.

Similarly in Ericsson Inc. v. Samsung Electronics Co., Ltd., 2007 WL 1202728, *2-3 (E.D. Tex. Apr. 20, 2007), the court concluded that the plaintiff's contract claim related to a dispute regarding the defendant's obligation to offer a reasonable and non-discriminatory license was separable from the claims for patent infringement. The court stayed resolution of the patent infringement claims until the breach of contract claim was resolved. Motorola has cited no cases in which the court concluded that contractual or antitrust claims related to licensing obligations cannot be resolved before resolution of related patent infringement suits.

In this case, the parties dispute whether Motorola is required by contract to make fair, reasonable and non-discriminatory offers to Apple and whether Motorola has done so. Apple's claims are not based on "hypothetical, speculative or illusory disputes," Wisconsin

13

Central, Ltd. v. Shannon, 539 F.3d 751, 759 (7th Cir. 2008); rather, they are based on allegations of concrete and ongoing injuries that are sufficiently imminent to warrant judicial action. Regional Rail Reorganization Act Cases, 419 U.S. at 143.

In addition, Apple may suffer hardship if the court withholds consideration of the issues presented. Hardship may be found when there may be a "substantial immediate impact" on the interests of plaintiff as a result of the challenged action. Hinrichs v. Whitburn, 975 F.2d 1329, 1335-36 (7th Cir. 1992). Apple alleges that it invested significant money and other resources into developing products that are compliant with the standards adopted by the various standards setting organizations, relying on Motorola's commitments that it would license patents that it had declared essential to those standards on fair, reasonable and non-discriminatory terms. Apple alleges that because Motorola has refused to offer licenses on fair, reasonable and non-discriminatory terms, Apple is involved in multiple patent infringement suits, risks losing the ability to sell its products in the market and is threatened by high royalty rates. These allegations imply that Apple would suffer hardship if the court dismisses its licensing claims at this time. In sum, at this stage I cannot conclude that no present dispute exists and that Apple would not be subject to hardship if its claims were dismissed. Therefore, I will deny Motorola's motion to dismiss Apple's complaint for lack of ripeness.

14

**A35**

2. <u>Adequacy of pleading</u>

Motorola also moves to dismiss each of Apple's counterclaims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.  A claim should be dismissed under Rule 12(b)(6) when the allegations in the complaint, however true, could not raise a plausible claim of entitlement to relief.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 558 (2007).  In ruling on a motion to dismiss, courts must construe all of the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  <u>Savory v. Lyons</u>, 469 F.3d 667, 670 (7th Cir. 2006).  However, courts are not required to accept as true a legal conclusion presented as a factual allegation.  <u>Iqbal</u>, 129 S. Ct. At 1949-50.

a.  Breach of contract

Apple has asserted six separate breach of contract counterclaims, alleging that Motorola breached the contracts it made with the European Telecommunications Standards Institute, the Institute of Electrical and Electronics Engineers, the 3G Project and the Telecommunication Industry Association  to license its patents on fair, reasonable and non-discriminatory terms.  Motorola contends that these breach of contract claims should be dismissed because Apple has failed to plead any of the elements of a breach of contract claim adequately.

The initial question is which law applies to the alleged contracts at issue.  Apple (a

15

California company) is suing Motorola (an Illinois company) for violation of commitments to the European Telecommunications Standards Institute (which is based in France), the Institute of Electrical and Electronics Engineers (based in New York) and the Telecommunication Industry Association (based on Virginia).  Neither party undertakes a choice-of-law analysis.  Although Motorola denies that the contracts are governed by Wisconsin law, it addresses only Wisconsin law.  Thus, I also apply Wisconsin law. FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 283 (7th Cir. 2002) (in absence of any discussion of choice of law issues by parties, court applies law of forum state).

To state a claim for breach of contract under Wisconsin law, Apple must plead (1) the existence of a contract creating obligations flowing from Motorola to Apple; (2) a breach of those obligations; and (3) damages arising from the breach.  Northwest Motor Car, Inc. v. Pope, 51 Wis. 2d 292, 296, 187 N.W.2d 200, 203 (1971); Brew City Redevelopment Group, LLC v. The Ferchill Group, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 807, 714 N.W.2d 582, 588.

According to Apple, the intellectual property rights policies of the various standards setting organizations constitute the "offers."  These policies contain requirements concerning whether and to what extent patentees owning potentially essential patents must commit to licensing such patents on fair, reasonable and non-discriminatory terms, as well as the disclosure of patents and patent applications that may be essential to standards.  Motorola accepted the offers by becoming a member of the organizations, agreeing to abide by their

16

**A37**

policies and receiving benefits by participating in the standard development process and influencing the choice of technology for the standards. The various commitments Motorola made to the organizations, including its declarations to the European Telecommunications Standards Institute and the 3G Project, its Letter of Assurance and Intellectual Property Statements to the Institute of Electrical and Electronics Engineers and its Statement from the Patent Holder to the Telecommunications Association, are consideration for those benefits. Thus, in consideration for the benefits that flowed from its membership in the standards setting organizations, Motorola provided assurances that it would timely disclose intellectual property and license essential patents on fair, reasonable and non-discriminatory terms.

Under Wisconsin law, the constitution, by-laws and resolutions of a voluntary association may form a binding contract between members of that association. Attoe v. Madison Professional Policemen's Association, 79 Wis. 2d 199, 205-6, 255 N.W.2d 489, 492 (1977). In addition, at least three courts have concluded that a member of a standards setting organization states a breach of contract claim based on a member's obligation to offer fair, reasonable and non-discriminatory licenses under the intellectual property policies of those organizations. Microsoft Corp. v. Motorola, Inc., No. 10-cv-1823-jlr, slip op. at 4-5 (W.D. Wash. May 31, 2011) (holding that Microsoft stated claim for breach of contract for Motorola's failure to offer licenses on fair, reasonable and non-discriminatory terms after promising it would do so to standards setting organization) (attached as exhibit #92-1 in this

17

**A38**

case); <u>Research In Motion Ltd. v. Motorola, Inc.</u>, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) (holding at motion to dismiss stage that plaintiff stated breach of contract claim based on defendant's failure to offer fair, reasonable and non-discriminatory terms as it had promised European Telecommunications Standards Institute and Institute of Electrical and Electronics Engineers); <u>ESS Technology, Inc. v. PC-Tel, Inc.</u>, 1999 WL 33520483, *4 (N.D. Cal. Nov. 4, 1999) (holding that third-party beneficiary of contract between standards setting organization and defendant-essential-patent holder, software manufacturer had properly stated claim for specific performance of agreement requiring defendant to license patents on non-discriminatory and reasonable terms); <u>see also</u> <u>Ericsson Inc. v. Samsung Electronics, Co.</u>, 2007 WL 1202728, *1 (E.D. Tex. Apr. 20, 2007) (plaintiff and defendant asserting claims for breach of contract agreed that licensing obligations were contractual and bound all members of standards setting organizations).

However, Motorola contends that the policies at issue in this case are too vague and indefinite to support a contractual obligation. Under Wisconsin law, contract terms must be definite enough that the basic obligations of the parties may be ascertained. <u>Goebel v. National Exchangors, Inc.</u>, 88 Wis. 2d 596, 615, 277 N.W.2d 755, 765 (1979) ("An offer must be so definite in its terms or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."); <u>see also</u> <u>Management Computer Services v. Hawkins, Ash, Baptie & Co.</u>, 206 Wis. 2d 158, 178, 557 N.W.2d 67, 75 (1996). A court cannot specifically enforce an agreement or award damages

for its breach when it lacks certainty.  Witt v. Realist, Inc., 18 Wis. 2d 282, 297, 118 N.W.2d 85, 93 (1962).

Accepting Apple's factual allegations as true, I conclude that Apple has pleaded contractual terms definite enough to constitute enforceable agreements.  The European Telecommunications Standards Institute's intellectual property rights policy states that its members "shall use its reasonable endeavors" to inform the organization of essential patents "in a timely fashion."  Apple's Cpt., dkt. #1, ¶ 28.  In addition, all members are asked to grant licenses to essential patents on fair, reasonable and non-discriminatory terms and if they refuse, they must explain their reasons in writing.  Id. ¶¶ 30, 31. The Institute will not adopt a standard incorporating patented technology to which it has not received a licensing commitment from the owner.  Id. ¶ 32.  According to the allegations in Apple's complaint, Motorola agreed to be bound by these policies when it joined the organization.  The combination of the policies and Motorola's assurances to the Institute that it would grant fair, reasonable and non-discriminatory licenses to the '697, '898, '230 and '559 patents constitute a contractual agreement between Motorola and the European Telecommunications Standards Institute.  In addition, because the 3G Project policy requires its members to abide by the intellectual property policies of the Institute, Motorola's membership in the 3G Project created a contractual obligation among the Institute, Motorola and the 3G Project.  Id. ¶ 33, 34.

Under the Institute of Electrical and Electronics Engineers's policy, members are to

19

submit a "Letter of Assurance" to the Institute of Electrical and Electronics Engineers that includes a commitment to license essential patents under reasonable and non-discriminatory terms.  Id. ¶¶ 35, 36.  A contractual obligation between the Institute and Motorola was created by this policy, Motorola's membership in the Institute and Motorola's Letters of Assurance and Intellectual Property Statement to the Institute in which it declared the '223, '712 and '193 patents essential to certain standards and stated its willingness to license those patents on reasonable and non-discriminatory terms.  Id. ¶¶ 85-90.

Finally, the Telecommunication Industry Association's policy states that the standard setting process is "made more efficient" if the existence of essential patents is made known as early as possible.  Id. ¶ 39.  The Association policy states that companies holding any essential patents necessary for a standard adopted by the Association must assure the Association that they will (1) license those essential patents without compensation; or (2) license those essential patents "to all applicants under terms that are reasonable and non-discriminatory."  Id. ¶ 42.  A contractual relationship arose between Motorola and the Association under this policy, Motorola's membership in the Telecommunication Industry Association, its declaration that the '712, '193 and '697 patents are essential to certain standards and its assurance to the Association that it would license those patents under reasonable terms and conditions.

In sum, Apple's allegations permit a reasonable inference that these policies are binding on the members of the organizations.  Each policy indicates that it will not adopt

a standard, or at least will use alternative technology in the standard, if the owner of a declared-essential patent refuses to offer fair, reasonable and non-discriminatory licensing. Thus, the policies assume that members will agree to license essential patents on fair, reasonable and non-discriminatory terms and that once a member makes such a commitment, it is enforceable.

Turning to whether Apple has a right to enforce the contracts, Motorola contends that Apple is neither a party to the contracts nor an intended third-party beneficiary. Becker v. Crispell-Snyder, Inc., 2009 WI App 24, ¶ 9, 316 Wis. 2d 359, 763 N.W.2d 192 (party wishing to enforce contract must either be party to contract or third-party beneficiary). However, Apple's allegations permit an inference that it has the right to enforce Motorola's contractual obligations as a third-party beneficiary. A third-party beneficiary is one whom the contracting parties intended to "directly and primarily" benefit. Becker, 2009 WI App 24, at ¶ 11 (citing Winnebago Homes, Inc. v. Sheldon, 29 Wis. 2d 692, 699, 139 N.W.2d 606 (1966)). The benefit proven must be direct; an indirect benefit incidental to the primary contractual purpose is insufficient. Id.

Apple alleges that the primary purpose of the intellectual property policies of the standards setting organizations is to protect companies that need to obtain licences to practice the adopted standards. In other words, prospective licensees of essential patents, like Apple, are the very parties who are intended to benefit from the existence of fair, reasonable and non-discriminatory licensing obligations and other similar policies. For

21

**A42**

example, the European Telecommunications Standards Institute policy states that it is an "objective" of the Institute to "reduce the risk" of an essential patent's becoming "unavailable." Apple's Cpt., dkt. #1, at ¶ 32. The unavailability of essential patents matters only to those who wish to practice the standards, such as Apple. Thus, Apple is "a member of a class of beneficiaries intended by the [contracting] parties to benefit from [the contract]." Pappas v. Jack O.A. Nelson Agency, Inc., 81 Wis. 2d 363, 371-72, 260 N.W.2d 721 (1978).

The final question is whether Apple has pleaded sufficiently that Motorola breached the contracts. Apple contends that Motorola breached the contracts by (1) failing to timely disclose patents to the European Telecommunications Standards Institute that it later claimed were essential to certain standards; and (2) failing to license its patents to Apple on fair, reasonable and nondiscriminatory terms.

With respect to the first alleged breach, Apple alleges that Motorola was involved in developing several standards with the European Telecommunications Standards Institute and the 3G Project, was aware that it had patents or patent applications relevant to the standards, but failed to disclose the patents until after the standards were adopted. Apple alleges that if Motorola had disclosed the patents before the standards were adopted and declared the patents essential to the standards, the members of the Institute and 3G Project would have considered other viable alternative technologies or declined to incorporate the aspects of the technical specifications or standards purportedly covered by Motorola's

22

**A43**

patents.  Now, companies who practice the standards must obtain licenses from Motorola to practice the standards.  These allegations state a claim that Motorola breached its commitments to the Institute and 3G Project.

With respect to the second alleged breach, Apple alleges that Motorola has made royalty demands on Apple that exceeded those made on comparable parties for use of the declared-essential patents, discriminated against Apple by terminating Qualcomm's contract with Motorola solely as to Apple, demanded a rate that was based on the total revenue base of Apple's products rather than the revenue from the components that utilize the technologies of the declared-essential patents, sought to include cross-licenses to certain of Apple's non-essential patents as a condition of a licensing agreement and sued Apple when Apple refused to accede to Motorola's demands.  At this stage of the case, these allegations are sufficient to imply that Motorola has not honored its promise to license on fair, reasonable and non-discriminatory terms.  <u>Research in Motion Ltd.</u>, 644 F. Supp. 2d at 797 (holding that plaintiff met pleading standard for breach of contract claim by alleging that defendant "demanded of [plaintiff] terms that are unfair, unreasonable, and, on information and belief, discriminatory").

Therefore, I will deny Motorola's motion to dismiss Apple's breach of contract claims.

b.  Antitrust

Apple contends that Motorola violated the antitrust laws by making false licensing

23

**A44**

commitments to standards setting organizations and by failing to disclose essential patents or applications to those organizations until after certain standards were adopted. (The parties agree that Apple's claim under the California Business and Professional Code § 17200 is subject to the same pleading requirements as Apple's claim under § 2 of the Sherman Act. I follow the parties' lead and apply the pleading standards for the federal antitrust claim to both claims.)

As an initial matter, the parties dispute what pleading standards applied to Apple's antitrust claims. At a minimum, every complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), and contain "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570; see also Iqbal, 129 S. Ct. at 1949. However, Motorola contends that Apple's antitrust counterclaim must meet the heightened pleading standards of Fed. R. Civ. P. 9(b) because the counterclaim is premised upon a course of fraudulent conduct.

The Court of Appeals for the Seventh Circuit has stated that Rule 9(b) applies whenever a claim is grounded upon alleged fraudulent conduct. Kennedy v. Venrock Associates, 348 F.3d 584, 593-94 (7th Cir. 2003); see also Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007) (whether Rule 9(b) applies is fact-based inquiry that depends on nature of plaintiff's factual allegations). In this case, Apple alleges in its antitrust counterclaim that Motorola "intentionally ma[de] false and deceptive F/RAND commitments [and] failed to disclose Declared-Essential Patents in a timely

24

**A45**

manner." Apple's Cpt., dkt. #1, at ¶ 165. Apple must plead these allegations of fraudulent conduct with particularity, identifying the "who, what, when, where and how" of the fraud. Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co., 631 F.3d 436, 441-42 (7th Cir. 2011).

To plead a viable antitrust claim under § 2 of the Sherman Act, Apple must plausibly allege (1) that Motorola has achieved monopoly power in a relevant market and (2) that it achieved monopoly power through anti-competitive or exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 571 (1966). Motorola contends that Apple has not alleged that Motorola engaged in anticompetitve conduct and has not alleged that Motorola has achieved monopoly power in a particular market. In addition, Motorola contends that Apple's allegations do not satisfy Rule 9(b) because Apple has failed to identify who made the allegedly false licensing commitments or failed to disclose essential patents, when the false commitments or untimely disclosures were made, the method by which the allegedly false commitments were communicated or the place the commitments were made.

Apple's theory of antitrust liability is fairly novel and has not been considered in this circuit. However, Apple's allegations in this case are similar to those made by the plaintiff in Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297 (3d Cir. 2007), a case involving two mobile wireless telephone companies. Broadcom filed suit against Qualcomm, alleging that

25

Qualcomm, a member of the European Telecommunications Standards Institute, had convinced the Institute to incorporate its technology into standards "in reliance on . . . Qualcomm's commitment to license that technology on [fair, reasonable and non-discriminatory] terms." Id. at 304. Broadcom argued that Qualcomm had later gone back on its word, and was "witholding favorable pricing," in order to obtain a bigger market share. Id.

The court of appeals stated that "the [licensing] commitments that [standards setting organizations] required of vendors were intended as a bulwark against unlawful monopoly." Id. Alternatively, the court stated, the organizations "might have chosen nonproprietary technologies for inclusion in the standard" or chosen other ways to prevent the use of standards from automatically granting monopoly power to essential patent holders. Id. The court held that "a patent holder's intentionally false promise to license essential proprietary technology on [fair, reasonable and non-discriminatory terms], . . . coupled with a [standards setting organization's] reliance on that promise . . . and the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct." Id. at 314; see also Clamp-All Corp. v. Cast Iron Soil Pipe Institute, 851 F.2d 478, 488 (1st Cir. 1988) (acknowledging possibility of antitrust claim where firms both prevented standards setting organization from adopting beneficial standard and did so through "unfair, or improper practices or procedures").

The court's reasoning in Broadcom applies to the facts alleged by Apple in support

26

**A47**

of its antitrust counterclaim. Apple alleges that Motorola assured the standards setting organizations that it would offer fair, reasonable and non-discriminatory licenses to all its essential patents. In addition, Apple alleges that if Motorola had disclosed to the standards setting organizations that its patents covered the standards, but that it would not offer fair, reasonable and non-discriminatory licenses to all implementers of those standards, the organizations' members may have chosen viable alternative technologies or declined to incorporate into the standards the functions purportedly covered by Motorola's patents. Apple's Cpt., dkt. #1, ¶¶ 77-78; see also Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 501 (1988) (noting need for private standards setting to be free "from being biased by members with economic interests in stifling product competition"). By making false commitments that led to the establishment of worldwide standards incorporating its own patents and eliminating competing alternative technologies, Motorola has become a gatekeeper, accruing the power to harm or eliminate competition in the relevant markets if it so desires. Apple alleges that Motorola achieved its gatekeeper status not through "growth or development as a consequence of a superior product, business acumen, or historic accident," Grinnell, 384 U.S. at 570-71, but through Motorola's false promises that it would license its patents on fair, reasonable and non-discriminatory terms. The relevant markets include the various technologies competing to perform the functions covered by Motorola's declared-essential patents for each of the relevant standards. These allegations imply that Motorola engaged in anticompetitive conduct and has achieved monopoly power.

27

Moreover, Apple has alleged injury to itself and the relevant market. Apple alleges that it has suffered the threat of being forced to pay exorbitant royalties, the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license, the expense of multiple patent infringement suits by Motorola and injury to Apple's business and property, specifically, the threat of imminent loss of profits, loss of current and potential customers and loss of goodwill and product image. If Motorola licenses only at exorbitant rates, it will force its competitors to increase prices in the downstream market in order to make a product. Anago, Inc. v. Tecnol Medical Products, Inc., 976 F.2d 248, 249 (5th Cir. 1992) (holding that "[t]ypical anticompetitive effects include increased prices and decreased output"). Thus, Apple's allegations permit an inference that Motorola's alleged anticompetitive conduct and refusal to grant fair, reasonable and non-discriminatory licenses may raise the costs associated with the manufacture and sale of standards compliant downstream products. Finally, Apple's allegations satisfy the heightened pleading standards of Rule 9(b) by identifying the specific patents that Motorola allegedly failed to disclose, the specific patents for which Motorola made fair, reasonable and non-discriminatory commitments, to whom the commitments were made and the dates on which they were made. Therefore I will deny Motorola's motion to dismiss Apple's counterclaims under § 2 of the Sherman Act and the California Business and Professional Code § 17200.

c. Patent misuse and waiver

Apple seeks a declaratory judgment that Motorola's patents are unenforceable as a result of patent misuse and waiver. As an initial matter, Motorola contends that Apple's patent misuse and waiver claims must be dismissed because they are not independent causes of action, but rather affirmative defenses to a charge of infringement. However, Apple points out that the Court of Appeals for the Seventh Circuit has allowed a claim of patent misuse to proceed as an independent equitable cause of action, even before a claim for infringement has been brought. County Materials Corp. v. Allan Block Corp., 502 F.3d 730, 733-34 (7th Cir. 2007); Rosenthal Collings Group, LLC v. Trading Technologies International, Inc., 2005 WL 3557947, *6 (N.D. Ill. Dec. 26, 2005) (allowing plaintiff to seek declaratory judgment of patent misuse as affirmative claim for injunctive relief). Thus, I will not dismiss Apple's patent misuse claim on that ground. However, I will dismiss Apple's waiver claim, as Apple has not cited any legal authority allowing waiver as a cause of action and I am aware of none.

To state a claim for patent misuse, Apple must allege facts showing that Motorola has employed anticompetitive practices in an effort to extend its patent grant beyond its statutory limits. USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 510 (7th Cir. 1982); see also Princo Corp. v. International Trade Commission, 616 F.3d 1318, 1328 (Fed. Cir. 2010) ("What patent misuse is about, in short, is 'patent leverage,' i.e., the use of patent power to impose overbroad conditions on the use of the patent in suit that are not within the reach of the monopoly granted by the Government.") As explained in the context of

29

Apple's antitrust claims above, Apple's allegations support an inference that the license Motorola seeks to impose on Apple extend beyond the reach of a lawful patent monopoly. This is sufficient to state a claim for patent misuse.

d.  Promissory estoppel

To survive a motion to dismiss on a promissory estoppel claim, Apple must plead that Motorola made a promise that it should have reasonably expected to cause Apple to change its position, and that the promise caused Apple to change position in such a manner that injustice can be avoided only by enforcing the promise.  Hoffman v. Red Owl Stores, Inc., 26 Wis. 2d 683, 693-94 133 N.W.2d 267, 273-74 (1965).  Motorola contends that Apple's promissory estoppel claim should be dismissed as inadequately pleaded because Apple has not alleged that Motorola made any promise to Apple.  I disagree.

Apple alleges that Motorola made promises to the standards setting organizations through its commitments that it would license any essential patents under fair, reasonable and non-discriminatory terms.  Apple's Cpt., dkt. #1, ¶¶ 27-45; 118.  Apple alleges that the intended purpose of Motorola's promises was to induce reliance and that Motorola "knew or should have reasonably expected that this promise would induce sellers of mobile wireless devices, like Apple, to develop products compliant with the relevant standards."  Id. ¶ 119. Apple alleges that it "invested billions of dollars in the applicable technology and developed and marketed its products and services in reliance on Motorola's (and others') promises . .

. including designing its products and services to be compliant with adopted standards." Id. ¶ 120. Finally, Apple alleges that it has been harmed as a result of its reasonable reliance on Motorola's promises and is threatened by loss of profits, customers, goodwill and product image, uncertainty in business planning and uncertainty among customers and potential customers. These facts are sufficient to state a claim for promissory estoppel.

e. Tortious interference with contract

Apple contends that Motorola unlawfully interfered with Apple's and Qualcomm's contract when Motorola terminated its own contract with Qualcomm solely with respect to Qualcomm's business with Apple. Motorola contends that Apple's claim for tortious interference must be dismissed because Apple has pleaded insufficient allegations regarding the contracts at issue, the harm plaintiff suffered or whether Motorola was justified or privileged to interfere with Apple and Qualcomm's contract. To state a claim for tortious interference, Apple must plead that (1) Apple had a current or prospective contractual relationship with a third party; (2) Motorola interfered with that relationship; (3) the interference was intentional; (4) a causal connection exists between Motorola's interference and Apple's damages; and (5) Motorola was not justified or privileged to interfere. Wolnak v. Cardiovascular & Thoracic Surgeons of Central Wisconsin, 2005 WI App 217, ¶ 14, 287 Wis. 2d 560, 574, 706 N.W.2d 667, 675 (citing Duct-O-Wire Co. v. United States Crane, Inc., 31 F.3d 506, 509 (7th Cir. 1994)).

31

Accepting Apple's allegations as true, I conclude that Apple has included sufficient facts in its complaint to state a claim for tortious interference. Apple alleges that under a December 2009 contract, it agreed to purchase chipsets from Qualcomm incorporating technology that Qualcomm licensed from Motorola. Apple's Cpt., dkt. #1, ¶ 46. In addition, Apple alleges that on January 11, 2011, the same day that Apple announced the Verizon iPhone, Motorola sent a letter to Qualcomm, identifying Apple as Qualcomm's customer and stating its intent to terminate any and all license covenant rights with respect to Apple, effective February 10, 2011. Id. ¶ 48. These allegations allow an inference that Motorola was aware of Qualcomm's contract with Apple. See also id. ¶ 195 ("Motorola knew of the [Apple-Qualcomm] contract and intended to interfere with the performance of this contract.")

Also, Apple alleges that it "made substantial investments in the research, design, manufacture, and marketing of wireless communication handsets . . . [including its] CDMA-2000-compliant version of its iPhone 4, which will utilize Qualcomm components" and that Motorola's selective termination of the Motorola-Qualcomm contract "will cause harm to Apple's business and/or property" and will "disadvantage Apple in relation to the other customers of Qualcomm who are Apple's competitors and are unaffected and can continue to receive their bargained for products." Id. ¶¶ 47, 50, 51, 196. This is sufficient to plead that Motorola's actions have harmed Apple. Duct-O-Wire Co., 31 F.3d at 509 (holding that plaintiff had shown harm by claiming deprivation of sales by competitor-defendant);

32

**A53**

<u>Magnum Radio, Inc. v. Brieske</u>, 217 Wis. 2d 130, 140, 577 N.W.2d 377, 380-81 (Ct. App. 1998) (holding that plaintiff had properly stated tortious interference claim where defendant's actions made performance of underlying contract "more expensive or burdensome").

Finally, Apple's conclusory allegation that "Motorola had no basis under its agreements with Qualcomm or otherwise for this selective, partial termination," <u>id.</u> ¶ 49, is sufficient at this stage because the ultimate burden for demonstrating privilege is on Motorola, not Apple. <u>Wolnak</u>, 2005 WI App 217, ¶ 27 (citing WIS JI-CIVIL 2780); <u>Tele-Port, Inc. v. Ameritech Mobile Communications, Inc.</u>, 49 F. Supp. 2d 1089, 1095 (E.D. Wis. 1999) (explaining that this element "may not even need to be pled by plaintiff because defendant bears the burden on that matter"). Therefore, I will deny Motorola's motion to dismiss Apple's claim for tortious interference with contract.

B. <u>Motorola's Motion to Sever and Consolidate</u>

Under Rule 42 of the Federal Rules of Civil Procedure, a court may bifurcate claims "for convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). In addition, courts may consolidate separate "actions involving a common question of law or fact" pending before it. Fed. R. Civ. P. 42(a). "It is within the court's broad managerial discretion to prevent 'unnecessary duplication of effort in related cases' through 34consolidation or other means." <u>SanDisk Corp. v. Phison Electronics Corp.</u>, 538 F. Supp.

33

2d 1060, 1068 (W.D. Wis. 2008) (quoting E.E.O.C. v. G-K-G, Inc., 39 F.3d 740, 745 (7th Cir. 1994)).

Motorola contends that because all of the essential patents at issue in the '178 case have been asserted in the '661 and '662 infringement actions, the '178 case should be severed and consolidated with the '661 and '662 cases. In particular, Motorola contends that Apple's estoppel, waiver, breach of contract, declaratory judgment, antitrust and unfair competition claims involving the '712, '230, '193, '559 and '898 patents should be severed from the '178 case and consolidated with the '662 case in which Motorola has asserted infringement claims regarding those five patents. In addition, Apple's estoppel, waiver, breach of contract, declaratory judgment, antitrust and unfair competition claims involving the '223 and '697 declared-essential patents should be severed from the '178 case and consolidated with the '661 case in which Motorola has asserted infringement claims regarding those two patents. Apple's claims involving the '223 and '697 patents would be stayed along with the rest of the '661 case. In fact, Motorola contends that Apple's claims involving the '223 and '697 patents must be stayed because they are subject to the mandatory stay provision in 28 U.S.C. § 1659.

For its part, Apple contends that the case cannot be severed for several reasons and rather, should proceed on an accelerated schedule so that the claims in this case can be decided before the patent infringement claims in the '661 and '662 cases are resolved. According to Apple, resolution of its breach of contract claims will "alleviate the need for

34

resolution of the infringement actions related to the essential patents." Dkt. #86. (Apple's argument assumes that it will succeed on its breach of contract claims, resulting in a license to Motorola's patents and mooting Motorola's infringement claims.) Essentially, both parties want their own affirmative claims adjudicated first and believe that their proposed organization plan will allow them to achieve that.

As an initial matter, I am not persuaded that the mandatory stay provision in 28 U.S.C. § 1659 applies to Apple's claims in this case. Under that provision, "at the request of a party to the civil action that is also a respondent in the proceeding before the [International Trade] Commission, the district court shall stay . . . proceedings in the civil action with respect to any claim that involves the same issues involved in the proceeding before the Commission" until the Commission's determination becomes final. 28 U.S.C. § 1659(a). The provision does not apply in this case, for two reasons. First, only a party that is a respondent in the Commission may seek a stay under § 1659. Motorola is not the respondent in the Commission; Apple is. Nno claims related to the '223 and '697 patents or any other subject are pending against Motorola in the Commission's '745 investigation.

Second, as I explained in a previous case, § 1659 was enacted to protect importers and producers from *identical* patent claims and defenses. SanDisk Corp., 538 F. Supp. 2d at 1065. This means that a stay is required only when parallel claims involving the same issues about the same patent are pending in the Commission and in the district court. In this case, Apple's breach of contract and antitrust claims are pending only in this court; they are not

pending before the Commission. The patent infringement claims being litigated in the Commission do not involve the same issues as Apple's non-patent counterclaims asserted in this case. In addition, although Apple has asserted a defense in the Commission of unclean hands related to Motorola's licensing commitments to standards setting organizations, the elements of that defense are different from the issues that must be resolved with respect to Apple's breach of contract and antitrust counterclaims. Thus, although some of the facts relevant to Apple's unclean hands defense will overlap with the claims it is asserting in this case, the legal issues are not the same. Therefore, any decision to sever, consolidate and stay Apple's claims in this case would be based on the court's discretionary powers and Fed. R. Civ. P. 42.

Severing this case and consolidating it with the '661 and '662 cases would provide some benefits, assuming the court were willing to stay discovery and decision on Apple's non-patent counterclaims. Although those counterclaims involve a host of issues not related to Motorola's infringement claims, discovery into these issues may ultimately be unnecessary because the resolution of Motorola's patent infringement claims could completely dispose of these counterclaims. In addition, Apple's counterclaims have factual overlap with some of the defenses it has asserted in the patent infringement case, including its estoppel defenses based on Motorola's alleged failure to license its patents on fair, reasonable and non-discriminatory terms.

That being said, I am not convinced that severing this case will result in increased

36

efficiency overall. As an initial matter, Motorola has not explained how Apple's claims can be separated cleanly into either the '661 or '662 case. For example, Apple's claim for tortious interference seems to be unrelated to the patent infringement cases and it would make no sense to consolidate it with one of the patent infringement cases. Thus, rather than eliminate the 11-cv-178 case, severance would merely spread Apple's claims into three cases.

In addition, I concluded in the context of the ripeness discussion above that the primary factual and legal questions necessary to resolve Apple's counterclaims are distinct from those necessary to resolve the patent infringement claims. Further, the facts and legal issues relevant to the parties' disputes regarding whether Motorola has offered Apple a license on fair, reasonable and non-discriminatory terms cannot necessarily be separated on the basis of the particular patent at issue. It became clear at the preliminary injunction hearing that Motorola's license offers to Apple are not based on individual patents; rather, Motorola offers to license its essential patents as a package deal. Presumably, this package includes patents at issue in both the '661 and '662 cases. Thus, it would be difficult to determine whether Motorola has made a fair, reasonable and non-discriminatory offer to Apple with respect to the patents in the '662 case, without considering the inclusion of the patents in the '661 case as part of the offer. Similarly, Apple's antitrust allegations suggest that Motorola has obtained a monopoly in the relevant markets by its ownership of several declared-essential patents. The facts relevant to the antitrust claim will necessarily include facts regarding Motorola ownership and licensing offers related to patents in both the '661

37

**A58**

and '662 cases.  For these reasons, I will deny Motorola's motion to sever and consolidate this case.

ORDER

IT IS ORDERED that

1.  Defendant Motorola Mobility, Inc.'s motion to dismiss, dkt. #33, is GRANTED with respect to plaintiff Apple Inc.'s claim of waiver and DENIED in all other respects. Plaintiff's claim of waiver is DISMISSED for failure to state a claim upon which relief may be granted.

2.  Defendant's motion to sever and consolidate, dkt. #39, is DENIED.

Entered this 7th day of June, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

38

# OPINION AND ORDER
# DATED AUGUST 10, 2012 (DKT 194)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                                       OPINION and ORDER

                Plaintiff,

                                11-cv-178-bbc

        v.

MOTOROLA MOBILITY, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case originated in the International Trade Commission, where defendant Motorola Mobility, Inc. filed an infringement action against plaintiff Apple, Inc., seeking an exclusion order that would have prevented Apple from selling its allegedly infringing products in the United States. After the case had been pending for a few months in the Commission, Apple filed several counterclaims against Motorola and removed the counterclaims to this court under 19 U.S.C. § 1337(c). In its counterclaims, Apple alleges that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by failing to timely disclose ownership of patents that it now declares are essential to technological standards adopted by the industry and by failing to offer Apple licenses to those patents on fair, reasonable and nondiscriminatory terms.

Now before the court are the parties' cross motions for summary judgment. Motorola has moved for summary judgment on all of Apple's claims on a variety of grounds. Dkt.

1

**A60**

#150.  Motorola contends that Apple's claims are barred by the doctrine of claim preclusion because Apple could have pursued them as defenses in the International Trade Commission.  Motorola also contends that Apple's antitrust claims are barred by the applicable statute of limitations and by the <u>Noerr-Pennington</u> doctrine, which provides immunity from antitrust claims that are filed in response to nonfrivolous lawsuits.  Finally, Motorola contends that Apple cannot prove the necessary elements of its tortious interference claim or its claims of unfair competition under California law and cannot prove that it suffered any damages compensable as contractual damages.

Apple has moved for partial summary judgment on specific issues relevant to its claims.  Dkt. #143.  In particular, Apple seeks determinations from the court that (1) Motorola's commitments to standards-setting organizations are contractually binding; (2) Apple has the right to enforce those contracts as a third-party beneficiary; (3) Motorola was required under the policies of the European Telecommunications Standards Institute (ETSI) to disclose its patents and patent applications before ETSI adopted technical standards incorporating technology covered by the patents or applications; and (4) Motorola did not disclose certain patents or applications until after ETSI adopted the standards incorporating technology from those patents.

After reviewing the parties' arguments and the facts in the record, I conclude that Motorola's motion must be granted in part and denied in part, and Apple's motion must be granted in full.  With respect to Motorola's motion, I conclude that Apple's claims are not barred by the doctrine of claim preclusion, but that the <u>Noerr-Pennington</u> doctrine provides

2

**A61**

Motorola immunity from Apple's antitrust and unfair competition claims premised on Motorola's patent infringement litigation and from Apple's claims for declaratory judgment, to the extent that those claims are premised on a theory of antitrust or unfair competition. Because I conclude that <u>Noerr-Pennington</u> immunity applies, I need not consider Motorola's statute of limitations argument.

Additionally, I conclude that Motorola is entitled to summary judgment on Apple's claim that Motorola tortiously interfered with its contract with Qualcomm, as well as Apple's claim under Cal. Bus. & Prof. Code § 17200 based on the same theory, because Apple has failed to adduce any evidence showing that it suffered damages from Motorola's actions.

However, I conclude that Motorola has failed to show that Apple's breach of contract or estoppel claims should be dismissed for Apple's failure to prove that it suffered any compensable damages. Therefore, I will deny Motorola's motion as to that issue.

With respect to Apple's motion, I conclude that Motorola has failed to show that there is any genuine dispute of material fact regarding the existence of contracts between Motorola and standards-setting organizations; Apple's status as a third-party beneficiary of those contracts; Motorola's obligations to disclose its intellectual property rights in a timely manner; and Motorola's failure to disclose its patents and applications before the adoption of standards incorporating its patents. Therefore, I am granting Apple's motion for summary judgment in full.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A.  Wireless Communication Industry

Plaintiff Apple, Inc. and defendant Motorola Mobility, Inc. are competitors in the wireless communication industry.  Motorola has been a player in the industry for longer than Apple and, since at least 1990, has been a member of numerous international standards-setting organizations devoted to the development of telecommunications and wireless standards.  Through the standards-setting organizations, companies agree on common technological standards so that all compliant products will work together.  Standards lower costs by increasing product manufacturing volume and increase price competition by eliminating the costs for consumers to switch between products manufactured by different firms.

Some technological standards incorporate patented technology.  If a patent claims technology selected by a standards-setting organization, the patent is called an "essential patent."  Many standards-setting organizations have adopted rules related to the disclosure and licensing of essential patents.  The policies often require or encourage members of the organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on fair, reasonable and nondiscriminatory terms to anyone who requests a license.  (These terms are often referred to by the acronyms FRAND or RAND.)  Such rules help to insure that standards do not allow the owners of essential patents to abuse their market power to extort competitors or prevent them from entering the marketplace.

4

**A63**

Two standards-setting organizations are relevant to the motions before the court: The European Telecommunications Standards Institute, known as ETSI; and the Institute of Electrical and Electronics Engineers, known as IEEE. At all relevant times, Motorola has been a member of these standards-setting organizations and has participated in developing technological standards for the wireless communication industry. Both organizations have intellectual property rights policies that address disclosure and licensing of patents that are essential to standards being considered or being adopted by the organizations. Additionally, Motorola has participated in the 3rd Generation Partnership Project, known as the 3G Project, which requires its members to abide by the intellectual property rights policies of ETSI and other standards-setting organizations.

1. <u>European Telecommunications Standards Institute (ETSI)</u>

ETSI is a standards-setting organization located in France that creates technological standards for the telecommunications industry. It has an intellectual property rights policy set forth in Annex 6 of its Rules of Procedure to govern the disclosure of intellectual property rights that are essential to standards being considered by ETSI. Dkt. #148-22. The policy defines "intellectual property right" as "any intellectual property right conferred by statute law including applications therefor. . . [but not] rights relating to . . . confidential information, trade secrets or the like." <u>Id.</u> § 15- 7. Since 1997, ETSI's policy has required members to disclose intellectual property that may be essential to standards. With minor variations, it has stated:

[E]ach MEMBER shall use its reasonable endeavours, in particular during the

5

**A64**

development of a STANDARD or TECHNICAL SPECIFICATION where it
participates, to inform ETSI of ESSENTIAL [intellectual property rights] in
a timely fashion. In particular, a MEMBER submitting a technical proposal for
a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis,
draw the attention of ETSI to any of that MEMBER's [intellectual property
rights] which might be ESSENTIAL if that proposal is adopted.

Id. § 4.1. The policy does not define "reasonable endeavours" or "bona fide basis."
However, it is generally understood that members of ETSI should disclose intellectual
property rights that they know are relevant to potential standards while the standard is being
discussed and before the standard is adopted. Generally, the engineers working on the
standards in working groups or technical meetings do not formally disclose intellectual
property rights at those meetings. Whinnett Dep., dkt. #142, at 101; Brown Dep., dkt.
#136 at 291; Smolinske Dep., dkt. #140, at 72-73. Rather, the owner of the intellectual
property right files a formal disclosure with ETSI.

ETSI's intellectual property rights policy also addresses the availability of licenses to
essential intellectual property rights. The policy requires the Director-General of ETSI to
ask owners of essential patents to agree to "grant irrevocable licences on fair, reasonable and
non-discriminatory terms and conditions." Id. § 6.1. Under ETSI's "Guide on Intellectual
Property Rights," the owner of the intellectual property right should notify ETSI of its
willingness to license by submitting an information and licensing declaration that identifies
specific patents or pending applications that may be essential. Guide, dkt. #149-23, § 2.1.2.
An owner may also use a general licensing declaration to notify ETSI that it is willing to
grant licenses for any of its intellectual property rights that become essential to a standard.
However, use of the general licensing declaration "does not take away the obligation for

members to declare essential patents to ETSI." Id.  Owners are not required to disclose any

specific licensing terms and ETSI's policies provide that "[s]pecific licensing terms and

negotiations are commercial issues between the companies and shall not be addressed within

ETSI." Id. § 4.1.

If a patent owner tells ETSI that it is not prepared to license one of its patents that

is relevant to a standard, ETSI's General Assembly reviews the requirements for that

standard to determine whether "a viable alternative technology is available for the standard

or technical specification" that is "not blocked by that [patent]." Dkt. #148-22, § 8.1.1.

If the General Assembly concludes that no such viable alternative technology exists, ETSI

"shall cease" work on the standard.  Id. § 8.1.2.  If the owner who is refusing to grant a

licensee is a member of ETSI, the Director-General of ETSI asks the member to reconsider

its position or provide a written explanation of its reasons for refusing to license its patents.

Id.  The Director-General forwards the written explanation to "ETSI Counselors for their

consideration." Id.

> The objective of ETSI's intellectual property rights policy is to
>
> reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS
> and TECHNICAL SPECIFICATIONS, that investment in the preparation,
> adoption and application of STANDARDS could be wasted as a result of an
> ESSENTIAL [intellectual property right] for a STANDARD or TECHNICAL
> SPECIFICATION being unavailable.  In achieving this objective, the ETSI
> [intellectual property rights policy] seeks a balance between the needs of
> standardization for public use in the field of telecommunications and the
> rights of the owners of [intellectual property rights].

Id. § 3.1.  The policy goes on to state that ETSI "shall take reasonable measures to ensure,

as far as possible," that standards and technical specifications will "be available to potential

users." Id. § 3.3.

ETSI's bylaws provide that any violation of the policy by an ETSI member "shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with ETSI Statutes." Id. § 14.

2. The Institute of Electrical and Electronics Engineers (IEEE)

IEEE is a standards-setting organization responsible for the standardization of wireless information exchange among systems and networks. IEEE's bylaws in place from December 1993 through December 1995 provided that "IEEE standards may include patented technology if there is no equivalent noninfringing way of achieving the objectives of the standard, if it is justified for technical reasons, and if the patent holder agrees to nondiscriminatory licensing at reasonable rates." Dkt. #148-23, § 5.

Between 1996 and 2005, IEEE requested owners of intellectual property rights that are essential to declared standards to submit a letter of assurance that was either a general disclaimer of their right to enforce patent claims against anyone practicing the standards or an agreement to license patent rights "without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." Dkt. #148-26, § 6.

The policies that were approved in February 2011 state that "[n]o license is implied by the submission of a Letter of Assurance," dkt. #7-12, § 6.2, and that IEEE is "not

8

responsible for identifying Essential Patent Claims for which a license may be required, for conducting inquiries into the legal validity or scope of those Patent Claims, or for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory." Id.

B. Motorola's Disclosure of Essential Patents and Commitments to License

Motorola has declared that its United States Patent Nos. 5,636,223 (the '223 patent), 5,311,516 (the '516 patent), 5,572,193 (the '193 patent), and the 5,319,712 (the '712 patent) are essential to the practice of the 802.11 wireless communication standard adopted by IEEE. In 1994, Motorola submitted a declaration to IEEE, stating that Motorola agreed to license any patents essential to the 802.11 standard "on a non-discriminatory basis offering fair and commercially reasonable terms." Dkt. #148-28.

In 2002, Motorola submitted declarations to ETSI and the 3G Project that its 6,175,559 (the '559 patent), 6,246,697 (the '697 patent) and 6,359,898 patents (the '898 patent) are essential or potentially essential to standards adopted by ETSI and the 3G Project. As to the '559 and '697 patents, Motorola declared in a December 20, 2002 letter to ETSI that it "is prepared to grant irrevocable licenses on fair, reasonable and nondiscriminatory terms and conditions under such [patents], to the extent that the [patents] remain essential." Dkt. #148-6. As to the '898 patent, Motorola declared to ETSI in 2003 that it was "prepared to grant irrevocable licenses under the [patents] on terms and

conditions which are in accordance with Clause 6.1 of the ETSI [intellectual property rights] Policy, in respect of the STANDARD, to the extent that the [patents] remain ESSENTIAL." Dkt. #148-3.

### C. Timeliness of Motorola's Disclosures

#### 1. '697 patent

Motorola filed the application that led to the '697 patent on January 24, 1998. In March 1998, Motorola submitted a proposal using the '697 patent's technology to SMG2, the working group developing a portion of the 3GPP standard for the 3G Project. One of the inventors of the '697 patent, Motorola employee Nicolas Whinnett, participated in SMG2 meetings at that time. Motorola did not disclose the '697 patent or application to ETSI, a partner in the 3G Project, or to the SMG2 working group.

In July 1999, the '697 patent inventors wrote an article discussing the technology of the '697 patent. They filed applications for foreign counterparts of the '697 patent that were published on July 29, 1999 and November 22, 2000.

The 3GPP standard, including technology covered by the '697 patent, was adopted by the 3G Project in December 1999. The '697 patent issued on June 12, 2001. Motorola disclosed the '697 patent to ETSI on September 20, 2002.

#### 2. '559 patent

Motorola filed the application that led to the '559 patent on July 7, 1999. On July

10

13-16, 1999 at an ETSI meeting in Finland, Tyler Brown, a representative of Motorola and the sole inventor of the '559 patent, proposed including technology covered by the '599 patent in a portion of ETSI's Universal Mobile Telecommunications System standard (known as the UMTS standard). Motorola did not disclose the '559 application. In March 2000, the relevant section of the standard was finalized and adopted. The '559 patent issued on January 16, 2001. Motorola disclosed the '559 patent as essential to the standard in September 2002.

### 3. '898 patent

Motorola filed a provisional, unpublished application that led to the '898 patent on September 2, 1997. At a meeting in Sophia Antipolis, France, in November 1997, Motorola submitted "Contribution A330" to the ETSI working group developing a portion of the GPRS Technical Specification. Motorola's Contribution A330 was created, in part, by two inventors of the '898 patent and it disclosed in nearly verbatim form the same technology that was described in a portion of the specification of the September 1997 patent application. On March 11, 1999, Motorola's application that resulted in the '898 patent was published when Motorola applied for foreign counterparts to the application. In April 2001, ETSI published the portion of the GPRS standard that incorporated the ideas from Motorola's Contribution A330.

The '898 patent issued on March 19, 2002. Motorola disclosed the '898 patent to ETSI on April 8, 2003.

11

**A70**

### D. Negotiations for Licensing between Apple and Motorola

In 2005, Apple began developing the iPhone. No later than mid-2006, Apple became aware that Motorola had declared patents essential to cellular standards. Apple released its iPhone in 2007 without seeking a patent license from Motorola.

In August 2007, Motorola offered Apple a license to its essential patents. At the initial meeting between the companies, Motorola presented information to Apple concerning its licensing program and stated that its standard royalty rate was 2.25% for a worldwide license to its portfolio of standards-essential patents. Apple rejected the 2.25% rate. Motorola continued to engage in license negotiations with Apple for approximately three years, but Apple refused to accept a license on any terms offered by Motorola.

### E. Motorola's Termination of the Qualcomm License

Apple entered into a "Strategic Terms Agreement" with Qualcomm on December 16, 2009. Dkt. #153-40. The agreement set terms on which "certain Apple authorized purchasers may purchase certain components from time to time from" a Qualcomm affiliate "for use and incorporation in Apple products." Id. at 1. Among these components are chipsets that allow mobile devices to communicate via cellular networks, including the baseband processor incorporated into the iPhone 4S. The chipsets incorporated technology that Qualcomm had licensed from Motorola since 1990. The Strategic Terms Agreement did not require Apple or any of its affiliates to actually purchase chipsets and also did not guarantee that the chipsets or any other components supplied by Qualcomm would be

12

**A71**

licensed under Motorola's or any other patent holder's patents.

On January 11, 2011, the day Apple announced the Verizon iPhone 4, Motorola sent a letter to Qualcomm, with a copy to Apple, stating that Motorola was terminating any and all license and covenant rights with respect to Qualcomm's business with Apple, effective February 10, 2011.

PROCEDURAL HISTORY

A.  Related Cases

This particular dispute is related to three other proceedings.  First, there is the investigation pending in the International Trade Commission that defendant Motorola initiated on October 6, 2010.  In the Matter of Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof, ITC Investigation No. 337-TA-745.  In that case, Motorola sought an exclusion order and a permanent cease and desist order as a result of plaintiff Apple's alleged infringement of several of Motorola's United States patents, including the '697 and '223 patents.

As part of its original defenses in the International Trade Commission action, Apple argued that Motorola should be barred from enforcing its patents because it had unclean hands and had failed to offer licenses on fair, reasonable and nondiscriminatory terms.  In July 20, 2011, Apple notified the commission that it would "not be pursuing as part of the 745 investigation any affirmative defenses based on Motorola's failure to make a [fair reasonable and nondiscriminatory] Offer," but that it was "specifically reserv[ing] the right

13

**A72**

. . . to pursue any of these defenses . . . and claims related to them in other actions, including for example, the 661, 662, and 178 actions pending in Wisconsin."  Dkt. #153-35.

On April 24, 2012, the administrative law judge issued a preliminary ruling in the International Trade Commission action, finding Motorola's '697 patent valid and infringed by Apple.  Dkt. #153-34.  (Before this determination, Motorola abandoned its infringement claims as to some of its patents.)  The administrative law judge rejected Apple's unclean hands defense, noting that Apple had no "proof that any act of Motorola actually caused any harm (to anyone)."  Id. at 151.

Second (and third), the parties are litigating their disputes in two other patent infringement cases filed in this court.  Plaintiff Apple filed case number 10-cv-661-bbc on October 29, 2010, asserting patent infringement claims against Motorola.  On November 9, 2010, Motorola filed counterclaims in the '661 action alleging infringement of the same patents at issue in the International Trade Commission's 337-TA-745 investigation.  On December 2, 2010, this court granted the parties' joint motion to stay the '661 case in favor of the proceedings in the commission.  The case remains stayed.

Also on October 29, 2010, plaintiff Apple filed case number 10-cv-662-bbc in this court, asserting patent infringement claims against Motorola.  On November 9, 2010, Motorola filed counterclaims against Apple for infringement of several of its United States patents, including the '516, '712, '230, '193, '559 and '898 patents, all of which Motorola has declared essential to certain standards adopted in the wireless communications industry. The 10-cv-662 case was transferred to the Northern District of Illinois in December 2011.,

14

**A73**

where the case was dismissed with prejudice on June 22, 2012. The court found that Motorola's patents were either invalid, not infringed by Apple or that Motorola could not prove the amount of damages to which it was entitled. <u>Apple, Inc. v. Motorola, Inc.</u>, 2012 WL 2376664 (N.D. Ill. June 22, 2012).

B. <u>The Case at Issue (11-cv-178-bbc)</u>

Shortly after Apple removed this case to federal court, it moved for preliminary injunctive relief, seeking an order that would have enjoined Motorola from (1) proceeding as a party in the 337-TA-745 investigation in the International Trade Commission with respect to the '223 and '697 patents; (2) proceeding with its counterclaims filed in case number 10-cv-662-bbc in this court with respect to the '712, '230, '193, '559 and '898 patents; and (3) selectively terminating its patent license agreement with Qualcomm as to Apple. A hearing was held on the motion on April 26, 2011. At the conclusion of the hearing, I denied Apple's motion for a preliminary injunction.

Motorola filed a motion to dismiss Apple's claims, which I granted only with respect to Apple's claim of waiver. Apple has the following 10 claims remaining in the case:

- Equitable estoppel (Count 1)

- Breach of contract with ETSI/3GPP (Count 2)

- Breach of contract with ETSI/3GPP to which Apple is a third party beneficiary (Count 3)

- Breach of contract with IEEE to which Apple is a third party beneficiary (Count 4)

- False commitments to license on fair, reasonable and nondiscriminatory terms and

15

**A74**

deceptive acts in violation of § 2 of the Sherman Act (Count 5)

• Unfair competition and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 (Count 6)

• Declaratory judgment that Motorola's offers have not been on fair, reasonable and nondiscriminatory terms (Count 7)

• Declaratory judgment on no entitlement to injunctive relief (Count 11)

• Declaratory judgment of patent misuse (Count 12)

• Interference with contract (Count 13)

Apple's Am. Cpt., dkt. #110.

OPINION

A. Motorola's Motion for Summary Judgment

1. Claim preclusion

Motorola contends that all of Apple's claims are barred by the doctrine of "res judicata" because Apple could have raised them in the International Trade Commission as defenses to Motorola's infringement claims, or did raise them there and they were rejected. Specifically, in the International Trade Commission action, Apple abandoned its argument that Motorola's patents were unenforceable because Motorola refused to license its patents on reasonable and nondiscriminatory terms. Apple did argue that Motorola's '697 patent was unenforceable under the doctrine of "unclean hands," but the administrative law judge rejected the argument and found that the '697 patent was valid and had been infringed by Apple.

16

**A75**

Res judicata is the traditional term for the doctrine of claim preclusion, but is sometimes used generally to refer to both claim and issue preclusion. Hayes v. City of Chicago, 670 F.3d 810, 814 n.1 (7th Cir. 2012). Motorola does not identify whether it is intending to invoke claim or issue preclusion, but the majority of cases it cites concern claim preclusion. Thus, I am assuming that Motorola is arguing for the application of claim preclusion.

Claim preclusion "prohibits litigants from relitigating claims that were or could have been litigated during an earlier proceeding." Id. at 813. The case on which Motorola relies primarily is Martino v. McDonald's System, Inc., 598 F.2d 1079 (7th Cir. 1979), in which the court of appeals held that the plaintiff was barred from bringing an antitrust claim that would have undermined a previous consent judgment issued by a federal district court against the plaintiff. Id. at 1083. The court explained that "res judicata . . . treats a judgment on the merits as an absolute bar to relitigation between the parties . . . of every matter offered and received to sustain or defeat the claim or demand and to every matter which might have been received for that purpose." Id.

This case is distinguishable from Martino and the other cases cited by Motorola. In Martino, the plaintiff was attempting to attack a judgment issued by a federal court; in this case, Apple is asserting counterclaims that have the potential to undermine the International Trade Commission's decision regarding Apple's infringement of Motorola's patents. It is well established law that decisions of the International Trade Commission on issues of patent validity and enforceability are not entitled to preclusive effect. E.g., Powertech

17

**A76**

Technology Inc. v. Tessera, Inc., 660 F.3d 1301, 1308 (Fed. Cir. 2011) ("resolution of the ITC action will not have preclusive effect" on district court action); Bio-Technology General Corp. v. Genentech, Inc., 80 F.3d 1553, 1564 (Fed. Cir. 1996); Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996); Texas Instruments Inc. v. International Trade Commission, 851 F.2d 342, 344 (Fed. Cir. 1988).

Motorola argues that the general rule against granting preclusive effect to International Trade Commission determinations does not apply here because there is no rule barring a district court from giving preclusive effect to the commission's decisions on "non-patent" issues, such as Apple's antitrust, estoppel and contract claims. Motorola cites three cases that it believes support its position. In the first two cases, Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992) and Baltimore Luggage Co. v. Samsonite Corp., 1992 WL 296368, *4 (4th Cir. 1992), the courts held that it was appropriate to give preclusive effect to commission decisions concerning antitrust and unfair competition. However, neither of those cases is particularly useful because neither involved decisions from the commission arising out of patent disputes.

The third case cited by Motorola, Telectronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832 (S.D.N.Y. 1988), is more helpful to its position. In Telectronics, the district court concluded that it was appropriate to apply issue preclusion to the commission's determination regarding a license defense to a patent dispute. The court distinguished between different types of defenses to patent infringement, stating that "[u]nlike invalidity and unenforeability, noninfringement is not a defense based on the validity of a patent.

18

**A77**

Rather, it is a defense based on a contractual right to use the patent, or on defendant's lack of use of the patent." Id. at 846, n.40. The court concluded that "the ITC's determination as regards the existence of a license under a patent . . . was not one of the validity of a patent but of the existence of a contract" and should be "accorded preclusive effect." Id. at 845-46.

However, unlike the district court in Telectronics, the Court of Appeals for the Federal Circuit has not distinguished between types of defenses to patent infringement when discussing the preclusive effect of International Trade Commission decisions. As the court of appeals explained in Texas Instruments, 90 F.3d at 1569, "once we accept . . . that ITC decisions are not binding on district courts in subsequent cases brought before them, it necessarily follows that accused infringers can raise *whatever defenses they believe are justified*, regardless whether they previously raised them and lost in the ITC." (Emphasis added). See also Epistar Corp. v. Philips Lumileds Lighting Co., 2008 WL 3930030, *2-4 (N.D. Cal. Aug. 26, 2008) (patent defendant not precluded from raising defenses of license and covenant not to sue in district court patent infringement action even though it had waived those defenses in International Trade Commission).

In Texas Instruments, the court of appeals recognized that any defense an alleged infringer raises is properly treated as a "patent issue" for purposes of determining whether preclusion principles should apply. In this case, it is clear from Motorola's arguments that it is seeking to give preclusive effect to the International Trade Commission's decision on "patent issues." By seeking to bar Apple from presenting any claim that would undermine the commission's determination of validity and infringement, in effect, Motorola is asking

19

**A78**

the court to give preclusive affect to the commission's conclusions regarding the enforceability of Motorola's patents. Motorola admits as much in its brief, stating that the defenses that Apple abandoned in the commission challenged whether "the patents are unenforceable." Motorola's Br., dkt. #151, at 5.

Motorola attempts to avoid the rule of Texas Instruments by arguing that the rule against giving preclusive affect to commission decisions applies only when an alleged patent infringer is facing parallel infringement claims before the commission and district court. Motorola contends that this case is different because Apple has not challenged Motorola's patent disclosures and licensing offers as defenses to an infringement claim, but as affirmative claims that constitute a direct attack on the commission's decisions. However, Motorola cites no cases suggesting that a commission decision should be given preclusive effect in some types of district court cases and not others.

Moreover, Motorola's claim preclusion argument fails for another reason. The claims Apple is pursuing in this case originated as "counterclaims" in the International Trade Commission that were subject to mandatory removal. 19 U.S.C. § 1337(c); 19 C.F.R. § 210.14(e). Thus, the commission never had jurisdiction to hear Apple's counterclaims or to grant the type of relief that Apple is seeking in this case. The doctrine of claim preclusion does not bar a party from asserting claims that could not have been raised in a previous proceeding. Carver v. Nall, 172 F.3d 513, 516 (7th Cir. 1999) ("Claim preclusion does not operate so harshly as to bar whichever set of claims the chosen forum could not hear."). See also Bio-Technology, 80 F.3d at 1563 ("[T]he bar against later claims based on the same

transactional facts is 'subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation.'") (citation omitted). Accordingly, Motorola is not entitled to summary judgment on the basis of claim preclusion.

2. Noerr-Pennington doctrine

Next, Motorola contends that all of Apple's claims are barred by the First Amendment under the Noerr-Pennington doctrine. The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Under the Noerr-Pennington doctrine, a party that exercises its First Amendment right to petition the government for redress generally is immune from antitrust liability premised on the petition. Eastern Railroad Presidents Conferance v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 670 (1965)). This includes a party who brings a legitimate dispute to the courts for judicial resolution. Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 56 (1993); California Motor Transportation Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972). However, petitioning conduct is not immune if it is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationship of a competitor." Noerr, 365 U.S. at 144. Motorola contends that Apple's claims in this case are based solely on Motorola's patent litigation in the International Trade Commission and district court, and that because its patent litigation is protected petitioning

21

**A80**

activity, Motorola is immune from liability on Apple's claims.

Apple does not deny that initiating and prosecuting a patent infringement action is the type of petitioning activity protected by the <u>Noerr-Pennington</u> doctrine, and several courts have reached the same conclusion.  <u>See, e.g.</u>, <u>ERBE Elektromedizin GmbH v. Canady Technology LLC</u>, 629 F.3d 1278, 1292 (Fed. Cir. 2010); <u>Monolithic Power Systems, Inc. v. O2 Micro International Ltd.</u>, 2007 WL 801886, *6 (N.D. Cal. Mar. 14, 2007); <u>Hyniz Semiconductor Inc. v. Rambus, Inc.</u>, 2006 WL 1883353, *1-2 (N.D. Cal. July 7, 2006); <u>In re Relafen Antitrust Litigation</u>, 360 F. Supp. 2d 166, 177-78 (D. Mass. 2005).  However, Apple contends that the immunity does not apply to any of its claims because they are not based on Motorola's petitioning activity.

a.  Apple's antitrust claim

Apple contends that its claim under § 2 of the Sherman Act arises out of Motorola's "abuse of the standard-setting process" and "Motorola's deceptive conduct and failure to offer a [fair, reasonable and nondiscriminatory] license."  Apple's Br., dkt. #167, at 6.  In support of its argument, Apple cites <u>ERBE Elekromedizin</u>, 629 F.3d at 1292, in which the Court of Appeals for the Federal Circuit explained that a party's assertion of non-sham claims for "patent infringement, trademark, and trade dress" was protected by <u>Noerr-Pennington</u> from antitrust liability, but that other conduct, including "interfering with and inhibiting the development and marketing of [disputed products], and interfering with . . . contracts and business expectations," could be a basis for antitrust liability.  <u>Id.</u> at 1292-93.

See also Hyniz Semiconductor, 2006 WL 1883353, at *2 (holding that Noerr-Pennington immunity applies only to protected litigation-related activities, but would not immunize defendant from antitrust claims premised on broader unlawful course of anticompetitive conduct).

The problem for Apple is that its allegations and arguments make clear that its antitrust claim is necessarily based on Motorola's patent litigation.  In its brief, Apple contends that its antitrust claim arose sometime in 2007, when Motorola offered it a license with exorbitant royalty rates.  Apple's Br., dkt. #167, at 13 (Apple's injury "could not have arisen until, at the very earliest, Motorola made its first royalty demand in September 2007").  However, Apple has presented no evidence that it suffered any antitrust injury as a result of Motorola's license demand.  It is well established law that a party can sustain an antitrust claim only if it has suffered an antitrust injury.  In re Copper Antitrust Litigation, 436 F.3d 782, 789 (7th Cir. 2006) ("[A]n antitrust cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (citation omitted); Warren General Hospital v. Amgen Inc., 643 F.3d 77, 92 (3d Cir. 2011) ("It is a basic tenet of antitrust law that a cause of action will not lie if the plaintiff has not been harmed.").

In this case, it is undisputed that Apple refused to pay the 2.25% royalty rate that Motorola demanded and continued to manufacture and market its products despite Motorola's demands.  Apple has produced no evidence or argument suggesting that Motorola's licensing demand caused Apple to change its product, delay the release of the

23

**A82**

iPhone, suffer from increased costs or lose any customers or market share.  Instead, the only injury Apple suffered as a result of Motorola's alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation initiated by Motorola. Apple's damages expert identifies no other damages except litigation fees and expenses. Thus, Apple's antitrust claim is premised on Motorola's attempt to enforce its patents. Because Motorola's enforcement of its patents is privileged conduct protected by the First Amendment, the Noerr-Pennington doctrine applies.  Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc., 944 F.2d 1525, 1529 (9th Cir. 1991) (holding that defendant was immune from antitrust liability under Noerr-Pennington because all of plaintiff's claimed antitrust injuries were caused by defendant's enforcement of copyrights, not by defendant's refusal to license its copyrighted work).

Apple devotes one paragraph in its brief to the argument that Motorola may not be entitled to Noerr-Pennington immunity because its patent infringement claims may fall under the "sham" exception to the doctrine.  Apple's Br., dkt. #167, at 9.  As the party asserting the sham exception, Apple has the burden of showing that it should apply.  IGEN International, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 312 (4th Cir. 2003); USS–POSCO Industries v. Contra Costa County Building & Construction Trades Council, AFL–CIO, 31 F.3d 800, 811 (9th Cir. 1994).  A petition or lawsuit may be considered a "sham" if it is (1) "objectively baseless"; and (2) subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief.  Professional Real Estate Investors, 508 U.S. at 61, 65.  Apple makes no real attempt to satisfy either

24

**A83**

prong, stating only that Motorola has dropped two of its patent infringement claims and three others were found to be invalid or not infringed. However, the fact that some or even all of Motorola's patent infringement claims were unsuccessful is not sufficient on its own to show that Motorola's claims are "objectively baseless," particularly in light of the preliminary finding of the International Trade Commission that Apple infringed one of Motorola's patents. Simply stating, without factual support, that Motorola's patent litigation may be a sham is not sufficient to raise a genuine issue of material fact regarding the sham exception. Accordingly, I find that Motorola is immune from Apple's antitrust claim.

b. Apple's claims under Cal. Bus. & Prof. Code § 17200

Apple has two theories to support its claim of unfair competition and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 (count 6). First, Apple contends that Motorola engaged in unlawful business practices when it interfered with Motorola's contract with Qualcomm. The <u>Noerr-Pennington</u> doctrine is not applicable to that theory because Motorola's actions toward Qualcomm are separate and distinct from Motorola's protected activity of patent litigation. However, Apple's second theory of liability in count 6 is premised on the same allegations as its antitrust claim under § 2 of the Sherman Act. In particular, Apple contends that Motorola engaged in unfair competition when it promised standards-setting organizations that it would disclose essential patents and license those patents on reasonable and nondiscriminatory terms, and later failed to disclose

25

**A84**

the patents in a timely manner, refused to offer Apple a reasonable and nondiscriminatory license and sued Apple for patent infringement.

As with Apple's antitrust claim, a violation of Cal. Bus. & Prof. Code § 17200, requires showing that the unfair practice caused the plaintiff an economic injury. Kwikset Corp. v. Superior Ct., 246 P.3d 877, 884-85 (holding that party asserting unfair competition or unlawful business practices claim must "establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury . . . and show that that economic injury was the result of, i.e., caused by, the unfair business practice . . . that is the gravamen of the claim"). The only economic injury Apple suffered is the cost of defending itself from Motorola's infringement claims. Thus, Motorola is immune from Apple's unfair competition claim that is premised on the same theory as Apple's antitrust claim. Monolithic Power Systems, 2007 WL 801886, at *6 (holding that Noerr-Pennington can provide immunity against California unfair competition claims).

c. Apple's other claims

Motorola contends that the Noerr-Pennington doctrine provides immunity not just to Apple's statutory antitrust and unfair competition claims, but to Apple's contract and tort claims also. As Motorola points out, courts have applied the Noerr-Pennington doctrine outside the antitrust context. Theme Promotions, Inc. v. News America Marketing FSI, 546 F.3d 991, 1006-1007 (9th Cir. 2008) (applying doctrine to claim for tortious interference with prospective economic advantage under California law); International Brotherhood of

26

**A85**

Teamsters v. Philip Morris Inc., 196 F.3d 818, 826 (7th Cir. 1999) (applying <u>Noerr-Pennington</u> immunity to protect petitioning activity from liability for RICO suits); <u>Tarpley v. Keistler</u>, 188 F.3d 788, 794 (7th Cir. 1999) (applying doctrine to § 1983 claims); <u>Video International Production, Inc. v. Warner–Amex Cable Communications, Inc.</u>, 858 F.2d 1075, 1084 (5th Cir. 1988) (applying doctrine to state law claim for tortious interference with contract).  Courts have reasoned that because the <u>Noerr-Pennington</u> doctrine derives from the First Amendment, it should be applied broadly to protect the right to petition the government.  <u>New West, L.P. v. City of Joliet</u>, 491 F.3d 717, 722 (7th Cir. 2007) ("<u>Noerr-Pennington</u> has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses."); <u>White v. Lee</u>, 227 F.3d 1214, 1231 (9th Cir. 2000) (explaining that because "<u>Noerr-Pennington</u> is a label for a form of First Amendment protection . . . to say that one does not have <u>Noerr-Pennington</u> immunity is to conclude that one's petitioning activity is unprotected by the First Amendment"); <u>Kottle v. Northwest Kidney Centers</u>, 146 F.3d 1056, 1059 (9th Cir. 1998) ("the doctrine is a direct application of the Petition Clause").

However, Motorola has cited no authority for the proposition that the <u>Noerr-Pennington</u> doctrine should apply to Apple's breach of contract claims (counts 2, 3, and 4), and I conclude that applying immunity to Motorola from Apple's breach of contract claims is not appropriate.  Although the First Amendment protects Motorola's right to petition the courts to enforce its patents, Apple's breach of contract claims are based on the theory that Motorola agreed by contract that it would not enforce its patent rights until it offered a

27

**A86**

license to Apple on fair, reasonable and nondiscriminatory terms. In other words, Apple contends that Motorola waived some of its petitioning rights through contract. It would be improper to use the <u>Noerr-Pennington</u> doctrine to bar Apple from enforcing that contract. <u>Powertech Technology, Inc. v. Tessera, Inc.</u>, — F. Supp. 2d —, 2012 WL 1835699, *5 (N.D. Cal. May 21, 2012) (concluding that <u>Noerr-Pennington</u> does not provide immunity against breach of contract claims).

Similarly, Motorola has failed to cite any authority or develop any argument for applying <u>Noerr-Pennington</u> to Apple's equitable estoppel claim (count 1), which appears to be an alternative claim to its breach of contract claims. Because Motorola failed to develop any argument about why it should be immune from the equitable estoppel claim or why the estoppel claim should be treated differently from the contract claim, I will not apply <u>Noerr-Pennington</u> to the equitable estoppel claim. Cf. <u>Garg v. Potter</u>, 521 F.3d 731, 736 (7th Cir. 2008) (explaining that undeveloped arguments are waived).

As to Apple's tortious interference with contract claim (count 13), it is clear that this claim is not premised on Motorola's patent litigation. Rather, it is premised on Motorola's actions in relation to Qualcomm. Therefore, the <u>Noerr-Pennington</u> doctrine does not apply to that claim.

Finally, I note that Apple asserts three claims for declaratory judgment in its amended complaint. Apple seeks declarations that the terms of the license offered by Motorola to Apple were not fair, reasonable and nondiscriminatory (count 7); Motorola is not entitled to injunctive relief on its patent infringement claims (count 11); and Motorola misused its

28

**A87**

patents by promising to offer fair licenses and then failing to do so (count 12). It is not clear from Apple's complaint whether its claims for declaratory judgment are based on a contract theory or an antitrust theory. To the extent that they are based on an antitrust theory, Motorola is immune under the <u>Noerr-Pennington</u> doctrine. To the extent that they are based on Apple's breach of contract theory or estoppel theory, they may proceed.

In sum, I am granting Motorola's motion for summary judgment on Apple's antitrust claim (count 5), its claim for unfair competition in violation of Cal. Bus. & Prof. Code § 17200 (count 6) as related to Motorola's licensing and disclosure obligations, and its claims for declaratory relief (counts 7, 11 and 12) to the extent they are based on antitrust or unfair competition theories of liability. Motorola is immune from liability for these claims under the <u>Noerr-Pennington</u> doctrine. I am denying Motorola's motion under the <u>Noerr-Pennington</u> doctrine with respect to Apple's remaining claims.

Because I am dismissing Apple's antitrust claim, I need not consider Motorola's argument that the antitrust claim is barred by the statute of limitations.

3. <u>Apple's tortious interference with contract claim</u>

Motorola has moved for summary judgment on Apple's claim that Motorola tortiously and unlawfully interfered with the Strategic Terms Agreement that Apple had entered into with Qualcomm in December 2009. Apple's Am. Cpt., dkt. #110, ¶¶ 190-195 (count 13). Under that agreement, Apple and Qualcomm agreed to terms under which Apple could purchase chipsets that would be used in Apple's products. The chipsets

incorporated Motorola's patented technology, and Motorola and Qualcomm had entered into a separate licensing agreement regarding the chipsets. Apple contends that Motorola committed the tort of interference with contract by terminating license and covenant rights with respect to Apple.

Apple and Qualcomm are both headquartered in California and both Apple and Motorola assume California law applies to Apple's tortious interference claim. Thus, I will apply California law. Auto-Owners Insurance Co. v. Websolv Computing, Inc., 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (citation omitted). To establish the tort of intentional interference with contract under California law, a plaintiff must show:

> (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

Pacific Gas & Electric Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126, 270 Cal. Rptr. 1 (Cal. 1990).

Motorola contends it is entitled to summary judgment on Apple's tortious interference claim because Apple cannot establish the last two elements of its claim. Specifically, Motorola contends that Apple has not shown that either it or Qualcomm breached the Strategic Terms Agreement or that the agreement was otherwise disrupted and that Apple cannot show that it has suffered any injury as a result of Motorola's terminating its license and covenant rights with respect to Apple.

I agree with Motorola. Apple concedes that Motorola's decision to terminate license

30

**A89**

rights with respect to Apple did not cause Apple or Qualcomm to breach the Strategic Terms Agreement. Motorola's actions did not affect the terms of the agreement itself, because the agreement never purported to guarantee that Qualcomm's chipsets were covered by licenses to third-party patents. Additionally, Apple admits that it has continued to purchase chipsets from Qualcomm under the agreement. Apple's Br., dkt. #167, at 30. Apple does not contend that Motorola's actions have made the chipsets more expensive, that it has been forced to seek chipsets from a different manufacturer or that it has incurred additional licensing fees in response to Motorola's decision to terminate any license and covenant rights Apple may have enjoyed under Motorola's agreement with Qualcomm. In fact, Apple does not even submit evidence about what benefits it would have enjoyed under the licensing agreement and whether it would have paid Qualcomm or Motorola any licensing fees on top of what it paid Qualcomm for chipsets, if Motorola had not terminated license and covenant rights with respect to Apple. Apple implies that the chipsets would have been covered under the Qualcomm's licensing agreement with Motorola, but submits no evidence on the issue.

Apple contends that even though Motorola's actions have not interrupted performance of the contract between Apple and Qualcomm, Motorola's actions constituted tortious interference because they have made performance of the contract "more expensive and burdensome." Pacific Gas & Electric, 50 Cal. 3d at 1127 ("interference which makes enjoyment of a contract more expensive or burdensome may be actionable"). However, Apple has adduced no factual support to show that Motorola has caused its contractual relationship with Qualcomm to be more expensive or burdensome. In its brief, Apple relies

31

**A90**

solely on the allegation that Motorola's actions caused Apple to file a lawsuit in a district court in California to clarify its rights to use chipsets manufactured by Qualcomm without threat of patent infringement litigation from Motorola.  Apple v. Motorola Mobility, Inc., Case No. 12-cv-355 (S.D. Cal.).  Apple argues that the cost of the California litigation qualifies as "damages" arising out of Motorola's tortious interference.

Apple's theory of damages arising out of the California litigation was not pleaded in its complaint.  This makes sense because Apple filed the amended complaint in this case in October 2011 and did not commence the California lawsuit until February 2012.  Even if it were appropriate to consider this new theory of damages, Apple has included no facts about the California lawsuit or its costs in its proposed findings of fact or responses to Motorola's proposed facts.  Apple cannot create a genuine factual dispute sufficient to defeat summary judgment simply by making a factual assertion in its brief.  Moreover, even if I considered Apple's assertions about the California lawsuit, Apple fails to connect its litigation costs to the contract between itself and Qualcomm.  Apple argues that it was forced to litigate to protect its contractual rights.  Apple's Br., dkt. #167, at 31.  However, according to Apple's own description of its litigation, it is not suing to protect its rights under its agreement with Qualcomm.  Rather, it is suing Motorola in an attempt to enforce the terms of *Motorola's* contract with Qualcomm.  Apple's own agreement with Qualcomm did not promise any of the benefits of which Apple now seeks to take advantage.

In sum, Apple has adduced no evidence that Motorola's decision to terminate license and covenant rights with respect to Apple interfered with Apple's rights or benefits under

32

**A91**

its agreement with Qualcomm or made Apple's contract with Qualcomm more expensive or burdensome. Therefore, Motorola is entitled to summary judgment on Apple's claim of tortious interference with contract.

4. Apple's claim under Cal. Bus. & Prof. Code § 17200

As discussed above, Apple's claim under Cal. Bus. & Prof. Code § 17200 can be divided into two separate theories: (1) Motorola violated the law by initiating patent litigation against Apple after failing to offer Apple a license on fair, reasonable and nondiscriminatory terms; and (2) Motorola violated the law by suspending its contract with Qualcomm as it related to Apple.

Motorola has moved for summary judgment on Apple's claim under the first theory, contending that it is barred by California Civil Code § 47(b), which provides that the filing of a lawsuit is privileged activity immune from tort liability. Because I concluded above that the Noerr-Pennington immunity doctrine applies to this claim, I need not address whether the claim would be barred by the California litigation privilege.

With respect to Apple's second theory of liability, Motorola contends that Apple has not proven that it suffered an economic injury, as required under Cal. Bus. & Prof. Code § 17200. Kwikset, 246 P.3d at 884-85. I agree. To defeat Motorola's motion for summary judgment, Apple was required to adduce specific evidence showing that it lost money or property as a result of Motorola's termination of any license and covenant rights that flowed to Apple through Qualcomm. As explained in the discussion of Apple's tortious interference

33

**A92**

claim, Apple has failed to adduce any specific facts on this issue. Therefore, Motorola is entitled to summary judgment on this claim.

### 5. Apple's breach of contract claims

Motorola has moved for partial summary judgment on Apple's breach of contract claims, seeking a determination from the court that Apple has not suffered any damages from the alleged breaches. (Motorola did not move for summary judgment on Apple's request for specific performance of Motorola's contractual obligations.) The only damages Apple seeks to recover through its contract claims are litigation costs. According to Apple's expert's report, Apple believes it is entitled to a minimum of $31,948,128.31 in damages based on "litigation costs, including attorneys' fees, Apple has incurred to date in (1) having to defend the ITC 745 Investigation; (2) having to defend the District Court Case; and (3) prosecuting the [present case] to establish Motorola's violation of its obligations to ETSI and IEEE." Napper Rep., dkt. #153-36 at 6. Motorola contends that litigation costs cannot be recovered as damages from a breach of contract claim.

The first question is what forum's law applies to Apple's contract claims. Apple (a California company) is suing Motorola (an Illinois company) for violation of commitments to ETSI (based in France) and IEEE (based in New York). Both parties agree that ETSI's bylaws are governed by the laws of France, so I will apply French law to Apple's claims involving ETSI. (Under Fed. R. Civ. P. 44.1, courts determining foreign law "may consider any relevant material or source, including testimony, whether or not submitted by a party

34

**A93**

or admissible under the Federal Rules of Evidence." Apple submitted an expert report from Philippe Delebecque regarding French contract law. Dkt. #159. Motorola submitted an excerpt regarding French law on damages from an English language treatise. Barry Nicholas, The French Law of Contract (2d ed. 1992), dkt. #176-1.)

Neither party undertakes an adequate choice of law analysis with respect to claims concerning IEEE, and both sides cite variously to Wisconsin, New York and Illinois law in support of their respective positions. However, it does not appear that there is a conflict among Wisconsin, New York or Illinois law relevant to the issues in this case. Thus, I will apply Wisconsin law to Apple's claims concerning IEEE. Danielson v. Gasper, 2001 WI App 12, ¶ 5, 240 Wis. 2d 633, 623 N.W.2d 182 (under Wisconsin's choice of law principles, if there is no genuine conflict between Wisconsin law and law of other possible state, court applies Wisconsin law); Tanner v. Jupiter Realty Corp., 433 F.3d 913, 915 (7th Cir. 2006) (federal court applies choice of law principles of forum state to determine which state's substantive law governs contract claim).

Motorola contends that under the laws of Wisconsin, France or any other jurisdiction, Apple cannot recover attorney fees as damages for a breach of contract action. However, Motorola does not cite any cases establishing such a bright-line rule. Motorola cites In re Guardianship & Protective Placement of Evelyn O., 214 N.W.2d 434, 571 N.W.2d 700 (1997), and Computer Docking Station Corp. v. Dell, Inc., 547 F. Supp. 2d 948, 951 (W.D. Wis. 2007), for the general "American rule" that a prevailing party may not recover attorneys fees unless authorized by statute or contract. However, Apple is not seeking an

35

**A94**

award of attorney fees to a prevailing party. It is seeking attorney fees as damages incurred because of Motorola's alleged breach of contract.

As Motorola concedes in its reply brief, Wisconsin law allows recovery of attorneys fees as contractual damages in some situations. Motorola's Br., dkt. #173, at 7 (citing Repinksi v. Clintonville Federal Savings & Loan Association, 49 Wis. 2d 53, 58, 181 N.W.2d 351, 354 (1970) ("An award of damages for breach of contract should compensate the injured party for losses necessarily flowing from the breach. . . .When litigation is a natural and proximate result of the breach, recovery may be had as damages for attorney's fees necessarily incurred in that litigation.") (dictum). Additionally, Motorola concedes that French law allows recovery for damages that are the "immediate and direct and foreseeable result of breach." Id. However, Motorola contends that the litigation costs that Apple incurred are not compensable because many specific costs that Apple's expert included in his damages calculations, such as the costs of attorneys' meals and laundry, have too tenuous a relationship to Motorola's alleged breach.

Motorola has not shown that it is entitled to summary judgment on this issue. Its legal analysis is incomplete; it cited no cases discussing whether a party can recover as contract damages the costs it incurred in previous litigation with the same defendant, let alone any cases actually holding that a party may not recover such costs. Further, Motorola raised several new arguments in its reply brief regarding whether Apple's litigation costs were the direct and foreseeable result of Motorola's alleged breach. Therefore, I am denying Motorola's motion for summary judgment on this issue. If Motorola wishes to make further

36

arguments regarding whether certain costs identified by Apple's expert should be excluded, it may file a motion in limine on the subject.

### B. Apple's Motion for Partial Summary Judgment

Apple has moved for partial summary judgment, seeking to establish certain elements of its claims. Because I have concluded that Motorola is entitled to summary judgment on all of Apple's claims with the exception of Apple's contract and estoppel claims, I will consider Apple's arguments only as they relate to those claims. In particular, Apple requests a determination that:

- Motorola entered into binding contractual obligations with ETSI and IEEE to license its declared-essential patents on fair, reasonable and nondiscriminatory terms.

- Apple is a third-party beneficiary of Motorola's contractual obligations to ETSI and IEEE.

- In submitting technical proposals to ETSI for inclusion of Motorola technology in ETSI standards, Motorola was obligated by ETSI policy to make a bona fide effort to identify essential intellectual property rights that might be required by the technical proposal before the adoption of the technical proposal into the standard.

- Motorola was obligated to make a bona fide effort to disclose the applications leading to the issuance of the '898, '559 and '697 patents to ETSI before the adoption of Motorola's technical proposals, even when those patent applications were unpublished.

- Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after the adoption of the standards to which Motorola contends those patents are essential.

Notably, Apple does not seek a determination that Motorola's failure to disclose its

intellectual property rights was intentional, that Motorola failed to comply with the disclosure requirements of ETSI and IEEE policies or that Motorola breached its contractual obligations by demanding unreasonable licensing fees for its patents from Apple.

1. Motorola's contracts with ETSI and IEEE

As discussed above, I am applying Wisconsin law to Apple's breach of contract claims related to IEEE and French law to the claims related to ETSI.

To form a valid contract under Wisconsin law, there must be evidence of an offer, acceptance and consideration, Kamikawa v. Keskinen, 44 Wis. 2d 705, 710, 172 N.W.2d 24, 26 (1969), and an understanding between the parties regarding the essential terms of the contract. Metropolitan Ventures, LLC v. GEA Associates, 2006 WI 71, ¶ 24, 291 Wis. 2d 393, 717 N.W.2d 58. Apple's expert states that French law requires the same general elements, which Motorola has not disputed. Delebecque Rep., dkt. #146, ¶ 31 ("French law considers that the contractual agreement is reached . . . as of the moment the parties have reached an agreement on the essential elements of the contract.").

In this case, the combination of the policies and bylaws of the standards-setting organizations, Motorola's membership in those organizations and Motorola's assurances that it would license its essential patents on fair, reasonable and nondiscriminatory terms constitute contractual agreements. The intellectual property rights policies of ETSI and IEEE constituted offers to Motorola for membership in the organization in exchange for Motorola's ability to participate in developing technical standards. The "offers" set out the

38

**A97**

essential terms of the contract, namely, that members must abide by intellectual property rights policies. Under IEEE's policy, members must submit letters of assurance including a commitment to license essential patents under reasonable and nondiscriminatory terms. Similarly, ETSI's policy states that its members shall use "reasonable endeavors" to inform the organization of essential patents "in a timely fashion." All members are asked to grant licenses to essential patents on fair, reasonable and nondiscriminatory terms; if they refuse, they must explain their reasons in writing.

Motorola accepted the offers and agreed to be bound by these policies when it joined ETSI and IEEE. Later, Motorola confirmed that it was bound by the organizations' policies when it submitted declarations and letters of assurance stating that it would license its patents on fair, reasonable and nondiscriminatory terms. In particular, Motorola sent declarations to ETSI regarding the '697, '898, '230 and '559 patents, and sent letters of assurance to IEEE regarding the '516, '193, '223 and '712 patents.

Both Motorola and the organizations benefited from this arrangement and thus, the element of consideration is satisfied. Motorola received the benefit of participating in the standards development process and influencing the choice of technology for the standards. The organizations benefited from Motorola's commitments by knowing that their technical standards would be available for use by third parties.

Several courts have reached similar conclusions. Microsoft Corp. v. Motorola, Inc., 2012 WL 2030098, *5-6 (W.D. Wash. June 6, 2012) (holding that contract was formed through Motorola's commitments to IEEE to license patents essential to 802.11 standard

39

on reasonable and nondiscriminatory terms); <u>Research In Motion Ltd. v. Motorola, Inc.</u>, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) (holding at motion to dismiss stage that plaintiff had stated breach of contract claim based on defendant's failure to offer FRAND terms as it had agreed to ETSI and IEEE); <u>ESS Technology, Inc. v. PC-Tel., Inc.</u>, 1999 WL 33520483, *4 (N.D. Cal. Nov. 4, 1999) (holding that, as third-party beneficiary of contract between standards-setting organization and defendant-essential-patent holder, software manufacturer had properly stated claim for specific performance of agreement requiring defendant to license patents on nondiscriminatory and reasonable terms).

In its opposition brief, Motorola states that it "does not dispute that it made commitments to the industry groups," and "does not dispute that obligations flow from those commitments." Motorola's Br., dkt. #164, at 1. However, Motorola argues that its commitments are not binding contracts and that neither the industry groups nor Apple can enforce those commitments. In other words, Motorola argues that although it made promises, the promises are largely meaningless because they cannot be enforced by either the organizations or third parties.

Motorola relies largely on language from ETSI's and IEEE's policies to argue that the organizations do not intend to enforce their intellectual property rights policies. IEEE's policy states that "[n]o license is implied by the submission of a Letter of Assurance," and that "IEEE is not responsible for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance . . . are reasonable and non-discriminatory." ETSI's policy states that "[s]pecific licensing terms and negotiations are

40

**A99**

commercial issues between the companies and shall not be addressed within ETSI."

These provisions do not say that the organizations will not enforce their policies. Rather, the provisions make clear that organizations will not be responsible for deciding what terms constitute a fair, reasonable and nondiscriminatory license. They will not resolve licensing disputes. However, ETSI and IEEE still require members to offer reasonable and nondiscriminatory licenses to their essential patents in order to comply with the conditions of membership and their declarations. ETSI's policies state explicitly that "[a]ny violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI." Similarly, in its commitment to IEEE, Motorola agreed that it would "license those patents on a non-discriminatory basis offering fair and commercially reasonable terms."

Motorola has several arguments about whether it complied with the terms of ETSI's and IEEE's policies by making reasonable efforts to disclose its patents and by offering to negotiate a licensing agreement with Apple. However, these arguments relate to whether Motorola breached the contracts, not whether contractual obligations exist. Neither Apple nor Motorola moved for summary judgment on the element of breach.

In sum, I am granting Apple's motion for summary judgment with respect to the existence of contracts between Motorola and the standards-setting organizations.

2. Apple's status as a third-party beneficiary

The next question is whether Apple has a right to enforce the contracts as a third

41

**A100**

party beneficiary.  <u>Becker v. Crispell-Snyder, Inc.</u>, 2009 WI App 24, ¶ 9, 316 Wis. 2d 359, 763 N.W.2d 192 (party wishing to enforce contract must either be party to contract or third-party beneficiary).  Under Wisconsin law, a third-party beneficiary is one whom the contracting parties intended to "directly and primarily" benefit.  <u>Id.</u> at ¶ 11 (citing <u>Winnebago Homes, Inc. v. Sheldon</u>, 29 Wis. 2d 692, 699, 139 N.W.2d 606 (1966)).  The benefit proven must be direct; an indirect benefit incidental to the primary contractual purpose is insufficient.  <u>Id.</u>  French law is consistent with Wisconsin law on this issue. Delebecque Rep., dkt. #159, ¶ 25.

Motorola advances several arguments in support of its contentions that its commitments to ETSI and IEEE were not intended primarily to benefit potential users of the standards.  However, none of its arguments are persuasive.  The primary purpose of the ETSI and IEEE intellectual property rights policies and Motorola's licensing commitments is to protect companies that need to obtain licences in order to practice the standards adopted by the organizations.  This is clear from the language of the policies.  For example, ETSI's policy states that an "objective" of the policy  is to "reduce the risk" of an essential patent's becoming "unavailable."  The entities that care the most about the availability of a license are those entities such as Apple, who will incorporate the standards into their own products.

As a potential user of the standards at issue and a prospective licensee of essential patents, Apple is a third party beneficiary of the agreements between Motorola and IEEE and Motorola and ETSI.  <u>See also</u> <u>Microsoft</u>, 2012 WL 2030098, at *5-6 (holding that

42

**A101**

Microsoft was third-party beneficiary of Motorola's agreements with standard setting organization because the "commitments are clearly designed to benefit potential licensees of Motorola's standard essential patent by ensuring that such patents are readily accessible to everybody at reasonable rates").

3.  Scope of contractual obligations to ETSI

Apple also seeks summary judgment on issues related to the scope of Motorola's contractual obligations to ETSI.  In particular, Apple seeks a determination that (1) the ETSI intellectual property rights policy required Motorola to make a "bona fide" effort to identify its intellectual property rights that might be essential to a technical standard *before* the technical proposal was adopted into the standard; and (2) that Motorola was required to include its unpublished patent applications as part of those disclosures.

With respect to the first issue, the ETSI intellectual property rights policy is clear. It states that members

> submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's [intellectual property rights] which *might* be ESSENTIAL *if that proposal is adopted*.

By using the terms "might" and "if," the policy clearly requires members to make efforts to disclose intellectual property rights *before* a standard is adopted.

Motorola has two arguments in opposition, neither of which is persuasive.  First, it says it was not required to disclose patents or patent applications at the time a technical proposal is made or during work meetings relating to the technical development of standards.

43

This argument is not responsive to Apple's motion. Apple has not argued that Motorola was required to disclose its intellectual property rights during work meetings or when it submitted technical proposals. Apple has argued only that Motorola was required to disclose its patents and patent applications at some point before a technical proposal is adopted into a standard.

Second, Motorola argues that it was relieved of its obligation to disclose specific patents by submitting a general declaration to ETSI, in which it agreed to license any of its essential patents on fair, reasonable, and nondiscriminatory terms. However, the ETSI policies make clear that the submission of a general declaration does not relieve a member of its duty to make a timely declaration of specific patents and applications that it believes may be essential to an ETSI standard. The ETSI Guide on Intellectual Property Rights states that use of a general licensing declaration "does not take away the obligation for members to declare essential patents to ETSI. . . ."

As to the issue of Motorola's obligation to disclose unpublished patent applications, ETSI's policy makes clear that members are required to disclose patents and "applications therefor." The policy exempts "confidential information." Apple asserts several reasons in its brief about why Motorola's patent applications issuing as the '898, '559 and '697 patents do not qualify as "confidential." Apple's Br., dkt. #144, at 22-23. For example, Apple contends that Motorola waived any confidentiality privilege that might have applied by publicly disclosing the relevant language in those applications through its technical proposals to the relevant working groups and through foreign patent applications.

44

**A103**

Motorola's only response is to assert that ETSI members are not required to disclose confidential information and that patent applications may qualify as confidential. This is nonresponsive to Apple's arguments. By failing to respond to Apple's contention that the specific patent applications at issue in this case were not confidential, Motorola has waived any arguments in opposition and has failed to meet its burden at summary judgment of showing the existence of material facts in dispute regarding this issue of the scope of its contractual obligations to ETSI. Wojtas v. Capital Guardian Trust Co., 477 F.3d 924, 926 (7th Cir. 2007) ("A failure to oppose an argument permits an inference of acquiescence and 'acquiescence operates as a waiver.'") (quoting Cincinnati Insurance Co. v. East Atlantic Insurance Co., 260 F.3d 742, 747 (7th Cir. 2001)).

4. Timing of Motorola's disclosure

Finally, Apple seeks a determination that Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after Motorola made technical proposals using technology from those patents and after ETSI adopted standards to which Motorola contends those patents are essential. I am granting Apple's motion on this issue because it is uncontested.

C. Issues Remaining for Trial

I am dismissing all of Apple's claims with the exception of its breach of contract and equitable estoppel claims and its declaratory judgment claims premised on a breach of

45

**A104**

contract or estoppel theory.

With respect to the breach of contract claims, Apple has shown that Motorola's membership in ETSI and IEEE and the intellectual property declarations it made established a contractual relationship that required Motorola to license its essential patents to third parties on fair, reasonable and nondiscriminatory terms. Additionally, Apple has shown that it is a third-party beneficiary of those contracts and has a right to enforce them. Apple has proven that Motorola's membership in ETSI required Motorola to make reasonable efforts to disclose any intellectual property rights that might have become essential to standards being considered by ETSI before those standards were adopted, including Motorola's unpublished patent applications that became the '898, '559 and '697 patents. Finally, Apple has shown that Motorola disclosed its '898, '559 and '697 patents to ETSI after Motorola made technical proposals using technology from those patents and after ETSI adopted standards to which Motorola contends those patents are essential.

However, there are still several unresolved issues related to Apple's breach of contract claims. To succeed on its claims, Apple must prove that Motorola breached a contract by failing to make bona fide efforts to disclose its patents to ETSI in a timely manner and by failing to offer a license to its essential patents to Apple on fair, reasonable and nondiscriminatory terms. As to the licensing offer, Apple must prove that Motorola's initial offer of a 2.25% royalty rate and attempts to negotiate were unfair, unreasonable or discriminatory and violated Motorola's commitments to ETSI and IEEE.

Additionally, Apple must prove that it suffered damages that are clearly connected to

46

Motorola's breach. At this point, it is not clear how Apple intends to prove that it was damaged by Motorola's failure to disclose patents to ETSI in a timely manner. Additionally, Apple must prove that any litigation damages it seeks to recover are directly attributable to Motorola's breach.

### ORDER

IT IS ORDERED that

1. Defendant Motorola Mobility, Inc.'s motion for partial summary judgment, dkt. #150, is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED with respect to plaintiff Apple Inc.'s claims that Motorola violated § 2 of the Sherman Act (count 5), that it violated Cal. Bus. & Prof. Code § 17200 (count 6), and that it tortiously interfered with contract (count 13), and with respect to Apple's requests for declaratory relief in conjunction with these claims.

The motion is DENIED in all other respects.

2. Plaintiff Apple Inc.'s motion for partial summary judgment, dkt. #143, is GRANTED. The court finds as a matter of law that

a. Motorola entered into binding contractual obligations with ETSI and IEEE to license its declared essential patents on fair, reasonable and nondiscriminatory terms.

b. Apple is a third-party beneficiary of Motorola's contractual obligations to ETSI and IEEE.

c. In submitting technical proposals to ETSI for inclusion of Motorola technology in ETSI standards, Motorola was obligated by ETSI policy to make a bona fide effort to identify essential intellectual property rights that might be required by the technical proposal before the adoption of the technical proposal into the standard.

47

d.  Motorola was obligated to make a bona fide effort to disclose the applications leading to the issuance of its United States patents 6,175,559, 6,359,898 and 6,246,697 to ETSI before the adoption of Motorola's technical proposals, even when those patent applications were unpublished.

e.  Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after the adoption of the standards to which Motorola contends those patents are essential.

Entered this 10th day of August, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

48

**A107**

# OPINION AND ORDER
# DATED OCTOBER 29, 2012 (DKT 424)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                                                       OPINION and ORDER

                     Plaintiff,

                                                 11-cv-178-bbc

       v.

MOTOROLA MOBILITY, INC.,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A court trial is scheduled for November 5, 2012 to resolve plaintiff Apple, Inc.'s claims for breach of contract, equitable estoppel and declaratory judgment, all premised on Apple's contention that defendant Motorola Mobility, Inc. promised two standards-setting organizations that it would offer licenses to its standards-essential patents on fair, reasonable and nondiscriminatory terms and then refused to do so.

Now before the court are the parties' motions in limine. I have grouped this for discussion purposes and resolved these as explained below.

TABLE OF CONTENTS

A.     Motions Regarding the Scope of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     1. Motorola's motion to preclude Apple
     from seeking specific performance, dkt. #280 . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     2. Motorola's motion to preclude Apple from
     admitting evidence arising after January 4, 2011
     in support of its breach of contract and estoppel
     claims, dkt. #289 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . 11

1

**A108**

3. Motorola's motion to exclude evidence and
references to irrelevant standards and standards-setting
bodies, dkt. #298 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. Motions Regarding the Relevance of Orders Issued in the
Related Patent Infringement Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. Apple's motion for judicial notice of public
documents, dkt. #321, and Motorola's motion to
exclude all evidence concerning prior litigation
decisions, dkt. #292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2. Apple's motion to exclude evidence and argument
that Motorola's patents ruled invalid or not infringed
have value, dkt. #311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. Apple's Motion to exclude evidence and argument
that Apple must satisfy a condition precedent to trigger
Motorola's obligation to license on fair, reasonable and
nondiscriminatory terms, dkt. #312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4. Whether Motorola breached its contracts by seeking
an injunction in the Illinois case and an exclusionary
order in the International Trade Commission
proceeding, dkt. ##286, 310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2

**A109**

C.  Motions Related to Apple's Claim that Motorola Breached
    its Contracts with ETSI by Failing to Make Bona Fide
    Efforts to Disclose its Patents to ETSI in a Timely Manner . . . . . . . . . . . . . . . . 30

    1.  Motorola's motion to preclude evidence and argument
    relating to timeliness of patent disclosures to ETSI, dkt. #283 . . . . . . . . . . . . . 30

    2.  Apple's motion to preclude Motorola from offering evidence
    or argument that it had a "process" for complying with ETSI's
    disclosure policies, dkt. #313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D.  Motions Related to Non-parties Chi Mei Communications
    Systems and Qualcomm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    1.  Motorola's motion to exclude any evidence and argument
    relating to non-parties Chi Mei Communication Systems
    and Qualcomm, dkt. #295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2.  Apple's motion to preclude Motorola from offering evidence
    about why it purported to suspend its license with
    Chi Mei, dkt. #314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    3.  Apple's motion to preclude Motorola from arguing that
    its cellular standards-essential patent rights were not "exhausted"
    as to the first iPhone, dkt. #315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

E.  Motions Related to Expert Witness Reports and Testimony . . . . . . . . . . . . . . . 38

    1.  Motorola's motion to preclude the testimony and
    opinions of Dr. Louis Berneman, dkt. #301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    2.  Motorola's motion to preclude the testimony and
    opinions of Dr. Dennis Carlton relating to licensing
    and market power, dkt. #304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    3.  Motorola's motion to exclude evidence or argument
    related to allegedly "non-infringing alternatives" to
    Motorola patents, dkt. #307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    4.  Apple's motion to preclude evidence and argument
    regarding opinions on alternatives from Motorola's
    technical experts, dkt. #316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

3

5.  Apple's motion to exclude Dr. Gregory Leonard from offering opinions on the correct fair, reasonable and nondiscriminatory royalty rate for Motorola's declared standards-essential patents, dkt. #318, and opinions about "synergies," dkt. #319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

6.  Apple's motion to exclude Motorola's expert testimony not previously disclosed in a report, dkt. #317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

7. Motions regarding Apple's use of supplemental expert reports by Dr. Cimini and Dr. Napper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

     a.  Dr. Cimini's August 14, 2012 report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

     b.  Brian Napper's supplemental report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

4

**A111**

## A.  **Motions Regarding the Scope of Trial**

It is clear from several of the motions that the parties have significant disagreements about the scope of the upcoming trial.  The main disagreement is whether the trial will result in a determination of a specific rate or range that constitutes a fair, reasonable and nondiscriminatory license for Motorola's patents and an order requiring Motorola to offer that license to Apple.  According to Motorola, the trial cannot and should not address what constitutes a fair, reasonable and nondiscriminatory license.  Instead, the only issues that should be resolved at trial with respect to Apple's breach of contract claim are whether Motorola's initial offer of a 2.25% royalty rate was unfair, unreasonable or discriminatory and whether Motorola failed to negotiate in good faith.  Motorola suggests that if Apple prevails on its breach of contract claim, Apple's only remedy would be nominal damages and perhaps an order from the court instructing the parties to negotiate a license.  (Apple reduced its damages demand to nominal damages of less than $20 when it filed its motion for a court trial.  Dkt. #255.)

Motorola finds support for its position from statements I made during a hearing on Apple's request for a preliminary injunction and the order issued at summary judgment.  During the April 26, 2011 hearing, I stated

> [A]t some point the court could say you haven't negotiated fairly.  I mean, it wouldn't be proper for the Court to say you haven't negotiated fairly, you should really be paying 1.36 or something like that.  But you could, after a determination of the facts, decide that one party or the other had not been participating reasonably in any attempt to negotiate a license.

Dkt. #90, Apr. 26, 2011 Hrg. Tr. at 82:11-18.  See also id. at 86:11-22 (The court: "My sense is that if the Court could do anything, it would only be in the situation in which the parties had absolutely refused and the party with the essential patents just said we're not going to — we aren't going to engage in any kind of negotiation; we don't want a license; we don't have to

**A112**

license; we're not going to do anything.").  However, these statements did not limit the issues

to be resolved in this case or limit the remedies to which Apple can seek at trial.  They were

made during a preliminary review of the case, before the parties had developed the facts or legal

theories.

Additionally, the summation in the summary judgment opinion regarding the issues

remaining for trial did not restrict Apple from seeking a particular remedy or limit the type of

evidence that may be presented at trial.  In an opinion and order entered August 10, 2012, I

granted Apple's motion for partial summary judgment and concluded that Motorola was a party

to binding contracts with the European Telecommunications Standards Institution (ETSI) and

the Institute of Electrical and Electronics Engineers (IEEE) and that those contracts required

Motorola to license its declared-essential patents to Apple on fair, reasonable and

nondiscriminatory terms.  Dkt. #194 at 38-42.  However, I pointed out that there were still

several unresolved issues related to Apple's breach of contract claims, stating:

> Apple must prove that Motorola's initial offer of a 2.25% royalty rate and
> attempts to negotiate were unfair, unreasonable or discriminatory and violated
> Motorola's commitments to ETSI and IEEE.  Additionally, Apple must prove that
> it suffered damages that are clearly connected to Motorola's breach.

Id. at 46-47.  Although Motorola contends that these issues identified in the court's summary

judgment opinion are the *only* issues remaining in the case, that is not what the opinion says.

At summary judgment, the focus was on the interpretation of the ETSI and IEEE contracts, as

well as damages issues.  Neither party had discussed the type of evidence that Apple would

present to prove its breach of contract claims and neither party had raised issues related to

equitable relief.  Thus, I did not include in the opinion any discussion of issues related to

equitable relief or of Apple's theories of liability that were not raised in the parties' summary

6

**A113**

judgment briefing. However, this does not mean that Apple is barred from raising other issues at trial; Apple may pursue any theories of liability and requests for relief that it pleaded in its amended complaint and that have not been explicitly dismissed from the case.

1. **Motorola's motion to preclude Apple from seeking specific performance, dkt. #280**

Motorola's motion to preclude Apple from seeking specific performance is related to its interpretation of the issues remaining in the case. If Apple prevails on its claim that Motorola breached its contracts with ETSI and IEEE by failing to offer a fair, reasonable and nondiscriminatory license to Apple, Apple intends to seek an order requiring specific performance of Motorola's contractual commitments. In particular, Apple intends to ask the court to order Motorola to offer a license for its standards-essential patents to Apple on fair, reasonable and nondiscriminatory terms. Motorola has moved for an order precluding Apple from seeking specific performance, contending that the court cannot order that because (1) Motorola's obligations under the contracts with the standards-setting organizations are too vague; (2) there is not enough evidence in the record from which the court could determine appropriate license terms; and (3) supervising the performance would not be practicable for the court. I am denying Motorola's motion.

With respect to its first argument, Motorola contends that specific performance is an exceptional remedy that is appropriate only if damages are inadequate and only if the terms of the contracts at issue are sufficiently specific. Motorola contends that its contracts with the standards-setting organizations are not specific because they do not explain what constitutes a "fair, reasonable and nondiscriminatory" license and they do not provide instructions on how

to determine appropriate license terms.

It is true that the "normal remedy for breach of contract is an award of damages," while specific performance is an "exceptional" remedy. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996). Additionally, courts generally order specific performance "only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order." TAS Distributing Co. v. Cummins Engine Co., 491 F.3d 625, 637 (7th Cir. 2007) (Illinois law). See also Krause v. Holand, 33 Wis. 2d 211, 214, 147 N.W.2d 333 (1967) (request for specific performance will normally be denied "if the essential terms of the contract are not established with clarity").

I conclude that specific performance may be an appropriate remedy under the circumstances of this case. In fact, it may be the only appropriate remedy. As I held previously, Motorola's declarations to ETSI and IEEE constitute binding agreements to license its essential patents on fair, reasonable and nondiscriminatory terms, and Apple is a third party beneficiary to those agreements. Dkt. #194 at 42. As a third party beneficiary, Apple is entitled to a license of Motorola's patents on fair, reasonable and nondiscriminatory terms. Unless and until Motorola gives Apple a fair license to its declared-essential patents, Apple will continue to face the threat of patent infringement litigation from Motorola. It would be highly inefficient to require Apple to bring a new lawsuit for monetary damages or declaratory relief each time Motorola sues it for patent infringement. Additionally, it makes little sense to order the parties to continue negotiating a license when they have been unable to reach an agreement through five years of negotiations.

Instead, it makes sense to allow Apple to sue for specific performance of Motorola's

8

**A115**

contractual obligations and for the court to determine license terms, if necessary. In fact, in situations such as this in which the parties cannot agree on the terms of a fair, reasonable and nondiscriminatory license, the court may be the only forum to determine license terms. Both ETSI and IEEE have declared their unwillingness to assist parties in determining license terms or in resolving disputes between the parties. E.g., dkt. #282-3, 2003 Report of the GA ad hoc group on ETSI's Intellectual Property Rights Policy operation, at § 4.4 (ETSI is "unable to define FRAND conditions" and "a court of law seems to be the only authority which can ultimately decide whether, or not, terms are Fair, Reasonable And Non-Discriminatory"); dkt. #282-5, ETSI Guide on Intellectual Property Rights, § 4.1 ("Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI."); dkt. #282-6, IEEE-SA Standards Board Bylaws, § 6.2 (IEEE not responsible for "determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory."). As the District Court for the Western District of Washington explained recently in a similar case involving Motorola's licensing commitments to IEEE,

> Having made the determination that Motorola must grant a [reasonable and nondiscriminatory] license for its essential patents, the court is left with the inescapable conclusion that a forum must exist to resolve honest disputes between the patent holder and implementer as to what in fact constitutes a [reasonable and nondiscriminatory] license agreement. Here, the courthouse may be the only such forum. . . Although no specific remedy has been determined, and certainly no remedy has been proven, the court declines to dismiss from Microsoft's possible remedies the very license agreement to which the court has already determined it is entitled.

Microsoft Corp. v. Motorola, Inc., Case No. C10-1823JLR, 2012 WL 4827743, *6 (W.D. Wash. Oct. 10, 2012).

9

**A116**

I am not persuaded by Motorola's argument that its commitments to the standards-setting organizations are too vague to allow the court to determine an appropriate license rate. In making this argument, Motorola fails to consider that specific performance is a remedy that would be considered only if Apple proves that Motorola has refused to give Apple a license on fair, reasonable and nondiscriminatory terms.  In other words, before the court considers the remedy of specific performance, Apple must first prove that Motorola breached its contract.  To prove this, Apple will have to show that Motorola's licensing offers have not been fair, reasonable and nondiscriminatory.  This will require the court to determine first what rate or range of rates would qualify as a fair, reasonable and nondiscriminatory license offer for Motorola's standards-essential patents and then determine whether Motorola's licensing offers were a breach of its duty to offer a license within that range.  If I reach the question whether specific performance would be an appropriate remedy, I necessarily will have determined a meaning for the phrase "fair, reasonable and nondiscriminatory" with respect to Motorola's standards-essential patents, and the only remaining question will be whether Motorola should be required to license its patents to Apple on those terms.

I am also not persuaded by Motorola's argument that Apple should be barred from seeking specific performance because there is insufficient evidence from which the court could determine a fair, reasonable and nondiscriminatory rate in this case.  Motorola's argument on this point is simply a critique of the methods and opinions of Apple's experts.  In particular, Motorola criticizes the methods used by Apple's experts and argues that the experts failed to consider the hundreds of essential patents owned by Motorola as well as the confidential settlement negotiations between the parties after January 4, 2011.  Motorola is free to make

10

**A117**

these arguments at trial and to present contrary opinions from its own experts to support its argument that it has offered fair licensing terms to Apple. However, I will not limit Apple's possible remedies simply because Motorola disagrees with the opinions of Apple's experts.

Finally, Motorola does not explain why the court would be required to engage in any monitoring or supervision of the parties as a result of an order of specific performance. Therefore, I will not bar Apple from seeking the remedy of specific performance at trial.

## 2. Motorola's motion to preclude Apple from admitting evidence arising after January 4, 2011 in support of its breach of contract and estoppel claims, dkt. #289

Motorola contends that all evidence relating to its conduct or the parties' patent license negotiations after January 4, 2011 should be precluded under the parties' Mutual Non-Disclosure and Rule 408 Agreement. The agreement places restrictions on the use of "Confidential Information" exchanged during settlement negotiations, dkt. #291-1, §§ 1-5, as well as restrictions on the use of "communications and documents exchanged between [the parties] in furtherance of their joint negotiation efforts." Id., § 10. Under § 10(C) of the agreement,

> No party to this Agreement shall use any documents or information contained or exchanged in any such meeting, discussion or correspondence (i) in any adversarial proceeding or as the basis for any adversarial proceeding in any forum in the United States or in any other country; (ii) in any manner or for any purpose other than in connection with the settlement negotiations between them; or (iii) as the basis for a declaratory judgment action . . . or other proceedings before any court. . . . The parties further agree that the existence of the settlement meetings, and documents and information prepared for or exchanged at any such meetings will not be admissible as evidence or used for any other purpose including, without limitation, filings with any court. . . .

Id., § 10.C. The agreement was extended in November 2011 until November 16, 2013. Dkt.

11

**A118**

#291-2.  Motorola contends that this language precludes Apple from introducing evidence of Motorola's conduct after January 4, 2011 or of any evidence obtained after that date.

I am granting Motorola's motion in part and denying it in part.  I agree with Motorola that the parties' non-disclosure agreements limit the parties' ability to introduce certain types of evidence at trial.  In particular, the non-disclosure agreements preclude the parties from introducing evidence of the parties' settlement discussions and of information and documents produced and exchanged during settlement negotiations.  Dkt. #291-1, § 10(A); dkt. #291-2, § 4.

However, I disagree with Motorola's argument that the non-disclosure agreements preclude *all* evidence relating to the parties' conduct after January 4, 2011.  The January 2011 agreement provides exceptions, generally allowing for the disclosure of information that is acquired independently of settlement discussions.  Dkt. #291-1, § 2 ("Recipient is not obligated to maintain as Confidential [information that] (i) is now available or becomes available to the public . . . (iii) is lawfully obtained from a third party or parties without the duty of confidentiality; (iv) is known to the Recipient prior to such disclosure; or (v) is independently developed by Recipient without the use of any Discloser's Confidential Information or any breach of this Agreement."); § 10.C ("The restrictions of [] paragraph 10(C) shall not apply to any document or information which (a) is in the public domain, or (b) is properly obtained by a party to this Agreement in discovery or otherwise from some source other than the settlement negotiations between them.").  Additionally, the November 2011 agreement includes an exception allowing either party to "submit[] the Confidential Information in the Pending Litigation to establish its position that it has engaged in good faith negotiations, or to address

12

**A119**

any inaccurate or incomplete position taken by another party. . . ."  Dkt. #291-2, § 15.
Therefore, Apple may introduce evidence of information or activities arising after January 4,
2011 that fall under these exceptions to the non-disclosure agreements.

Motorola did not move to exclude any specific evidence that Apple intends to introduce,
so I cannot provide any further guidance for the parties on this issue beyond stating that the
parties are both constrained by the explicit prohibitions of the non-disclosure agreement, but not
beyond those explicit prohibitions.


### 3. **Motorola's motion to exclude evidence and references to irrelevant standards and standards-setting bodies, dkt. #298**

Apple's breach of contract claims are premised on Motorola's commitments to ETSI and
IEEE with respect to certain standards, including ETSI's Universal Mobile Telecommunications
System standard, the General Packet Radio Service functionality of ETSI's Global System for
Mobile Communications standard and the IEEE's 802.11 standard.  Motorola has moved to
exclude evidence relating to standards-setting organizations and standards that are not at issue
in this case.  Apple opposes the motion, contending that Motorola has made such evidence an
issue by introducing evidence regarding its practices in relation to other standards-setting
organizations.

I am granting this motion in part and denying it in part.  I agree with Motorola that
testimony and evidence regarding standards-setting bodies and standards other than ETSI, IEEE
and their standards should be precluded because it is irrelevant and would be waste of time.
Thus, Apple will be precluded from arguing that Motorola breached its contractual obligations

to other organizations or failed to disclose patents relevant to other standards not at issue. However, if Motorola introduces evidence of its practices with respect to other standards or standards-setting organizations in an attempt to show that it made a bona fide effort to comply with its disclosure and licensing obligations to ETSI and IEEE, Apple may introduce evidence to the contrary.

### B.  Motions Regarding the Relevance of Orders Issued in the Related Patent Infringement Proceedings

The patents at issue in this case are Motorola's United States Patents Nos. 5,636,223 (the '223 patent), 5,311,516 (the '516 patent), 5,572,193 (the '193 patent), 5,319,712 (the '712 patent), 6,175,559 (the '559 patent), 6,246,697 (the '697 patent) and 6,359,898 (the '898 patent).  All of these patents have been the subject of prior litigation between Motorola and Apple, either in the International Trade Commission or federal court.  The '697 and '223 patents were the subject of In re Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof, U.S.I.T.C. Investigation No. 337-TA-745.  In that case, Motorola sought an exclusion order and permanent cease and desist order as a result of Apple's alleged infringement of the '697 and '223 patents, among other patents.  In a decision issued August 24, 2012, the commission concluded that the accused Apple products did not infringe either the '697 or '223 patents.  Dkt. #294-1 at 23, 47.

The '898, '559, '516, '712, '230 and '193 patents were all the subject of Apple Inc. v. Motorola Inc., Case No. 1:11-cv-8540 (N.D. Ill.), which was a case that originated in this court as 10-cv-662-bbc and was transferred to the Northern District of Illinois in December 2011.

14

**A121**

Motorola voluntarily withdrew the '516 and '230 patents from suit. On summary judgment, the district court found that the '193 patent was invalid, that the '712 and '559 patents were not infringed and that Motorola could not prove the amount of damages to which it was entitled with respect to the '898 patent. Dkt. #320-3 (Order of Jan. 16, 2012 in Illinois case, finding '193 patent invalid and '712 patent not infringed); #320-4 (Order of Apr. 9, 2012 in Illinois case, finding claim 4 of '559 patent not infringed); #320-5 (Order of June 5, 2012 in Illinois case, finding claim 5 of '559 patent not infringed). The case was dismissed with prejudice on June 22, 2012. Apple, Inc. v. Motorola, Inc., 2012 WL 2376664 (N.D. Ill. June 22, 2012).

The parties have filed several motions in limine related to filings and decisions from the district court and International Trade Commission proceedings.

## 1. Apple's motion for judicial notice of public documents, dkt. #321, and Motorola's motion to exclude all evidence concerning prior litigation decisions, dkt. #292

As a threshold matter, both parties have filed motions regarding whether documents related to the International Trade Commission and Northern District of Illinois proceedings may be admitted for *any* purpose at trial. Motorola has moved under Fed. R. Evid. 402, 403 and 802 to exclude all evidence and argument related to these proceedings, contending that it would be irrelevant and inadmissible hearsay. Dkt. #292. Apple disagrees, and has moved for judicial notice under Fed. R. Evid. 201(b) of several filings and decisions related to those proceedings, as well as for judicial notice of documents from other patent infringement litigation involving the parties. Dkt. #321. Lopez Dec., Exhs. 1-45, dkt. ##322-1 to 323-28. Under Rule 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1)

15

**A122**

is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

I am granting Apple's motion and denying Motorola's motion on this issue. The documents for which Apple seeks judicial notice fall into the following categories: (1) records of court proceedings and administrative agencies in which determinations were made regarding infringement and validity of Motorola's patents; (2) party filings in court proceedings; (3) patents and patent-related documents; (4) documents filed publicly with the Securities and Exchange Commission; and (5) interest and foreign exchange rates published by the Federal Reserve Board. These types of documents are appropriate for judicial notice: they are matters of judicial and public record and Motorola has not disputed their authenticity. General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records."); Opoka v. Immigration and Naturalization Services, 94 F.3d 392, 394 (7th Cir. 1996) ("[I]t is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice."); Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994) ("district court may also take judicial notice of matters of public record").

Motorola's objections to these documents are not actually about whether the particular documents are the type that are generally appropriate for judicial notice. Instead, Motorola's arguments address the weight that should be given the conclusions or opinions expressed within the documents, rather than about the admissibility of the documents generally. However, I am

16

**A123**

not taking judicial notice of the truth or accuracy of the facts, opinions or decisions contained within the documents. I am taking judicial notice that the contents of these documents are contained in the public record or were filed in related proceedings. Whether these documents have any persuasive or preclusive effect depends on the documents and purpose for which they are being presented.

**2. Apple's motion to exclude evidence and argument that Motorola's patents ruled invalid or not infringed have value, dkt. #311**

Whether Motorola's license offer to Apple was fair and nondiscriminatory depends on the value of Motorola's patent portfolio, and both parties intend to introduce expert testimony and other evidence on this issue. However, Apple has moved to preclude Motorola from offering evidence regarding the value of the patents in its declared standards-essential portfolio that have been adjudged invalid or not infringed by Apple in the Northern District of Illinois or the International Trade Commission. Apple contends that because these patents are either invalid or not infringed, they have no value and should not be considered when determining the value of a fair, reasonable and nondiscriminatory license.

In response, Motorola contends that the reasonableness of its 2.25% licensing offer to Apple must be evaluated in light of the information available at the time the offer was made. I agree. At the time Motorola made its initial 2.25% offer to Apple in August 2007, Motorola's patents were presumed valid and essential to cellular standards. 35 U.S.C. § 282 ("A patent shall be presumed valid."). As Apple's own experts have testified, the value of Motorola's declared-essential patents should be determined by an assessment of their value over any non-

17

**A124**

infringing alternatives at the time Motorola's patents were incorporated into the standard.  E.g., Carlton Rep., dkt. #208, ¶ 49.  The invalidity and infringement decisions were issued by the International Trade Commission and the Northern District of Illinois nearly four years after Motorola's license demands and are not relevant or admissible to show that Motorola's license offers were unfair or discriminatory at any time before the decisions were issued.

It is a different question whether the decisions of the International Trade Commission and Northern District of Illinois are relevant to the *present* value of Motorola's standards-essential patent portfolio.  If Apple prevails on its breach of contract claim and persuades the court that it is entitled to specific performance, the court will need to determine what constitutes a fair, reasonable and nondiscriminatory license to Motorola's standards-essential patents.  I agree with Apple that the validity of Motorola's patents and whether Apple's products infringe them would be relevant in calculating the current fair license rate for purposes of specific performance.

This leaves the question whether the decisions by the Northern District of Illinois and the International Trade Commission on infringement and validity of certain of Motorola's patents have preclusive effect on this court's determination of the value of those patents.  Apple contends that the decisions of these courts have preclusive effect under the doctrine of issue preclusion.  The federal common law of issue preclusion applies if:

> (1) the issue sought to be precluded must be the same as that involved in the prior action, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.

Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd LLC, 383 F.3d 633, 636 (7th Cir. 2004)

I agree with Apple that Judge Posner's decisions in the Illinois case on the invalidity and

infringement of the '559, '712 and '193 patents are entitled to preclusive effect. All of the factors of issue preclusion are present. First, because the patents were found invalid or not infringed by Apple in the Illinois case, they are unnecessary to Apple's compliance with the relevant standards and therefore have no value to Apple. The second and third factors are met because the issue was actually litigated and the court's determination that the patents were invalid or not infringed was necessary to the court's final judgment dismissing Motorola's infringement claims on these patents. It does not matter that Motorola has appealed the judgment in Illinois. A final judgment for purposes of issue preclusion can include judgments at the district court level that are final and pending appeal. Old Republic Insurance Co. v. Chuhak & Tecson, P.C., 84 F.3d 998, 1000-01 (7th Cir. 1996). Finally, Motorola is the same party to both actions and was represented in the Illinois case. Accordingly, the '559, '712 and '193 patents should not be included as evidence of what value would constitute a current fair, reasonable and nondiscriminatory license to Motorola's standards-essential patents to Apple.

With respect to the decision by the International Trade Commission regarding infringement and validity of the '697 and '223 patents, the general rule is that determinations of patent infringement and validity by the International Trade Commission are not entitled to preclusive effect. Powertech Tech. Inc. v. Tessera, Inc., 660 F.3d 1301, 1308 (Fed. Cir. 2011); Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996). Thus, the commission's decision alone would be insufficient to prove that Motorola's '697 and '223 patents lack value. However, findings by the commission can be considered by district courts for their persuasive value, so the parties may present evidence and argument at trial about whether the decision of the commission should affect the value of Motorola's standards-essential

19

**A126**

patent portfolio and the calculation of a fair, reasonable and nondiscriminatory license rate.

<u>Texas Instruments</u>, 90 F.3d at 1569 ("The district court can attribute whatever persuasive value

to the prior ITC decision that it considers justified.").

**3. <u>Apple's Motion to exclude evidence and argument that Apple must satisfy a condition precedent to trigger Motorola's obligation to license on fair, reasonable and nondiscriminatory terms, dkt. #312</u>**

At trial, Motorola intends to argue as a defense to Apple's breach of contract claim that

Apple failed to meet *Apple's* obligations under the ETSI and IEEE policies to negotiate with

Motorola as a condition to receiving a fair, reasonable and nondiscriminatory license.  Apple has

moved to preclude this line of argument, contending that it is barred by the doctrine of issue

preclusion.  Apple contends that Judge Posner decided in the Illinois case that Apple was not

required to negotiate or make counteroffers as a condition to receiving a fair, reasonable and

nondiscriminatory offer from Motorola.

In the Illinois patent infringement case, Judge Posner rejected Motorola's argument that

"Apple should lose the FRAND safe harbor" because Apple "refus[ed] to negotiate with

[Motorola] after rejecting its initial offer of a 2.25 percent royalty."  <u>Apple, Inc.</u>, 2012 WL

2376664, at *12.  Judge Posner explained that:

> Motorola agreed to license its standards-essential patents on FRAND terms as a
> *quid pro quo* for their being declared essential to the standard . . . It does not claim
> to have conditioned agreement on prospective licensees' making counteroffers in
> license negotiations.

<u>Id.</u>  He went on to explain that "[i]f Apple said no to 2.25 percent, it ran the risk of being

ordered by a court to pay an equal or even higher royalty rate, but that is not the same thing as

20

**A127**

Motorola's being excused from no longer having to comply with its FRAND obligations." Id.

I agree with Apple that the doctrine of issue preclusion applies to Judge Posner's conclusion that Motorola was required to give Apple a fair and nondiscriminatory license regardless whether Apple made counteroffers to Motorola. Judge Posner considered the same issue that is present in this case: whether Motorola's obligation to give a fair and nondiscriminatory license was dependent on Apple's refusal to negotiate by making counteroffers to Motorola's 2.25% demand. The issue was actually litigated and was necessary to Judge Posner's conclusion that Motorola was not entitled to injunctive relief on its patent infringement claim.

Motorola contends that issue preclusion should not apply because Judge Posner did not consider the particular contracts at issue in this case to evaluate whether Motorola had conditioned its licensing commitments on prospective licensees' willingness to make counteroffers and engage in negotiations. However, even if issue preclusion did not apply, Motorola points to nothing in either the ETSI or IEEE policies to support its argument that potential licensees must negotiate for a license and make counteroffers before Motorola's obligations are triggered, and my review of the contracts reveals no provisions supporting such a requirement. The District Court for the Western District of Washington reached a similar conclusion when considering Motorola's contracts with IEEE, holding that "it was not the intent of the contracting parties (Motorola and the IEEE/ITU) to require that [the] implementer of a standard first apply for a license and then negotiate for a license in good faith before Motorola's RAND obligations are triggered." Microsoft Corp. v. Motorola, Inc., C10-1823- JLR, 2012 WL 2030098 (W.D. Wash. June 6, 2012). The court explained that

> [N]o words that would indicate the parties' conditional intent . . .are found in Motorola's Letters of Assurance to the IEEE. . . . Likewise, a finding that negotiating in good faith is condition precedent to Motorola's RAND obligations to the implementer would run contrary to the purpose of Motorola's commitments to the IEEE, [because it would allow Motorola to] preemptively request exorbitant compensation for its standard essential technology, and the implementer would be compelled to negotiate in good faith in response to the exorbitant demand.

Id. at *8-9.  I agree with this reasoning.  Motorola's contracts with ETSI and IEEE placed the burden of fair and nondiscriminatory licensing on Motorola, not on potential licensees.  As Judge Posner explained, Motorola received an important benefit from the agreements by having its intellectual property rights incorporated into standards.  Apple, Inc., 2012 WL 2376664, at *12 ("Motorola agreed to license its standards-essential patents on FRAND terms as a *quid pro quo* for their being declared essential to the standard.").

All that being said, Motorola raises an issue in its response to Apple's motion in limine to which neither party has given much attention in this case.  Motorola points out that under ETSI's Intellectual Property Rights policies, it was entitled to condition its license offer to Apple on receiving a reciprocal license for Apple's standards-essential patents.  The provision at issue states that members' commitments to license standards-essential patents on fair, reasonable and nondiscriminatory terms "may be made subject to the condition that those who seek licenses agree to reciprocate."  Dkt. #288-3, Annex 6: ETSI Intellectual Property Rights Policy § 6.1.

This provision does not change my conclusion that Judge Posner's decision is entitled to preclusive effect on the issue whether Apple was required to make counteroffers and negotiate with respect to Motorola's 2.25% offer as a condition to Motorola's offering a fair, reasonable and nondiscriminatory license.  However, this provision does suggest that Motorola cannot be found to have made an unreasonable or discriminatory offer simply because it demanded that

22

**A129**

Apple provide a reciprocal license to Apple's standards-essential patents.  Additionally, this provision suggests that Apple may have been required to engage in licensing negotiations related to its own patents.  In other words, evidence that Apple refused to provide a license to its own patents or refused to engage in negotiations related to its own patents would be relevant to whether Motorola breached its contract with ETSI.  Neither party has provided evidence or argument on this issue, so I cannot determine the significance of this provision at this stage.  The parties should be prepared to address this issue at trial.

### 4.  **Whether Motorola breached its contracts by seeking an injunction in the Illinois case and an exclusionary order in the International Trade Commission proceeding, dkt. ##286, 310**

In separate motions in limine, both parties have sought clarification about what constitutes a "breach" of Motorola's contracts with ETSI and IEEE.  In particular, both seek the court's interpretation whether, as a matter of contract law, the ETSI and IEEE policies at issue in this case precluded Motorola from seeking injunctive relief to enforce its patent rights in its standards-essential patents.

In Apple's motion, dkt. #310, Apple asks the court to conclude that Motorola breached its contracts with ETSI and IEEE by seeking injunctive and exclusionary relief through patent infringement litigation.  Apple argues that Motorola's commitments to ETSI and IEEE prohibit Motorola from bringing a suit to bar Apple from producing or selling products that incorporate Motorola's technology that is essential to ETSI or IEEE standards.  Motorola objects to Apple's proposed interpretation of the contracts, contending that nothing in the language of its

23

**A130**

commitments to ETSI and IEEE bars Motorola from seeking injunctive relief or exclusion orders. Dkt. #286. The threshold question is whether this issue was resolved by Judge Posner in the context of the parties' patent infringement case in the Northern District of Illinois. Apple contends that the parties litigated this issue and that Judge Posner concluded that Motorola's commitments to ETSI and IEEE barred it from seeking injunctive relief.

Judge Posner dismissed Motorola's claim for damages in the patent infringement case, concluding that Motorola had provided no evidence from which a fair, reasonable and nondiscriminatory royalty could be calculated. Apple, Inc., 2012 WL 2376664, at *11. He then considered whether Motorola could be entitled to injunctive relief on its infringement claims. Motorola presented arguments on the issue, contending that its commitments to standards-setting organizations should have no effect on the availability of injunctive relief. Dkt. #382-7 at 16-17 (Motorola's Br. in 11-cv-8540 (N.D. Ill)). Motorola argued that as a policy matter, if "Apple has no risk whatsoever of an injunction for any standards-essential patents, Apple would effectively have no incentive to ever engage in any good faith licensing negotiations regarding these standards based patents." Id. at 17. Motorola also argued that although ETSI used to have a rule barring injunctions, that rule was changed in 1994 and there was currently "no ETSI rule barring injunctions." Id. Finally, Motorola cited cases in which district courts had imposed injunctions for standards-essential patents. Id. (citing CSIRO v. Buffalo Tech. Inc., 492 F. Supp. 2d 600, 603-08 (E.D. Tex. 2007)).

Judge Posner rejected Motorola's argument, stating:

> I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the '898 [patent] unless Apple refuses to pay a royalty that meets the FRAND requirement. By committing to license its patents on FRAND terms, Motorola committed to license the '898 to anyone willing to pay a FRAND

24

royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent. How could it do otherwise? How could it be permitted to enjoin Apple from using an invention that it contends Apple *must* use if it wants to make a cell phone with UMTS telecommunications capability—without which it would not be a cell *phone*. . . Motorola agreed to license its standards-essential patents on FRAND terms as a quid pro quo for their being declared essential to the standard.

Apple, Inc., 2012 WL 2376664, at *12 (emphasis in original). See also id. at *13 ("A FRAND royalty would provide all the relief to which Motorola would be entitled if it proved infringement of the '898 patent, and thus it is not entitled to an injunction."). Judge Posner's conclusion was clear: Motorola's request for injunctive relief was incompatible with its commitment to license its declared-essential patents in exchange for a fair, reasonable and nondiscriminatory license.

Apple argues that the only reasonable interpretation of Judge Posner's decision is that Motorola breached its contracts with the standards-setting organizations by seeking an injunction. I disagree. Judge Posner's decision did not resolve the contract issue now before this court. Although Judge Posner concluded that Motorola was not entitled to injunctive relief, he did not state explicitly that Motorola's act of seeking injunctive relief constituted a *breach of its contract* with ETSI or IEEE. He did not purport to interpret the terms of the ETSI or IEEE contracts or make any rulings with respect to Motorola's contractual obligations under the ETSI and IEEE policies. In fact, he never refers to the ETSI or IEEE policies as "contracts." In dismissing Motorola's claim for injunctive relief, Judge Posner cited policy and economic arguments, not contract provisions. Id. at *12.

It could be that Judge Posner believed Motorola was contractually barred from seeking injunctive relief. However, it also could be that he believed Motorola was barred by the equitable defenses of estoppel or waiver, or even that Motorola's commitments created an

implied license that rendered moot any claim to injunctive relief. E.g. "Submission of the Office of Unfair Import Investigations on Remedy and the Public Interest," filed on July 18, 2012, in In re Certain Wireless Communication Devices, Portable Music & Data Processing Devices, Computers & Components Thereof, Inv. No. 337–TA–745, 2012 WL 4840603 (existence of "RAND commitment" is "an affirmative defense" to patent infringement, not an "obligation preclud[ing] issuance of an exclusion order"); Doug Lichtman, Understanding the Rand Commitment, 47 Hous. L. Rev. 1023, 1043 (2010) (suggesting that licensing commitments to standards-setting organizations could be interpreted "as a public commitment that creates a defense of equitable estoppel" to patent infringement or as "creating an implied license, with the license rendering moot any claim to injunctive relief or triple damages, but leaving the court with the power to determine the royalty due"). It is simply not clear that Judge Posner relied on contract law in dismissing Motorola's claim for injunctive relief. Thus, the doctrine of issue preclusion does not resolve the parties' motions in limine.

Apple contends that even if issue preclusion does not apply, the court should interpret Motorola's contracts with ETSI and IEEE as prohibiting Motorola from seeking an injunction or exclusionary order because any other interpretation would completely frustrate the policies underlying the standards-setting process's insistence on licensing commitments. At least two courts have found this reasoning persuasive and have questioned whether injunctive relief is appropriate where a patent is encumbered by fair, reasonable and nondiscriminatory licensing obligations. E.g. Microsoft Corp. v. Motorola, Inc., Case No. 12-35352, —F.3d—, 2012 WL 4477215, *12 (9th Cir. Sept. 28, 2012) ("Implicit in such a sweeping promise [made by Motorola to standards-setting organizations] is, at least arguably, a guarantee that the

patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made . . . [I]njunctive relief against infringement is arguably a remedy inconsistent with th[at] licensing commitment."); <u>Realtek Semiconductor Corp. v. LSI Corp.</u>, Case No. C-12-03451-RMW, 2012 WL 4845628 (N.D. Cal. Oct. 10, 2012) (noting that in light of defendants' obligations to license on fair and nondiscriminatory terms, "[t]he court is troubled by defendants' decision to choose, in the first instance, a forum for enforcing their patent rights in which money damages are unavailable and the only relief is injunctive in nature").

I agree with Apple that from a policy and economic standpoint, it makes sense that in most situations owners of declared-essential patents that have made licensing commitments to standards-setting organizations should be precluded from obtaining an injunction or exclusionary order that would bar a company from practicing the patents. Thus, it may be entirely appropriate for a court or the International Trade Commission to deny a request for an injunction or exclusionary order by a patent holder that has made commitments to offer a license on reasonable and nondiscriminatory terms. However, whether Motorola breached its contracts with ETSI and IEEE by seeking an injunction is a question that must be resolved using principles of contract law, not on the basis of economic policy or equitable principles.

When interpreting a contract, the court's goal is to "ascertain the true intentions of the parties as expressed by the contractual language." <u>Town Bank v. City Real Estate Development, LLC</u>, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W. 2d 476. (At summary judgment, I applied Wisconsin law to Motorola's contracts with IEEE and French law to the ETSI contracts. In their motions on limine, both parties cite Wisconsin contract law and do not argue that

27

**A134**

French law is any different. I will apply general principles of Wisconsin contract law to interpret Motorola's commitments to both IEEE and ETSI.) Thus, in determining the meaning of Motorola's commitments to license its essential patents on fair, reasonable and nondiscriminatory terms, I must consider the policies of ETSI and IEEE as well as Motorola's written agreements with the organizations.

The parties cite only a couple of provisions as being relevant to the analysis of the parties' intent. With respect to IEEE, Section 6 of the IEEE's Intellectual Property Rights Policy requires members to submit letters of assurance including a commitment to license essential patents under reasonable and nondiscriminatory terms. Dkt. #148-26, § 6. Similarly, ETSI's Intellectual Property Rights Policy requires its members to use "reasonable endeavors" to inform the organization of essential patents "in a timely fashion," and asks members to grant irrevocable licenses to essential patents on fair, reasonable and nondiscriminatory terms. Dkt. #148-22, §§ 4.1, 6.1. The objectives of ETSI's policy are to insure that standards remain available for adoption by members of the industry and also to insure that holders of essential patents are able to receive adequate compensation from their innovations. Id. §§ 3.1, 3.2. The parties point to no other provisions in ETSI's or IEEE's policies relevant to Motorola's contractual obligations.

None of these provisions expressly precludes Motorola or any patent owner from pursuing an injunction or other relief as a remedy for infringement. Nonetheless, Apple contends that the court should infer that the contracts bar injunctive relief as a matter of contract law. However, it points to no provisions in the contract from which I could draw that inference. As I explained in a previous case, "a court's role in contract interpretation . . . is not to make contracts or to reform them, but to determine what the parties contracted to do; not

28

**A135**

necessarily what they intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use." FPL Energy Point Beach, LLC v. Energy Resource of Australia Ltd., 565 F. Supp. 2d 999, 1004 (W.D. Wis. 2008) (quoting Miller v. Miller, 67 Wis. 2d 435, 441-42, 227 N.W.2d 626, 629 (1975)). There is no language in either the ETSI or IEEE contracts suggesting that Motorola and the standards-setting organizations intended or agreed to prohibit Motorola from seeking injunctive relief. In fact, both policies are silent on the question of injunctive relief. Moreover, in light of the fact that patent owners generally have the right to seek injunctive relief both in district courts, 35 U.S.C. § 283, and in the International Trade Commission, 19 U.S.C. § 1337(d), I conclude that any contract purportedly depriving a patent owner of that right should clearly do so. The contracts at issue are not clear. Therefore, I conclude that Motorola did not breach its contracts simply by requesting an injunction and exclusionary order in its patent infringement actions. I will deny Apple's motion in limine on this issue.

I will also deny Motorola's motion in limine on this issue. Motorola suggests in its motion in limine that there is *no* situation in which it could have breached its contracts by filing suit. However, Motorola does not respond to Apple's argument that the contracts require Motorola to first offer a license to Apple on fair, reasonable and nondiscriminatory terms before filing suit. Because this argument was not addressed fully by either party, I cannot resolve it at this point.

29

**A136**

**C. Motions Related to Apple's Claim that Motorola Breached its Contracts with ETSI by Failing to Make Bona Fide Efforts to Disclose its Patents to ETSI in a Timely Manner**

One of Apple's breach of contract claims remaining in this case is that Motorola breached its contracts with ETSI by failing to make "bona fide efforts" to disclose intellectual property rights in its '559, '697 and '898 patents to ETSI in a timely manner. In the August 10 summary judgment order, I granted Apple's motion for partial summary judgment on several issues of contract interpretation related to this claim, but noted that Apple would have to prove at trial that Motorola failed in fact to make bona fide efforts to disclose its patents to ETSI in a timely manner and that Apple was injured by Motorola's untimely disclosure. Dkt. #194 at 47. Both parties have filed motions in limine relevant to this untimely disclosure claim.

**1. Motorola's motion to preclude evidence and argument relating to timeliness of patent disclosures to ETSI, dkt. #283**

Motorola has moved to dismiss Apple's breach of contract claim based on ETSI's disclosure policy, arguing that there is no relief the court can grant Apple on that claim. First, Motorola argues that Apple did not request any declaratory or equitable remedy in its amended complaint for Motorola's alleged breach of ETSI's disclosure policy. Motorola argues that because Apple has reduced its damages claim to nominal damages, it makes no sense to resolve a claim for which Apple could receive no relief. Second, Motorola argues that Apple cannot prove that it suffered any harm from Motorola's alleged untimely disclosure of its essential patents.

30

**A137**

I am denying the motion. Motorola's argument that Apple failed to plead a claim for declaratory or injunctive relief is simply incorrect. In its amended complaint, dkt. #110, Apple pleaded claims for breach of contract, equitable estoppel and patent misuse based on Motorola's untimely disclosure of intellectual property rights to ETSI and sought relief in the form of (1) an order that Motorola be estopped from enforcing its untimely disclosed intellectual property rights in the International Trade Commission or any other forum, id. at ¶ 197(a); (2) an order that Motorola be barred from seeking an injunction to prevent Apple from practicing certain standards, id. at ¶ 197(l); and (3) an order declaring that Motorola's essential intellectual property rights be declared unenforceable for patent misuse, id. at ¶ 197(m).

Additionally, Motorola's arguments about Apple's inability to prove that Motorola's alleged breach of the disclosure policy caused Apple any harm are nothing more than broad challenges to the weight of Apple's evidence. Although it would have been appropriate to challenge Apple's ability to prove breach of contract at the summary judgment stage, Motorola did not move for summary judgment on those grounds. Instead, Motorola argued only that Apple's claim was barred by the Noerr-Pennington doctrine. I rejected that argument and concluded that Apple could proceed with its breach of contract claims premised on Motorola's untimely disclosure of its intellectual property rights. Dkt. #194 at 28-29. Although I noted that it was "not clear how Apple intends to prove that it was damaged by Motorola's failure to disclose patents to ETSI in a timely manner," id. at 47, this was not an invitation for Motorola to file an untimely and undeveloped summary judgment motion in the form of a motion in limine. In its motion in limine, Motorola devotes only two paragraphs to its argument that Apple cannot prove that it suffered harm from Motorola's late disclosures, dkt. #284 at 5-6, and

fails to explain with any specificity why it believes Apple's evidence of injury is insufficient. Therefore, I will not bar Apple from presenting its nondisclosure case at trial.

## 2. Apple's motion to preclude Motorola from offering evidence or argument that it had a "process" for complying with ETSI's disclosure policies, dkt. #313

As discussed above, one of the issue remaining in this case is whether Motorola made "bona fide" efforts to comply with ETSI's disclosure policies. Motorola's position is that it had an internal process in place to insure compliance with the intellectual property rights disclosure policies of standards-setting organizations such as ETSI. However, Apple contends that Motorola should be precluded from introducing any evidence or argument about such a "process" because Motorola has continually invoked attorney-client privilege and refused to disclose any information about the process.

Motorola's arguments in opposition to Apple's motion are nonresponsive. Motorola argues that Apple is not entitled to an "adverse inference" that Motorola failed to make bona fide efforts simply because it invoked attorney-client privilege. However, Apple has not argued that it is entitled to an adverse inference. Apple argues only that Motorola should be precluded from introducing evidence at trial of a process that it has kept hidden from Apple.

I am granting the motion, with one exception. Motorola cannot introduce any evidence at trial regarding its process for disclosing intellectual property rights unless it made that information available to Apple during discovery. For example, although Motorola's 30(b)(6) witness invoked attorney-client privilege frequently during her deposition when asked about Motorola's disclosure procedures, she did provide some general information on the subject. E.g.,

32

**A139**

Gordon Dep., dkt. #161, at 138-40; Gordon Dep., dkt. #250, at 143-50. Thus, Motorola may introduce information it provided during discovery but may not introduce any information to which it previously claimed privilege. <u>Manning v. Buchan</u>, 357 F. Supp. 2d 1036, 1048 (N.D. Ill. 2004) ("[W]hen a party asserts a privilege to preclude its opponent from obtaining information in discovery, it relinquishes the ability to use that information in its favor at trial.").

### D. Motions Related to Non-parties Chi Mei Communications Systems and Qualcomm

Among the claims I dismissed at summary judgment was Apple's claim that Motorola tortiously and unlawfully interfered with a contract that Apple had entered into with Qualcomm in December 2009. Under that agreement, Apple and Qualcomm agreed to terms under which Apple could purchase chipsets that would be used in Apple's products. The chipsets incorporated Motorola's patented technology, and Motorola and Qualcomm had entered into a separate licensing agreement regarding the chipsets. Apple contended that Motorola committed the tort of interference with contract by terminating Qualcomm's license and covenant rights with respect to Apple. I granted Motorola's motion for summary judgment on that claim because Apple had failed to adduce any evidence that Motorola's actions had disrupted performance of Apple's contract with Qualcomm. Dkt. #194 at 31.

Although Apple's tortious interference claim has been dismissed, the facts surrounding Motorola's termination of Qualcomm's licensing rights remain relevant to the case. Specifically, Apple pleaded a breach of contract theory premised on Motorola's termination of the Qualcomm license, contending that Motorola's selective termination violated its contractual obligations to

offer fair, reasonable and nondiscriminatory licenses to its patents. Apple's Am. Cpt., dkt. #110, ¶¶ 110-11.

In a related breach of contract theory, Apple also alleged in its amended complaint that Motorola unreasonably terminated an agreement it had with Chi Mei Communications Systems, another supplier of component parts for Apple, through which Apple had paid royalties of approximately $1 for each phone for a license to certain of Motorola's standards-essential patents. Id. at ¶¶ 54-55. Shortly after Motorola terminated the Chi Mei license, Motorola sought a license rate from Apple of $12 for each phone. At summary judgment, Motorola did not challenge Apple's ability to prove breach of contract on the basis of the Chi Mei and Qualcomm licenses.

Both parties have filed motions in limine regarding admissibility of evidence regarding these companies.

1. **Motorola's motion to exclude any evidence and argument relating to non-parties Chi Mei Communication Systems and Qualcomm, dkt. #295**

Motorola has moved to preclude Apple from offering evidence and argument at trial relating to Chi Mei and Qualcomm, arguing that Apple's breach of contract theories relating to these two companies are too "tenuous" to be asserted in this action and would "unnecessarily complicate the issues for trial." Dkt. #296 at 3. Specifically, Motorola argues that to resolve Apple's claims, the court would be required to interpret the contracts between Motorola, Chi Mei and Qualcomm and determine whether Apple qualifies as a third party beneficiary to those contracts, whether Motorola's actions were permitted under the contracts and whether

34

**A141**

Motorola's actions breached Apple's alleged third party beneficiary rights in those contracts.

In response, Apple contends that its breach of contract claims do not depend on resolution of the issues identified by Motorola. Apple does not intend to debate at trial whether it was a third party beneficiary to the contracts between Motorola and Chi Mei or Qualcomm or whether Motorola breached some particular clause of its contracts with those companies. Instead, Apple contends that whether or not Motorola's actions were permitted under its contracts with those companies, its actions were unreasonable and discriminatory and constituted a breach of its contractual obligations to ETSI and IEEE to grant "irrevocable licenses on fair, reasonable and nondiscriminatory terms." Apple's Br., dkt. #376 at 2.

Apple's breach of contract theories premised on the Chi Mei and Qualcomm licenses may be flawed. Although Motorola's contracts with ETSI and IEEE required it to give Apple a fair, reasonable and nondiscriminatory license to its standards-essential patents, it is not clear that the contracts prohibited Motorola from altering its license agreements with Chi Mei and Qualcomm simply because Apple was benefiting from the licenses. Motorola's contracts with ETSI and IEEE required it to offer Apple a fair license, not to offer Apple a license through a third party. Unfortunately, this issue was not raised at summary judgment and the parties' briefing on the present motion in limine does not clarify the issue. Instead of addressing Apple's theories directly, Motorola attempts to avoid them by arguing that they are complicated and irrelevant. Without more evidence and argument from the parties on this issue, I cannot conclude that Apple's theories are unsupported by the contracts or the law. Moreover, I agree with Apple that at the very least, the Chi Mei and Qualcomm licenses are relevant to the reasonableness of Motorola's licensing demands. Therefore, I will not preclude Apple from

35

**A142**

introducing evidence of the Chi Mei and Qualcomm licenses and of Motorola's actions in terminating them.

## 2. **Apple's motion to preclude Motorola from offering evidence about why it purported to suspend its license with Chi Mei, dkt. #314**

Apple contends that Motorola should be precluded from offering any evidence about the reasons why it suspended its license with Chi Mei in August 2007 because Motorola has continually asserted attorney-client privilege on this issue and has refused to provide any information to Apple regarding the suspension. Apple points to the depositions of Motorola's Rule 30(b)(6) witness, Ray Warren, in particular. On several occasions during his two depositions, Warren refused to answer questions about Motorola's termination of the Chi Mei license on the basis of privilege. E.g., Warren Dep., dkt. #162, at 179-180; Warren Dep., dkt. #268, at 132-33.

I agree with Apple that Motorola should not be permitted to submit evidence at trial about the particular reasons it terminated its license with Chi Mei, to the extent that Motorola refused to answer specific questions and provide specific information on that issue. However, Motorola did provide some general information during discovery regarding its relationship with Chi Mei and module licensing, through the testimony of Neill Taylor. E.g., Neill Taylor Dep., dkt. #158, at 139-142. Motorola may present any evidence on this issue at trial that it provided to Apple during discovery.

36

3.  **Apple's motion to preclude Motorola from arguing that its cellular standards-essential patent rights were not "exhausted" as to the first iPhone, dkt. #315**

Apple has moved to preclude Motorola from arguing that its license agreement with Chi Mei did not "exhaust" its patent rights with respect to its standards-essential patents that were incorporated into Chi Mei's modules, or that the covenant-not-to-sue contained in the Chi Mei license did not apply to Apple.  The doctrine of patent exhaustion provides "that the initial authorized sale of a patented item terminates all patent rights to that item." Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 625 (2008).  Under Apple's theory, because its iPhone was covered by Chi Mei's license with Motorola, Motorola could not sue Apple for patent infringement of the standards-essential patents covered by the license.  Additionally, after Motorola suspended the license, Motorola could not sue Apple under a covenant-not-to-sue contained in the Chi Mei license.

Apple's motion is less a motion to preclude Motorola from presenting certain evidence than it is an opportunity for Apple to present a new theory based on the doctrine of patent exhaustion.  Apple's amended complaint contained no suggestion that it was pursuing a patent exhaustion theory or that its breach of contract claims were related in any way to a covenant-not-to-sue provision in the Chi Mei license.  Allowing Apple to raise this new theory on the eve of trial through a motion in limine would be highly prejudicial to Motorola.  Therefore, I am denying the motion.

37

**A144**

### E. Motions Related to Expert Witness Reports and Testimony

Both parties disclosed several experts who have provided reports and who may testify at trial. Both parties have filed multiple motions seeking to exclude or limit the testimony of the opposing side's experts under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). In assessing a motion to exclude testimony under Rule 702 and Daubert, the court must consider whether the proposed opinion witness (1) is qualified to offer opinion testimony under Rule 702, (2) has employed reliable methods, (3) proposes to offer opinions that follow rationally from the application of his "knowledge, skill, experience, training, or education" and (4) presents testimony on a matter that is relevant to the case at hand, and thus helpful to the trier of fact. Walker v. Soo Line R.R. Co., 208 F.3d 581, 586 (7th Cir. 2000). This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt or reject Daubert factors to accommodate the facts of a particular case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999).

Before turning to the parties' specific motions and arguments, I note that because this case will be tried as a bench trial, there is less need to make Rule 702 admissibility determinations before the testimony is presented. "That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial." In re Salem, 465 F.3d 767, 777 (7th Cir. 2006). See also Metavante Corp. v. Emigrant Savings Bank, 619 F.3d 748, 760 (7th Cir. 2010) (observing that "the court in a bench trial need not make reliability determinations before evidence is presented"). Thus, I am not overly concerned about admitting expert opinions grounded on questionable methods or of limited significance. During

38

**A145**

the trial, the parties will have the opportunity to question experts about their methods and make arguments about the flaws or limitations of the analyses and conclusions presented. If I determine at trial that an expert's testimony is not useful, I will put an end to the questioning. If I conclude later that any expert opinions that were admitted were unreliable, I will not consider them in making a decision. Still, it will be helpful to the parties to have rulings on their specific arguments about expert testimony, so I will address their motions.

**1.**  **Motorola's motion to preclude the testimony and opinions of Dr. Louis Berneman, dkt. #301**

Motorola has moved to preclude Apple from introducing or relying on opinions from its expert Dr. Louis Berneman at trial. Motorola contends that Berneman's opinions do not meet the threshold requirements for admissibility under Rule 702 and <u>Daubert</u> because Berneman "admitted" that he did not apply proper and accepted methods for valuing Motorola's portfolio of standards-essential patents in reaching his conclusion that Motorola's 2.25% opening offer was unreasonable and discriminatory. Motorola's Br., dkt. #302, at 3. In particular, Motorola argues that Berneman failed to use analytical tools to determine the value of each patent in Motorola's portfolio.

Motorola misconstrues Berneman's deposition testimony. At his deposition, Berneman testified that there are two ways to value a standards-essential patent portfolio: (1) differential valuation, which requires using analytic tools that rate and rank the value of each individual patent in the portfolio; and (2) proportional valuation, which assigns equal value to all patents essential to a standard and thus uses the number of patents in the portfolio to approximate

39

**A146**

portfolio value.  Berneman Dep., dkt. #260, at 43-45.  Berneman went on to explain that he did not attempt to value Motorola's individual patents using analytical tools because he applied "proportional valuation" to Motorola's patent portfolio.  Id. at 49-50.  He offered the opinion that proportional valuation was more appropriate in the standards-setting context.  Id. at 43.

Motorola does not argue that proportional valuation is an unreliable method of valuing patent portfolios.  Instead, it argues only that Berneman "admitted" that he failed to use appropriate methods by failing to use analytical tools in his valuation.  Contrary to Motorola's assertions, Berneman did not testify that he had failed to use appropriate methods and he did not testify that it was necessary to use analytical tools and determine the value of each patent in Motorola's portfolio before a fair and nondiscriminatory license rate could be calculated.  Therefore, Motorola has not identified any valid basis for excluding Berneman's testimony.

## 2.  Motorola's motion to preclude the testimony and opinions of Dr. Dennis Carlton relating to licensing and market power, dkt. #304

Motorola has moved to preclude the testimony and opinions of Apple's expert, Dr. Dennis Carlton, regarding the reasonableness of Motorola's 2.25% license offer to Apple.  Motorola contends that Dr. Carlton's opinions are unreliable and should be excluded under Rule 702 and Daubert for three reasons: (1) Dr. Carlton considered the value of only five of Motorola's patents and failed to analyze the remainder of Motorola's portfolio of standards-essential patents; (2) Dr. Carlton failed to undertake any independent analysis of Motorola's existing licensing agreements before concluding that Motorola's offer was discriminatory; and (3) Dr. Carlton's opinions relating to "market power" were relevant only to Apple's now-

dismissed antitrust and unfair competition claims.

    With respect to Motorola's first argument, Motorola does not take issue with Carlton's general method for valuing patents in the standards-setting context. Both Carlton and Motorola's expert, Dr. Gregory Leonard, agree that a reasonable royalty for a declared-essential patent is a royalty that reflects the value of the patent over the next-best alternative available to the standards-setting organization before the standard was set. Carlton Rep., dkt. #208, ¶ 49; Leonard Rep., dkt. #209, ¶ 19. However, Motorola contends that Dr. Carton's conclusions are flawed because he applied his method only to the specific patents Motorola asserted against Apple in patent infringement lawsuits and not to the "hundreds" of other patents Motorola also claims as essential to cellular and wireless standards.

    Instead of considering the ex ante value of each patent in Motorola's portfolio, Dr. Carlton used as a benchmark for the value of Motorola's entire portfolio the rate Apple had paid Chi Mei of 93 cents on each iPhone for the rights to Motorola's declared-essential patents. Carlton Rep., dkt. #208, ¶¶ 55-60. To test the benchmark, Carlton considered whether the five specific patents Motorola was asserting against Apple (as of March 2012) had sufficient value to justify Motorola's attempt to charge Apple a rate twelve times what Apple had been paying Chi Mei, or approximately $12.35 an iPhone. Id. at ¶¶ 55-56. Carlton concluded that the five patents represent only marginal improvements over alternatives that were available at the time the standards were being set and thus, Motorola's licensing demand was "inconsistent with the limited value of the [asserted] patents themselves." Id. at ¶ 56.

    Motorola contends that in order to determine whether its license offers were reasonable and nondiscriminatory, Dr. Carlton was required to analyze and value Motorola's entire

41

**A148**

portfolio of essential patents and any possible technological alternatives to those patents that existed before the relevant standards were adopted. However, Motorola cites no evidence or expert opinion in support of its criticism of the report or its assertion that it would be necessary or even possible to analyze each of its standards-essential patents to determine a reasonable royalty rate. Additionally, Motorola does not provide any specific criticism of Dr. Carlton's decision to use the Chi Mei rate and the incremental value of a few patents to evaluate Motorola's licensing offer to Apple. Without more specific challenges from Motorola, I cannot conclude that Dr. Carlton's opinions are unreliable.

Motorola's second argument is that Dr. Carlton's opinions are unreliable because he did not apply any analysis in identifying which license agreements would be comparable to a license between Apple and Motorola. Instead, Carlton relied wholly on the work of another Apple expert, Dr. Brian Napper.

By itself, the fact that Carlton relied on Dr. Napper's work in forming his own opinions is not a sufficient reason to exclude Carlton's opinions. Walker, 208 F.3d at 588 (observing that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable"). See also Owens v. Ford Motor Co., 297 F. Supp. 2d 1099, 1108 (S.D. Ind. 2003) (testifying expert may rely on another expert's opinions); Janopoulos v. Harvey L. Walner & Associates, Ltd., 866 F. Supp. 1086, 1095 (N.D. Ill. 1994) (same). However, "[e]xpert testimony relying on the opinions of others should, of course, be rejected if the testifying expert's opinion is too speculative . . . or the underlying basis is faulty." Walker, 208 F.3d at 588.

Motorola presents no persuasive reason for finding the work of Dr. Napper on which

42

Carlton relied was unreliable or faulty. Motorola criticizes Napper's September 14, 2011 report regarding "balancing payments," but there is no indication in Carlton's report that he relied on Napper's September 14 report. Motorola also criticizes Napper's March 1, 2012 report, a report on which Carlton did rely, for failing to "disclose with specificity the analysis or investigation" Napper undertook to determine licensees comparable to Apple. Motorola's Br., dkt. #305, at 7. However, Motorola fails to acknowledge that Napper's March 1 report includes a section titled "Determining the Licensees Comparable to Apple," in which Napper describes how he identified licensees that may be comparable to Apple's. Napper's Supp. Rep., dkt. #355, at 3-5 ("Determining the Licensees Comparable to Apple"). Because Motorola failed to address Napper's own description of his method, I cannot determine whether Napper's work is too "speculative" or "faulty" to provide a basis for Carlton's opinions.

Motorola's final argument is that Carlton's opinions on "market power" should be excluded because those opinions were relevant only to Apple's now-dismissed antitrust claims. Motorola does not identify particular opinions that it thinks should be precluded as irrelevant, arguing instead that the court should exclude all opinions included under the sections titled "Market Power Concerns with Collective Standards Setting" and "Motorola's Acquisition and Exercise of Market Power." The problem with this broad argument is that those two sections make up 28 of the 32 total pages of Carlton's report and include several opinions regarding issues that remain relevant in this case, including the potential for patent hold up and discrimination in standards-setting contexts, how licensing and disclosure obligations address those problems, Carlton's interpretation of "reasonable and "nondiscriminatory" and his opinions as to whether Motorola complied with its licensing and disclosure obligations. Because

43

Motorola does not identify specific opinions that should be excluded, I will not preclude any opinions contained in those sections.

### 3.  Motorola's motion to exclude evidence or argument related to allegedly "non-infringing alternatives" to Motorola patents, dkt. #307

In their expert reports, Apple's experts identified and analyzed potential alternatives to the technologies covered by five of Motorola's declared-essential patents and concluded that Motorola's technical proposals to the standards-setting organizations were competing with equally beneficial alternatives for inclusion in the relevant standards.  Heegard Rep., dkt. #278, ¶ 7; Heegard Rep., dkt. #279, ¶¶ 76-79; Cimini Rep., dkt. #233, at ¶¶ 36, 39.  Motorola has moved to preclude Apple from presenting any argument or evidence at trial related to alternatives to Motorola's '516, '559 or '898 patents for three reasons: (1) Apple's experts failed to consider whether the purported alternatives were covered by patents; (2) Dr. Heegard's opinions about alternatives to the '559 patent are speculative; and (3) Dr. Cimini's opinions about alternatives to the '898 patent rely on flawed methods.

Motorola's first argument is that Apple's experts' conclusions regarding alternative technology are not reliable because they fail to address the costs associated with adopting an alternate technology, namely, the potential patent licensing fees that would have been paid to a third party whose alternate technology was adopted.  The problem with this argument is that Motorola never explains why potential patent licensing fees are relevant to the purpose for which Apple's experts analyzed the alternative technologies.  Apple intends to use evidence of alternatives to establish a reasonable license rate for Motorola's declared-essential patents, based

44

**A151**

on the value of Motorola's patents before they were incorporated into standards. Apple says that the existence of alternatives that provide the same technical benefit as Motorola's proposals show that Motorola's patented proposals were "valueless" under an ex ante valuation analysis. Also, Apple contends that the existence of potential patent licensing fees on the purported alternatives is not relevant to the ex ante analysis. Motorola does not explain how potential patent licensing fees should have been incorporated into Apple's experts' analyses of ex ante valuation.

Motorola's second argument is that Dr. Heegard's opinions about non-infringing alternatives to the '559 patent are based on "unfounded speculation" about the standards-setting process. Motorola objects in particular to Heegard's statement that there are "many reasons why one proposal is chosen over another for inclusion in a standard," including "negotiations among participants," "compromise and 'horse trading.'" Id. at ¶ 13. Motorola argues that Heegard's suggestion that "negotiation" or "horse trading" influenced the inclusion of the '559 technology into the UMTS standard is based entirely on speculation because Heegard was not involved in developing the UMTS standard and has not even attended any ETSI working groups or meetings.

Motorola's criticisms of Heegard are more about the weight that should be given Heegard's opinions, not about the reliability of Heegard's methods or the usefulness of his report. As explained in his deposition, Heegard's opinions about negotiations and horse trading were based on his personal experience with standards-setting organizations generally. Heegard Dep., dkt. #264, at 150-51. Although Heegard has not participated in ETSI meetings and did not participate in development of the UMTS standard, he stated that he had "been involved in

45

**A152**

quite a few different standards," including some comparable to ETSI standards, and that in his experience, standards-setting necessarily involves negotiation and horse trading.  Heegard Dep., dkt. #264, at 114. This is legitimate expert opinion.  Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, *experience*, training, or education may testify in the form of an opinion or otherwise . . . .") (emphasis added).  Cf. Gayton v. McCoy, 593 F.3d 610, 619 (7th Cir. 2011) ("[A]n expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome.").  If Motorola believes that Heegard's opinions deserve less weight because of his lack of experience with ETSI and the UMTS standard in particular, Motorola is free to make that argument at trial.

Motorola's final argument addresses Dr. Cimini's opinions about alternatives to the '898 patent.  Dr. Cimini gave the opinion that there were two alternatives to the '898 patent proposed by Nortel and Ericsson that ETSI could have adopted and that neither of those alternatives was covered by patents.  Motorola contends that Dr. Cimini's opinions should be excluded because he relied on flawed search parameters when searching for patents that might cover the two alternatives.  Notably, Motorola does not contend that it looked for or discovered any patents that cover the two alternatives identified by Cimini.  Instead, Motorola argues that Cimini should have looked harder and used different search terms.  Additionally, Motorola argues that Cimini should have considered whether the Nortel alternative was covered by a Nortel patent that was filed more than one year *after* the alternative was published.

I am not persuaded that Cimini's failure to consider the later-filed patent and his failure to search exhaustively for patents that may cover the Nortel and Ericsson alternatives are

46

**A153**

sufficient reasons to preclude his opinions.  As with Motorola's previous objections to Apple's experts' opinions, these objections are more about the weight that should be given Cimini's opinions than whether Cimini's opinions are reliable.  Therefore, I am denying Motorola's motion in full.

### 4. **Apple's motion to preclude evidence and argument regarding opinions on alternatives from Motorola's technical experts, dkt. #316**

Apple contends that Motorola should be precluded from relying on its technical experts' analyses of potential alternatives to its standards-essential patents that existed at the time Motorola's patents were adopted into standards.  First, Apple contends that any expert opinion regarding alternatives to the '223, '559 and '697 patents is irrelevant because those patents were found "worthless" in the related patent infringement suits in the International Trade Commission and Northern District of Illinois.  As I explained already, evidence regarding the value of these three patents is relevant to whether Motorola's initial license offer to Apple was fair, reasonable and nondiscriminatory because that offer was made before the patents had been found invalid or not infringed.  Apple makes no other argument about why this evidence should be precluded.

Second, Apple contends that Motorola's experts' testimony regarding potential alternatives to the '516 and '898 patents should be excluded because the experts failed to "quantify" the purported benefits that these patents had over potential alternatives.  Apple criticizes Dr. Kevin Almeroth for not calculating how often the transmitter and receiver may lose synchronization under Apple's alleged ETS 300 alternative method.  Apple's Br., dkt. #316 at

47

**A154**

4-5.  Apple criticizes Dr. Tim Williams for failing to calculate "how much faster the ['898 patent system] can re-allocate resources or how much more data the system can handle by using the method of the '898 patent."  Id. at 5.

Apple does not explain why Dr. Almeroth or Dr. Williams was required to "quantify" the purported benefits of Motorola's patents or make the specific calculations identified by Apple in order to comply with the requirements of Rule 702 and Daubert.  Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000) ("[T]he Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome.").  Apple cites an order issued by Judge Posner in the Illinois patent infringement case in which he excluded the testimony of Motorola's damages expert, in part because she did not "quantify the benefit" to Apple of using the AT&T network over another carrier, such as Verizon.  Apple, Inc., 2012 WL 1959560, *11.  However, Apple does not explain why Judge Posner's analysis of the testimony of a *damages* expert in the patent infringement case has any applicability to the opinions of the *technical* experts in this case.  Both Dr. Almeroth and Dr. Williams provided detailed expert reports containing extensive descriptions of Motorola's patents, as well as the possible alternatives.  If Apple believes their reports are deficient, it may present evidence and argument at trial to undermine them.  However, Apple has not shown that their testimony should be excluded under Rule 702.  Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992, 996 (W.D. Wis. 2006) ("Although defendants' challenges to these experts' qualifications are fodder for cross-examination at trial, they do not demonstrate that the opinions fail to meet the requirements of Fed. R. Evid. 702.).

5. **Apple's motion to exclude Dr. Gregory Leonard from offering opinions on the correct fair, reasonable and nondiscriminatory royalty rate for Motorola's declared standards-essential patents, dkt. #318, and opinions about "synergies," dkt. #319**

Apple contends that Motorola's expert Dr. Leonard should not be permitted to testify or offer opinions as to what would constitute a fair, reasonable and nondiscriminatory royalty rate for a license of Motorola's standards-essential patents because he did not disclose these opinions in his expert report or deposition testimony. Additionally, Apple contends that Dr. Leonard should be precluded from offering opinions that Motorola's patented technology creates "synergies" with non-accused features of Apple's products, making it appropriate for Motorola to seek a royalty based on the handset price of Apple's products.

I am granting these motions in part and denying them in part. Motorola concedes that Dr. Leonard did not offer any opinion about what particular rate or range or rates would constitute a fair, reasonable and nondiscriminatory royalty. Motorola's Resp. Br., dkt. #363, at 1. Therefore, he may not testify about a particular rate at trial. However, Dr. Leonard did offer opinions in his report and at his deposition about whether Motorola's 2.25% offer was so unreasonable as to be a breach of Motorola's contracts with ETSI and IEEE. Additionally, Dr. Leonard offered criticisms of the method used by Apple's experts to calculate a particular rate and concluded that Apple's experts failed to consider the overall value that Motorola's technology added to Apple's products. He may testify as to any of these opinions contained in his report. Although Apple challenges Dr. Leonard's opinions as not being supported by the law of damages in patent infringement cases, this is not a patent infringement case. Moreover, neither party has cited any clearly established law regarding what factors may be considered in

49

determining a fair, reasonable and nondiscriminatory license rate in the standards-setting context. Under these circumstances, I conclude that it makes sense to hear what both sides' expert economists have to say on the subject. Apple's challenges may be appropriately pursued in cross-examination at trial.

**6. Apple's motion to exclude Motorola's expert testimony not previously disclosed in a report, dkt. #317**

Apple has moved to exclude Motorola from introducing expert testimony at trial that was not disclosed previously in expert reports. This motion is redundant of Apple's other motions regarding expert reports and is unnecessary. Further, Motorola "agrees that neither party should be ambushed at trial with expert opinions on which it did not have adequate notice." Motorola's Br., dkt. #365, at 1. If Apple believes at trial that Motorola is attempting to introduce opinions that were not disclosed previously, it may object to them at the appropriate time. This broad motion will be denied.

**7. Motions regarding Apple's use of supplemental expert reports by Dr. Cimini and Dr. Napper**

The parties filed three motions addressing Apple's use of supplemental expert reports. Motorola filed a motion to strike the August 14, 2012 supplemental report of Dr. Leonard Cimini, dkt. #218, and the August 23, 2012 supplemental report of Dr. Brian Napper, dkt. #229, while Apple filed a motion requesting leave to use the two supplemental reports at trial, dkt. #226.

50

**A157**

a. **Dr. Cimini's August 14, 2012 report**

Expert reports were due in this case on March 6, 2012, with responsive reports due April 3, 2012. Dkt. #117. On March 6, 2012, Apple filed an initial report by Dr. Cimini, in which Cimini offered the opinion that there were at least two viable alternatives to the technology of the '898 patent that existed at the time the '898 patent was declared essential to ETSI standards and was incorporated into standards adopted by the 3G Project. The two alternative methods were documented in publications by Ericsson and Nortel and were termed "Contributions 75/95 and 99/96." Dkt. #233, ¶¶ 19, 24.

On August 14, 2012, Apple filed a supplement report, in which Cimini identifies two additional alternatives to the technology of the '898 patent. Dkt. #234. In particular, Cimini states that the 3G Project could have considered Contribution 239/97 and GSM 03.64 as alternatives. Id. at ¶ 6. Cimini's supplemental report relied on documents produced by AT&T on March 2, 2012, describing the functionality of base stations created by Ericsson and Nokia Siemens Networks. Id. at 11. The documents were produced in response to a subpoena that had been issued by Motorola to AT&T on February 8, 2012. AT&T later produced similar documents on March 30, 2012 in response to a subpoena served by Apple.

Motorola contends that Cimini's supplemental report should be stricken under Fed. R. Civ. P. 37(c) the ground that it was not timely disclosed as required by Rule 26(a) or (e) and it is prejudicial. In response (and in support of its motion to supplement), Apple contends that Cimini's supplemental report was a timely supplemental report under Rule 26(e) and this court's scheduling order, and that even if it was untimely, the delay was substantially justified and

caused no prejudice to Motorola.

Under the scheduling order in this case, Rule 26(e) supplementation to an expert report must be "limited to matters raised in an expert's first report, must be in writing and must be served not later than five calendar days before the expert's deposition. . . ." Dkt. #102 at 2. Under Rule 37,

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing,  or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c).

Apple contends that Cimini's August 14 supplemental report complies with these rules because it was served nearly two weeks before his deposition was scheduled on August 31 and was limited to matters raised in his first report. In particular, Apple contends that both Cimini's initial and supplemental reports focused on alternatives that the 3G Project could have used in place of the technology claimed in the '898 patent. The supplemental report merely elaborates on points he made in his original report.

Apple's arguments are not persuasive. Although Cimini's new report covers the same general topics as his original report, it includes significant new details. Rule 26(e) is intended to provide parties an opportunity to correct mistakes or oversights, not to include new examples and illustrations to bolster previous opinions. Innogenetics N.V. v. Abbott Laboratories, 2006 WL 6000791, *2 (W.D. Wis. 2006). Although Apple contends that the AT&T documents were not "available," it does not suggest that its failure to discover the documents earlier was Motorola's fault and it does not identify any particular reason why it could not have found the documents in time to include them in Cimini's original report.

52

**A159**

Additionally, Apple has not shown that its late supplementation is "substantially justified." Apple received the information produced by AT&T and used by Cimini in his supplemental report on March 2, 2012, four days before Apple filed Cimini's initial report in this case. Apple states that Cimini had finished his initial report on March 1, 2012, so that it could be filed in the related patent infringement case pending in the Northern District of Illinois, and that Cimini did not have time to update that report before the March 6 deadline in this case. That may be true, but Apple does not explain why it waited *more than five months* until August 14, 2012 to update Cimini's report.

Instead of explaining its five-month delay, Apple argues that Motorola was not prejudiced by Cimini's new opinions because Motorola has been aware of the AT&T documents since at least March 2, 2012 and questioned Cimini about the AT&T documents during his May 4, 2012 deposition in the Illinois case. I disagree. Although Motorola knew that Apple intended to rely on the AT&T documents in the Illinois case, it did not know that Apple would rely on those documents in this case. Motorola could have believed reasonably that Apple's decision not to file a supplemental expert report in this case meant that Apple did not intend to rely on the documents.

Finally, Motorola's expert did not prepare a response to Cimini's supplemental opinion. If I allowed Apple to rely on the new opinion at trial, Motorola would have to devote resources to rebutting that opinion when it otherwise could be preparing for other aspects of trial. Motorola's ability to prepare for trial should not be hampered in order to accommodate Apple's untimely supplemental opinion.

In sum, because Apple has not shown that Cimini's supplemental report is either justified

or harmless, I am denying Apple's motion to supplement, dkt. #226 and granting Motorola's motion to strike it. Dkt. #208.

### b. Brian Napper's supplemental report

The parties also dispute whether Apple should be allowed to rely on the supplemental report of its damages expert, Brian Napper. Although the parties disagree about whether Apple's supplementation was proper, the more important question is why Apple needs to rely on this report at all. Apple has withdrawn its claim for damages over the amount of $20 and has agreed to pursue only nominal damages, equitable remedies and declaratory relief at trial. Napper's supplemental report contains opinions about additional fees that Apple incurred in the International Trade Commission investigation and the Illinois case, but Apple has not explained why these opinions remain relevant. Therefore, I am denying Apple's motion to supplement, dkt. #226 and granting Motorola's motion to strike the report, dkt. #229.

ORDER

IT IS ORDERED that

1.  Plaintiff Apple Inc.'s motion to preclude Defendant Motorola Mobility, Inc. from offering evidence or argument that it was entitled to seek injunctive relief or that it did not breach its contracts with ETSI and IEEE by doing so, dkt. #310, is DENIED.

2.  Apple's motion to exclude evidence and argument that Motorola's patents ruled invalid or not infringed have value, dkt. #311, is GRANTED IN PART and DENIED IN PART. Prior decisions regarding validity and infringement of Motorola's declared-essential patents are

54

**A161**

relevant to the current fair, reasonable and nondiscriminatory rate for Motorola's standards-essential patent portfolio, but are not relevant to Motorola's license offers made before the decisions were issued, as explained in this opinion.

3.   Apple's motion to exclude evidence and argument that Apple must satisfy a condition precedent to trigger Motorola's licensing obligation, dkt. #312, is GRANTED.

4.   Apple's motion to preclude Motorola from offering evidence or argument that it had a "process" for complying with standards-setting organizations' disclosure policies, dkt. #313, is GRANTED IN PART and DENIED IN PART.  Motorola cannot introduce any evidence at trial regarding its process for disclosing intellectual property rights unless it made that information available to Apple during discovery.

5.   Apple's motion to preclude Motorola from offering evidence about why it purported to suspend its license with Chi Mei, dkt. #314, is GRANTED IN PART and DENIED IN PART.  Motorola may present any evidence on this issue at trial that it provided to Apple during discovery.

6.   Apple's motion to preclude Motorola from arguing that its cellular standards-essential patent rights were not exhausted as to the first iPhone, dkt. #315, is DENIED.

7.   Apple's motion to preclude evidence and argument regarding opinions on alternatives from Motorola's technical experts, dkt. #316, is DENIED.

8.   Apple's motion to exclude certain Motorola expert testimony, dkt. #317, is DENIED.

9.   Apple's motion to exclude Dr. Leonard from opining on the correct royalty rate for Motorola's declared standards-essential patents, dkt. #318, is GRANTED IN PART and DENIED IN PART.  Dr. Leonard may not testify about a particular rate or range that qualifies

55

**A162**

as a fair, reasonable and nondiscriminatory rate for Motorola's standards-essential patents, but may offer opinions about whether Motorola's 2.25% offer was a breach of Motorola's contracts with ETSI and IEEE. Additionally, Dr. Leonard may offer criticisms of the methods used by Apple's experts to calculate a particular rate.

10. Apple's motion to exclude testimony of Dr. Leonard relating to synergies, dkt. #319, is DENIED.

11. Apple's motion to take judicial notice of Exhibits 1-45, dkt. ##322, 323, to the Sept. 28, 2012 Declaration of Richard Anthony Lopez, dkt. #321, is GRANTED.

12. Apple's motion for leave to rely on supplemental expert reports, dkt. #226, is DENIED.

13. Motorola's motion to preclude Apple from seeking specific performance, dkt. #280, is DENIED.

14. Motorola's motion to preclude evidence and argument relating to timeliness of patent disclosures to ETSI, dkt. #283, is DENIED.

15. Motorola's motion to determine the terms of ETSI and IEEE policies, dkt. #286, is DENIED.

16. Motorola's motion to preclude evidence and argument arising after January 4, 2011, dkt. #289, is GRANTED IN PART and DENIED IN PART. Both parties are constrained by the explicit prohibitions of their non-disclosure agreements, but may introduce evidence arising after January 4, 2011 that is not expressly prohibited by those agreements.

17. Motorola's motion to exclude evidence and argument concerning prior litigation judicial decisions regarding the patents-in-suit, dkt. #292, is DENIED.

18.  Motorola's motion to exclude evidence and argument relating to non-parties Chi Mei Communications Systems and Qualcomm, dkt. #295, is DENIED.

19.  Motorola's motion to exclude evidence and references to irrelevant standards and standards-setting bodies, dkt. #298, is GRANTED IN PART AND DENIED IN PART.  Apple is precluded from introducing testimony and evidence regarding standards that are not at issue in this case and standards-setting bodies other than ETSI and IEEE, and ETSI and IEEE standards that are not at issue in this case, unless Motorola opens the door to such evidence and argument.

20.  Motorola's motion to preclude the testimony and opinions of Dr. Louis Berneman, dkt. #301, is DENIED.

21.  Motorola's motion to preclude the testimony and opinions of Dr. Dennis Carlton, dkt. #304, is DENIED.

22.  Motorola's motion to exclude evidence or argument related to allegedly "non-infringing alternatives" to Motorola patents, dkt. #307, is DENIED.

23.  Motorola's motion to strike the supplemental expert report of Dr. Cimini, dkt. #218, is GRANTED.

24.  Motorola's motion to strike the supplemental expert report of Dr. Brian Napper, dkt. #229, is GRANTED.

Entered this 29th day of October, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

**A164**

# FINAL PRETRIAL
# CONFERENCE ORDER

# DATED NOVEMBER 2, 2012 (DKT 485)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE INC.                                    FINAL PRETRIAL CONFERENCE
                                                       ORDER
                    Plaintiff,
                                                  11-cv-178-bbc

          v.

MOTOROLA MOBILITY, INC.

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A final pretrial conference was held in this case on November 1, 2012 before United States District Judge Barbara B. Crabb.  Plaintiff Apple Inc. appeared by Matt Powers, Jaron Raofield and Christine Saunders Haskett.  Defendant appeared by Stephen Swedlow, Brian Cannon, Edward DeFranco, Chester Day and Lynn Stathas.

Counsel predicted that the case would take 8-9 days to try.  They understand that trial days will begin at 9:00 and will run until 5:30, with at least an hour for lunch, a short break in the morning and another in the afternoon.

Counsel agreed that with the exception of experts and corporate representatives, all witnesses would be sequestered.  Counsel are either familiar with the court's visual

1

**A165**

presentation system or will make arrangements with the clerk for instruction on the system.

No later than 5:00 p.m. on November 2, 2012, plaintiff's counsel will advise defendant's counsel of the witnesses plaintiff will be calling on Monday and the order in which they will be called. Counsel should give similar advice at the end of each trial day; defendant's counsel shall have the same responsibility in advance of its case.

Counsel may have no more than 45 minutes for opening statements and should confine their statements to an explanation of what they expect the evidence will show. Arguments are to be reserved for the end of the trial.

Counsel should use the microphones at all times and address the bench with all objections. If counsel need to consult with one another, they should ask for permission to do so. Only the lawyer questioning a particular witness may raise objections to questions put to the witness by the opposing party and argue the objection.

NOTE: It is not necessary for counsel to provide copies of documentary evidence to the court until the end of trial. The exhibits that the parties introduce will be displayed on the exhibit monitor.

Counsel should know that matters that have been kept under seal during the pendency of this case, including exhibits, will be disclosed to the public to the extent they are the subject of testimony. The exhibits themselves will not be part of this court's record; counsel are responsible for their own exhibits.

2

**A166**

**NOTE:** From this date forward, any documents filed with the court under seal must be accompanied by a document that has been redacted to remove only the truly confidential information. I will not review every document to be sure that this directive has been followed but will reserve the right to impose sanctions if any party uses redaction improperly, to hide information that it cannot persuade the court is covered by the protective order.

The parties agreed to present their primary deposition testimony in pared down form. Each deposition introduced will begin with a short running of the deposition so that the court can get a sense of the deponent and with a two-to three minute explanation by counsel about what the deposition will cover; the party's opponent may then have an opportunity to respond to the explanation and ask the court to read sections of the deposition it believes flesh out the portions identified by the other counsel. The court will read the portions of the depositions identified by the parties so that it will not be necessary to use in-court time to listen to them.

The parties are to advise the court when they intend to introduce evidence that is confidential so that the courtroom may be cleared. They anticipate that this will happen only rarely. In some cases, counsel will introduce evidence solely on the visual presenter without discussion but without the need to close the courtroom.

Counsel agreed to accommodate each other's scheduling problems by using Friday, November 9, 2012 for witnesses unable to appear during the following week. If there is a

3

witness who has started testifying and could finish his testimony and avoid staying in Madison for the three-day weekend, every effort will be made to get that testimony in as well.

Motorola's motion to strike the reports of David E. Culler and Steven W. McLaughlin is DENIED, but the reports may be used only as factual evidence about the prior litigation of the '516 patent and possibly as materials for cross examination. If Apple seeks to use the reports for the latter purpose, it must first clear the use with the court.

The parties are directed to revise their proposed special verdicts with a focus on the factual matters that the court must decide in order to answer each proposed question in the verdict. Proposing a general question is not helpful. What is helpful is to break the question down into questions about specific facts. For example, instead of asking "Was the driver negligent?" the questions can be framed in specifics, tracking the trial evidence: "Was the driver exceeding the speed limit at the time of the accident?" "Did the driver fail to signal his turn?" etc. In revising the verdicts, counsel should start with the goal of including every question they believe the court must answer in order to decide this case.

In addition, Apple is to revise its proposed special verdict by tying each question to a specific claim in the first amended complaint and explaining which remedy sought matches which claim and why.

In addition, the parties are to prune and supplement their proposed findings of fact

to exclude proposed facts that are no longer relevant and to identify every fact they intend to prove that bears on each question they want the court to answer.  The revised special verdict forms and proposed findings of fact are to be filed with the court no later than noon on Wednesday, November 7, 2012.

Without reaching any resolution, the court and the parties discussed at length questions about the justiciability of the issues raised by Apple and the implications of the court's picking a specific FRAND rate, particularly in view of Apple's statement that it does not consider itself bound to accept any rate determined by the court.

Entered this 2d day of November, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

5

# OPINION AND ORDER
# DATED NOVEMBER 2, 2012 (DKT 487)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                            Plaintiff,

       v.

MOTOROLA MOBILITY, INC.,

                            Defendant.

OPINION and ORDER

11-cv-178-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In an order entered October 29, 2012 resolving the parties' motions in limine, dkt. #424, I denied Motorola's motion to preclude Apple from seeking specific performance. Id. at 7-11. In its amended complaint, Apple had requested "[a]n order ordering Motorola to specifically perform its contractual commitment to license its essential patents on F/RAND terms." Dkt. #110 at ¶ 197(h). From this request for relief, I understood Apple to be requesting an order requiring Motorola to offer a license for its standards-essential patents to Apple and to be representing that Apple was ready and willing to accept such a license, or at least that Apple would be bound by the license rate set by the court for Motorola's standards-essential patents. In denying Motorola's motion in limine, I stated that "specific performance *may* be an appropriate remedy under the circumstances of this case" because

> [u]nless and until Motorola gives Apple a fair license to its declared-essential patents, Apple will continue to face the threat of patent infringement litigation from Motorola. It would be highly inefficient to require Apple to bring a new lawsuit for monetary damages or declaratory relief each time Motorola sues it for patent infringement. Additionally, it makes little sense to order the parties to continue negotiating a license when they have been unable to reach an agreement

1

**A170**

through five years of negotiations.

Dkt. #424 at 8.

Since issuing the October 29 order, it has become clear that Apple's interest in a license is qualified. In its response to Motorola's motion for clarification on the specific performance issue, Apple states that it will not commit to be bound by any FRAND rate determined by the court and will not agree to accept any license from Motorola unless the court sets a rate of $1 or less for each Apple phone. Apple's Resp. Br., dkt. #448 at 8. In other words, if Apple is unsatisfied with the rate chosen by the court, it "reserves the right to refuse and proceed to further infringement litigation." Id. at 2. Despite its position, Apple maintains that it is entitled to specific performance in the form of the court determining what a FRAND rate is for Motorola's patents. At the final pretrial conference, I asked Apple to explain why it believed the court should determine a FRAND rate even though the rate may not resolve the parties' licensing or infringement disputes. I questioned whether it was appropriate for a court to undertake the complex task of determining a FRAND rate if the end result would be simply a suggestion that could be used later as a bargaining chip between the parties. Apple responded that the rate would resolve the dispute in this particular case, namely, whether Motorola's license offer was FRAND and if not, what the rate should have been.

Apple's response was not satisfactory and did not assuage my concerns about determining a FRAND rate that may be used solely as a negotiating tool between the parties. After further consideration, I believe it would be inappropriate to grant Apple's clarified request for specific performance. As I explained in the October 29 order, the normal remedy for a breach of contract is an award of damages, while specific performance is an "exceptional" remedy. Dkt.

2

**A171**

#424 at 8.  It may have been appropriate to order exceptional relief in this case if it would have prevented continued patent infringement litigation or protracted negotiations.  However, it is now clear that specific performance would not resolve those concerns.

Moreover, because specific performance is a request for equitable relief in the form of a "positive injunction," Chicago United Industries, Ltd. v. City of Chicago, 445 F.3d 940, 945 (7th Cir. 2006), a party requesting specific performance must satisfy the four-factor test set forth in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  This test applies to requests for injunctive relief in federal court, regardless whether the underlying claim is premised on patent law, federal statutory law or state law.  E.g., Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1184 (9th Cir. 2011) (stating "[e]ven in [National Environmental Policy Act] cases,[a]n injunction should issue only if the traditional four-factor test is satisfied") (citation omitted); Kartman v. State Farm Mutual Automobile Insurance Co., 634 F.3d 883, 886, 892 (7th Cir. 2011) (using four-factor eBay test to analyze whether proposed class of plaintiffs might obtain injunction for claims originally brought in state court alleging breach of contract, bad-faith denial of insurance benefits and unjust enrichment); e360 Insight v. Spamhaus Project, 500 F.3d 594, 596, 604 (7th Cir. 2007) (citing eBay in support of "conclu[sion] that a more substantial inquiry . . . was necessary prior to the entry of equitable relief" for various torts).  Under ebay, a plaintiff seeking an injunction must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc., 547 U.S. at 391.

Apple's request for a FRAND rate that may or may not resolve the licensing and infringement disputes between the parties and would likely be used simply as a starting point for future negotiations does not satisfy these basic requirements for an injunction. First, Apple has not shown that it would suffer irreparable harm without its requested relief. In its trial brief, Apple's only allegation of irreparable harm is that Motorola has sued it for patent infringement and has sought to enjoin or exclude Apple from selling its products in the United States. Apple contends that if its products were enjoined or excluded from the United States, it would suffer lost profits, loss of potential customers, loss of goodwill and other irreparable harm.

Apple's allegations of "irreparable harm" have at least two problems. The first problem is that Apple's request for specific performance in the form of court declaration of a FRAND rate without any obligation by Apple to accept the rate would not prevent Motorola from suing Apple for patent infringement and requesting injunctive relief. In other words, if Apple refuses to be bound by the rate determined by the court, Motorola could continue to sue Apple for patent infringement and request injunctive relief.

The second problem is that Apple has provided no reason why its injuries would not be remedied by an award of money damages. It is undisputed that Motorola has failed to obtain any exclusion order or permanent injunction against Apple in the related patent infringement proceedings. Further, although Apple suggests that it will continue to face threats of permanent injunction or exclusionary orders related to Motorola's standards-essential patents, it is not clear why this would be so if this court had resolved Apple's claim for money damages in its favor. If Apple had been awarded money damages in this case, the court would have necessarily determined that Motorola breached a contract by failing to offer Apple a FRAND rate. Under

4

**A173**

such circumstances, Apple would have an obvious defense in any future proceeding in which Motorola sought an injunction or exclusionary order against Apple.

With respect to the remaining <u>eBay</u> factors, I am particularly convinced that the public interest factor weighs against granting Apple's request for specific performance in this case. As I explained at the final pretrial conference, courts are not in the best position to determine a FRAND rate for a portfolio consisting of hundreds of patents that would be used later in licensing negotiations between two highly sophisticated parties. Both parties in this case employ licensing experts whose job it is to negotiate these types of licenses and who are in a much better position than the court to determine a FRAND rate. Apple's request that the court determine the FRAND rate places an enormous and possibly unjustifiable burden on the judiciary's resources. In light of this reality, it would not be in the public interest for the court to spend such enormous resources to determine a FRAND rate that may ultimately lead only to additional litigation and would set a troubling precedent for future cases involving FRAND commitments. As the Court of Appeals for the Seventh Circuit has said, courts should consider the practicality of a requested injunction and "as a practical matter, . . . what purpose would be served by" a proposed injunction. <u>Kartman</u>, 634 F.3d at 893.

Finally, although Apple suggested at the final pretrial conference that this court could determine a FRAND rate as part of Apple's request for declaratory relief, regardless of the requirements for seeking specific performance, it would be inappropriate to "declare" a FRAND rate for the same reasons explained above. The decision whether to grant declaratory relief is discretionary, 28 U.S.C. § 2201(a) (courts "may" issue declaratory judgments), and it is inappropriate to issue declaratory judgment if "such a judgment would have no practical effect." <u>Apple, Inc. v. Motorola, Inc.</u>, Case No. 1:11-CV-08540, 2012 WL 2376664, *23 (N.D. Ill. June

22, 2012).

In light of these observations, I am prepared to conclude that the court will not "declare" a specific FRAND rate for Motorola's standards-essential patents. This would mean that, with respect to Apple's breach of contract claim arising from Motorola's FRAND commitments, the trial would resolve only the issue whether Motorola's 2.25% licensing offer and subsequent negotiations complied with its FRAND obligations. However, this leads to an obvious question: what purpose would be served by the court's declaring that Motorola's actions constituted a breach of its FRAND contracts? Such a declaration would lead to the same situation as a declaration of a particular FRAND rate; the parties would be sent back to the negotiation table to hammer out the details of a license. Further, although a declaration might be useful for Apple as a defense to a future patent infringement suit brought by Motorola, Apple has not shown at this point that future patent infringement suits are likely or that it would be appropriate to declare that Motorola breached its contracts simply to provide Apple a defense in hypothetical future infringement actions. This leads to the question whether any trial should be held on Apple's breach of contract claim relating to the FRAND contracts.

Additionally, these observations lead to the question whether a trial should be held regarding Apple's other claims. Along with its claim that Motorola breached its FRAND commitments, Apple is asserting claims that Motorola violated disclosure obligations to ETSI and engaged in patent misuse. Apple is seeking extraordinary equitable and declaratory remedies on these claims, including an order rendering Motorola's patents unenforceable against Apple. However, its allegations of irreparable harm and its arguments about the insufficiency of monetary damages focus on the possibility that Motorola may sue Apple for infringement and

6

**A175**

seek an exclusionary order against Apple in the future. Apple's Trial Br., dkt. #465, at 35, 52. As explained above, Apple has not explained why money damages would not be a more appropriate and adequate remedy, and in particular, why Apple believes that Motorola could obtain an injunction or exclusionary order against it after this court had determined that Motorola had injured Apple by breaching its duty to disclose its patents to ETSI.

Before making any final decisions on these issues, I will give the parties an opportunity to respond to the concerns raised in this order. I understand that the parties are working hard to prepare for the trial at this point and it is unfortunate that these issues were not raised earlier in this case so that they could have been resolved before the eve of trial. However, they need resolution and I am confident the parties will be able to respond promptly. Therefore, the parties may have until Sunday, November 4, 2012 at 12:00 p.m. to respond to this order. The parties should be prepared to discuss these issues on Monday morning at 9:00 a.m.

At this point I cannot say that I will be able to make a final decision on Monday morning so the parties should be prepared to commence the trial at 1:00 after discussion of these issues.

Entered this 2d day of November, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

CASE PARTICIPANTS ONLY

# OPINION AND ORDER
# DATED NOVEMBER 8, 2012 (DKT 503)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE INC.,

                Plaintiff,

      v.

MOTOROLA MOBILITY, INC.,

                Defendant.

OPINION AND ORDER

11-cv-178-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In a statement from the bench on November 5, 2012, following a hearing with the parties, I advised them in general terms why I was dismissing plaintiff Apple Inc.'s remaining claims against defendant Motorola Mobility, Inc. This order is intended to explain in more detail why I have determined that Apple's claims for relief in the form of nominal damages, specific performance and declaratory judgment cannot succeed. Apple has not shown either that it has a right to the relief that it is seeking or because that the discretionary relief it requests would have any practical effect.

Some background may be helpful to non-parties' understanding of the dispute and the reasons for its dismissal. Apple and Motorola are competitors in the wireless communications industry. Motorola owns a number of patents that it has declared to be patents essential to various technological standards set by international standard setting organizations relevant to wireless communication devices. The standard setting

1

organizations consist of technology representatives from companies interested in determining standards for a particular aspect of technology; their purpose is to agree on common technological standards to enable all compliant products to work together. Often the agreed upon standard will cover technology that is the subject of a patent; in that case, the patent becomes an "essential patent." The standard setting organizations have developed policies for this situation in an effort to prevent patent holders from abusing the market power that flows from owning technology that has become a standard. They encourage members to make known to the organization patents essential to a proposed standard and to agree to license those patents on fair, reasonable and non-discriminatory terms to anyone who asks for a license. (Such terms are referred to in the industry as "FRAND" terms.) Motorola has many patents in the cellular communication industry, some of which it has disclosed to various standard setting organizations. It has assured the organizations that these patents will be made available to competitors under "reasonable terms and conditions that are demonstrably free of any unfair discrimination."

This suit began as part of an infringement action that Motorola filed against Apple in the International Trade Commission. After the case had been pending for a few months, Apple filed counterclaims against Motorola and removed the counterclaims to this court on March 11, 2011. It sought preliminary injunctive relief against Motorola; that motion was denied. Dkt. #85. Motorola sought dismissal of the action; that motion was denied as well, with one inconsequential exception. Dkt. #93. On September 16, 2011, Apple filed an amended complaint, alleging ten claims for relief, dkt. #110, all variants of its primary

2

claims that Motorola was bound by its contracts with these standard setting organizations. Under those contracts, it had an obligation both to disclose to the organizations any patents it owned that would be covered by standards adopted by the organizations and to offer licenses to those patents to competitors under terms that were fair, reasonable and non-discriminatory. Apple contended that it was a third party beneficiary of these contracts and thus entitled to damages for Motorola's breach of contract and inequitable conduct; specific performance of Motorola's contractual commitment to license its standards-essential patents on FRAND terms; and declaratory relief, specifically, judgments declaring that Motorola had breached its contracts, that the terms it had offered Apple to license patents were not FRAND terms and that Motorola was not entitled to seek injunctive relief preventing Apple from practicing certain standards. Apple alleged other claims on which it sought injunctive relief and damages but those claims were dismissed earlier and are no longer before the court.

In deciding the parties' cross motions for summary judgment, I found in favor of Apple on its claims that it was a third party beneficiary of the contracts between Motorola and the standards setting organizations, that the contracts bound Motorola to disclose its intellectual property rights in a timely manner and that Motorola had failed to make the disclosures before the adoption of the standards incorporating its patents. Order, dkt. #194, at 3. I found also that Motorola had failed to show that Apple's breach of contract or estoppel claims should be dismissed for Apple's failure to prove that it had suffered any compensable damages. Id.

On September 24, 2012, Apple dropped its claim for money damages on any

3

remaining claims, asking only for nominal damages of less than $20. With only its claims

for specific performance and declaratory relief remaining, it requested a court trial. Dkt.

#255. The request was granted.

In preparation for a November 5, 2012 trial, the parties filed motions in limine that

revealed considerable disagreement about the scope of the trial. Apple anticipated that the

trial would result in a determination of a specific rate or range that would qualify as a fair,

reasonable and non-discriminatory rate for a license to Motorola's essential patents and an

order requiring Motorola to offer that license. Motorola argued for a determination limited

to the question whether its initial royalty offer of 2.25% was fair, reasonable and non-

discriminatory and whether it had failed to negotiate in good faith. It pointed out that a

victory for Apple would mean nothing more than nominal damages and possibly an order

from the court to negotiate a license. At the time, Motorola's argument did not seem

persuasive. It appeared possible that specific performance would be an appropriate remedy

if Apple proved that Motorola had breached its contracts with the standard setting

organizations. I anticipated that the court would decide, first, whether Motorola had

breached its contractual obligation by failing to offer a fair, reasonable and non-

discriminatory rate for a license, which would require determining just what such rate would

be or at least what the proper range of such a rate would be, and second, whether Motorola

should be required to license its patents to Apple on those terms.

An order to this effect issued on October 29, 2012. The next day, Motorola moved

for clarification, arguing that if the court determined a fair, reasonable and non-

4

discriminatory rate, Apple should be required to accept a license to Motorola's essential patents and pay the license fee for all accused devices. Dkt. #444. Apple responded on October 31, making clear its opposition to the suggestion that it agree to be bound by any rate determined by the court. Apple's Br., dkt. #448, at 1 ("Motorola's commitment to standard-setting organizations to offer a FRAND rate does not bind Apple to write a blank check and accept that offer.") Although Apple wanted the court to determine a fair, reasonable and non-discriminatory rate that Motorola must offer to Apple, it maintained that Motorola had never asked the court for an order requiring Apple to accept this rate. Rather, Apple argued, the case had always focused on Motorola's obligation to offer a fair, reasonable and non-discriminatory license to Apple. Id. at 4. It added, however, that it would be willing to pay a rate of no more than $1 for each Apple device going forward, while it retained the right to appeal any award higher than $1, as well as to refuse any such rate and proceed to further infringement litigation. Id. at 5.

Perhaps it should have been evident earlier in the case that Apple was seeking only a ceiling on the potential license rate that it could use for negotiating purposes, but it was not. This became clear only when Apple informed the court in its October 31 response that it did not intend to be bound by any rate that the court determined. This meant that the court would determine what it believed to be a fair, reasonable and non-discriminatory rate for a license with Motorola, but Apple would pay that rate only if it was the rate Apple wanted. Even then, it was only volunteering to pay the rate. If Apple succeeded in showing that a breach occurred but did not win the rate it wanted, it could walk away, leaving

**A181**

Motorola without a mechanism for obtaining compensation from Apple for the use of its patents except by filing infringement suits. The court would be resolving all of the issues raised in this case without necessarily bringing the parties any closer to a license agreement. In effect, Apple was asking the court to assist it in negotiating, not in putting the parties' dispute to rest.

At the final pretrial conference on November 1, 2012, I advised the parties that it was doubtful whether the case would proceed to trial on November 5, as scheduled, because of the court's uncertainty over the propriety of engaging in the complex task of determining a FRAND rate if the end result would not resolve the parties' disputes over licensing and infringement. In an order entered the next day, November 2, I elaborated on these questions, asking in effect whether the relief sought by Apple would actually resolve any dispute between the parties. The parties were given until Sunday to file briefs in response, with a hearing to follow on Monday morning and the trial continued until 1:00 p.m.

Apple came back with three suggestions: First, the trial could proceed as previously scheduled and on the same terms as the court had determined in the order deciding the motions in limine. Second, the trial could go forward as scheduled on the understanding that the court would determine a FRAND rate under a method the court would construct for determining patent value and both parties would agree that the method would be binding on them. In other words, Motorola would have to agree that any valuation method the court determined would apply to Motorola's and Apple's patents. Presumably, it would follow that Apple would be entitled to credit or compensation on the license fee for this value

6

because Motorola would be gaining a cross-license to Apple's patents. Third, if Motorola would not agree to be bound by a valuation method adopted by the court, the trial would be continued for six to nine months to allow the development of a record as to both parties' essential patents so that the court could determine in one proceeding what the FRAND rate would be, with both parties agreeing to be bound by the court's determination. Apple's Resp., dkt. #497, at 2-3. Apple told the court that if it adopted this third proposal and agreed to determine the value of Apple's patents as well as Motorola's, Apple would agree to be bound by the determination. Id.

The parties discussed these options at the Monday hearing. As for option one, Apple made no persuasive arguments about why the case should proceed under its original conception of the trial, with the court determining a non-binding FRAND rate for Motorola's standard-essential patents. With respect to its breach of contract claim, the only relief to which Apple would be entitled if it prevailed would be damages, which it has foresworn, or specific performance, which it has not shown is warranted in these circumstances. As I explained in the November 2 order, not only has Apple failed to show that it can satisfy the four-factor test for equitable relief set forth in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006), it makes no sense for Apple to ask for this relief when it is obvious that there can be no real performance by either side until all of the terms of the contract are negotiated.

Apple argued at the hearing that the trial could proceed under option one because it is asking the court simply to order specific performance that would "complete the circle" of

7

the contract that Motorola entered into with the standard setting organizations. However, Apple has not cited any authority for this proposition and it has never explained why an order that did no more than "complete a circle" would justify an order of specific performance.

Additionally, Apple has made the argument that the trial should proceed under option one on its breach of contract claims because it is entitled to nominal damages, but it has not cited a case in which a court allowed a party to proceed to trial on a claim for nominal damages. The cases it has cited all arose in situations in which the party seeking damages had failed to prove damages at trial or the court had concluded that the determination of damages was too difficult. Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1372 (7th Cir. 1990); Felton v. Teel Plastics, 724 F. Supp. 2d 941, 954 (W.D. Wis. 2010). The fact is that the request for nominal damages in this case is just another way of asking for declaratory relief and, as explained in the November 1, 2012 order, dkt. #487, it is improper to order declaratory relief when it would have no practical effect.

Apple attempted to address the problems with option one through its two new proposals. Under option two, the trial would go forward as scheduled with the court determining a method for valuing each party's standards essential patents and assessing a fair, reasonable and non-discriminatory rate for a license or an offer of one. Motorola expressed strong resistance to option two, making the obvious objection that the question of the value of Apple's patents had never come up before because Motorola had never asserted a claim involving these patents. Therefore, Apple was asking the court to construct

8

**A184**

a method for determining the value of both parties' patents to each other, except that the court would not know anything about Apple's patents. Not only was Apple expecting the court to create an evaluation method without all of the information it needed, but it was asking the court to create a one-size-fits-all-evaluation method that might bind other patent holders who have nothing in common with either Apple or Motorola.

In response, Apple argued that a patent-by-patent analysis of all of the standard-essential patents was not necessary to because the court could rely on a "percentage of intellectual property rights" approach. Each party would identify the number of patents it has declared to be essential to the relevant standards. The court would then compute a percentage derived from the number of the party's own patents to the number that have been declared essential and apply that percentage to the cost of the chip or to the board, depending on which part the court determined was the smallest saleable unit that used the technology providing all the cellular functionality covered by the patents.

Alternatively, Apple argued, the court could determine a FRAND rate by looking at the licensor's own licensing history, but it acknowledged that this approach would not carry over to a determination of a FRAND rate for any other patent holder's portfolio. As a third alternative, it suggested that the court could rely simply on Motorola's history with a Chinese company to which it had licensed its technology in the past. Again, this alternative would not assist the court in deciding the value of Apple's own patents. As Motorola noted, the proposals are a good illustration of the idiosyncratic variances of negotiations over patent valuation. Hrg. trans., dkt. #500, at 21-22.

9

**A185**

From the arguments that Apple made, it is not realistic to think that a court could construct a "method" into which the parties could insert numbers to produce a fair valuation of a company's patent portfolio in a given area of technology. It is no more realistic to think that this court could arrive at a fair valuation of the Apple patents simply by applying the percentage of intellectual property rights approach that Apple has suggested. Each proposal exposes more of the difficulties inherent in trying to pick a particular monetary rate for an agreement as complex as a licencing fee for rapidly changing technology. Apple has not explained how it is possible to determine a rate without knowing the answers to such questions as how a cross-license to the other party's patents may affect that rate or what the scope of the license is (a worldwide license will be more valuable than a license to sell in only one country or only a few countries); what guarantees are incorporated into the agreement; the length of the agreement; or the frequency of payments. In effect, Apple is asking the court to assess one part of a complex contract that has yet to be negotiated.

This leaves option three, which was Apple's request to continue the trial for six to nine months. Even if option three were adopted and the trial were continued to allow the parties to litigate the value of Apple's patents, the trial would not resolve all of the matters that have to be considered before the parties can agree upon a license fee. There is no guarantee that the parties will complete the negotiation and actually enter into a licensing agreement under which Apple will pay Motorola for the use of its technology. In these circumstances, I am not persuaded that the case should proceed.

Apple asserted claims for declaratory relief for Motorola's violation of its disclosure

10

**A186**

obligations to the standard setting organization ETSI and engaged in patent misuse, but it has not explained why monetary damages would be inadequate relief if Motorola were to sue it for infringement and seek an exclusionary order against it in the future. Certainly there is no need to address Apple's claim for declaratory relief as it relates to Motorola's '898 patent. There is no likelihood that Motorola will (or can) sue Apple on the '898 patent after Judge Posner dismissed Motorola's claims with prejudice when Motorola was unable to prove the damages it alleged had been caused by Apple. Of course, it is possible that this ruling will be overturned on appeal, but until it is, Motorola cannot maintain a suit against Apple based on the '898 patent. If the ruling is overturned and the issue is remanded to the court in Illinois, Apple and Motorola can litigate the matter there.

Moreover, Apple has not identified any case that would support an order of exclusion if Motorola were found to have breached its obligation to disclose patents to ETSI when it failed to disclose the '898 patent. In any event, the remedy that Apple is seeking (an order of unenforceability) is so far out of proportion to any harm that Apple has suffered or is likely to suffer in the future that it is unlikely that any court would impose such an order. This is an example of what Judge Posner noted in the Illinois case: the requested injunctive relief "would impose costs disproportionate to the harm to the patentee" Apple Inc. v. Motorola Mobility, 2012 WL 2362630, *1 (June 7, 2012).

Apple has asked that if the case is dismissed it be without prejudice. A decision on that question will be made once the parties have completed the briefing.

11

**A187**

At the November 5 hearing, Motorola suggested that the parties engage in binding arbitration to resolve their dispute. If the parties really wish to resolve this licensing dispute, this is the obvious solution. It would have many advantages to the parties. It would be conducted in private; the parties would not be bound by their pleadings; they would be able to negotiate any and all of the many aspects of their licensing agreement on which they disagree; and they would finish the process with an agreement that would determine once and for all what amount of licensing fees Apple is required to pay Motorola. In the end, this seems to be the best way, if not the only way, for the parties to negotiate a rate that takes into account the many elements of a licensing fee that are not part of this case but are critical to the determination of a fair, reasonable and non-discriminatory rate.

ORDER

IT IS ORDERED that

1. Plaintiff Apple's motion, dkt. #488, for reconsideration of the denial of its motion in limine to preclude defendant Motorola from introducing evidence that it was entitled to seek injunctions and exclusion orders to enforce its declared standards-essential patents and that doing so was not a violation of its obligations to the standard setting organizations and its motion to exclude Motorola's newly disclosed FRAND theories, dkt. #489, are DENIED as moot;

2. Apple's claim for declaratory relief is DENIED.

3. Apple's motion to enforce the court's determination at summary judgment that

12

**A188**

ETSI's intellectual property rights policy unambiguously requires pre-adoption disclosure where a party submits a technical proposal, dkt. #491, is DENIED as moot; and

4. This case is DISMISSED.

5. The court will decide whether the dismissal is with or without prejudice after the parties have completed briefing on the issue.

Entered this 8th day of November, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

13

**A189**

CASE PARTICIPANTS ONLY Document: 41 Page: 269 Filed: 07/23/2013

# OPINION AND ORDER
# DATED NOVEMBER 28, 2012 (DKT 509)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE INC.,

                            Plaintiff,

                v.

MOTOROLA MOBILITY, INC.,

                            Defendant.

OPINION AND ORDER

11-cv-178-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In a statement from the bench on November 5, 2012, I dismissed plaintiff Apple's Inc.'s remaining claims against defendant Motorola Mobility, Inc.  In an order dated November 8, 2012, I explained in more detail the reasons for the dismissal, but I reserved a decision on the form of the dismissal and gave the parties an opportunity to brief the issue. Both parties have responded, with Apple arguing that its claims should be dismissed without prejudice and Motorola arguing the opposite.

I conclude that Apple's claims that were dismissed at the summary judgment stage must be dismissed with prejudice.  Those include Apple's claims that Motorola violated § 2 of the Sherman Act (count 5), violated Cal. Bus. & Prof. Code § 17200 (count 6), and tortiously interfered with contracts (count 13). Order, dkt. #194 at 47. Those claims were dismissed on the merits and Apple has made no argument about why they should not be dismissed with prejudice.  Turek v. General Mills, Inc., 662 F.3d 423, 425 (7th Cir. 2011)

1

(claim dismissed on merits should be dismissed with prejudice).

This leaves Apple's claims for equitable estoppel (count 1); breach of contract (counts 2, 3, 4); and declaratory judgment (counts 7, 11, 12). As relief for those claims, Apple was seeking a declaration that Motorola had breached contracts with standards setting organizations and a determination by the court of a specific FRAND rate for Motorola's standards-essential patents. Additionally, Apple had requested that the court declare Motorola's '898 patent invalid and unenforceable as a result of Motorola's failure to timely disclose it to standards setting organizations. I dismissed those claims because Apple had failed to show that its requests for extraordinary injunctive relief and discretionary declaratory relief were warranted under the circumstances. After reviewing the parties' arguments on the issue, I conclude that Apple's declaratory judgment, equitable estoppel and breach of contract claims must be dismissed without prejudice.

Generally, when a court dismisses a claim without reaching the merits, it should dismiss the claim without prejudice. Murray v. Conseco, Inc., 467 F.3d 602, 605 (7th Cir. 2006) (vacating district court's dismissal with prejudice for lack of subject matter jurisdiction and remanding with instructions to dismiss complaint without prejudice because "[a] dismissal for lack of subject matter jurisdiction is not on the merits"). Thus, when courts decline to exercise discretionary jurisdiction or reach the merits of a declaratory judgment claim, they usually dismiss the claim without prejudice. E.g., International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1218 (7th Cir. 1980) (explaining that claim for declaratory relief should have been dismissed without prejudice because court lacked subject matter

2

**A191**

jurisdiction over claim, and even if jurisdiction existed, requested declaratory relief was not appropriate "at [the] time").  See also Ven-Fuel, Inc. v. Department of the Treasury, 673 F.2d 1194, 1195 (11th Cir. 1982) (modifying district court's dismissal with prejudice of declaratory judgment action to dismissal without prejudice because district court declined to reach merits); Continental Casualty Co. v. Duckson, 826 F. Supp. 2d 1086, 1103 (N.D. Ill. 2011) (dismissing declaratory judgment claim without prejudice because claim was premature); Hickman v. Wells Fargo Bank N.A., 683 F. Supp. 2d 779, 790 (N.D. Ill. 2010) (dismissing declaratory judgment claim without prejudice because plaintiff failed to explain why declaration was necessary or appropriate).

As I explained in the orders entered November 2, dkt. #487, and November 8, dkt. #503, I dismissed Apple's claims for declaratory relief because the decision whether to grant declaratory relief is discretionary, 28 U.S.C. § 2201(a), and it is inappropriate to issue declaratory judgment if "such a judgment would have no practical effect."  Dkt. #487 at 5 (citing Apple, Inc. v. Motorola, Inc., Case No. 1:11-CV-08540, 2012 WL 2376664, *23 (N.D. Ill. June 22, 2012).  See also International Harvester Co., 623 F.2d at 1218 ("A declaratory judgment should issue only when it will serve a useful purpose.").  With respect to Apple's request for declaratory relief related to Motorola's '898 patent, Apple had not shown that the declaration was necessary or appropriate, in light of Judge Posner's dismissal of Motorola's patent infringement claims and Apple's alleged harm.  With respect to Apple's declaratory judgment claim regarding licensing, I concluded that Apple had failed to show that its requested declaration would serve any purpose other than providing Apple a ceiling

3

on the potential license rate that it could use for negotiating purposes. Apple was requesting that the court declare that Motorola breached its contracts and "declare" a FRAND rate for Motorola's patents, but Apple had refused to be bound by the rate chosen by the court. Instead, the rate simply would clarify whether Motorola's license offers to Apple had been FRAND and if not, what the rate should have been. Thus, if Apple succeeded in establishing that Motorola breached its contracts but then refused to accept the rate chosen by the court, further litigation likely would be necessary to resolve the parties' licensing and infringement disputes. Even under Apple's modified trial proposals in which Apple agreed to be bound by a FRAND rate chosen by the court, there would be numerous issues remaining related to the parties' licensing disputes. Thus, Apple's requested declarations were unlikely to "serve a useful purpose."

Under different circumstances, it may be appropriate for a court to entertain Apple's requests for declaratory relief and consider the merits of Apple's claims. International Harvester Co., 623 F.2d at 1218 (explaining that because dismissal was without prejudice, plaintiff was "free to seek a declaratory judgment in the future . . . when its need for relief is more compelling"). For example, it may be appropriate for a court to consider Apple's arguments in the context of a patent infringement suit. However, under the circumstances presented, it was inappropriate to reach the merits of Apple's claims for declaratory judgment, so I exercised the court's discretion in dismissing the claims. Because I did not reach the merits of Apple's declaratory judgment claims, I will dismiss them without prejudice.

4

**A193**

With respect to Apple's claims for which it sought injunctive relief, I dismissed those claims because Apple failed to show that the court should order the extraordinary relief of specific performance.  As I explained in the November 2 and November 8 orders, Apple's request for injunctive relief required it to satisfy the standards set forth in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  Apple failed to satisfy the eBay standards because it did not show that it had suffered irreparable harm, that money damages would be inadequate or that the public interest favored granting an injunction.  Dkt. #487 at 4-5.

Although the legal basis for dismissing Apple's claims for injunctive relief was slightly different from the legal basis for dismissing the claims for declaratory judgment (Apple was not required to satisfy the eBay standards on its declaratory judgment claims), I dismissed the claims for injunctive relief for many of the reasons I dismissed the declaratory judgment claims.  In particular, Apple failed to show that its requested injunction would serve any purpose other than providing Apple a bargaining chip in future negotiations or litigation. Kartman v. State Farm Mutual Automobile Insurance Co., 634 F.3d 883, 893 (7th Cir. 2011) (considering "as a practical matter, . . . what purpose would be served by" proposed injunction).  As explained above, I am dismissing Apple's claim for declaratory relief without prejudice.  I conclude that because Apple's claims for declaratory and injunctive relief are based on the same facts and arguments, rely on the same underlying theories of liability (breach of contract and equitable estoppel), were dismissed for similar reasons, and ultimately, seek similar forms of relief, Apple's claims for which it sought injunctive relief should also be dismissed without prejudice.

5

**A194**

The parties suggest in their briefs that they are considering taking their disputes to arbitration, though they have disagreements about the scope and form of the arbitration. In addition to the explanations provided above, the possibility that this dispute can be resolved through binding arbitration is another reason why I conclude that Apple's breach of contract, equitable estoppel and declaratory judgment claims should be dismissed without prejudice. A dismissal with prejudice could inhibit the parties' efforts at resolving their disputes through binding arbitration.

ORDER

IT IS ORDERED that plaintiff Apple Inc.'s claims that defendant Motorola Mobility, Inc. violated § 2 of the Sherman Act (count 5), violated Cal. Bus. & Prof. Code § 17200 (count 6), and tortiously interfered with contracts (count 13) are DISMISSED WITH PREJUDICE. Apple's claims against Motorola for equitable estoppel (count 1), breach of contract (counts 2, 3, 4), and declaratory judgment (counts 7, 11, 12), are DISMISSED WITHOUT PREJUDICE. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 28th day of November, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

6

**A195**

# JUDGMENT
# DATED DECEMBER 5, 2012 (DKT 510)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

APPLE INC.,

                Plaintiff,

    v.

MOTOROLA MOBILITY, INC.,

                Defendant.

JUDGMENT IN A CIVIL CASE

Case No. 11-cv-178-bbc

---

      This action came for consideration before the court with District Judge Barbara B. Crabb presiding. The issues have been considered and a decision has been rendered.

---

      IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendant Motorola Mobility, Inc. and against plaintiff Apple Inc. as follows:

1. Granting defendant's motion to dismiss plaintiff's claim of waiver for failure to state a claim upon which relief may be granted;

2. Granting defendant's motion for partial summary judgment and dismissing with prejudice plaintiff's claims that defendant violated § 2 of the Sherman Act (count 5), violated Cal. Bus. & Prof. Code § 17200 (count 6), and tortiously interfered with contracts (count 13); and

3. Dismissing without prejudice plaintiff's claims against defendant for equitable estoppel (count 1), breach of contract (counts 2, 3 and 4), and declaratory judgment (counts 7, 11 and 12).

---

_Peter Oppeneer_
Peter Oppeneer, Clerk of Court

       _12/5/12_
            Date

**A196**

# CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2013, I caused the nonconfidential

version of the Opening Brief and Addendum of Plaintiff-Appellant

Apple Inc. to be electronically filed with the Clerk of the Court using

CM/ECF, which will automatically send e-mail notification of such filing

to the following counsel of record:

Brian Cosmo Cannon
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Email: briancannon@quinnemanuel.com

Edward J. DeFranco
David Morad Elihu
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Email: eddefranco@quinnemanuel.com
Email: davidelihu@quinnemanuel.com

David A. Nelson
Stephen A. Swedlow
Quinn Emanuel Urquhart & Sullivan, LLP
500 West Madison Street, Suite 2450
Chicago, IL 60661
Email: davenelson@quinnemanuel.com
Email: stephenswedlow@quinnemanuel.com

*Attorneys for Cross-Appellant*
*Motorola Mobility LLC*

/s/ E. Joshua Rosenkranz
*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULES OF APPELLATE PROCEDURE
## 32(a)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Plaintiffs-Appellants Apple Inc. and NeXT Software,

Inc. certifies that the brief contained herein has a proportionally spaced

14-point typeface and contains 13,940 words, based on the "Word

Count" feature of Word 2007, including footnotes and endnotes.

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and

Federal Circuit Rule 32(b), this word count does not include the words

contained in the Certificate of Interest, Table of Contents, Table of

Authorities, Abbreviations, and Statement of Related Cases.

Dated:     July 23, 2013            Respectfully submitted,


                                    /s/ E. Joshua Rosenkranz
                                    *Attorney for Plaintiff-Appellant*