NON-CONFIDENTIAL

Appeal Nos. 2013-1150, -1182

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

APPLE INC.,

*Plaintiff-Appellant*,

v.

MOTOROLA MOBILITY LLC,

*Defendant-Appellee-Cross-Appellant*,

_____

Appeals from the United States District Court for the Western District of
Wisconsin in No. 11-CV-0178, Senior Judge Barbara B. Crabb

_____

## RESPONSE AND OPENING BRIEF AND ADDENDUM OF DEFENDANT-APPELLEE AND CROSS-APPELLANT MOTOROLA MOBILITY, LLC

_____

David A. Nelson
Stephen A. Swedlow
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
500 W. Madison St., Suite 2450
Chicago, IL  60661
(312) 705-7400

Kathleen M. Sullivan
Edward J. DeFranco
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY  10010
(212) 849-7000

Brian C. Cannon
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

*Attorneys for Defendant-Appellee-Cross-Appellant*

## **CERTIFICATE OF INTEREST**

Counsel for Appellee-Cross-Appellant Motorola Mobility, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

Motorola Mobility, LLC, formerly known as Motorola Mobility, Inc. On June 22, 2012, Appellant Motorola Mobility, Inc. was converted into a Delaware limited liability company, changing its name to Motorola Mobility, LLC.

2.     The name of the real parties in interest represented by me is:

None.

3.     All parent corporation and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Motorola Mobility, LLC is a wholly owned subsidiary of Google Inc., a publicly held company.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

See the Addendum to Motorola's Certificate of Interest on the following page.

## <u>ADDENDUM TO MOTOROLA'S CERTIFICATE OF INTEREST</u>

Counsel for Appellee-Cross-Appellant Motorola Mobility, LLC certifies the following:

The names of all law firms and partners or associates that appeared for the parties now represented by me in the agency or that are expected to appear in this court are:

**QUINN EMANUEL URQUHART & SULLIVAN, LLP:**

Jennifer A. Bauer
Linda J. Brewer
Meghan Bordonaro
Brian C. Cannon
Melissa N. Chan
Thomas W. Cushing
Edward J. DeFranco
David M. Elihu
Richard W. Erwine
Kevin Johnson
Michael R. McCray
David A. Nelson
Shawna M. Reeder
Matthew D. Robson
Carlos A. Rodriguez
Alexander Rudis
David L. Shaul
Robert W. Stone
Kathleen M. Sullivan
Stephen A. Swedlow
Thomas R. Watson
Amanda S. Williamson

**WINSTON & STRAWN LLP**

Peter J. Chassman

**REINHART BOERNER VAN DEUREN, S.C.**

Scott W. Hansen
Rebecca Frihart-Kennedy
Lisa Nester Kass
Lynn M. Stathas

Respectfully submitted,

Dated:  November 5, 2013      By:    _s/Kathleen M. Sullivan_
                              Kathleen M. Sullivan
                              Edward J. DeFranco
                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP
                              51 Madison Ave., 22nd Floor
                              New York, NY  10010
                              *(212) 849-7000*

                              David A. Nelson
                              Stephen A. Swedlow
                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP
                              500 W. Madison St., Suite 2450
                              Chicago, IL  60661
                              (312) 705-7400

                              Brian C. Cannon
                              QUINN EMANUEL URQUHART & SULLIVAN,
                              LLP
                              555 Twin Dolphin Drive, 5th Floor
                              Redwood Shores, CA 94065
                              (650) 801-5000

                              *Attorneys for Appellee-Cross Appellant*

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ................................................................XIV

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ..................................................................3

COUNTER-STATEMENT OF THE ISSUES ....................................................4

COUNTER-STATEMENT OF THE CASE ........................................................5

STATEMENT OF FACTS ................................................................................7

    A.    Motorola's Contributions to SSOs and FRAND Licensing History ....................................................................................7

    B.    The Standards and SSOs at Issue ..................................................7

    C.    Motorola's Contributions To ETSI Cellular Standards ......................11

    D.    Apple's Late Entry Into The Cell Phone Business ...........................12

    E.    Motorola's Patent Infringement Actions............................................13

    F.    Apple's Claims In This Action..........................................................15

    G.    The District Court's Decision ..........................................................17

SUMMARY OF THE ARGUMENT ................................................................21

STANDARD OF REVIEW ............................................................................23

ARGUMENT ................................................................................................23

I.    THIS COURT LACKS APPELLATE JURISDICTION AND SHOULD DISMISS OR ORDER TRANSFER TO THE SEVENTH CIRCUIT ................................................................................................23

    A.    Apple's Claims Do Not "Arise Under" Federal Patent Law ..............23

    B.    Apple Cannot Tie Its Claims To Motorola's Patent Infringement Claims........................................................................25

II.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S
       DISMISSAL OF APPLE'S ANTITRUST AND UNFAIR
       COMPETITION CLAIMS UNDER THE *NOERR-PENNINGTON*
       DOCTRINE ............................................................................... 26

       A.    Motorola May Not Be Held Liable For Its Legitimate Pursuit
             Of Patent Infringement Litigation ...................................... 26

       B.    Apple Failed To Allege Any Liability Or Damages Apart From
             Motorola's Protected Conduct ........................................... 28

       C.    The Exception For "Sham Litigation" Does Not Apply .......... 32

III.   THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S
       DISMISSAL OF APPLE'S CONTRACT CLAIM .............................. 33

       A.    The District Court Correctly Dismissed Apple's Contract Claim
             As Nonjusticiable ............................................................. 33

       B.    This Court May Affirm Dismissal Of Apple's Contract Claim
             On Alternative Grounds ..................................................... 39

             1.    Apple's Contract Claims, Like Its Antitrust Claims, Are
                   Barred Under The *Noerr- Pennington* Doctrine .............. 39

             2.    As An Unwilling Licensee, Apple Lacks The Power To
                   Enforce  The ETSI And IEEE Commitments  As A
                   Third- Party Beneficiary ................................................ 42

             3.    Denying Apple's Contract Claims Here Will Not
                   Undermine The Purposes Of The Standards System ........... 52

IV.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S
       DISMISSAL OF APPLE'S DECLARATORY JUDGMENT
       CLAIMS ................................................................................. 55

       A.    Apple's Request For A Declaration that Motorola's Opening
             Offer Was Not FRAND Improperly Sought An Advisory
             Opinion ........................................................................... 56

       B.    Apple's Request For A Declaration That Motorola's '898
             Patent Is Unenforceable Is Properly Litigated As A Defense To
             Motorola's Patent Infringement Claims .............................. 57

vi

ISSUE ON CROSS-APPEAL .................................................................59

V.    APPLE'S CLAIMS FOR BREACH OF CONTRACT, EQUITABLE
      ESTOPPEL AND DECLARATORY JUDGMENT SHOULD HAVE
      BEEN DISMISSED WITH PREJUDICE ....................................................59

CONCLUSION ...................................................................................62

## ADDENDUM

Opinion and Order, Dated August 10, 2012 (DKT 194) .............................A60-107

Opinion and Order, Dated November 28, 2012 (DKT 509) ........................A190-95

Judgment, Dated December 5, 2012 (DKT 510) ................................................A196

Material has been deleted from pages 7, 9, 13, 16, and 56 of the nonconfidential Brief of Defendant-Cross-Appellant Motorola Mobility, LLC.  This material is deemed confidential information pursuant to the Protective Order entered January 28, 2011 (Dkt. 52) and the Cross-Use Agreement filed April 8, 2011 (Dkt. 80), in *Apple Inc. v. Motorola, Inc.*, Case No. 11-cv-8540 (N.D. Ill.) and in the district court action below.  *See* Dkt No. 101.  The material omitted from these pages contains confidential deposition testimony, confidential business information, and confidential licensing information.

# TABLE OF AUTHORITIES

## CASES

*Apple Inc. v. Motorola, Inc.*,
  869 F. Supp. 2d 901 (N.D. Ill. 2012)..................................................... 57, 62

*Apple v. Samsung Elecs. Co.*,
  No. 11-01846, 2011 WL 4848567 (N.D. Cal. Oct. 18, 2011)......................31

*Apple, Inc. v. Motorola, Inc.*,
  1:11-CV-08540, 2012 WL 1959560, at *11-12 (N.D. Ill. May 22,
  2012) .........................................................................................................57

*Ass'n Benefit Servs. v. Caremark Rx, Inc.*,
  493 F.3d 841 (7th Cir. 2007) ........................................................................46

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)......................................................................................28

*Bird v. Penn Central Co.*,
  351 F. Supp. 700 (E.D. Pa. 1972)...............................................................36

*Bonzel v. Pfizer, Inc.*,
  439 F.3d 1358 (Fed. Cir. 2006) ...................................................................24

*Broadcom v. Qualcomm*,
  501 F.3d 297 (3d Cir. 2007) ................................................................ 31, 42

*Brown v. Advocate S. Suburban Hosp.*,
  700 F.3d 1101 (7th Cir. 2012) ...................................................................30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................................28

*Cherry v. FCC*,
  641 F.3d 494 (D.C. Cir. 2011).....................................................................35

*Chicago & S. Air Lines v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948)......................................................................................33

*Chicago Unified Indus. v. City of Chicago,*
    445 F.3d 940 (7th Cir. 2006) ........................................................................38

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800 (1988)..................................................................................24

*Clear View Estates, Inc. v. Veitch,*
    227 N.W. 2d 84 (Wis. 1975) ........................................................................48

*Clinton v. Acequia, Inc.,*
    94 F.3d 568 (9th Cir. 1996) ........................................................................36

*Conroy v. Reebok Int'l, Ltd.,*
    14 F.3d 1570 (Fed. Cir. 1994) ........................................................................23

*Crane v. Mulliken,*
    408 N.E. 2d 778 (Ill. 1980)..........................................................................38

*D'Amato v. Wisconsin Gas Co.,*
    760 F.2d 1474 (7th Cir. 1985) ........................................................................45

*Dunlop v. Laitsch,*
    16 Wis. 2d 36 (Wis. 1962)..........................................................................47

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)............................................................................. passim

*Edlin v. Soderstrom,*
    264 N.W. 2d 275 (Wis. 1978) ............................................................ 23, 37

*ERBE Electromedizin GmbH v. Canady Tech. LLC,*
    629 F.3d 1278 (Fed. Cir. 2010) ................................... 27, 28, 31, 32

*Estate of Luster v. Allstate Ins. Co.,*
    598 F.3d 903 (7th Cir. 2010) ........................................................................38

*Flast v. Cohen,*
    392 U.S. 83 (1968)..................................................................................33

*FPL Energy Point Beach, LLC v. Energy Resources of Australia Ltd.,*
    565 F. Supp. 2d 999 (W.D. Wis. 2008) ........................................................................39

*Gerruth Realty Co. v. Pire*,
    17 Wis. 2d 89 (Wis. 1962)............................................................47

*Gordon v. United States*,
    117 U.S. 697 (1864).................................................................34

*H&R Block E. Enters., Inc. v. Raskin*,
    591 F.3d 718 (4th Cir. 2010) .........................................................34

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    441 F. Supp. 2d 1066 (N.D. Cal. 2006).........................................50

*In re Copper Antitrust Litigation*,
    436 F.3d 782 (7th Cir. 2006) ......................................................28

*Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*,
    599 F.3d 1277 (Fed. Cir. 2010) ............................................ 23, 24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................35

*MDS (Canada) Inc. v. RadSourceTechs., Inc.*,
    720 F.3d 833 (11th Cir. 2013) ....................................................25

*Mead v. Ringling*,
    64 N.W. 2d 222 (Wis. 1954) ............................................... 46, 48

*Metropolitan Ventures, LLC v. GEA Assoc's*,
    291 Wis. 2d 393 (Wis. 2006).......................................................46

*Micron Technology, Inc. v. Mosaid Techs., Inc.*,
    518 F.3d 897 (Fed. Cir. 2008) ....................................................56

*Microwave Acquisition Corp. v. FCC*,
    145 F.3d 1410 (D.C. Cir. 1998)...................................................35

*Miller v. LeSea Broad.*,
    87 F.3d 224 (7th Cir. 1996) ............................................... 38, 39

*Minn. Mining and Mfg. Co. v. Norton Co.*,
    929 F.2d 67 (Fed. Cir. 1991) ......................................................56

*New West, L.P. v. City of Joliet*,
  491 F.3d 717 (7th Cir. 2007) ........................................................................40

*Nodolf v. Nelson*,
  309 N.W. 2d 397 (Wis. Ct. App. 1981) .......................................................47

*Oppedahl & Larson v. Network Solutions, Inc.*,
  3 F. Supp. 2d 1147 (D. Colo. 1998) .............................................................36

*Preiser v. Newkirk*,
  422 U.S. 395 (1975) ......................................................................................33

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) .................................................................................. 26, 27

*Qualcomm Inc. v. Broadcom Corp.*,
  548 F.3d 1004 (Fed. Cir. 2008) ....................................................................50

*Rambus Inc. v. Infineon Techs. Ag*,
  318 F.3d 108 (Fed. Cir. 2003) ......................................................................50

*Research in Motion Ltd. v. Motorola, Inc.*,
  644 F. Supp. 2d 788 (N.D. Tex. 2008) .........................................................31

*Schell v. Knickelbein*,
  252 N.W.2d 921 (Wis. 1977) ........................................................................43

*Schilling by Foy v. Employers Mut. Cas. Co.*,
  569 N.W. 2d 776 (Wis. Ct. App. 1997) .......................................... 43, 44, 45

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*,
  427 F.3d 971 (Fed. Cir. 2005) ......................................................................59

*State v. Conway*,
  148 N.W.2d 721 (Wis. 1967) ........................................................................48

*Sussex Tool & Supply, Inc. v. Mainline Sewer & Water, Inc.*,
  605 N.W.2d 620 (Wis. Ct. App. 1999) ................................................. 43, 45

*Tarpley v. Keistler*,
  188 F.3d 788 (7th Cir. 1999) ........................................................................40

*TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*,
    491 F.3d 625 (7th Cir. 2007) ................................................................. 37, 38

*Textile Prods., Inc. v. Mead Corp.*,
    134 F.3d 1481 (Fed. Cir. 1988) .......................................................59

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) .........................................................40

*Tibbs v. City of Chicago*,
    469 F.3d 661 n.2 (7th Cir. 2006) ....................................................31

*Trippe Mfg. Co. v. Am. Power Conversion*,
    46 F.3d 624 (7th Cir. 1995) ...........................................................58

*United States v. Killingsworth*,
    507 F.3d 1087 (Fed. Cir. 2007) ......................................................23

*Univ. of Pittsburgh v. Varian Med. Sys., Inc.*,
    569 F.3d 1328 (Fed. Cir. 2009) ......................................................23

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*,
    858 F.2d 1075 (5th Cir. 1988) .......................................................40

*Welch v. Chippewa Sales Co.*,
    31 N.W.2d 170 (Wis. 1948) ..........................................................38

*Westlands Water Distr. Distribution Dist. v. Natural Res. Def. Council, Inc.*,
    276 F. Supp. 2d 1046 (E.D. Cal. 2003) ..........................................36

*Winnebago Homes, Inc. v. Sheldon*,
    139 N.W.2d 606 (Wis. 1966) .........................................................43

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)........................................................................30

## **STATUTES**

15 U.S.C. § 15b.................................................................................30

15 U.S.C. § 26 ............................................................................ 16, 30

19 U.S.C. § 1337(d) ................................................................................41

28 U.S.C. § 1295(a) ........................................................... 3, 23, 24

35 U.S.C. § 271 ......................................................................................57

35 U.S.C. § 283 ......................................................................................41

## **OTHER AUTHORITIES**

Cal. Bus. & Prof. Code § 17200 ................................................. 15, 17, 62

Decision and Order, *In the Matter of Motorola Mobility LLC*,
    Docket No. C-4410 (FTC July 23, 2013) .....................................35

DOJ & PTO,
    *Policy Statement on Remedies for Standards-Essential Patents Subject
    to Voluntary F/RAND Commitments* (Jan. 8, 2013) ............................... 49, 54

*In the Matter of Certain Elec. Devices, Including Wireless Commc'n
    Devices, Portable Music and Data Processing Devices, and Tablet
    Computers*,
    ITC Inv. No. 337-TA-794, Initial Determination on Violation of
    Section 337 and Recommended Determination on Remedy and Bond,
    2012 WL 4752221 (U.S.I.T.C. Sept. 14, 2012) .............................................51

Layne-Farrar, Anne,
    *Assessing IPR Disclosure Within Standard Setting: An ICT Case
    Study* (Nov. 28, 2011) ....................................................................51

National Research Council,
    *Patent Challenges for Standard-Setting in the Global Economy*, at 49
    (2013) ................................................................................... 47, 53

Restatement (Second) of Contracts § 362 ...............................................38

## STATEMENT OF RELATED CASES

In October 2010, Motorola filed a complaint before the ITC alleging infringement by Apple of five Motorola patents, including the '223 patent, which relates to the 802.11 standard, and the '697 patent, which relates to the UMTS standard. *See* A28, 475 (*In re Certain Wireless Commc'n Devices, Portable Music and Data Processing Devices, Computers and Components Thereof*, ITC Inv. No. 337-TA-745). Apple asserted defenses in that action relating to purported FRAND violations by Motorola, but withdrew those defenses before trial. A29194. Apple also asserted a defense relating to the timing of Motorola's identification of the '697 patent as essential to ETSI, which was rejected in an initial determination by the ALJ. A29175-29192. This Court is currently considering Motorola's appeals of the ITC's determinations in that investigation regarding two non standard-essential patents. *Motorola Mobility LLC v. ITC*, Fed. Cir. No. 12-1666; *Motorola Mobility LLC v. ITC*, Fed. Cir. No. 13-1417.

In October 2010, Motorola also filed claims in the Western District of Wisconsin alleging infringement by Apple of the same patents at issue before the ITC. *See Apple Inc. v. Motorola Inc.*, Case No. 10-CV-00661-BBC (W.D. Wis., filed Oct. 29, 2010). That case has been administratively stayed pending resolution of ITC proceedings pursuant to 28 U.S.C. § 1659.

In October 2010, Apple filed a complaint in the Western District of Wisconsin alleging that Motorola infringes several Apple patents. Motorola filed counterclaims alleging that Apple infringes several Motorola patents, including the '516, '712 and '193 patents, which relate to the 802.11 standard; the '559 and '230 patents, which relate to the UMTS standard; and the '898 patent, which relates to the EDGE standard. In December 2011, the case was transferred to the Northern District of Illinois and assigned to Hon. Richard A. Posner of the Seventh Circuit, sitting by designation. *See Apple Inc. v. Motorola, Inc.*, Case No. 11-CV-08540 (N.D. Ill., transferred Dec. 1, 2011). Apple asserted defenses in that action relating to purported FRAND violations by Motorola and the timing of Motorola's identification of certain patents to ETSI, but Judge Posner dismissed Motorola's infringement claims without reaching those defenses. This Court is currently considering the parties' cross-appeals of Judge Posner's judgment. *See Apple Inc. v. Motorola, Inc.*, Fed. Cir. Nos. 12-1548, 12-1549.

Apple initiated this action for, *inter alia*, antitrust violations, breach of contract, and declaratory judgments relating to alleged FRAND violations by Motorola, as counterclaims in the ITC 337-TA-745 investigation on March 11, 2011, and removed those claims to the United States District Court for the Western District of Wisconsin pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R. § 201.14(e). A288-89, 331-47 (*Apple Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC (filed Mar. 11, 2011)). The district court dismissed Apple's claims, resulting in this appeal. No other appeal from this proceeding was previously before the Court or any other appellate court.

## INTRODUCTION

In its opening appeal brief ("AOB"), Apple fails to acknowledge the key fact at the core of this case—that Apple has long infringed Motorola's standard-essential patents while refusing to take a license to those patents or even to engage in good faith negotiations toward such a license.  Motorola made pioneering contributions to the standards supporting cellular and wireless communication technologies and has successfully negotiated cross-licenses to its standard-essential patents with major cell phone makers around the world, including manufacturers from North America, Europe, Japan, South Korea and Taiwan.  Motorola was and is committed to the standardization process, which has worked exceptionally well for decades and has enabled the WiFi and cellular networks we take for granted today.  But Apple—a latecomer to the cellular communication business—seeks to free-ride on the contributions of the technology companies that cooperatively advanced wireless communication while seeking a new set of rules to govern standard-essential patents.  This Court should affirm the district court's dismissal of Apple's claims.

Apple filed the antitrust and contract claims below in response to Motorola's  2010 actions against Apple for patent infringement in the International Trade Commission ("ITC") and the district courts.  Motorola was forced to file those actions by Apple's incorrigible infringement and unwillingness to license.

The district court correctly dismissed Apple's antitrust claims against Motorola as barred by the *Noerr-Pennington* doctrine. While Apple attempts on appeal to reframe those claims as directed at Motorola's actions before the standard-setting organizations ("SSOs") in 1999-2000, that effort is unavailing, for Apple's sole theory of damages was that it incurred attorneys' fees and costs in defending against Motorola's patent actions, and any action against Motorola's pre-litigation conduct would have been time-barred.

The district court also properly dismissed Apple's contract claims, finding them nonjusticiable because they requested an advisory opinion. Just as it was a persistent unwilling licensee before trial, Apple at trial sought specific performance as a remedy for Motorola's supposed breach of its commitments to ETSI and IEEE and then refused to be bound by any adjudicated FRAND rate the court might set. The district court properly refused to be used as a pawn in Apple's efforts to gain leverage in extrajudicial negotiations. The district court likewise properly dismissed Apple's declaratory judgment claims for similar reasons.

Even if the district court had not been correct to dismiss the contract claims as nonjusticiable, the dismissal of those claims should be affirmed nonetheless because Apple failed to show on the record here that it was entitled as a third-party beneficiary to enforce Motorola's FRAND commitments to ETSI and IEEE. Apple has pointed to nothing in the ETSI or IEEE commitments or policies that

shows the contracting parties' intent to grant an unwilling licensee like Apple the right to step into the shoes of ETSI or IEEE to enforce obligations and obtain consequential damages for breach. While the FRAND commitments made by Motorola are enforceable, and Motorola honors them and expects other essential patent owners to do the same, such commitments require at a minimum that any infringing party seeking to enforce them be willing to license—something Apple has refused to do.

The district court, having dismissed Apple's claims, should have dismissed them with prejudice. Apple had every opportunity to litigate these claims and they should have been resolved with finality.

## JURISDICTIONAL STATEMENT

The district court entered final judgment dismissing Apple's claims on December 5, 2012.

Apple filed its notice of appeal to this Court on January 4, 2013. Motorola timely filed its cross notice of appeal on January 18, 2013. This Court does not have jurisdiction over this appeal because it is not a "civil action arising under . . . any Act of Congress relating to patents or plant variety protection." *See* 28 U.S.C. § 1295(a).

## COUNTER-STATEMENT OF THE ISSUES

1.     Whether appellate jurisdiction lies with the Seventh Circuit rather than this Court because Apple's claims involve no issue arising under the Patent Act.

### Issues on Appeal

1.     Whether the district court properly dismissed Apple's antitrust and unfair competition claims as precluded by the *Noerr-Pennington* doctrine because its claims are premised on Motorola's pursuit of patent-infringement lawsuits.

2.     Whether the district court's dismissal of Apple's breach-of-contract claim (a) was proper because those claims were nonjusticiable given Apple's refusal to be bound by any judicially determined FRAND terms, or (b) may be affirmed in any case on the alternative grounds that (i) *Noerr-Pennington* bars the claim and/or (ii) Motorola's commitments to ETSI and IEEE did not create contractual obligations enforceable by Apple, an unwilling licensee.

3.     Whether the district court properly exercised its discretion in dismissing Apple's declaratory judgment claims.

### Issue on Cross Appeal

1.     Whether the district court should have dismissed Apple's breach of contract, equitable estoppel, and declaratory judgment claims with prejudice, rather than without prejudice.

## COUNTER-STATEMENT OF THE CASE

In late 2010, Motorola filed patent infringement lawsuits against Apple in the Western District of Wisconsin (later transferred to the Northern District of Illinois) and the ITC.

On March 11, 2011, Apple filed antitrust, breach of contract, unfair competition, tortious interference, equitable estoppel, and declaratory judgment claims in the ITC based on Motorola's patent infringement lawsuits filed in district court and the ITC, and removed those claims to the Western District of Wisconsin. A288-351. That same day, Apple sought a preliminary injunction to enjoin Motorola from asserting its patents in the ITC. The district court denied Apple's preliminary injunction request on May 2, 2011. *See* A21; A30-31.

On June 7, 2011, the district court denied Motorola's motion to dismiss, in which Motorola argued that Apple claims were not ripe and that Apple had not properly alleged breach of any contract because the standard-setting policies and bylaws were too vague and indefinite to support a contractual obligation. A22-44, 59.

On August 10, 2012, the district court granted Apple partial summary judgment that Motorola had entered into enforceable contracts with IEEE and ETSI to offer licenses to its essential patents on RAND terms, and that Motorola had to make "bona fide efforts" to disclose its patents to ETSI in a "timely"

manner.  A106-107.  The district court granted Motorola summary judgment on Apple's § 2 Sherman Act antitrust claim and unfair competition claims, dismissing them with prejudice.  A106; A195-96.

On September 24, 2012, Apple filed a motion withdrawing its damages claim, indicating that it sought only "equitable remedies and declaratory relief for which there is no right to a jury trial."  A9859-61.

The district court issued an order on the parties' motions *in limine* on October 29, 2012, indicating that, absent clear contract language, Motorola did not breach its ETSI or IEEE commitments by seeking injunctions in district court or exclusion orders before the ITC.  A130-36. The district court also indicated that it reserved the right to grant specific performance determining the FRAND terms of the licenses between the parties.  A114-18.  The next day, Motorola sought clarification whether Apple would accept any license created by the court or whether the "specific performance" Apple sought was actually a request for an advisory opinion.  A23932-38.  In subsequent briefing prior to the trial scheduled for November 5, 2012, Apple indicated that it reserved the right to reject any license terms determined by the court.  A24624-36, 27871-83.  The district court accordingly dismissed the contract and declaratory judgment claims.  A188-89. After briefing, the district court held that the claims were dismissed without prejudice.  A195-96.

CONFIDENTIAL
MATERIAL OMITTED

## STATEMENT OF FACTS

### A.    Motorola's Contributions to SSOs and FRAND Licensing History

Motorola is a pioneer in the area of wireless communications and has contributed over the years to the standards and infrastructure that make today's cellular and wireless communication technology possible.  A1812-1813, A1816-1817.  As a result of its multi-billion dollar investments in research and development, Motorola owns a valuable portfolio of patents, many of which are considered essential to the practice of industry standards.  A2087-2088.  From the outset of its participation in standards development, Motorola has promised to be willing to grant licenses to its cellular and wireless standard-essential patents on fair, reasonable, and non-discriminatory ("FRAND") terms to all comers, subject to conditions such as reciprocity and a willingness on the part of the prospective licensee to engage in good-faith negotiations.  A2086; *see, e.g.,* A1870; A28008.  Apple's corporate witness on standard-setting participation could not say that Motorola has been anything other than a "good corporate citizen" of SSOs.  A5644.

Since the early 1990s, Motorola has negotiated over 50 license agreements with the vast majority of major handset manufacturers including █████████ █████████████████, and in exchange has received valuable cross-license rights for its own products and over ████████████ in royalties.  A2086-87; 28051.

### B.    The Standards and SSOs at Issue

7

The standard-setting organizations relevant to this case are the European Telecommunications Standards Institute ("ETSI") and the Institute of Electrical and Electronics Engineers ("IEEE").

Based in France, ETSI develops cellular telephone communication technologies, including those commonly known as 2.5G (GPRS/EDGE), 3G (UMTS) and 4G (LTE).  ETSI is officially recognized by the European Union as a European Standards Organization.   ETSI promulgates a set of governing procedures and guidelines.  A5712-52.  This includes an Intellectual Property Rights ("IPR") Policy which relates to patents, and sets forth requirements  to practice the standards developed by ETSI.  A5743-47.  Section 4.1 of the ETSI Intellectual Property Rights ("IPR") Policy states:

> Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

A5743.  ETSI expressly does not provide a definition for the phrase "timely." A5716 ("Definitions for 'Timeliness' or 'Timely' cannot be agreed because such definitions would constitute a 'change to the Policy.'").

8

CONFIDENTIAL
MATERIAL OMITTED

John Phillips, the former Chairman of the ETSI General Assembly, testified that ETSI does not have a definition of either "reasonable endeavors" or "bona fide basis," and that he could not define those terms himself:



A3539 (objections omitted); A6323-24.  Moreover Section 6.1 of the IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD is brought to the attention of ETSI, the

> Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms and conditions under such IPR
>
> […]
>
> The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

A5744.   Section 14 of that same IPR policy explains that the ETSI General Assembly may decide the action to be taken (if any) against an ETSI member in the event of a breach of ETSI's policies:

> Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI.  The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

A5746.  Nothing in the ETSI policy authorizes a third party to step into the shoes of ETSI to enforce the ETSI rules.

The IEEE is a U.S.-based standard-setting organization and is responsible for the 802.11 (WiFi) wireless standard.  With respect to patents that are or may become essential to a standard, the IEEE rules direct the IEEE to request that the patent owner provide a letter of assurance:

> A Letter of Assurance shall be either:
>
> (a) A general disclaimer to the effect that the Submitter without conditions will not enforce any present or future

10

Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

(b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. At its sole option, the Submitter may provide with its assurance any of the following: (i) a not-to-exceed license fee or rate commitment, (ii) a sample license agreement, or (iii) one or more material licensing terms.

A12286.

Neither ETSI nor IEEE defines "reasonable and non-discriminatory terms." Indeed, the ETSI ad hoc group responsible for ETSI's intellectual property rights policies issued a report stating that "[t]he ETSI IPR Policy does not define FRAND," and that ETSI is "unable to define FRAND terms and conditions." A11975. Likewise, the IEEE-SA's Standards Board Bylaws state that the IEEE is not responsible for "determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory." A12287. Instead, FRAND terms and conditions are left to be determined through private, bilateral negotiation.

### C.    Motorola's Contributions To ETSI Cellular Standards

11

Standards are developed through a collaborative process where the members make technical contributions that are then considered for inclusion in the standard. The technical group members focus exclusively on the technical value of the contribution and will vote for the contributions they believe will be most useful for the standard, *i.e.*, the best solution for the technical issue at hand.  A1795-97.

For decades, Motorola has spent considerable investment in research and development to help develop cellular technologies and has contributed its innovations for inclusion in ETSI's cellular standards.  *See* A1812-13; A1816-17; A1823-68; A28008.  Some of these  technologies were patented, but many were not.  In the late 1990s, Motorola's researchers developed and later contributed valuable technologies to the entities that determined the details of today's widely successful 2.5G and 3G cellular standards.  A4797-4800; A5157-82; A5306-11.

In addition to its technical contributions, over the years, Motorola has made commitments to ETSI to license patents essential to ETSI cellular standards on FRAND terms.  *See, e.g.,* A1823-1868, A28008.  Motorola has also identified patents to ETSI which it believes are essential to these standards.  *See, e.g.,* A1823-68.  Separately, Motorola has also made commitments to IEEE to license patents essential to the IEEE 802.11 Standard on FRAND terms.  *See, e.g.,* A1870. Motorola is a member in good standing with both ETSI and IEEE.

**D.    Apple's Late Entry Into The Cell Phone Business**

12

CONFIDENTIAL
MATERIAL OMITTED

Apple began developing the iPhone at least as early as ███. A5562. No later than ███████, Apple became aware of Motorola's valuable standard-essential cellular patents. A5621. Apple released its iPhone in 2007 without obtaining a patent license from Motorola, even though the iPhone practiced multiple cellular and Wi-Fi standards covered by Motorola's standard-essential patent portfolio. A1886.

Shortly after Apple released the first iPhone in the summer of 2007, Motorola reached out to Apple to initiate cross-license discussions. A2199-2200. At their first meeting, Motorola offered to license its standard-essential patent portfolios to Apple in exchange for a 2.25% royalty on licensed sales, the same proposal Motorola has made to dozens of other companies, and consistent with cellular industry rates of 1-5%. A2087-89, A2212; A2194, A15506-07, A27342-43. But Apple made clear at the parties' initial meeting that it had no intention of taking a license, and rejected Motorola's offer. A15351.

Motorola for three years continued to seek to license its portfolios to Apple, but Apple continued to refuse to pay for a license, rejected all of Motorola's proposals, and refused to provide any financial counter-offer of its own. A71; A2089; A15391; A27329.

### E.    Motorola's Patent Infringement Actions

After Apple sued smartphone manufacturer HTC in October 2010 for patent infringement based on the same Android operating system used in Motorola's products (A1938), Motorola commenced patent litigation to enforce its patents against Apple.  Motorola brought these actions in the ITC  (Investigation No. 337-TA-745), and the district courts (Northern District of Illinois Case No. 11-cv-08540).  These cases are now on appeal in this Court.  *See Apple Inc. v. Motorola, Inc.*, Case Nos. 12-1548, -1549 (Fed. Cir.); *Motorola Mobility LLC v. ITC*, Case No. 12-1666 (Fed. Cir.); *Motorola Mobility LLC v. ITC*, Case No. 13-1417 (Fed. Cir.).

Certain of the patents Motorola asserted in those suits are essential to the EDGE (2.5G), UMTS (3G) cellular and 802.11 (WiFi) wireless standards.  In the ITC, these included Motorola U.S. Patent Nos. 6,246,697 (UMTS) and 5,636,223 (802.11).  In the district court case, they included Motorola U.S. Patent Nos. 6,175,559 (UMTS), 6,359,898 (EDGE), 5,311,516 (802.11), 5,319,712 (802.11), 5,572,193 (802.11), and 5,490,230 (UMTS).  Apple argued that these patents are unenforceable because Motorola's standard rate is unreasonable and because Motorola did not disclose the cellular patents when the EDGE and UMTS standards were being developed in 1998-1999. Trial in ITC Investigation No. 337-TA-745 took place in December, 2011 (A6422); trial in the Northern District of Illinois Case No. 11-cv-08540 was set for June, 2012, but both Motorola's and

Apple's claims in that case were dismissed prior to trial.  A6422; *see also Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 924 (N.D. Ill. 2012).

### F.    Apple's Claims In This Action

On March 11, 2011, Apple filed counterclaims in the ITC action alleging antitrust, unfair competition, tortious interference, breach of contract, declaratory judgment, and equitable estoppel claims.  A288-351.  That same day, Apple removed all of its claims  to the district court below.  As amended, these claims were:

Count I – Equitable Estoppel

Count II – Breach of Contract – ETSI/3GPP

Count III – Breach of Contract to Which Apple is a Third Party Beneficiary – ETSI/3GPP

Count IV – Breach of Contract to Which Apple is a Third Party Beneficiary – IEEE

Count V – False F/RAND Commitments and Deceptive Acts in Violation of Section 2 of the Sherman Act

Count VI – Unfair Competition and Unlawful Business Practices in Violation of Cal. Bus. & Prof Code ¶ 17200, et seq.

Count VII – Declaratory Judgment That Motorola's Offers have not been on F/RAND Terms

Count XI [*sic*] – Declaratory Judgment of No Entitlement to Injunctive Relief

Count XII [*sic*] – Declaratory Judgment of Patent Misuse

Count XIII [*sic*] – Interference with Contract

15

CONFIDENTIAL
MATERIAL OMITTED

A3283-94.  Apple sought monetary damages stemming from each of its causes of action, including treble damages for Motorola's purported antitrust violation pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26.  A3295-96.

Apple's opening expert reports were due March 6, 2012, nearly a year after it initiated this action.  A3337.  Among the reports Apple served on March 6 was a report by its damages expert, Mr. Brian Napper.  Mr. Napper concluded that Apple had suffered a minimum of ██████████ in damages based on "litigation costs, including attorneys' fees, Apple [had] incurred to date in (1) having to defend the ITC 745 Investigation; (2) having to defend the [NDIL] District Court Case; and (3) prosecuting the 178 case to establish Motorola's violation of its obligations to ETSI and IEEE."  A9121-23.  Mr. Napper's conclusions were based on summaries of invoices from the law firms representing Apple in each of those cases, which identified generalized fees for the defense and prosecution of the three cases, as well as costs for items such as Apple's attorneys' car fare, meals and laundry.  A29269-312; *see, e.g.*, A29298-99.

Months later, on August 31, 2012, Apple sought leave from the district court to rely on a new "supplemental" report by Mr. Napper withdrawing Apple's claims for attorneys' fees and costs, and instead concluding that Apple was entitled to only ██████████ in damages for expert witness fees and costs purportedly incurred in connection with the ITC 745 case and the NDIL district court case, as

well as other "administrative costs" incurred in prosecuting yet another lawsuit filed by Apple against Motorola in the Southern District of California. A8599-8616; A9096-9103. Though Motorola sought corporate deposition testimony on Apple's damages claims, as well as other discovery, Apple provided no further information beyond that cited in its expert's reports. *See, e.g.,* A8622-24.

Mr. Napper's deposition was set to proceed on September 19, 2012, less than three weeks after Apple sought leave to rely on his new damages report and only a month and a half before trial. *See* A8605. In the midst of Mr. Napper's deposition, counsel for Apple informed Motorola for the first time that Apple intended to withdraw its damages claim entirely, in favor of seeking nominal damages, declaratory and equitable relief, conditioned on Motorola's agreement to waive its right to a jury trial. A22078.

## G.     The District Court's Decision

The district court granted dismissal or summary judgment for Motorola on all of Apple's claims. A195-96. With respect to Apple's claims for antitrust violations under Section 2 of the Sherman Act, and unfair competition under Cal. Bus. & Prof. Code § 17200, the district court concluded that those claims were barred under the *Noerr-Pennington* doctrine and granted summary judgment in favor of Motorola, dismissing those claims with prejudice. A80-85; A195. The district court held that Apple's "antitrust claim is necessarily based on Motorola's

17

patent litigation" and that "the only injury Apple suffered as a result of Motorola's alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation initiated by Motorola." A82-83. The court noted that Apple had failed to show that it has suffered any damage apart from that litigation expense, for "Motorola's license demand" had not caused it "to change its product, delay the release of the iPhone, suffer from increased costs or lose any customers or market share." A82-83. Because Apple's unfair competition claim was "premised on the same theory as Apple's antitrust claim," the district court held that that claim was likewise barred. A84-85

With respect to Apple's claims for breach of contract, the district court initially granted Apple's motion for partial summary judgment "with respect to the existence of contracts between Motorola and the standards-setting organizations" at issue, and with respect to Apple's status as a third-party beneficiary of those contracts. A97-102. The district court recognized, however, that the ETSI and IEEE policies "make clear that [the] organizations will not be responsible for deciding what terms constitute a fair, reasonable and nondiscriminatory license" and that "[t]hey will not resolve licensing disputes." A97, A100.

Apple withdrew its damages claim in favor of pursuing a judgment declaring a specific FRAND rate for Motorola's patent portfolios, but  then refused to commit to accepting any rate determined by the court. A24624-36. Faced with

Apple's refusal to be bound, the district court raised "questions about the justiciability of the issues raised by Apple." A169. In particular, the district court "questioned whether it was appropriate for a court to undertake the complex task of determining a FRAND rate if the end result would be simply a suggestion that could be used later as a bargaining chip between the parties." A171. The district court reasoned that "[i]t may have been appropriate to order exceptional relief in this case if it would have prevented continued patent infringement litigation or protracted negotiations. However, it is now clear that specific performance would not resolve those concerns." A172. The district court further reasoned that granting judgment for Apple on its declaratory relief claims "would lead to the same situation as a declaration of a particular FRAND rate; the parties would be sent back to the negotiation table to hammer out the details of a license," and questioned whether any trial should be held on Apple's claims. A175.

After considering further briefing and argument from the parties, the district court dismissed Apple's remaining claims. A177-89. The district court noted that "[p]erhaps it should have been evident earlier in the case that Apple was seeking only a ceiling on the potential license rate that it could use for negotiating purposes, but it was not." A181. "If Apple succeeded in showing that a breach occurred but did not win the rate it wanted, it could walk away, leaving Motorola without a mechanism for obtaining compensation from Apple for the use of its

patents except by filing infringement suits. The court would be resolving all of the issues raised in this case without necessarily bringing the parties any closer to a license agreement." A181-82. Though Apple proposed different frameworks under which the court could set a FRAND rate, the district court found that "[e]ach proposal exposes more of the difficulties inherent in trying to pick a particular monetary rate for an agreement as complex as a licensing fee for rapidly changing technology," and "[i]n effect, Apple is asking the court to assess one part of a complex contract that has yet to be negotiated." A186. The district court concluded that there was "no guarantee that the parties will complete the negotiation and actually enter into a licensing agreement under which Apple will pay Motorola for the use of its technology," and thus was "not persuaded that the case should proceed." A186.

The district court further concluded that Apple's claims for declaratory relief should be dismissed without prejudice because, in dismissing those claims, the district court had concluded "it was inappropriate to reach the merits of [those] claims." A193. With respect to Apple's claims for specific performance and injunctive relief, although the district court found that those claims failed "because Apple failed to show that the court should order the extraordinary relief of specific performance," the court determined that those claims should be dismissed without

prejudice as well because they were ultimately dismissed "for similar reasons" as the declaratory judgment claims.  A194.

## SUMMARY OF THE ARGUMENT

Apple characterizes this case as whether a district court is powerless to remedy supposed violations of FRAND commitments to ETSI and IEEE.  Not so. The law provides extensive mechanisms for enforcing promises to SSOs, in particular as affirmative defenses to patent infringement actions.  What this case is really about is Apple's campaign to chill patent owners from asserting their standard-essential patent rights by attaching antitrust liability for simply filing a lawsuit, and by seeking contract remedies even though Apple itself refuses to take a license and refuses to be bound by the remedy it requested the district court to award.

This Court should transfer the appeal to the Seventh Circuit because Apple's choice to bring a stand-alone antitrust and contract action means that no claims here arise under the Patent Act.

If the merits are reached, this Court should affirm the district court's dismissal of all of Apple's claims.  *First*, as the district court correctly found, Apple's antitrust and unfair competition claims fall squarely within the *Noerr-Pennington* doctrine because they are directed at Motorola's protected patent litigation activity.

*Second*, as the district court likewise properly ruled, Apple's contract claims sought a nonjusticiable advisory opinion once Apple, an unwilling licensee since 2007, maintained on the eve of trial its refusal to commit to pay a license fee set by the court even in the face of its request for specific performance.   As an alternative ground to affirm dismissal of the contract claims, this Court may hold that *Noerr-Pennington* bars Apple's contract claims as well as its antitrust claims. Apple's judicial positions made clear that it was seeking to attach liability for Motorola's assertion of its patent rights, not for any actual antitrust injury, not for any detrimental reliance, and not for enforcement of any contract with ETSI and IEEE. The Court may also affirm on the alternative ground that Apple failed to prove that, as an unwilling licensee, it could step into the shoes of ETSI or IEEE as a third-party beneficiary to enforce Motorola's FRAND commitments.  Nothing in the ETSI or IEEE commitments or policies gives unwilling licensees any such unilateral right.

*Third*, the district court correctly rejected Apple's declaratory judgment claims for the same reasons as its contract claims.

*Finally*,   on cross-appeal, Motorola submits that the district court should have dismissed all of Apple's claims with prejudice as Apple had ample opportunity to litigate them and the grounds for dismissal were of Apple's own creation.

## STANDARD OF REVIEW

This Court reviews a lower court's grant of summary judgment *de novo*. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed. Cir. 1994). Under Wisconsin law, the denial of a request for specific performance is reviewed for abuse of discretion. *Edlin v. Soderstrom*, 264 N.W. 2d 275, 281 (Wis. 1978).

This Court reviews a district court's decision to dismiss with or without prejudice under the law of the regional circuit. *Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1331 (Fed. Cir. 2009). In the Seventh Circuit, the nature of a case's dismissal is reviewed for abuse of discretion. *See United States v. Killingsworth*, 507 F.3d 1087, 1090 (Fed. Cir. 2007).

## ARGUMENT

## I.   THIS COURT LACKS APPELLATE JURISDICTION AND SHOULD DISMISS OR ORDER TRANSFER TO THE SEVENTH CIRCUIT

This Court has jurisdiction over "a final decision of a district court of the United States, . . . in any civil action arising under, or in any civil action in which a party has asserted a compulsory counterclaim arising under, any Act of Congress relating to patents or plant variety protection." 28 U.S.C. § 1295(a)(1). The appellant bears the burden of demonstrating that this Court has jurisdiction over its claims. *See Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*, 599 F.3d 1277, 1283 (Fed. Cir. 2010). Apple has failed to meet that burden in this case.

### A.   Apple's Claims Do Not "Arise Under" Federal Patent Law

Despite Apple's protestations (AOB 74), its claims do not "arise under" federal patent law. 28 U.S.C. § 1295(a)(1) extends the exclusive jurisdiction of the Federal Circuit "only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988).

None of Apple's claims as pleaded in this case is based on patent law, nor does Apple's right to relief depend on resolving a substantial question of patent law. Breach-of-contract actions that involve patent licenses do not require the resolution of a disputed question of patent law; "the mere presence of a patent as relevant evidence to a claim does not by itself present a substantial issue of patent law." *Lab. Corp.*, 599 F.3d at 1279, 1284 (concluding that this Court lacked appellate jurisdiction and transferring the appeal to the Tenth Circuit). Likewise, Apple seeks relief in the form of specific performance of a contract and declarations of rights under that contract—remedies far removed from any patent case within this Court's jurisdiction. *See Bonzel v. Pfizer, Inc.*, 439 F.3d 1358, 1363 (Fed. Cir. 2006) (holding that a complaint seeking specific performance of a patent license did not arise under federal patent law). Finding that Apple's claims

24

arise under the federal patent laws would "upset the congressionally approved balance of federal and state judicial responsibilities."  *MDS (Canada) Inc. v. RadSourceTechs., Inc*., 720 F.3d 833, 843 (11th Cir. 2013).

### B.    Apple Cannot Tie Its Claims To Motorola's Patent Infringement Claims

Apple now argues (AOB 73) that its claims are part and parcel of Motorola's "coercive action . . . for patent infringement,"  but its litigation choices belie any such assertion.  Apple initially raised its claims as counterclaims in the ITC, but then removed them into the separate, stand-alone antitrust and contract action below.    Moreover, Apple argued successfully in the district court *against* consolidating the antitrust and contract claims with Motorola's patent infringement claims, asserting that trying both sets of claims together "would deprive Apple of the relief it seeks—an injunction against the patent infringement action Motorola improperly initiated."  A2447.  Appeals in Motorola's ITC and district court patent infringement actions, which do properly "arise under" federal patent law, have already been filed in this Court independent of this case.  *See Apple Inc. v. Motorola, Inc.*, Case Nos. 12-1548, -1549 (Fed. Cir.); *Motorola Mobility LLC v. ITC*, Case No. 12-1666 (Fed. Cir.); *Motorola Mobility LLC v. ITC*, Case No. 13-1417 (Fed. Cir.).

Apple's appeal of its stand-alone antitrust and contract action accordingly should be dismissed or transferred to the Seventh Circuit.

25

## II. THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL OF APPLE'S ANTITRUST AND UNFAIR COMPETITION CLAIMS UNDER THE *NOERR-PENNINGTON* DOCTRINE

In dismissing Apple's Sherman Act and unfair competition claims, the district court correctly applied *Noerr-Pennington*, a doctrine rooted in First Amendment principles. *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961). That doctrine provides that "[t]hose who petition government for redress are generally immune from antitrust liability." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56 (1993). The doctrine is based on the principle that "the Sherman Act does not prohibit . . . persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* (citing *Noerr*, 365 U.S. at 136). The same is true of petitions to the judicial branch, and objectively reasonable efforts to litigate are protected regardless of subjective intent. *Prof'l Real Estate*, 508 U.S. at 57.

### A. Motorola May Not Be Held Liable For Its Legitimate Pursuit Of Patent Infringement Litigation

The district court properly concluded that the *Noerr-Pennington* doctrine barred Apple's antitrust and unfair competition claims because those claims were directed at Motorola's litigation against Apple. A81-85. It is well-established that enforcing intellectual property rights is a protected petitioning activity subject to

*Noerr-Pennington* immunity.  *See Prof'l Real Estate Investors*, 508 U.S. at 63-66 (affirming the application of *Noerr-Pennington* to bar claims premised on copyright infringement litigation).  As this Court has recognized, the pursuit of non-sham patent infringement litigation is squarely within the First Amendment's and *Noerr-Pennington*'s protection, and may not form a basis for antitrust liability.  In *ERBE Electromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278 (Fed. Cir. 2010), for example, this Court affirmed a district court's summary judgment holding that patent infringement defendant Canady's antitrust counterclaims were barred under the *Noerr-Pennington* doctrine.  *Id*. at 1293.  The Court determined that, under the *Noerr-Pennington* doctrine, ERBE was immune from antitrust liability for pursuing patent infringement litigation against Canady, and that the narrow exception for sham litigation did not apply.  *Id*. at 1292.  The Court further rejected Canady's arguments that the district court had improperly failed to consider evidence of other allegedly anticompetitive acts because Canady had failed to come forward with any evidence to support those allegations, holding that "[i]t is Canady Technology, and not ERBE, who bears the burden of seeking discovery on its antitrust claims and establishing some genuine issue of material fact as to the other predatory acts it argues the district court ignored.  Canady Technology failed to do either."  *Id*. at 1293.  The same principles compel dismissal of Apple's claims here.

**B.    Apple Failed To Allege Any Liability Or Damages Apart From Motorola's Protected Conduct**

To survive summary judgment on its antitrust and unfair competition claims, Apple would have had to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also ERBE Electromedizin*, 629 F.3d at 1293. The district court concluded that Apple failed to satisfy that burden because it failed to produce evidence that its antitrust claims were premised on any harm other than having to defend itself from Motorola's legitimate and protected patent infringement claims. A82-83.

That ruling was plainly correct, for the only antitrust injury Apple ever asserted was the fees and costs it incurred in litigating against Motorola. It is well-settled that, in order to prove an antitrust claim, a plaintiff must show that it has suffered an antitrust injury. *In re Copper Antitrust Litigation*, 436 F.3d 782, 789 (7th Cir. 2006) ("[A]n antitrust cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (citation omitted). The injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

In this case, Apple sought damages for expenses incurred in defending itself in the district courts and the ITC against Motorola's patent infringement claims, and in pursuing its affirmative breach of contract and antitrust claims against

28

Motorola.    A83.    These expenses included attorneys' fees, as well as other expenses incurred by Apple's attorneys in connection with the litigation between the parties.    A82-83; A6423-24; A9121-23.    Apple's economist expert also suggested that Apple may incur future damages if Motorola prevails on its patent infringement claims and obtains a royalty that violates FRAND.  A8086-87.  In addition to its claims for damages, Apple sought anti-suit injunctions barring Motorola from enforcing its patents and continuing to pursue its then-pending infringement claims in the district court and ITC, as well as declarations that Motorola's patents were unenforceable.  A352-58, A3296.

By contrast, as the district court  correctly found (A82-83), Apple provided no evidence of any alleged damages to Apple stemming from any alleged anticompetitive conduct by Motorola *apart from* Motorola's patent litigation against Apple.   Nor could it, for Apple has used the standards embodying Motorola's patented technology without interruption since at least 2007, and thus has not suffered any costs from lost market opportunities or delay in releasing its products.

Apple accordingly should not now be heard to argue (AOB 30) that it properly pleaded antitrust claims based on harms it would have suffered "even if Motorola had never filed a lawsuit"—including "the threat of being forced to pay exorbitant royalties" and "the uncertainty created by Motorola's refusal to offer a

fair, reasonable and non-discriminatory license" (AOB 41).[1]   These belated allegations are not enough to withstand summary judgment, and the district court properly disregarded them.   A82-83.   Though Apple now points to *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) for the proposition that a "significant threat" of antitrust injury is sufficient to establish a claim for an injunction under 15 U.S.C. § 26 (AOB 39-40), in that case the plaintiff established evidence that it had actually suffered "the type of loss that the claimed violations of the antitrust laws would be likely to cause" in one market, and that defendant's actions showed a propensity to cause similar harms elsewhere.   *Zenith*, 395 U.S. at 126, 132-133.   Apple came forward with no such evidence here.   In order to demonstrate a genuine issue of material fact, Apple was required to come forward with objective evidence showing some antitrust harm other than having to defend itself in litigation—and allegations in a complaint are not evidence.   *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Mere allegations in a complaint, however, are not 'evidence' and do not establish a

---

[1]   As a threshold matter, Apple's new assertion that it suffered antitrust harm based on conduct that occurred "years before" Motorola sought to enforce its patents is contradicted by the arguments it made to the district court for why its antitrust claims should not be barred under the relevant statute of limitations.   In Sherman Act cases, a plaintiff must bring its claims within four years after the cause of action accrues.   15 U.S.C. § 15b.   Apple argued that its claim did not accrue until at least 2007, when Motorola first sought to license its patents to Apple.   A6378-79.

triable issue of fact.") (citing *Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006)).

Apple also may not now rely (AOB 32-33) on the district court's order denying Motorola's motion to dismiss Apple's complaint or on the Third Circuit's decision in *Broadcom v. Qualcomm*, 501 F.3d 297, 314 (3d Cir. 2007), holding that intentionally false FRAND commitments may form a basis for an antitrust claim sufficient to survive a motion to dismiss.   Unlike when deciding a motion to dismiss, a district court at summary judgment is not required to accept allegations pleaded in a complaint.   As the Third Circuit itself made clear in *Broadcom*, its decision was limited to whether Broadcom had sufficiently *pleaded* an antitrust claim, and not whether Broadcom had successfully established that claim.   *See, e.g., id.* at 319 (discussing Broadcom's attempted monopolization claim). Likewise, Apple's reliance on *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008), and *Apple v. Samsung Elecs. Co.*, No. 11-01846, 2011 WL 4848567 (N.D. Cal. Oct. 18, 2011) (AOB 40-41) is misplaced since both of those cases involved motions to dismiss and are limited to whether the plaintiffs had sufficiently pleaded antitrust claims.

To the contrary, Apple's arguments resemble those this Court rejected in *ERBE Elektromedizin*.   Like the antitrust claimant in *ERBE Elektromedizin*, Apple failed to develop through discovery the very theories of harm that it now contends

the district court should have considered.  *See ERBE Elektromedizin*, 629 F.3d at 1292-93.  The district court correctly concluded that Apple failed to produce any facts supporting its other theories of harm.  A81-82. Thus, although Apple asserts (AOB 41) that it has been or would be harmed by "the threat of being forced to pay exorbitant royalties" and "the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license," the district court rightly acknowledged that Apple had produced no evidence showing that this "threat" or "uncertainty" caused Apple to "change its product, delay the release of the iPhone, suffer from increased costs or lose any customers or market share."  A81-82. Accordingly, because the *only* harm Apple was able to show was the cost of defending itself from patent-infringement claims, the district court correctly concluded that Apple could not prove an antitrust violation without relying on protected petitioning activity, and thus correctly dismissed Apple's claims.  A83.

## C.    The Exception For "Sham Litigation" Does Not Apply

Apple now appears to have  abandoned its earlier argument that Motorola's infringement claims fell within the *Noerr-Pennington* doctrine's narrow "sham" litigation exception.   If this Court were to reach that issue, it should affirm dismissal because, as the district court properly concluded (A83-84; *see* A136), Motorola's infringement claims were not "objectively baseless" and thus this exception did not apply.

32

## III.  THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL OF APPLE'S CONTRACT CLAIM

Because Apple dropped its claim for damages and told Motorola and the district court it wanted the court to set a FRAND rate under a breach of contract theory (A9859-64; 20368-92), but then refused to be bound to whatever rate the court might set (A24624-36; A27871-83), the district court properly dismissed Apple's contract claim as seeking a nonjusticiable, advisory opinion. A186-89. If this Court disagrees, it should still affirm on the alternative grounds that *Noerr-Pennington* warrants dismissal of the contract as well as the antitrust claims because predicated on Motorola's protected litigation conduct, and/or that Apple, as an unwilling licensee, failed to show that it was entitled to enforce Motorola's commitments to ETSI and IEEE.

### A.    The District Court Correctly Dismissed Apple's Contract Claim As Nonjusticiable

"The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy," and a federal court may not render an advisory opinion. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *see also Flast v. Cohen*, 392 U.S. 83, 97 (1968). For this reason, it has "been the firm and unvarying practice of Constitutional Courts to render no judgments not binding and conclusive on the parties." *Chicago & S. Air Lines v. Waterman S.S. Corp*., 333 U.S. 103, 113-14 (1948); *see also H&R Block E. Enters., Inc. v. Raskin*, 591 F.3d

33

718, 724 (4th Cir. 2010). Indeed, the Supreme Court has long held that federal courts must not render judgments that "would not be final and conclusive upon the rights of the parties." *Gordon v. United States*, 117 U.S. 697, 702 (1864). In doing so, the Court emphasized that final judgments must be enforceable and definitively resolve the parties' dispute, noting that, without execution, "the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties. . . ." *Id.*

In light of these well-established principles, the district court correctly dismissed Apple's claims as seeking an advisory opinion. A170-89. Because Apple insisted that it reserved the right to "refuse [a court-set rate] and proceed to further infringement litigation" (A24634), granting the requested specific performance could not have ended the parties' dispute or resolved the issues between the parties. Instead, as the district court recognized, if the court had granted the requested performance but Apple then rejected the court-set rate as too high, the court would be "just rolling the ball down the road a little bit….[and] not deciding the case and ending it," A90177, and Apple would simply use the court-set rate as a bargaining chip between the parties. *See* A171 (noting that "Apple's interest in a license is qualified," that it is asking this court for a "bargaining chip," and on this basis denying Apple's request for specific performance).

34

The court might equally have dismissed for want of standing or ripeness under Article III. As to standing, Apple's claimed injuries were unredressable by any court order, which could not resolve the parties' disputes. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (treating redressability as a constitutional prerequisite of Article III standing).[2] Standing is properly denied where ultimate redress would depend on intervening actions beyond the court's control. For example, in *Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410, 1413 (D.C. Cir. 1998), the court held that an appellant lacked Article III standing to appeal a FCC decision because there was no action the court could take to remedy its claimed loss of a contractual right to acquire a third party. Likewise, in *Cherry v. FCC*, 641 F.3d 494, 498-99 (D.C. Cir. 2011), the D.C. Circuit found lack of standing where the remedy depended n the outcome of parallel proceedings outside the court's control. Apple's claims are likewise unredressable because, here, any end to the parties' patent disputes would depend on Apple's decision whether to accept a court-ordered rate and resolution of many additional material terms of any license including, but not limited to, reciprocity, geographic scope, termination and payment. *See* A186 ("Apple has not explained how it is possible

---

[2]    *See also* Decision and Order, *In the Matter of Motorola Mobility LLC*, Docket No. C-4410, at 9 (FTC July 23, 2013) ("nothing herein shall restrict the ability of any party from presenting evidence or making arguments . . .that the District Court hearing the Request for a FRAND Determination cannot or should not hear the action on jurisdictional or justiciability grounds.").

to determine a rate without knowing the answers to such questions as how a cross-license to the other party's patents may affect that rate or what the scope of the license is (a worldwide license will be more valuable than a license to sell in only one country or only a few countries); what guarantees are incorporated into the agreement; the length of the agreement; or the frequency of payments. In effect, Apple is asking the court to assess one part of a complex contract that has yet to be negotiated.").

Likewise, Apple's refusal to accept any court-ordered rate also rendered its breach claim unripe for adjudication.  Federal courts should not interfere in contract negotiations unless adjudication will bind the parties.  For example, in *Clinton v. Acequia, Inc*., 94 F.3d 568, 572 (9th Cir. 1996), the Ninth Circuit held that a claim for breach of contract presented "no live case or controversy" because it depended on a future conduct by one party to that agreement.  *Id*.  Other courts have similarly declined to advise parties of their contractual rights where the resolution of the parties' dispute depended on events that had not yet happened. *See, e.g., Westlands Water Distr. Distribution Dist. v. Natural Res. Def. Council, Inc*., 276 F. Supp. 2d 1046, 1050 (E.D. Cal. 2003); *Bird v. Penn Central Co*., 351 F. Supp. 700, 701-02 (E.D. Pa. 1972); *Oppedahl & Larson v. Network Solutions, Inc*., 3 F. Supp. 2d 1147, 1164 (D. Colo. 1998).

Given Apple's refusal to be bound to the very contract it sought to enforce, the district court was correct in dismissing the claims as nonjusticiable. Permitting unwilling licensees like Apple to file breach-of-contract and equitable claims in response to standard-essential patentholders' lawsuits would have a chilling effect on bilateral cross-license negotiations, and would unnecessarily burden courts with a whole new category of lawsuits over the reasonableness of every material term of a complex patent cross-license agreement. Private bilateral negotiations for reciprocal SEP cross-licenses are the intended method of SEP licensing, and determination of FRAND terms by possible binding arbitration or judicial resolution should be at most a last resort if private negotiations have been attempted in good faith but reach an impasse. A188. As the district court recognized, "a court's role in contract interpretation . . . is not to make contracts or to reform them," A135-136, and judicial intrusion into the dynamics of private contract negotiations over the economic value of patented technology is inappropriate, particularly where the court's role is to provide purely advisory opinions on a single contract term.

Moreover, what Apple sought here was specific performance, and a trial court's decision to deny specific performance should be upheld absent a showing of abuse of discretion. *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 637 (7th Cir. 2007); *Edlin*, 264 N.W. 2d at 281. "Specific performance

is an exceptional remedy and is normally available only when damages constitute an inadequate remedy." *TAS Distrib.*, 491 F.3d at 637 (applying Illinois law) (citing *Miller v. LeSea Broad.*, 87 F.3d 224, 230 (7th Cir. 1996)).    Contrary to Apple's assertions (AOB 48-49 (quoting *Welch v. Chippewa Sales Co.*, 31 N.W.2d 170, 171 (Wis. 1948)), damages remain the default remedy for breach of contract, and injunctive and other equitable relief "is reserved for extraordinary cases." *Estate of Luster v. Allstate Ins. Co.*, 598 F.3d 903, 908 (7th Cir. 2010).    Apple failed to show any predicate for the equitable remedy of specific performance. *Chicago Unified Indus. v. City of Chicago*, 445 F.3d 940, 945 (7th Cir. 2006).    Nor does it have any support for its assertion (AOB 60) that a non-exclusive patent license is akin to a right to exclusively possess land or some other non-fungible good where an exception might be warranted.

Finally, "an order for specific performance is appropriate only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order." *TAS Distrib.*, 491 F.3d at 437 (citing *Crane v. Mulliken*, 408 N.E. 2d 778, 780 (Ill. 1980)); *see also* Restatement (Second) of Contracts § 362 ("Specific performance or an injunction will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order.").    Here, Apple's demand that Motorola be ordered to grant a license at a specific rate while Apple refused to commit to accepting that rate deprived the contract of sufficient

38

definiteness to warrant an order of specific performance. The terms of the ETSI and IEEE policies thus do not expressly contemplate the present situation, where one party refuses to negotiate in good faith and demands that a court set out every FRAND license term and condition, starting with a FRAND royalty. Again, "a court's role in contract interpretation . . . 'is not to make contracts or to reform them, but to determine what the parties contracted to do . . . as evidenced by the language they saw fit to use.'" *FPL Energy Point Beach, LLC v. Energy Resources of Australia Ltd.*, 565 F. Supp. 2d 999, 1004 (W.D. Wis. 2008) (quoting *Miller v. Miller*, 227 N.W. 2d 626, 629 (Wis. 1975)).

## B. This Court May Affirm Dismissal Of Apple's Contract Claim On Alternative Grounds

Although the district court was correct in dismissing Apple's contract claims as nonjusticiable, should this Court reject the court's reasoning, it should still affirm on the alternative grounds that the claim is barred by *Noerr- Pennington*, and/or that Apple, an unwilling licensee, failed to establish any entitlement as a third-party beneficiary to enforce Motorola's commitments to ETSI or IEEE.

### 1. Apple's Contract Claims, Like Its Antitrust Claims, Are Barred Under The *Noerr- Pennington* Doctrine

As noted above, the district court was correct in dismissing Apple's antitrust and unfair competition claims as being barred under the *Noerr-Pennington* doctrine. Apple's breach of contract, equitable estoppel, and declaratory judgment

claims—which alleged an identical form of injury and damages—are properly deemed barred under the same doctrine.[3]  Although *Noerr-Pennington* originated in the antitrust context, it has been extended to bar liability in any action premised on protected conduct.  *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007).  As the district court acknowledged, courts have routinely applied the *Noerr-Pennington* doctrine outside the antitrust context.  A85-86; *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999) ("Although originally applied to provide immunity from antitrust prosecution, the *Noerr-Pennington* cloak of protection has been extended to cover other areas of law."); *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) (applying doctrine to state-law tortious interference with prospective economic advantage claims); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (same).  There is no dispute that Apple's breach of contract and equitable estoppel claims, just like its antitrust claims, sought to recover only litigation expenses in defending against Motorola's patent infringement suits and no damages from unprotected conduct.

It is no answer to suggest (A86-87) that Motorola contractually waived its right to sue Apple for patent infringement, for there is nothing in Motorola's

---

[3]    Because Apple has not appealed the district court's grant of summary judgment on its tortious interference claim, this Court need not address whether that claim is also barred by the *Noerr-Pennington* doctrine.

commitments to either ETSI or IEEE that prohibits Motorola from seeking such relief in court particularly where, as here, it is subject to incorrigible infringement by an unwilling licensee.  As the district court  found in analyzing the language of the IEEE and ETSI commitments, "[n]one of [the ETSI or IEEE] provisions expressly precludes Motorola or any patent owner from pursuing an injunction or other relief as a remedy for infringement."  A135; *see* A136 ("[I]n light of the fact that patent owners generally have the right to seek injunctive relief both in district courts, 35 U.S.C. § 283, and in the International Trade Commission, 19 U.S.C. § 1337(d), I conclude that any contract purportedly depriving a patent owner of that right should clearly do so.  The contracts at issue are not clear.  Therefore, I conclude that Motorola did not breach its contracts simply by requesting an injunction and exclusionary order in its patent infringement actions.").

Enforcing *Noerr-Pennington* to bar contract and equitable claims like Apple's in response to SEP infringement suits will not leave implementers of standard-essential technologies without recourse for purported violations of SSO policies.  Infringers who fail to demonstrate actionable antitrust injury or detrimental reliance may raise such violations as affirmative defenses to patent infringement claims.  Indeed, Apple asserted FRAND-related affirmative defenses mirroring its affirmative claims in this case in each of the relevant infringement cases below, and this Court is well-suited to adjudicate such claims as affirmative

defenses in patent appeals when necessary. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004 (Fed. Cir. 2008) (reviewing affirmative defenses of waiver and equitable estoppel). But *Noerr-Pennington* should be interpreted to preclude the launch of a whole new wave of stand-alone contract litigation designed to chill the enforcement of patent rights in a standard-essential patent context—a new wave that would burden the courts needlessly with claims better handled as patent defenses.

### 2. As An Unwilling Licensee, Apple Lacks The Power To Enforce The ETSI And IEEE Commitments As A Third-Party Beneficiary

As an additional alternative ground to affirm dismissal of Apple's contract claims, this Court may find that Apple failed, in the posture of this case, to establish any right as a third-party beneficiary to enforce Motorola's ETSI or IEEE commitments. Apple is not a signatory to the ETSI/IEEE commitments at issue. Instead, Apple seeks to step into the shoes of ETSI or IEEE and enforce supposed contracts between Motorola and the SSOs. In particular, Apple seeks to enforce the financial aspects of the commitments, *i.e.,* the FRAND royalties, as well as the process for patent holders to disclose their patent rights to ETSI and IEEE. Apple's argument fails because Apple has not proven that it is an intended beneficiary as opposed to an incidental beneficiary under the contract law doctrine it seeks to enforce. And Apple's interpretation of the clauses in question, including

42

its refusal to be bound by any remedy it seeks, does not comport with the contractual requirement that obligations be clear and definite.

(a) Apple Is Not An Intended Beneficiary

Under Wisconsin law, it is well established that "[t]o maintain an action as a third party beneficiary, a plaintiff must show that the parties to the contract intentionally entered their agreement directly and primarily for his benefit." *Schell v. Knickelbein*, 252 N.W.2d 921, 924-25 (Wis. 1977) (quotations omitted); *Winnebago Homes, Inc. v. Sheldon*, 139 N.W.2d 606, 609 (Wis. 1966).  There must be specific language in the contract establishing the parties' intent to benefit that third party, and the benefit intended for that third party must be direct, not indirect.  *Schilling by Foy v. Employers Mut. Cas. Co.*, 569 N.W. 2d 776, 780 (Wis. Ct. App. 1997); *Sussex Tool & Supply, Inc. v. Mainline Sewer & Water, Inc.*, 605 N.W.2d 620, 623 (Wis. Ct. App. 1999)).

Apple has pointed to no evidence that Motorola's assurances under the relevant SSO policies were ever intended to directly and primarily benefit implementers like Apple by conferring a private contract right of action.  ETSI expressly stated that the ETSI governing body—the ETSI General Assembly— would have the requisite standing to bring a suit against an ETSI member for violation of an IPR policy.  Section 14 of the ETSI IPR Policy is entitled "Violation of Policy," and states: "Any violation of the POLICY by a MEMBER

43

shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI.  The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach."  A4409.  For its part, Motorola could not have intended to directly and specifically benefit a latecomer like Apple when Motorola began participating in ETSI and IEEE and made the relevant commitments to those organizations in the 1990s, long before Apple had even entered the cellular phone market or conceived of the iPhone.

Accordingly, Apple failed to show that it is an intended rather than incidental beneficiary and thus lacks third-party beneficiary standing under Wisconsin law.  For example, in *Schilling by Foy v. Employers Mut. Cas. Co.*, a high school student had been injured at school while working at the tech shop, and sued as a purported third-party beneficiary of the employment contract between the school district and one of its teachers, who was supervising the shop at the time of injury.  Part of the teacher's duties under the employment contract was to ensure the safety of students.  But the court of appeals found that this was not enough and "that the test for a third party beneficiary" cannot "be so easily satisfied":

> [S]tudents are incidental beneficiaries of all teachers'
> employment contracts, and, indeed, all contracts the
> school district enters into for services to the students.
> However, this does not satisfy the burden of showing that
> this teacher and this school board entered into this
> contract primarily and directly for the benefit of students.
> No case cited by Schilling, and none we have been able

to discover, suggest that the test for a third party
beneficiary can be so easily satisfied.

569 N.W. 2d at 781.  While Apple certainly benefits from cellular and wireless
standards, as in *Schilling*, there is no evidence that Motorola and ETSI or IEEE
entered into any contract "primarily and directly for the benefit" of Apple such that
Apple could step into the shoes of ETSI/IEEE and sue patent owners for damages.

Similarly, in *Sussex Tool & Supply, Inc. v. Mainline Sewer and Water, Inc.*,
a business owner sued a contractor with a town for alleged lost profits due to
decreased road accessibility during sewer construction.  In finding that the business
owner was not a third-party beneficiary to the contract, the court of appeals
deemed it critical that the owner sought "economic damages resulting from the
alleged breach" whereas the purpose of the contract was to benefit the public as a
whole.  605 N.W. 2d at 623.  Similarly, Apple sought only its own litigation costs
as damages, whereas ETSI stated that the ETSI General Assembly, rather than any
particular private ETSI member or third party, had the authority to act in the event
of a breach by a member's obligations under the IPR Policy.  Apple thus cannot
meet its burden of showing that any alleged contract was primarily created for its
benefit and thus it is at best an incidental beneficiary of any contract between
Motorola and ETSI.  *See D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1479 (7th
Cir. 1985) ("Plaintiff argues that because the affirmative action clauses benefit the
handicapped, the handicapped are direct beneficiaries and therefore entitled to sue.

45

This analysis is overly simplistic. The question is not whether the contracts would benefit the handicapped, but whether the parties intended to confer an actionable right on the handicapped.").

        (b)     Apple Has Failed To Demonstrate Specific And Definite Terms To Enforce In This Case

***FRAND Rates.*** In order to be a binding, enforceable agreement, a contract must have definite and certain terms. *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (applying Illinois law); *Metropolitan Ventures, LLC v. GEA Assoc's*, 291 Wis. 2d 393 (Wis. 2006) (parties must have an understanding regarding the essential terms of the contracts); *Mead v. Ringling*, 64 N.W. 2d 222, 225 (Wis. 1954). While Motorola does not dispute that FRAND commitments are binding and enforceable under proper circumstances, Apple failed to establish that it had a right to enforce Motorola's FRAND commitments under the facts of this case, where Apple was unwilling to license Motorola's patents even under a court-determined FRAND rate, and insisted that FRAND commitments are merely "options" that Apple should be allowed to enforce, only later to be free to reject.

ETSI has expressly stated that it is "unable to define FRAND conditions." A11975-76. And IEEE has stated that it is not responsible for determining whether

licensing terms are reasonable or non-discriminatory. A12287.[4] For this very reason, there is currently considerable debate within these standard-setting bodies concerning whether to clarify the nature and scope of FRAND commitments, and Apple itself has submitted statements to ETSI seeking "clarification" of ETSI's FRAND policies. A11796-97, A11799-800.

Apple's own unwillingness to license even under a court-determined FRAND rate renders FRAND in these ETSI and IEEE commitments indefinite in this case. *See Gerruth Realty Co. v. Pire*, 17 Wis. 2d 89, 95 (Wis. 1962) (declining to supply an essential term to create a contract); *Dunlop v. Laitsch*, 16 Wis. 2d 36, 42 (Wis. 1962) ("agreement to agree" is not enforceable); *Nodolf v. Nelson*, 309 N.W. 2d 397, 398-99 (Wis. Ct. App. 1981) (lack of finance terms rendered the agreement unenforceable). Apple's refusal to provide financial counteroffers and its unwillingness to license creates a vacuum in which a court cannot create pricing terms with respect to the IEEE and ETSI policies at issue, and Apple has pointed to nothing that would allow the court in this case to fill in the gaps.

Apple's arguments that the district court should have enforced Motorola's ETSI and IEEE FRAND commitments as "option" contracts (A50) is likewise

---

[4]    *See also* National Research Council, *Patent Challenges for Standard-Setting in the Global Economy*, at 49 (2013) ("NRC Report") ("SSOs generally do not define what is meant by FRAND and its component terms: 'fair, reasonable, and non-discriminatory.' This ambiguity invites increasing litigation in which courts must decide between different parties' widely divergent interpretations of FRAND.").

unsupported by the record and the case law. Option contracts have specific requirements, including that time is of the essence in exercising the option. *Clear View Estates, Inc. v. Veitch*, 227 N.W. 2d 84, 87-88 (Wis. 1975). If, as Apple now contends, FRAND commitments are no more than agreements to, at some point in the future, unilaterally offer a FRAND license that the future offeree would be free to reject, then the terms of those commitments cannot be sufficiently "definite and certain" to constitute binding, enforceable contracts. *See, e.g., Mead*, 64 N.W. 2d at 225 (holding that plaintiff could recover under *quantum meruit*, but noting that no contract existed because of the lack of definite terms). Moreover, the case Apple relies on, *State v. Conway*, 148 N.W. 2d 721 (Wis. 1967) (AOB 55), is inapposite, for that case involved a written option executed to purchase a particular piece of land, not an agreement to offer land for sale to third parties.

Indeed, under Apple's reading of the ETSI and IEEE policies, *any* third-party implementer acting in bad faith could raise a claim for damages and specific performance simply by rejecting a patent owner's opening license offer, skipping bilateral negotiations and proceeding to litigation without any commitment to be bound by a court-determined FRAND rate—thus seeking the benefits of FRAND without undertaking any reciprocal obligations. As recognized by the DOJ and PTO, this creates perverse incentives to engage in delay tactics "where the putative licensee believes its worst-case outcome after litigation is to pay the same amount

48

it would have paid earlier for a license."  DOJ & PTO, *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013), at 7 & n. 7 ("PTO/DOJ Statement"), http://www.justice.gov/atr/public/guidelines/290994.pdf ("[I]f a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate. Such a refusal could take the form of a constructive refusal to negotiate, such as by insisting on terms clearly outside the bounds of what could reasonably be considered to be F/RAND terms in an attempt to evade the putative licensee's obligation to fairly compensate the patent holder.").

Even if Motorola's FRAND commitments were option contracts, Apple has waived its right to enforce its option.  *First*, in light of the Wisconsin rule that time is of the essence in option contracts, Apple's delay in seeking to enforce its option results in waiver.  Motorola made its FRAND commitments to ETSI and IEEE in the 1990s, but Apple, after releasing its infringing phone in 2007, did not seek to enforce the option contracts until 2011.  *Second*, Apple has now made clear that, even if provided with a court-set FRAND "option," it will reject that option if the royalty rate exceeds $1 (AOB53; A24624-36).

**SEP Disclosure Obligations**.  This Court may similarly affirm dismissal of Apple's contract claims based on Motorola's supposed failure to "make efforts to

49

disclose intellectual property rights," including its confidential patent applications, "before a standard is adopted" (A102), because those terms too are too indefinite to be enforced by Apple.[5]   The disclosure provision in Section 4.1 of the 1997 ETSI IPR policy states:

> Each MEMBER shall use its *reasonable endeavors* to *timely* inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD shall, *on a bona fide basis*, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

A5743 (emphases added).   The ETSI Guide on Intellectual Property Rights ("IPRs") explains that the phrase "timely" is undefined.  A12025 ("Definitions for 'Timeliness' or 'Timely' cannot be agreed because such definitions would constitute a 'change to the Policy.'").  On this basis, an administrative law judge recently concluded that, "[i]f ETSI cannot arrive at a definition of 'timely,' for someone outside that body to do so would amount to an assumption of non-delegated legislative power. It would be ill-advised to decree what the members

---

[5]    This Court has previously required a close reading of the disclosure policies of SSOs, and has cautioned against interpreting the standard-setting "disclosure duty unbounded." *Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1101 (Fed. Cir. 2003) (close analysis of JEDEC disclosure obligations); *See also Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1012 (Fed. Cir. 2008) (close analysis of JVT disclosure obligations); *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1080 (N.D. Cal. 2006) (denying summary judgment because "the disclosure duty arising from the practice of JEDEC members is defined by the members' conduct and treatment of the stated policy").

might by consensus not agree with." *In the Matter of Certain Elec. Devices, Including Wireless Commc'n Devices, Portable Music and Data Processing Devices, and Tablet Computers*, ITC Inv. No. 337-TA-794, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, 2012 WL 4752221, at *263 (U.S.I.T.C. Sept. 14, 2012).

Moreover, Motorola submitted unrebutted evidence that ETSI had not defined what constitutes "reasonable endeavors" and "bona fide basis" under its IPR policies, and that the former Chairman of the ETSI General Assembly could not even provide any interpretation of those terms. A12025; A6285; A3539; A6323-24. Motorola also submitted unrebutted evidence from Motorola and Apple's witnesses that in practice, patents and patent applications were not disclosed at standard setting meetings. (A6283-85.). The empirical evidence suggests that industry participants do not believe themselves to be under a duty to disclose patent applications prior to adoption of the standard. *See* Layne-Farrar, Anne, *Assessing IPR Disclosure Within Standard Setting: An ICT Case Study*, at 15, 18 (Nov. 28, 2011), available at SSRN: http://ssrn.com/abstract=1912198 (finding that 88.7% of ETSI IPR disclosures for the 2G, 2.5G, 3G, and 4G standards have been made *after* adoption of the technical standard, and with respect to the 2.5G standard, that the pre-adoption disclosure rate was just 0.2%.).

Thus, in the alternative, should this Court not affirm that the contract claims should be dismissed, the Court should find that Apple provided no clear and definite basis on which to enforce its allegation that Motorola failed to timely disclose its patent applications to ETSI.

### 3.    Denying Apple's Contract Claims Here Will Not Undermine The Purposes Of The Standards System

The primary purposes of ETSI and IEEE standards development process are two-fold: (1) inducing the creation of valuable interoperability standards incorporating the best technology available, and (2) inducing widespread adoption of the standard. *First*, owners of valuable technology will not have incentives to contribute to open standards development unless they believe that they will receive reasonable compensation even from hold-out licensees. Instead, they may choose to channel their innovation into proprietary standards that lack interoperability. *Second*, FRAND licensing encourages widespread adoption because implementers know patentholders will not retain exclusive rights if they are willing to license in good faith. FRAND policies reflect a balance between fairly compensating patentholders for their innovations and encouraging widespread adoption through licensing. Affirming dismissal of Apple's claims here is entirely consistent with these complementary purposes. Apple's arguments (AOB 7-8, 17, 32) err in focusing exclusively on implementers' hold-up and stacking concerns without considering the equal and opposite concerns that unwilling licensees can destroy

the standards system through hold-out. Apple offers no empirical evidence to support its supposed stacking or hold-up concerns. The evidence if anything is to the contrary. *See* NRC Report at 56 ("[T]he committee has found no empirical evidence showing that royalty stacking currently suppresses the adoption or use of standard-compliant products"); Microsoft June 14, 2011 FTC Comment, at 16, http://www.ftc.gov/os/comments/patentstandardsworkshop/00009-60523.pdf ("There is little evidence that patent hold-up in the standards context is a real problem. Most patent holders also are implementers, whether with regard to the same standard or in terms of the broader ICT standards landscape, and thus share an interest in maintaining reasonable royalty rates. This ecosystem generates few IPR-related disputes as a result."). Likewise, Apple offers no basis to suggest that FRAND rates should be designed solely to lower cumulative royalty burdens or eliminate hold-up. There is no evidence that SSOs like IEEE and ETSI value widespread adoption of standards as their only objective. There may be many varied business arrangements in connection with licensing patent technology, e.g., patent pools, each with their own objectives. ETSI and IEEE, however, have balanced a number of objectives, including providing reasonable compensation to patent owners, which incentivizes continued participation in the process. *See* A9562 (ETSI IPR Policy § 3.2 ("IPR holders whether members of ETSI and their

AFFILIATES or third parties, should be adequately and fairly rewarded for the use in the field of telecommunications and the rights of the owners of IPRs.")).

This Court should recognize, as the PTO and DOJ have recognized, that hold-out by infringers disrupts the balance set by the standards system just as much as hold-up by SEP-holders. As a result, dismissal of contract/antitrust claims by unwilling licensees like Apple serves the purposes of the standards system. Such unwilling licensees willfully "evade the putative licensee's obligation to fairly compensate the patent holder." Thus patent remedies including injunctive relief may be appropriate against unwilling licensees like Apple, who refuse to be bound by court-ordered rates. *See* PTO/DOJ Statement at 7 ("[I]f a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate."). If infringers are permitted to file breach-of-contract and equitable claims in response to every SEP-holder's attempt to enforce its patents, they will have every incentive to hold out and refuse FRAND license offers in order to increase the delay and transaction costs to SEP owners. *See id.* ("We recognize that the risk of a refusal to license decreases where the putative licensee perceives a cost associated with delay and increases where the putative licensee believes its worst-case outcome after litigation is to pay the same amount it would have paid earlier for a license."); *see* Microsoft June 24, 2011 FTC Comment, at 13 ("Any

uniform declaration that [injunctive] relief would not be available if the patent holder has made a commitment to offer a RAND license for its essential patent claims in connection with a standard may reduce any incentives that implementers might have to engage in good faith negotiations with the patent holder.").

Therefore, if this Court declines to affirm based on the nonjusticiability of Apple's contract claims, it should nonetheless affirm on the alternative grounds that such claims lack merit when asserted by an unwilling licensee like Apple.

## IV.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S DISMISSAL OF APPLE'S DECLARATORY JUDGMENT CLAIMS

The district court was correct in dismissing Apple's remaining declaratory judgment claims for the same reasons as it was correct in dismissing Apple's contract claims.  Apple sought declarations (1) that Motorola's opening license offer to Apple was not FRAND, and (2) that Motorola's '898 patent was unenforceable.  But a judgment for Apple on these claims could not have resolved the parties' disputes and would only have served as a bargaining chip for future negotiations or litigation.  A171; A182 ("Apple was asking the court to assist it in negotiating, not in putting the parties' dispute to rest.").

Because Article III bars advisory opinions, district courts have broad discretion in declining jurisdiction over claims for declaratory relief.  A district court's exercise of that discretion should not be overturned absent a showing that "(1) the court's decision was clearly unreasonable, arbitrary, or fanciful; (2) the

CONFIDENTIAL
MATERIAL OMITTED

decision was based on an erroneous conclusion of law; (3) the court's findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could base its decision." *Micron Technology, Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 905 (Fed. Cir. 2008) (quoting *Minn. Mining and Mfg. Co. v. Norton Co.*, 929 F.2d 670, 673 (Fed. Cir. 1991)).

### A.     Apple's Request For A Declaration that Motorola's Opening Offer Was Not FRAND Improperly Sought An Advisory Opinion

Because Apple did not stand ready to be bound by and accept a court-ordered FRAND rate, a declaration that Motorola's 2.25% opening offer was not FRAND would be an advisory opinion that would do nothing to resolve the parties' licensing dispute. Apple is incorrect to contend (AOB 63-68) that such an order would resolve "uncertainty" surrounding the parties' negotiations. Apple's argument (AOB 64) that Motorola's initial 2.25% opening offer constituted an "insurmountable roadblock" in the parties' negotiations is meritless, as the parties have been negotiating for many years since 2007, and continue to negotiate. A2089-90. Indeed, Apple's director of patent licensing and lead negotiator Boris Teksler testified that, ███████████████████████████████████

███████████████████████████████████████

███████████████████. A15311-12. Mr. Teksler further confirmed that, ████████

███████████████████████████████████████. A15390.

Moreover, Apple continues to litigate the question of whether 2.25% is a FRAND rate in the parties' separate patent litigation. There, Apple has argued that Motorola's purported failure to offer a FRAND rate acts as a bar to injunctive relief, and that FRAND is a limitation on damages. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 911-14 (N.D. Ill. 2012); *Apple, Inc. v. Motorola, Inc.*, 1:11-CV-08540, 2012 WL 1959560, at *11-12 (N.D. Ill. May 22, 2012). Should this Court remand Motorola's infringement claims for further proceedings in the Northern District of Illinois, Apple can argue its FRAND defenses there. *See Apple Inc. v. Motorola, Inc.*, Case No. 12-1548, -1549 (Fed. Cir.) (oral argument held Sept. 11, 2013).

### B.    Apple's Request For A Declaration That Motorola's '898 Patent Is Unenforceable Is Properly Litigated As A Defense To Motorola's Patent Infringement Claims

Likewise, Apple could have asserted and did assert its "claim" that Motorola's '898 patent is unenforceable for patent misuse as an equitable defense to Motorola's claim for infringement of the '898 patent. Patent misuse is a defense to patent infringement under 35 U.S.C. § 271, not a cause of action. Motorola's claim for infringement of the '898 patent was dismissed on other grounds in the Illinois patent action, *Apple Inc. v. Motorola, Inc.*, 869 F. Supp. 2d at 911-915, so at the time the district court dismissed Apple's declaratory judgment claim there was no immediate threat that Apple would soon be subject to an injunction or

required to pay damages for infringing the '898 patent. Indeed, although Apple had initially sought declarations that other Motorola patents (including those asserted in the ITC) were likewise unenforceable, Apple withdrew those claims after Motorola's infringement claims were dismissed. *See* AOB 24 (indicating that at trial, Apple's "request for a declaration of unenforceability due to patent misuse . . . by that time applied only to the '898 patent.").

The district court was thus within its discretion in declining jurisdiction over Apple's patent misuse declaratory judgment claim when that claim could have been more efficiently tried as a defense in connection with Motorola's infringement claim for the same patent. Indeed, if this Court reverses Judge Posner's dismissal of Motorola's patent infringement claim and remands that claim for trial, the Northern District of Illinois could efficiently resolve this dispute. *See Trippe Mfg. Co. v. Am. Power Conversion*, 46 F.3d 624, 629 (7th Cir. 1995) (district courts should "administer their dockets so as to conserve scarce judicial resources," and district courts have "an ample degree of discretion in deferring to another federal proceeding involving the same parties and issues to avoid duplicative litigation") (internal citations, quotations omitted)).

## ISSUE ON CROSS-APPEAL

## V.   APPLE'S CLAIMS FOR BREACH OF CONTRACT, EQUITABLE ESTOPPEL AND DECLARATORY JUDGMENT SHOULD HAVE BEEN DISMISSED WITH PREJUDICE

At the pre-trial hearing dismissing Apple's breach of contract, declaratory judgment, and equitable estoppel claims, the Court indicated that it would be dismissing these claims with prejudice.  A90282; A27884.  The court abused its discretion when just days later, it reversed course and determined these claims should be dismissed without prejudice.   A190-95.

Because Apple had ample opportunity to establish a justiciable case on its breach of contract, declaratory judgment, and equitable estoppel claims, but simply failed to do so, the district court should have dismissed the case with prejudice. *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005) (district court acted within its discretion in dismissing case with prejudice where plaintiff "already had a chance to cure the defect and failed"); *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1485 (Fed. Cir. 1988) ("The district court correctly dismissed the infringement claim with prejudice because Textile had its chance to show standing and failed.").   Apple had every full and fair opportunity to litigate its claims.  This was not a nascent case dismissed on the pleadings, in which case it might have been reasonable to dismiss without prejudice and to give the plaintiff an opportunity to re-file its claims to cure any deficiencies.  Here, fact and expert

discovery were both closed, and the district court had expended considerable resources ruling on detailed summary judgment briefings, well over a dozen motions *in limine*, and multiple *Daubert* motions.

To the contrary, Apple's claims failed because of Apple's own misguided choices and strategic maneuvering. A90257 ("THE COURT: You've had a chance to make a case on the claims that you raised and that you amended and I don't think that you've made that case."); A90255 ("THE COURT: And that's definitely a problem in my mind. Apple had—has had 20 months to construct a case and here we are gathered for trial and it's trying to expand that case."). Apple first reduced, then withdrew its damages claim (A6831; A9859-64), only to indicate on the eve of trial that it would instead seek specific performance of Motorola's FRAND commitments while holding out that it might still refuse to accept that performance if ordered (A24624-36). By going all or nothing, even after the court cautioned that any relief it might grant must be concrete and not advisory, Apple proved itself once again an unwilling licensee and killed its own claims. *See* A24627 ("To the extent the Court sets the rate higher than $1 per unit, Apple reserves . . . the right to refuse and proceed to further infringement litigation."); A182 ("Apple was asking the court to assist it in negotiating, not in putting the parties' dispute to rest."). Apple should not be given the option of reviving those claims in another court, at a later date.

This is especially so with respect to the damages claim. Apple voluntarily withdrew its claim for damages because it wished to seek only specific performance, and because it viewed a bench trial as potentially more favorable to it. A9859-64. Now having lost its bid for specific performance, Apple should not be able to revive its waived damages claims in a new case.

Other than the monetary damages, which Apple dropped from the case on its decision alone, Apple sought only equitable remedies and declaratory relief. A9860. With respect to these other remedies, the district court made specific findings that Apple could not satisfy the *eBay* test and obtain an anti-suit injunction or specific performance of Motorola's RAND obligations. A172-75. The court also determined that, based on the well-developed record, it and future courts would not grant the only form of declaratory relief Apple sought—a declaration that Motorola's '898 patent is unenforceable. A186-87 ("Apple asserted claims for declaratory relief for Motorola's violation of its disclosure obligations to the standard setting organization ETSI and engage [sic] in patent misuse, but it has not explained why monetary damages would be inadequate relief if Motorola were to sue it for infringement and seek an exclusionary order against it in the future."); A187 ("the remedy that Apple is seeking (an order of unenforceability) is so far out of proportion to any harm that Apple has suffered or is likely to suffer in the future that it is unlikely that any court would impose such an order."). This was

thus a dismissal on the merits, and dismissal with prejudice was appropriate. *See Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 924 (N.D. Ill. 2012).

## CONCLUSION

For the foregoing reasons, the Court lacks jurisdiction over this appeal, and should dismiss the appeal or transfer it to the Seventh Circuit.

If the Court retains jurisdiction, it should affirm the district court's grant of summary judgment in Motorola's favor as to Apple's claims for unlawful monopolization in violation of Section 2 of the Sherman Act, and for unfair competition in violation of California Business and Professions Code Section 17200. The Court should also affirm the district court's dismissal of Apple's claims for breach of contract and for declaratory judgment, and should hold that those claims are dismissed with prejudice.

Dated:  November 5, 2013                        Respectfully submitted,

                                                    *s/ Kathleen M. Sullivan*
                                                Kathleen M. Sullivan
                                                QUINN EMANUEL URQUHART&
                                                SULLIVAN, LLP
                                                51 Madison Ave., 22nd Floor
                                                New York, NY 10010
                                                (212) 849-7000
                                                *Attorney for Appellee-Cross Appellant*

# ADDENDUM

# OPINION AND ORDER

# DATED AUGUST 10, 2012

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                                                 OPINION and ORDER

            Plaintiff,

                                              11-cv-178-bbc

        v.

MOTOROLA MOBILITY, INC.,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This case originated in the International Trade Commission, where defendant

Motorola Mobility, Inc. filed an infringement action against plaintiff Apple, Inc., seeking an

exclusion order that would have prevented Apple from selling its allegedly infringing

products in the United States. After the case had been pending for a few months in the

Commission, Apple filed several counterclaims against Motorola and removed the

counterclaims to this court under 19 U.S.C. § 1337(c). In its counterclaims, Apple alleges

that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by

failing to timely disclose ownership of patents that it now declares are essential to

technological standards adopted by the industry and by failing to offer Apple licenses to

those patents on fair, reasonable and nondiscriminatory terms.

      Now before the court are the parties' cross motions for summary judgment. Motorola

has moved for summary judgment on all of Apple's claims on a variety of grounds. Dkt.

1

**A60**

#150.  Motorola contends that Apple's claims are barred by the doctrine of claim preclusion because Apple could have pursued them as defenses in the International Trade Commission. Motorola also contends that Apple's antitrust claims are barred by the applicable statute of limitations and by the Noerr-Pennington doctrine, which provides immunity from antitrust claims that are filed in response to nonfrivolous lawsuits.  Finally, Motorola contends that Apple cannot prove the necessary elements of its tortious interference claim or its claims of unfair competition under California law and cannot prove that it suffered any damages compensable as contractual damages.

Apple has moved for partial summary judgment on specific issues relevant to its claims.  Dkt. #143.  In particular, Apple seeks determinations from the court that (1) Motorola's commitments to standards-setting organizations are contractually binding; (2) Apple has the right to enforce those contracts as a third-party beneficiary; (3) Motorola was required under the policies of the European Telecommunications Standards Institute (ETSI) to disclose its patents and patent applications before ETSI adopted technical standards incorporating technology covered by the patents or applications; and (4) Motorola did not disclose certain patents or applications until after ETSI adopted the standards incorporating technology from those patents.

After reviewing the parties' arguments and the facts in the record, I conclude that Motorola's motion must be granted in part and denied in part, and Apple's motion must be granted in full.  With respect to Motorola's motion, I conclude that Apple's claims are not barred by the doctrine of claim preclusion, but that the Noerr-Pennington doctrine provides

Motorola immunity from Apple's antitrust and unfair competition claims premised on Motorola's patent infringement litigation and from Apple's claims for declaratory judgment, to the extent that those claims are premised on a theory of antitrust or unfair competition. Because I conclude that <u>Noerr-Pennington</u> immunity applies, I need not consider Motorola's statute of limitations argument.

Additionally, I conclude that Motorola is entitled to summary judgment on Apple's claim that Motorola tortiously interfered with its contract with Qualcomm, as well as Apple's claim under Cal. Bus. & Prof. Code § 17200 based on the same theory, because Apple has failed to adduce any evidence showing that it suffered damages from Motorola's actions.

However, I conclude that Motorola has failed to show that Apple's breach of contract or estoppel claims should be dismissed for Apple's failure to prove that it suffered any compensable damages. Therefore, I will deny Motorola's motion as to that issue.

With respect to Apple's motion, I conclude that Motorola has failed to show that there is any genuine dispute of material fact regarding the existence of contracts between Motorola and standards-setting organizations; Apple's status as a third-party beneficiary of those contracts; Motorola's obligations to disclose its intellectual property rights in a timely manner; and Motorola's failure to disclose its patents and applications before the adoption of standards incorporating its patents. Therefore, I am granting Apple's motion for summary judgment in full.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. Wireless Communication Industry

Plaintiff Apple, Inc. and defendant Motorola Mobility, Inc. are competitors in the wireless communication industry. Motorola has been a player in the industry for longer than Apple and, since at least 1990, has been a member of numerous international standards-setting organizations devoted to the development of telecommunications and wireless standards. Through the standards-setting organizations, companies agree on common technological standards so that all compliant products will work together. Standards lower costs by increasing product manufacturing volume and increase price competition by eliminating the costs for consumers to switch between products manufactured by different firms.

Some technological standards incorporate patented technology. If a patent claims technology selected by a standards-setting organization, the patent is called an "essential patent." Many standards-setting organizations have adopted rules related to the disclosure and licensing of essential patents. The policies often require or encourage members of the organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on fair, reasonable and nondiscriminatory terms to anyone who requests a license. (These terms are often referred to by the acronyms FRAND or RAND.) Such rules help to insure that standards do not allow the owners of essential patents to abuse their market power to extort competitors or prevent them from entering the marketplace.

4

**A63**

Two standards-setting organizations are relevant to the motions before the court: The European Telecommunications Standards Institute, known as ETSI; and the Institute of Electrical and Electronics Engineers, known as IEEE. At all relevant times, Motorola has been a member of these standards-setting organizations and has participated in developing technological standards for the wireless communication industry. Both organizations have intellectual property rights policies that address disclosure and licensing of patents that are essential to standards being considered or being adopted by the organizations. Additionally, Motorola has participated in the 3rd Generation Partnership Project, known as the 3G Project, which requires its members to abide by the intellectual property rights policies of ETSI and other standards-setting organizations.

1. European Telecommunications Standards Institute (ETSI)

ETSI is a standards-setting organization located in France that creates technological standards for the telecommunications industry. It has an intellectual property rights policy set forth in Annex 6 of its Rules of Procedure to govern the disclosure of intellectual property rights that are essential to standards being considered by ETSI. Dkt. #148-22. The policy defines "intellectual property right" as "any intellectual property right conferred by statute law including applications therefor. . . [but not] rights relating to . . . confidential information, trade secrets or the like." Id. § 15- 7. Since 1997, ETSI's policy has required members to disclose intellectual property that may be essential to standards. With minor variations, it has stated:

[E]ach MEMBER shall use its reasonable endeavours, in particular during the

5

**A64**

development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL [intellectual property rights] in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's [intellectual property rights] which might be ESSENTIAL if that proposal is adopted.

Id. § 4.1. The policy does not define "reasonable endeavours" or "bona fide basis." However, it is generally understood that members of ETSI should disclose intellectual property rights that they know are relevant to potential standards while the standard is being discussed and before the standard is adopted. Generally, the engineers working on the standards in working groups or technical meetings do not formally disclose intellectual property rights at those meetings. Whinnett Dep., dkt. #142, at 101; Brown Dep., dkt. #136 at 291; Smolinske Dep., dkt. #140, at 72-73. Rather, the owner of the intellectual property right files a formal disclosure with ETSI.

ETSI's intellectual property rights policy also addresses the availability of licenses to essential intellectual property rights. The policy requires the Director-General of ETSI to ask owners of essential patents to agree to "grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions." Id. § 6.1. Under ETSI's "Guide on Intellectual Property Rights," the owner of the intellectual property right should notify ETSI of its willingness to license by submitting an information and licensing declaration that identifies specific patents or pending applications that may be essential. Guide, dkt. #149-23, § 2.1.2. An owner may also use a general licensing declaration to notify ETSI that it is willing to grant licenses for any of its intellectual property rights that become essential to a standard. However, use of the general licensing declaration "does not take away the obligation for

6

**A65**

members to declare essential patents to ETSI." Id. Owners are not required to disclose any specific licensing terms and ETSI's policies provide that "[s]pecific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI." Id. § 4.1.

If a patent owner tells ETSI that it is not prepared to license one of its patents that is relevant to a standard, ETSI's General Assembly reviews the requirements for that standard to determine whether "a viable alternative technology is available for the standard or technical specification" that is "not blocked by that [patent]." Dkt. #148-22, § 8.1.1. If the General Assembly concludes that no such viable alternative technology exists, ETSI "shall cease" work on the standard. Id. § 8.1.2. If the owner who is refusing to grant a licensee is a member of ETSI, the Director-General of ETSI asks the member to reconsider its position or provide a written explanation of its reasons for refusing to license its patents. Id. The Director-General forwards the written explanation to "ETSI Counselors for their consideration." Id.

> The objective of ETSI's intellectual property rights policy is to
>
> reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL [intellectual property right] for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI [intellectual property rights policy] seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of [intellectual property rights].

Id. § 3.1. The policy goes on to state that ETSI "shall take reasonable measures to ensure, as far as possible," that standards and technical specifications will "be available to potential

**A66**

users." Id. § 3.3.

ETSI's bylaws provide that any violation of the policy by an ETSI member "shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI.  The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with ETSI Statutes."  Id. § 14.

## 2.  The Institute of Electrical and Electronics Engineers (IEEE)

IEEE is a standards-setting organization responsible for the standardization of wireless information exchange among systems and networks.  IEEE's bylaws in place from December 1993 through December 1995 provided that "IEEE standards may include patented technology if there is no equivalent noninfringing way of achieving the objectives of the standard, if it is justified for technical reasons, and if the patent holder agrees to nondiscriminatory licensing at reasonable rates."  Dkt. #148-23, § 5.

Between 1996 and 2005, IEEE requested owners of intellectual property rights that are essential to declared standards to submit a letter of assurance that was either a general disclaimer of their right to enforce patent claims against anyone practicing the standards or an agreement to license patent rights "without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."  Dkt. #148-26, § 6.

The policies that were approved in February 2011 state that "[n]o license is implied by the submission of a Letter of Assurance," dkt. #7-12, § 6.2, and that IEEE is "not

8

responsible for identifying Essential Patent Claims for which a license may be required, for conducting inquiries into the legal validity or scope of those Patent Claims, or for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory." Id.

B.  Motorola's Disclosure of Essential Patents and Commitments to License

Motorola has declared that its United States Patent Nos. 5,636,223 (the '223 patent), 5,311,516 (the '516 patent),  5,572,193 (the '193 patent), and the 5,319,712 (the '712 patent) are essential to the practice of the 802.11 wireless communication standard adopted by IEEE.  In 1994, Motorola submitted a declaration to IEEE, stating that Motorola agreed to license any patents essential to the 802.11 standard "on a non-discriminatory basis offering fair and commercially reasonable terms."  Dkt. #148-28.

In 2002, Motorola submitted declarations to ETSI and the 3G Project that its 6,175,559 (the '559 patent),  6,246,697 (the '697 patent) and 6,359,898 patents (the '898 patent) are essential or potentially essential to standards adopted by ETSI and the 3G Project.  As to the '559 and '697 patents, Motorola declared in a December 20, 2002 letter to ETSI that it "is prepared to grant irrevocable licenses on fair, reasonable and nondiscriminatory terms and conditions under such [patents], to the extent that the [patents] remain essential." Dkt. #148-6.  As to the '898 patent, Motorola declared to ETSI in 2003 that it was "prepared to grant irrevocable licenses under the [patents] on terms and

9

conditions which are in accordance with Clause 6.1 of the ETSI [intellectual property rights] Policy, in respect of the STANDARD, to the extent that the [patents] remain ESSENTIAL." Dkt. #148-3.

### C. Timeliness of Motorola's Disclosures

#### 1. '697 patent

Motorola filed the application that led to the '697 patent on January 24, 1998. In March 1998, Motorola submitted a proposal using the '697 patent's technology to SMG2, the working group developing a portion of the 3GPP standard for the 3G Project. One of the inventors of the '697 patent, Motorola employee Nicolas Whinnett, participated in SMG2 meetings at that time. Motorola did not disclose the '697 patent or application to ETSI, a partner in the 3G Project, or to the SMG2 working group.

In July 1999, the '697 patent inventors wrote an article discussing the technology of the '697 patent. They filed applications for foreign counterparts of the '697 patent that were published on July 29, 1999 and November 22, 2000.

The 3GPP standard, including technology covered by the '697 patent, was adopted by the 3G Project in December 1999. The '697 patent issued on June 12, 2001. Motorola disclosed the '697 patent to ETSI on September 20, 2002.

#### 2. '559 patent

Motorola filed the application that led to the '559 patent on July 7, 1999. On July

10

**A69**

13-16, 1999 at an ETSI meeting in Finland, Tyler Brown, a representative of Motorola and the sole inventor of the '559 patent, proposed including technology covered by the '599 patent in a portion of ETSI's Universal Mobile Telecommunications System standard (known as the UMTS standard). Motorola did not disclose the '559 application. In March 2000, the relevant section of the standard was finalized and adopted. The '559 patent issued on January 16, 2001. Motorola disclosed the '559 patent as essential to the standard in September 2002.

### 3. '898 patent

Motorola filed a provisional, unpublished application that led to the '898 patent on September 2, 1997. At a meeting in Sophia Antipolis, France, in November 1997, Motorola submitted "Contribution A330" to the ETSI working group developing a portion of the GPRS Technical Specification. Motorola's Contribution A330 was created, in part, by two inventors of the '898 patent and it disclosed in nearly verbatim form the same technology that was described in a portion of the specification of the September 1997 patent application. On March 11, 1999, Motorola's application that resulted in the '898 patent was published when Motorola applied for foreign counterparts to the application. In April 2001, ETSI published the portion of the GPRS standard that incorporated the ideas from Motorola's Contribution A330.

The '898 patent issued on March 19, 2002. Motorola disclosed the '898 patent to ETSI on April 8, 2003.

11

**A70**

D.  Negotiations for Licensing between Apple and Motorola

In 2005, Apple began developing the iPhone.  No later than mid-2006, Apple became aware that Motorola had declared patents essential to cellular standards.  Apple released its iPhone in 2007 without seeking a patent license from Motorola.

In August 2007, Motorola offered Apple a license to its essential patents.  At the initial meeting between the companies, Motorola presented information to Apple concerning its licensing program and stated that its standard royalty rate was 2.25% for a worldwide license to its portfolio of standards-essential patents.  Apple rejected the 2.25% rate. Motorola continued to engage in license negotiations with Apple for approximately three years, but Apple refused to accept a license on any terms offered by Motorola.

E.  Motorola's Termination of the Qualcomm License

Apple entered into a "Strategic Terms Agreement" with Qualcomm on December 16, 2009.  Dkt. #153-40.  The agreement set terms on which "certain Apple authorized purchasers may purchase certain components from time to time from" a Qualcomm affiliate "for use and incorporation in Apple products."  Id. at 1.  Among these components are chipsets that allow mobile devices to communicate via cellular networks, including the baseband processor incorporated into the iPhone 4S.  The chipsets incorporated technology that Qualcomm had licensed from Motorola since 1990.  The Strategic Terms Agreement did not require Apple or any of its affiliates to actually purchase chipsets and also did not guarantee that the chipsets or any other components supplied by Qualcomm would be

12

**A71**

licensed under Motorola's or any other patent holder's patents.

On January 11, 2011, the day Apple announced the Verizon iPhone 4, Motorola sent a letter to Qualcomm, with a copy to Apple, stating that Motorola was terminating any and all license and covenant rights with respect to Qualcomm's business with Apple, effective February 10, 2011.

## PROCEDURAL HISTORY

### A.  Related Cases

This particular dispute is related to three other proceedings.  First, there is the investigation pending in the International Trade Commission that defendant Motorola initiated on October 6, 2010.  In the Matter of Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof, ITC Investigation No. 337-TA-745.  In that case, Motorola sought an exclusion order and a permanent cease and desist order as a result of plaintiff Apple's alleged infringement of several of Motorola's United States patents, including the '697 and '223 patents.

As part of its original defenses in the International Trade Commission action, Apple argued that Motorola should be barred from enforcing its patents because it had unclean hands and had failed to offer licenses on fair, reasonable and nondiscriminatory terms.  In July 20, 2011, Apple notified the commission that it would "not be pursuing as part of the 745 investigation any affirmative defenses based on Motorola's failure to make a [fair reasonable and nondiscriminatory] Offer," but that it was "specifically reserv[ing] the right

13

**A72**

. . . to pursue any of these defenses . . . and claims related to them in other actions, including for example, the 661, 662, and 178 actions pending in Wisconsin." Dkt. #153-35.

On April 24, 2012, the administrative law judge issued a preliminary ruling in the International Trade Commission action, finding Motorola's '697 patent valid and infringed by Apple. Dkt. #153-34. (Before this determination, Motorola abandoned its infringement claims as to some of its patents.) The administrative law judge rejected Apple's unclean hands defense, noting that Apple had no "proof that any act of Motorola actually caused any harm (to anyone)." Id. at 151.

Second (and third), the parties are litigating their disputes in two other patent infringement cases filed in this court. Plaintiff Apple filed case number 10-cv-661-bbc on October 29, 2010, asserting patent infringement claims against Motorola. On November 9, 2010, Motorola filed counterclaims in the '661 action alleging infringement of the same patents at issue in the International Trade Commission's 337-TA-745 investigation. On December 2, 2010, this court granted the parties' joint motion to stay the '661 case in favor of the proceedings in the commission. The case remains stayed.

Also on October 29, 2010, plaintiff Apple filed case number 10-cv-662-bbc in this court, asserting patent infringement claims against Motorola. On November 9, 2010, Motorola filed counterclaims against Apple for infringement of several of its United States patents, including the '516, '712, '230, '193, '559 and '898 patents, all of which Motorola has declared essential to certain standards adopted in the wireless communications industry. The 10-cv-662 case was transferred to the Northern District of Illinois in December 2011.,

14

**A73**

where the case was dismissed with prejudice on June 22, 2012. The court found that Motorola's patents were either invalid, not infringed by Apple or that Motorola could not prove the amount of damages to which it was entitled. Apple, Inc. v. Motorola, Inc., 2012 WL 2376664 (N.D. Ill. June 22, 2012).

### B.  The Case at Issue (11-cv-178-bbc)

Shortly after Apple removed this case to federal court, it moved for preliminary injunctive relief, seeking an order that would have enjoined Motorola from (1) proceeding as a party in the 337-TA-745 investigation in the International Trade Commission with respect to the '223 and '697 patents; (2) proceeding with its counterclaims filed in case number 10-cv-662-bbc in this court with respect to the '712, '230, '193, '559 and '898 patents; and (3) selectively terminating its patent license agreement with Qualcomm as to Apple. A hearing was held on the motion on April 26, 2011. At the conclusion of the hearing, I denied Apple's motion for a preliminary injunction.

Motorola filed a motion to dismiss Apple's claims, which I granted only with respect to Apple's claim of waiver. Apple has the following 10 claims remaining in the case:

- Equitable estoppel (Count 1)

- Breach of contract with ETSI/3GPP (Count 2)

- Breach of contract with ETSI/3GPP to which Apple is a third party beneficiary (Count 3)

- Breach of contract with IEEE to which Apple is a third party beneficiary (Count 4)

- False commitments to license on fair, reasonable and nondiscriminatory terms and

deceptive acts in violation of § 2 of the Sherman Act (Count 5)

• Unfair competition and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 (Count 6)

• Declaratory judgment that Motorola's offers have not been on fair, reasonable and nondiscriminatory terms (Count 7)

• Declaratory judgment on no entitlement to injunctive relief (Count 11)

• Declaratory judgment of patent misuse (Count 12)

• Interference with contract (Count 13)

Apple's Am. Cpt., dkt. #110.


## OPINION

### A.  Motorola's Motion for Summary Judgment

#### 1.  Claim preclusion

Motorola contends that all of Apple's claims are barred by the doctrine of "res judicata" because Apple could have raised them in the International Trade Commission as defenses to Motorola's infringement claims, or did raise them there and they were rejected. Specifically, in the International Trade Commission action, Apple abandoned its argument that Motorola's patents were unenforceable because Motorola refused to license its patents on reasonable and nondiscriminatory terms.  Apple did argue that Motorola's '697 patent was unenforceable under the doctrine of "unclean hands," but the administrative law judge rejected the argument and found that the '697 patent was valid and had been infringed by Apple.

Res judicata is the traditional term for the doctrine of claim preclusion, but is sometimes used generally to refer to both claim and issue preclusion.  <u>Hayes v. City of Chicago</u>, 670 F.3d 810, 814 n.1 (7th Cir. 2012).  Motorola does not identify whether it is intending to invoke claim or issue preclusion, but the majority of cases it cites concern claim preclusion.  Thus, I am assuming that Motorola is arguing for the application of claim preclusion.

Claim preclusion "prohibits litigants from relitigating claims that were or could have been litigated during an earlier proceeding."  <u>Id.</u> at 813.  The case on which Motorola relies primarily is <u>Martino v. McDonald's System, Inc.</u>, 598 F.2d 1079 (7th Cir. 1979), in which the court of appeals held that the plaintiff was barred from bringing an antitrust claim that would have undermined a previous consent judgment issued by a federal district court against the plaintiff.  <u>Id.</u> at 1083.  The court explained that "res judicata . . . treats a judgment on the merits as an absolute bar to relitigation between the parties . . . of every matter offered and received to sustain or defeat the claim or demand and to every matter which might have been received for that purpose."  <u>Id.</u>

This case is distinguishable from <u>Martino</u> and the other cases cited by Motorola.  In <u>Martino</u>, the plaintiff was attempting to attack a judgment issued by a federal court; in this case, Apple is asserting counterclaims that have the potential to undermine the International Trade Commission's decision regarding Apple's infringement of Motorola's patents.  It is well established law that decisions of the International Trade Commission on issues of patent validity and enforceability are not entitled to preclusive effect.  <u>E.g.,</u> <u>Powertech</u>

17

**A76**

Technology Inc. v. Tessera, Inc., 660 F.3d 1301, 1308 (Fed. Cir. 2011) ("resolution of the ITC action will not have preclusive effect" on district court action); Bio-Technology General Corp. v. Genentech, Inc., 80 F.3d 1553, 1564 (Fed. Cir. 1996); Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996); Texas Instruments Inc. v. International Trade Commission, 851 F.2d 342, 344 (Fed. Cir. 1988).

Motorola argues that the general rule against granting preclusive effect to International Trade Commission determinations does not apply here because there is no rule barring a district court from giving preclusive effect to the commission's decisions on "non-patent" issues, such as Apple's antitrust, estoppel and contract claims. Motorola cites three cases that it believes support its position. In the first two cases, Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992) and Baltimore Luggage Co. v. Samsonite Corp., 1992 WL 296368, *4 (4th Cir. 1992), the courts held that it was appropriate to give preclusive effect to commission decisions concerning antitrust and unfair competition. However, neither of those cases is particularly useful because neither involved decisions from the commission arising out of patent disputes.

The third case cited by Motorola, Telectronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832 (S.D.N.Y. 1988), is more helpful to its position. In Telectronics, the district court concluded that it was appropriate to apply issue preclusion to the commission's determination regarding a license defense to a patent dispute. The court distinguished between different types of defenses to patent infringement, stating that "[u]nlike invalidity and unenforeability, noninfringement is not a defense based on the validity of a patent.

18

**A77**

Rather, it is a defense based on a contractual right to use the patent, or on defendant's lack of use of the patent." Id. at 846, n.40. The court concluded that "the ITC's determination as regards the existence of a license under a patent . . . was not one of the validity of a patent but of the existence of a contract" and should be "accorded preclusive effect." Id. at 845-46.

However, unlike the district court in Telectronics, the Court of Appeals for the Federal Circuit has not distinguished between types of defenses to patent infringement when discussing the preclusive effect of International Trade Commission decisions. As the court of appeals explained in Texas Instruments, 90 F.3d at 1569, "once we accept . . . that ITC decisions are not binding on district courts in subsequent cases brought before them, it necessarily follows that accused infringers can raise *whatever defenses they believe are justified*, regardless whether they previously raised them and lost in the ITC." (Emphasis added). See also Epistar Corp. v. Philips Lumileds Lighting Co., 2008 WL 3930030, *2-4 (N.D. Cal. Aug. 26, 2008) (patent defendant not precluded from raising defenses of license and covenant not to sue in district court patent infringement action even though it had waived those defenses in International Trade Commission).

In Texas Instruments, the court of appeals recognized that any defense an alleged infringer raises is properly treated as a "patent issue" for purposes of determining whether preclusion principles should apply. In this case, it is clear from Motorola's arguments that it is seeking to give preclusive effect to the International Trade Commission's decision on "patent issues." By seeking to bar Apple from presenting any claim that would undermine the commission's determination of validity and infringement, in effect, Motorola is asking

19

**A78**

the court to give preclusive affect to the commission's conclusions regarding the enforceability of Motorola's patents. Motorola admits as much in its brief, stating that the defenses that Apple abandoned in the commission challenged whether "the patents are unenforceable." Motorola's Br., dkt. #151, at 5.

Motorola attempts to avoid the rule of <u>Texas Instruments</u> by arguing that the rule against giving preclusive affect to commission decisions applies only when an alleged patent infringer is facing parallel infringement claims before the commission and district court. Motorola contends that this case is different because Apple has not challenged Motorola's patent disclosures and licensing offers as defenses to an infringement claim, but as affirmative claims that constitute a direct attack on the commission's decisions. However, Motorola cites no cases suggesting that a commission decision should be given preclusive effect in some types of district court cases and not others.

Moreover, Motorola's claim preclusion argument fails for another reason. The claims Apple is pursuing in this case originated as "counterclaims" in the International Trade Commission that were subject to mandatory removal. 19 U.S.C. § 1337(c); 19 C.F.R. § 210.14(e). Thus, the commission never had jurisdiction to hear Apple's counterclaims or to grant the type of relief that Apple is seeking in this case. The doctrine of claim preclusion does not bar a party from asserting claims that could not have been raised in a previous proceeding. <u>Carver v. Nall</u>, 172 F.3d 513, 516 (7th Cir. 1999) ("Claim preclusion does not operate so harshly as to bar whichever set of claims the chosen forum could not hear."). <u>See also</u> <u>Bio-Technology</u>, 80 F.3d at 1563 ("[T]he bar against later claims based on the same

transactional facts is 'subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation.'") (citation omitted).  Accordingly, Motorola is not entitled to summary judgment on the basis of claim preclusion.

2.  <u>Noerr-Pennington doctrine</u>

Next, Motorola contends that all of Apple's claims are barred by the First Amendment under the <u>Noerr-Pennington</u> doctrine.  The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Under the <u>Noerr-Pennington</u> doctrine, a party that exercises its First Amendment right to petition the government for redress generally is immune from antitrust liability premised on the petition.  <u>Eastern Railroad Presidents Conferance v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127, 136 (1961); <u>United Mine Workers of America v. Pennington</u>, 381 U.S. 657, 670 (1965)).  This includes a party who brings a legitimate dispute to the courts for judicial resolution.  <u>Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.</u>, 508 U.S. 49, 56 (1993); <u>California Motor Transportation Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510 (1972).  However, petitioning conduct is not immune if it is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationship of a competitor."  <u>Noerr</u>, 365 U.S. at 144.  Motorola contends that Apple's claims in this case are based solely on Motorola's patent litigation in the International Trade Commission and district court, and that because its patent litigation is protected petitioning

21

**A80**

activity, Motorola is immune from liability on Apple's claims.

Apple does not deny that initiating and prosecuting a patent infringement action is the type of petitioning activity protected by the Noerr-Pennington doctrine, and several courts have reached the same conclusion. See, e.g., ERBE Elektromedizin GmbH v. Canady Technology LLC, 629 F.3d 1278, 1292 (Fed. Cir. 2010); Monolithic Power Systems, Inc. v. O2 Micro International Ltd., 2007 WL 801886, *6 (N.D. Cal. Mar. 14, 2007); Hyniz Semiconductor Inc. v. Rambus, Inc., 2006 WL 1883353, *1-2 (N.D. Cal. July 7, 2006); In re Relafen Antitrust Litigation, 360 F. Supp. 2d 166, 177-78 (D. Mass. 2005). However, Apple contends that the immunity does not apply to any of its claims because they are not based on Motorola's petitioning activity.

a. Apple's antitrust claim

Apple contends that its claim under § 2 of the Sherman Act arises out of Motorola's "abuse of the standard-setting process" and "Motorola's deceptive conduct and failure to offer a [fair, reasonable and nondiscriminatory] license." Apple's Br., dkt. #167, at 6. In support of its argument, Apple cites ERBE Elekromedizin, 629 F.3d at 1292, in which the Court of Appeals for the Federal Circuit explained that a party's assertion of non-sham claims for "patent infringement, trademark, and trade dress" was protected by Noerr-Pennington from antitrust liability, but that other conduct, including "interfering with and inhibiting the development and marketing of [disputed products], and interfering with . . . contracts and business expectations," could be a basis for antitrust liability. Id. at 1292-93.

22

**A81**

See also Hyniz Semiconductor, 2006 WL 1883353, at *2 (holding that Noerr-Pennington immunity applies only to protected litigation-related activities, but would not immunize defendant from antitrust claims premised on broader unlawful course of anticompetitive conduct).

The problem for Apple is that its allegations and arguments make clear that its antitrust claim is necessarily based on Motorola's patent litigation. In its brief, Apple contends that its antitrust claim arose sometime in 2007, when Motorola offered it a license with exorbitant royalty rates. Apple's Br., dkt. #167, at 13 (Apple's injury "could not have arisen until, at the very earliest, Motorola made its first royalty demand in September 2007"). However, Apple has presented no evidence that it suffered any antitrust injury as a result of Motorola's license demand. It is well established law that a party can sustain an antitrust claim only if it has suffered an antitrust injury. In re Copper Antitrust Litigation, 436 F.3d 782, 789 (7th Cir. 2006) ("[A]n antitrust cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (citation omitted); Warren General Hospital v. Amgen Inc., 643 F.3d 77, 92 (3d Cir. 2011) ("It is a basic tenet of antitrust law that a cause of action will not lie if the plaintiff has not been harmed.").

In this case, it is undisputed that Apple refused to pay the 2.25% royalty rate that Motorola demanded and continued to manufacture and market its products despite Motorola's demands. Apple has produced no evidence or argument suggesting that Motorola's licensing demand caused Apple to change its product, delay the release of the

iPhone, suffer from increased costs or lose any customers or market share. Instead, the only injury Apple suffered as a result of Motorola's alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation initiated by Motorola. Apple's damages expert identifies no other damages except litigation fees and expenses. Thus, Apple's antitrust claim is premised on Motorola's attempt to enforce its patents. Because Motorola's enforcement of its patents is privileged conduct protected by the First Amendment, the Noerr-Pennington doctrine applies. Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc., 944 F.2d 1525, 1529 (9th Cir. 1991) (holding that defendant was immune from antitrust liability under Noerr-Pennington because all of plaintiff's claimed antitrust injuries were caused by defendant's enforcement of copyrights, not by defendant's refusal to license its copyrighted work).

Apple devotes one paragraph in its brief to the argument that Motorola may not be entitled to Noerr-Pennington immunity because its patent infringement claims may fall under the "sham" exception to the doctrine. Apple's Br., dkt. #167, at 9. As the party asserting the sham exception, Apple has the burden of showing that it should apply. IGEN International, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 312 (4th Cir. 2003); USS–POSCO Industries v. Contra Costa County Building & Construction Trades Council, AFL–CIO, 31 F.3d 800, 811 (9th Cir. 1994). A petition or lawsuit may be considered a "sham" if it is (1) "objectively baseless"; and (2) subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief. Professional Real Estate Investors, 508 U.S. at 61, 65. Apple makes no real attempt to satisfy either

24

**A83**

prong, stating only that Motorola has dropped two of its patent infringement claims and three others were found to be invalid or not infringed. However, the fact that some or even all of Motorola's patent infringement claims were unsuccessful is not sufficient on its own to show that Motorola's claims are "objectively baseless," particularly in light of the preliminary finding of the International Trade Commission that Apple infringed one of Motorola's patents. Simply stating, without factual support, that Motorola's patent litigation may be a sham is not sufficient to raise a genuine issue of material fact regarding the sham exception. Accordingly, I find that Motorola is immune from Apple's antitrust claim.

b. Apple's claims under Cal. Bus. & Prof. Code § 17200

Apple has two theories to support its claim of unfair competition and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 (count 6). First, Apple contends that Motorola engaged in unlawful business practices when it interfered with Motorola's contract with Qualcomm. The Noerr-Pennington doctrine is not applicable to that theory because Motorola's actions toward Qualcomm are separate and distinct from Motorola's protected activity of patent litigation. However, Apple's second theory of liability in count 6 is premised on the same allegations as its antitrust claim under § 2 of the Sherman Act. In particular, Apple contends that Motorola engaged in unfair competition when it promised standards-setting organizations that it would disclose essential patents and license those patents on reasonable and nondiscriminatory terms, and later failed to disclose

25

**A84**

the patents in a timely manner, refused to offer Apple a reasonable and nondiscriminatory license and sued Apple for patent infringement.

As with Apple's antitrust claim, a violation of Cal. Bus. & Prof. Code § 17200, requires showing that the unfair practice caused the plaintiff an economic injury. Kwikset Corp. v. Superior Ct., 246 P.3d 877, 884-85 (holding that party asserting unfair competition or unlawful business practices claim must "establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury . . . and show that that economic injury was the result of, i.e., caused by, the unfair business practice . . . that is the gravamen of the claim"). The only economic injury Apple suffered is the cost of defending itself from Motorola's infringement claims. Thus, Motorola is immune from Apple's unfair competition claim that is premised on the same theory as Apple's antitrust claim. Monolithic Power Systems, 2007 WL 801886, at *6 (holding that Noerr-Pennington can provide immunity against California unfair competition claims).

c. Apple's other claims

Motorola contends that the Noerr-Pennington doctrine provides immunity not just to Apple's statutory antitrust and unfair competition claims, but to Apple's contract and tort claims also. As Motorola points out, courts have applied the Noerr-Pennington doctrine outside the antitrust context. Theme Promotions, Inc. v. News America Marketing FSI, 546 F.3d 991, 1006-1007 (9th Cir. 2008) (applying doctrine to claim for tortious interference with prospective economic advantage under California law); International Brotherhood of

26

**A85**

Teamsters v. Philip Morris Inc., 196 F.3d 818, 826 (7th Cir. 1999) (applying Noerr-Pennington immunity to protect petitioning activity from liability for RICO suits); Tarpley v. Keistler, 188 F.3d 788, 794 (7th Cir. 1999) (applying doctrine to § 1983 claims); Video International Production, Inc. v. Warner–Amex Cable Communications, Inc., 858 F.2d 1075, 1084 (5th Cir. 1988) (applying doctrine to state law claim for tortious interference with contract). Courts have reasoned that because the Noerr-Pennington doctrine derives from the First Amendment, it should be applied broadly to protect the right to petition the government. New West, L.P. v. City of Joliet, 491 F.3d 717, 722 (7th Cir. 2007) ("Noerr-Pennington has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses."); White v. Lee, 227 F.3d 1214, 1231 (9th Cir. 2000) (explaining that because "Noerr-Pennington is a label for a form of First Amendment protection . . . to say that one does not have Noerr-Pennington immunity is to conclude that one's petitioning activity is unprotected by the First Amendment"); Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1059 (9th Cir. 1998) ("the doctrine is a direct application of the Petition Clause").

However, Motorola has cited no authority for the proposition that the Noerr-Pennington doctrine should apply to Apple's breach of contract claims (counts 2, 3, and 4), and I conclude that applying immunity to Motorola from Apple's breach of contract claims is not appropriate. Although the First Amendment protects Motorola's right to petition the courts to enforce its patents, Apple's breach of contract claims are based on the theory that Motorola agreed by contract that it would not enforce its patent rights until it offered a

license to Apple on fair, reasonable and nondiscriminatory terms.  In other words, Apple contends that Motorola waived some of its petitioning rights through contract.  It would be improper to use the <u>Noerr-Pennington</u> doctrine to bar Apple from enforcing that contract.  <u>Powertech Technology, Inc. v. Tessera, Inc.</u>, — F. Supp. 2d —, 2012 WL 1835699, *5 (N.D. Cal. May 21, 2012) (concluding that <u>Noerr-Pennington</u> does not provide immunity against breach of contract claims).

Similarly, Motorola has failed to cite any authority or develop any argument for applying <u>Noerr-Pennington</u> to Apple's equitable estoppel claim (count 1), which appears to be an alternative claim to its breach of contract claims.  Because Motorola failed to develop any argument about why it should be immune from the equitable estoppel claim or why the estoppel claim should be treated differently from the contract claim, I will not apply <u>Noerr-Pennington</u> to the equitable estoppel claim.  <u>Cf.</u> <u>Garg v. Potter</u>, 521 F.3d 731, 736 (7th Cir. 2008) (explaining that undeveloped arguments are waived).

As to Apple's tortious interference with contract claim (count 13), it is clear that this claim is not premised on Motorola's patent litigation.  Rather, it is premised on Motorola's actions in relation to Qualcomm.  Therefore, the <u>Noerr-Pennington</u> doctrine does not apply to that claim.

Finally, I note that Apple asserts three claims for declaratory judgment in its amended complaint.  Apple seeks declarations that the terms of the license offered by Motorola to Apple were not fair, reasonable and nondiscriminatory (count 7); Motorola is not entitled to injunctive relief on its patent infringement claims (count 11); and Motorola misused its

patents by promising to offer fair licenses and then failing to do so (count 12). It is not clear from Apple's complaint whether its claims for declaratory judgment are based on a contract theory or an antitrust theory. To the extent that they are based on an antitrust theory, Motorola is immune under the <u>Noerr-Pennington</u> doctrine. To the extent that they are based on Apple's breach of contract theory or estoppel theory, they may proceed.

In sum, I am granting Motorola's motion for summary judgment on Apple's antitrust claim (count 5), its claim for unfair competition in violation of Cal. Bus. & Prof. Code § 17200 (count 6) as related to Motorola's licensing and disclosure obligations, and its claims for declaratory relief (counts 7, 11 and 12) to the extent they are based on antitrust or unfair competition theories of liability. Motorola is immune from liability for these claims under the <u>Noerr-Pennington</u> doctrine. I am denying Motorola's motion under the <u>Noerr-Pennington</u> doctrine with respect to Apple's remaining claims.

Because I am dismissing Apple's antitrust claim, I need not consider Motorola's argument that the antitrust claim is barred by the statute of limitations.

3. <u>Apple's tortious interference with contract claim</u>

Motorola has moved for summary judgment on Apple's claim that Motorola tortiously and unlawfully interfered with the Strategic Terms Agreement that Apple had entered into with Qualcomm in December 2009. Apple's Am. Cpt., dkt. #110, ¶¶ 190-195 (count 13). Under that agreement, Apple and Qualcomm agreed to terms under which Apple could purchase chipsets that would be used in Apple's products. The chipsets

29

**A88**

incorporated Motorola's patented technology, and Motorola and Qualcomm had entered into a separate licensing agreement regarding the chipsets.  Apple contends that Motorola committed the tort of interference with contract by terminating license and covenant rights with respect to Apple.

Apple and Qualcomm are both headquartered in California and both Apple and Motorola assume California law applies to Apple's tortious interference claim.  Thus, I will apply California law.  <u>Auto-Owners Insurance Co. v. Websolv Computing, Inc.</u>, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (citation omitted).  To establish the tort of intentional interference with contract under California law, a plaintiff must show:

> (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

<u>Pacific Gas & Electric Co. v. Bear Stearns & Co.</u>, 50 Cal. 3d 1118, 1126, 270 Cal. Rptr. 1 (Cal. 1990).

Motorola contends it is entitled to summary judgment on Apple's tortious interference claim because Apple cannot establish the last two elements of its claim.  Specifically, Motorola contends that Apple has not shown that either it or Qualcomm breached the Strategic Terms Agreement or that the agreement was otherwise disrupted and that Apple cannot show that it has suffered any injury as a result of Motorola's terminating its license and covenant rights with respect to Apple.

I agree with Motorola.  Apple concedes that Motorola's decision to terminate license

30

**A89**

rights with respect to Apple did not cause Apple or Qualcomm to breach the Strategic Terms Agreement. Motorola's actions did not affect the terms of the agreement itself, because the agreement never purported to guarantee that Qualcomm's chipsets were covered by licenses to third-party patents. Additionally, Apple admits that it has continued to purchase chipsets from Qualcomm under the agreement. Apple's Br., dkt. #167, at 30. Apple does not contend that Motorola's actions have made the chipsets more expensive, that it has been forced to seek chipsets from a different manufacturer or that it has incurred additional licensing fees in response to Motorola's decision to terminate any license and covenant rights Apple may have enjoyed under Motorola's agreement with Qualcomm. In fact, Apple does not even submit evidence about what benefits it would have enjoyed under the licensing agreement and whether it would have paid Qualcomm or Motorola any licensing fees on top of what it paid Qualcomm for chipsets, if Motorola had not terminated license and covenant rights with respect to Apple. Apple implies that the chipsets would have been covered under the Qualcomm's licensing agreement with Motorola, but submits no evidence on the issue.

Apple contends that even though Motorola's actions have not interrupted performance of the contract between Apple and Qualcomm, Motorola's actions constituted tortious interference because they have made performance of the contract "more expensive and burdensome." Pacific Gas & Electric, 50 Cal. 3d at 1127 ("interference which makes enjoyment of a contract more expensive or burdensome may be actionable"). However, Apple has adduced no factual support to show that Motorola has caused its contractual relationship with Qualcomm to be more expensive or burdensome. In its brief, Apple relies

solely on the allegation that Motorola's actions caused Apple to file a lawsuit in a district court in California to clarify its rights to use chipsets manufactured by Qualcomm without threat of patent infringement litigation from Motorola. Apple v. Motorola Mobility, Inc., Case No. 12-cv-355 (S.D. Cal.). Apple argues that the cost of the California litigation qualifies as "damages" arising out of Motorola's tortious interference.

Apple's theory of damages arising out of the California litigation was not pleaded in its complaint. This makes sense because Apple filed the amended complaint in this case in October 2011 and did not commence the California lawsuit until February 2012. Even if it were appropriate to consider this new theory of damages, Apple has included no facts about the California lawsuit or its costs in its proposed findings of fact or responses to Motorola's proposed facts. Apple cannot create a genuine factual dispute sufficient to defeat summary judgment simply by making a factual assertion in its brief. Moreover, even if I considered Apple's assertions about the California lawsuit, Apple fails to connect its litigation costs to the contract between itself and Qualcomm. Apple argues that it was forced to litigate to protect its contractual rights. Apple's Br., dkt. #167, at 31. However, according to Apple's own description of its litigation, it is not suing to protect its rights under its agreement with Qualcomm. Rather, it is suing Motorola in an attempt to enforce the terms of *Motorola's* contract with Qualcomm. Apple's own agreement with Qualcomm did not promise any of the benefits of which Apple now seeks to take advantage.

In sum, Apple has adduced no evidence that Motorola's decision to terminate license and covenant rights with respect to Apple interfered with Apple's rights or benefits under

32

**A91**

its agreement with Qualcomm or made Apple's contract with Qualcomm more expensive or burdensome. Therefore, Motorola is entitled to summary judgment on Apple's claim of tortious interference with contract.

4. Apple's claim under Cal. Bus. & Prof. Code § 17200

As discussed above, Apple's claim under Cal. Bus. & Prof. Code § 17200 can be divided into two separate theories: (1) Motorola violated the law by initiating patent litigation against Apple after failing to offer Apple a license on fair, reasonable and nondiscriminatory terms; and (2) Motorola violated the law by suspending its contract with Qualcomm as it related to Apple.

Motorola has moved for summary judgment on Apple's claim under the first theory, contending that it is barred by California Civil Code § 47(b), which provides that the filing of a lawsuit is privileged activity immune from tort liability. Because I concluded above that the Noerr-Pennington immunity doctrine applies to this claim, I need not address whether the claim would be barred by the California litigation privilege.

With respect to Apple's second theory of liability, Motorola contends that Apple has not proven that it suffered an economic injury, as required under Cal. Bus. & Prof. Code § 17200. Kwikset, 246 P.3d at 884-85. I agree. To defeat Motorola's motion for summary judgment, Apple was required to adduce specific evidence showing that it lost money or property as a result of Motorola's termination of any license and covenant rights that flowed to Apple through Qualcomm. As explained in the discussion of Apple's tortious interference

33

**A92**

claim, Apple has failed to adduce any specific facts on this issue.  Therefore, Motorola is entitled to summary judgment on this claim.

5.  Apple's breach of contract claims

Motorola has moved for partial summary judgment on Apple's breach of contract claims, seeking a determination from the court that Apple has not suffered any damages from the alleged breaches.  (Motorola did not move for summary judgment on Apple's request for specific performance of Motorola's contractual obligations.)  The only damages Apple seeks to recover through its contract claims are litigation costs.  According to Apple's expert's report, Apple believes it is entitled to a minimum of $31,948,128.31 in damages based on "litigation costs, including attorneys' fees, Apple has incurred to date in (1) having to defend the ITC 745 Investigation; (2) having to defend the District Court Case; and (3) prosecuting the [present case] to establish Motorola's violation of its obligations to ETSI and IEEE."  Napper Rep., dkt. #153-36 at 6.  Motorola contends that litigation costs cannot be recovered as damages from a breach of contract claim.

The first question is what forum's law applies to Apple's contract claims.  Apple (a California company) is suing Motorola (an Illinois company) for violation of commitments to ETSI (based in France) and IEEE (based in New York).  Both parties agree that ETSI's bylaws are governed by the laws of France, so I will apply French law to Apple's claims involving ETSI.  (Under Fed. R. Civ. P. 44.1, courts determining foreign law "may consider any relevant material or source, including testimony, whether or not submitted by a party

or admissible under the Federal Rules of Evidence."  Apple submitted an expert report from

Philippe Delebecque regarding French contract law.  Dkt. #159.  Motorola submitted an

excerpt regarding French law on damages from an English language treatise.  Barry Nicholas,

The French Law of Contract (2d ed. 1992), dkt. #176-1.)

Neither party undertakes an adequate choice of law analysis with respect to claims

concerning IEEE, and both sides cite variously to Wisconsin, New York and Illinois law in

support of their respective positions.  However, it does not appear that there is a conflict

among Wisconsin, New York or Illinois law relevant to the issues in this case.  Thus, I will

apply Wisconsin law to Apple's claims concerning IEEE.  Danielson v. Gasper, 2001 WI App

12, ¶ 5, 240 Wis. 2d 633, 623 N.W.2d 182 (under Wisconsin's choice of law principles, if

there is no genuine conflict between Wisconsin law and law of other possible state, court

applies Wisconsin law); Tanner v. Jupiter Realty Corp., 433 F.3d 913, 915 (7th Cir. 2006)

(federal court applies choice of law principles of forum state to determine which state's

substantive law governs contract claim).

Motorola contends that under the laws of Wisconsin, France or any other jurisdiction,

Apple cannot recover attorney fees as damages for a breach of contract action.  However,

Motorola does not cite any cases establishing such a bright-line rule.  Motorola cites In re

Guardianship & Protective Placement of Evelyn O., 214 N.W.2d 434, 571 N.W.2d 700

(1997), and Computer Docking Station Corp. v. Dell, Inc., 547 F. Supp. 2d 948, 951 (W.D.

Wis. 2007), for the general "American rule" that a prevailing party may not recover

attorneys fees unless authorized by statute or contract.  However, Apple is not seeking an

award of attorney fees to a prevailing party. It is seeking attorney fees as damages incurred because of Motorola's alleged breach of contract.

As Motorola concedes in its reply brief, Wisconsin law allows recovery of attorneys fees as contractual damages in some situations. Motorola's Br., dkt. #173, at 7 (citing Repinksi v. Clintonville Federal Savings & Loan Association, 49 Wis. 2d 53, 58, 181 N.W.2d 351, 354 (1970) ("An award of damages for breach of contract should compensate the injured party for losses necessarily flowing from the breach. . . .When litigation is a natural and proximate result of the breach, recovery may be had as damages for attorney's fees necessarily incurred in that litigation.") (dictum). Additionally, Motorola concedes that French law allows recovery for damages that are the "immediate and direct and foreseeable result of breach." Id. However, Motorola contends that the litigation costs that Apple incurred are not compensable because many specific costs that Apple's expert included in his damages calculations, such as the costs of attorneys' meals and laundry, have too tenuous a relationship to Motorola's alleged breach.

Motorola has not shown that it is entitled to summary judgment on this issue. Its legal analysis is incomplete; it cited no cases discussing whether a party can recover as contract damages the costs it incurred in previous litigation with the same defendant, let alone any cases actually holding that a party may not recover such costs. Further, Motorola raised several new arguments in its reply brief regarding whether Apple's litigation costs were the direct and foreseeable result of Motorola's alleged breach. Therefore, I am denying Motorola's motion for summary judgment on this issue. If Motorola wishes to make further

arguments regarding whether certain costs identified by Apple's expert should be excluded, it may file a motion in limine on the subject.

### B. Apple's Motion for Partial Summary Judgment

Apple has moved for partial summary judgment, seeking to establish certain elements of its claims. Because I have concluded that Motorola is entitled to summary judgment on all of Apple's claims with the exception of Apple's contract and estoppel claims, I will consider Apple's arguments only as they relate to those claims. In particular, Apple requests a determination that:

- Motorola entered into binding contractual obligations with ETSI and IEEE to license its declared-essential patents on fair, reasonable and nondiscriminatory terms.

- Apple is a third-party beneficiary of Motorola's contractual obligations to ETSI and IEEE.

- In submitting technical proposals to ETSI for inclusion of Motorola technology in ETSI standards, Motorola was obligated by ETSI policy to make a bona fide effort to identify essential intellectual property rights that might be required by the technical proposal before the adoption of the technical proposal into the standard.

- Motorola was obligated to make a bona fide effort to disclose the applications leading to the issuance of the '898, '559 and '697 patents to ETSI before the adoption of Motorola's technical proposals, even when those patent applications were unpublished.

- Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after the adoption of the standards to which Motorola contends those patents are essential.

Notably, Apple does not seek a determination that Motorola's failure to disclose its

intellectual property rights was intentional, that Motorola failed to comply with the disclosure requirements of ETSI and IEEE policies or that Motorola breached its contractual obligations by demanding unreasonable licensing fees for its patents from Apple.

1.  Motorola's contracts with ETSI and IEEE

As discussed above, I am applying Wisconsin law to Apple's breach of contract claims related to IEEE and French law to the claims related to ETSI.

To form a valid contract under Wisconsin law, there must be evidence of an offer, acceptance and consideration, Kamikawa v. Keskinen, 44 Wis. 2d 705, 710, 172 N.W.2d 24, 26 (1969), and an understanding between the parties regarding the essential terms of the contract.  Metropolitan Ventures, LLC v. GEA Associates, 2006 WI 71, ¶ 24, 291 Wis. 2d 393, 717 N.W.2d 58.  Apple's expert states that French law requires the same general elements, which Motorola has not disputed.  Delebecque Rep., dkt. #146, ¶ 31 ("French law considers that the contractual agreement is reached . . . as of the moment the parties have reached an agreement on the essential elements of the contract.").

In this case, the combination of the policies and bylaws of the standards-setting organizations, Motorola's membership in those organizations and Motorola's assurances that it would license its essential patents on fair, reasonable and nondiscriminatory terms constitute contractual agreements.  The intellectual property rights policies of ETSI and IEEE constituted offers to Motorola for membership in the organization in exchange for Motorola's ability to participate in developing technical standards.  The "offers" set out the

38

**A97**

essential terms of the contract, namely, that members must abide by intellectual property rights policies.  Under IEEE's policy, members must submit letters of assurance including a commitment to license essential patents under reasonable and nondiscriminatory terms.  Similarly, ETSI's policy states that its members shall use "reasonable endeavors" to inform the organization of essential patents "in a timely fashion."  All members are asked to grant licenses to essential patents on fair, reasonable and nondiscriminatory terms; if they refuse, they must explain their reasons in writing.

Motorola accepted the offers and agreed to be bound by these policies when it joined ETSI and IEEE.  Later, Motorola confirmed that it was bound by the organizations' policies when it submitted declarations and letters of assurance stating that it would license its patents on fair, reasonable and nondiscriminatory terms.  In particular, Motorola sent declarations to ETSI regarding the '697, '898, '230 and '559 patents, and sent letters of assurance to IEEE regarding the '516, '193, '223 and '712 patents.

Both Motorola and the organizations benefited from this arrangement and thus, the element of consideration is satisfied.  Motorola received the benefit of participating in the standards development process and influencing the choice of technology for the standards. The organizations benefited from Motorola's commitments by knowing that their technical standards would be available for use by third parties.

Several courts have reached similar conclusions.  Microsoft Corp. v. Motorola, Inc., 2012 WL 2030098, *5-6 (W.D. Wash. June 6, 2012) (holding that contract was formed through Motorola's commitments to IEEE to license patents essential to 802.11 standard

39

**A98**

on reasonable and nondiscriminatory terms); <u>Research In Motion Ltd. v. Motorola, Inc.</u>, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) (holding at motion to dismiss stage that plaintiff had stated breach of contract claim based on defendant's failure to offer FRAND terms as it had agreed to ETSI and IEEE); <u>ESS Technology, Inc. v. PC-Tel., Inc.</u>, 1999 WL 33520483, *4 (N.D. Cal. Nov. 4, 1999) (holding that, as third-party beneficiary of contract between standards-setting organization and defendant-essential-patent holder, software manufacturer had properly stated claim for specific performance of agreement requiring defendant to license patents on nondiscriminatory and reasonable terms).

In its opposition brief, Motorola states that it "does not dispute that it made commitments to the industry groups," and "does not dispute that obligations flow from those commitments." Motorola's Br., dkt. #164, at 1. However, Motorola argues that its commitments are not binding contracts and that neither the industry groups nor Apple can enforce those commitments. In other words, Motorola argues that although it made promises, the promises are largely meaningless because they cannot be enforced by either the organizations or third parties.

Motorola relies largely on language from ETSI's and IEEE's policies to argue that the organizations do not intend to enforce their intellectual property rights policies. IEEE's policy states that "[n]o license is implied by the submission of a Letter of Assurance," and that "IEEE is not responsible for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance . . . are reasonable and non-discriminatory." ETSI's policy states that "[s]pecific licensing terms and negotiations are

40

**A99**

commercial issues between the companies and shall not be addressed within ETSI."

These provisions do not say that the organizations will not enforce their policies. Rather, the provisions make clear that organizations will not be responsible for deciding what terms constitute a fair, reasonable and nondiscriminatory license. They will not resolve licensing disputes. However, ETSI and IEEE still require members to offer reasonable and nondiscriminatory licenses to their essential patents in order to comply with the conditions of membership and their declarations. ETSI's policies state explicitly that "[a]ny violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI." Similarly, in its commitment to IEEE, Motorola agreed that it would "license those patents on a non-discriminatory basis offering fair and commercially reasonable terms."

Motorola has several arguments about whether it complied with the terms of ETSI's and IEEE's policies by making reasonable efforts to disclose its patents and by offering to negotiate a licensing agreement with Apple. However, these arguments relate to whether Motorola breached the contracts, not whether contractual obligations exist. Neither Apple nor Motorola moved for summary judgment on the element of breach.

In sum, I am granting Apple's motion for summary judgment with respect to the existence of contracts between Motorola and the standards-setting organizations.

2. Apple's status as a third-party beneficiary

The next question is whether Apple has a right to enforce the contracts as a third

41

**A100**

party beneficiary.  <u>Becker v. Crispell-Snyder, Inc.</u>, 2009 WI App 24, ¶ 9, 316 Wis. 2d 359,

763 N.W.2d 192 (party wishing to enforce contract must either be party to contract or

third-party beneficiary).  Under Wisconsin law, a third-party beneficiary is one whom the

contracting parties intended to "directly and primarily" benefit.  <u>Id.</u> at ¶ 11 (citing

<u>Winnebago Homes, Inc. v. Sheldon</u>, 29 Wis. 2d 692, 699, 139 N.W.2d 606 (1966)).  The

benefit proven must be direct; an indirect benefit incidental to the primary contractual

purpose is insufficient.  <u>Id.</u>  French law is consistent with Wisconsin law on this issue.

Delebecque Rep., dkt. #159, ¶ 25.

 Motorola advances several arguments in support of its contentions that its

commitments to ETSI and IEEE were not intended primarily to benefit potential users of

the standards.  However, none of its arguments are persuasive.  The primary purpose of the

ETSI and IEEE intellectual property rights policies and Motorola's licensing commitments

is to protect companies that need to obtain licences in order to practice the standards

adopted by the organizations.  This is clear from the language of the policies.  For example,

ETSI's policy states that an "objective" of the policy  is to "reduce the risk" of an essential

patent's becoming "unavailable."  The entities that care the most about the availability of

a license are those entities such as Apple, who will incorporate the standards into their own

products.

 As a potential user of the standards at issue and a prospective licensee of essential

patents, Apple is a third party beneficiary of the agreements between Motorola and IEEE and

Motorola and ETSI.  <u>See also</u> <u>Microsoft</u>, 2012 WL 2030098, at *5-6 (holding that

Microsoft was third-party beneficiary of Motorola's agreements with standard setting organization because the "commitments are clearly designed to benefit potential licensees of Motorola's standard essential patent by ensuring that such patents are readily accessible to everybody at reasonable rates").

3. Scope of contractual obligations to ETSI

Apple also seeks summary judgment on issues related to the scope of Motorola's contractual obligations to ETSI. In particular, Apple seeks a determination that (1) the ETSI intellectual property rights policy required Motorola to make a "bona fide" effort to identify its intellectual property rights that might be essential to a technical standard *before* the technical proposal was adopted into the standard; and (2) that Motorola was required to include its unpublished patent applications as part of those disclosures.

With respect to the first issue, the ETSI intellectual property rights policy is clear. It states that members

submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's [intellectual property rights] which *might* be ESSENTIAL *if that proposal is adopted*.

By using the terms "might" and "if," the policy clearly requires members to make efforts to disclose intellectual property rights *before* a standard is adopted.

Motorola has two arguments in opposition, neither of which is persuasive. First, it says it was not required to disclose patents or patent applications at the time a technical proposal is made or during work meetings relating to the technical development of standards.

43

**A102**

This argument is not responsive to Apple's motion. Apple has not argued that Motorola was required to disclose its intellectual property rights during work meetings or when it submitted technical proposals. Apple has argued only that Motorola was required to disclose its patents and patent applications at some point before a technical proposal is adopted into a standard.

Second, Motorola argues that it was relieved of its obligation to disclose specific patents by submitting a general declaration to ETSI, in which it agreed to license any of its essential patents on fair, reasonable, and nondiscriminatory terms. However, the ETSI policies make clear that the submission of a general declaration does not relieve a member of its duty to make a timely declaration of specific patents and applications that it believes may be essential to an ETSI standard. The ETSI Guide on Intellectual Property Rights states that use of a general licensing declaration "does not take away the obligation for members to declare essential patents to ETSI. . . ."

As to the issue of Motorola's obligation to disclose unpublished patent applications, ETSI's policy makes clear that members are required to disclose patents and "applications therefor." The policy exempts "confidential information." Apple asserts several reasons in its brief about why Motorola's patent applications issuing as the '898, '559 and '697 patents do not qualify as "confidential." Apple's Br., dkt. #144, at 22-23. For example, Apple contends that Motorola waived any confidentiality privilege that might have applied by publicly disclosing the relevant language in those applications through its technical proposals to the relevant working groups and through foreign patent applications.

44

**A103**

Motorola's only response is to assert that ETSI members are not required to disclose confidential information and that patent applications may qualify as confidential. This is nonresponsive to Apple's arguments. By failing to respond to Apple's contention that the specific patent applications at issue in this case were not confidential, Motorola has waived any arguments in opposition and has failed to meet its burden at summary judgment of showing the existence of material facts in dispute regarding this issue of the scope of its contractual obligations to ETSI. Wojtas v. Capital Guardian Trust Co., 477 F.3d 924, 926 (7th Cir. 2007) ("A failure to oppose an argument permits an inference of acquiescence and 'acquiescence operates as a waiver.'") (quoting Cincinnati Insurance Co. v. East Atlantic Insurance Co., 260 F.3d 742,747 (7th Cir. 2001)).

4. Timing of Motorola's disclosure

Finally, Apple seeks a determination that Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after Motorola made technical proposals using technology from those patents and after ETSI adopted standards to which Motorola contends those patents are essential. I am granting Apple's motion on this issue because it is uncontested.

C. Issues Remaining for Trial

I am dismissing all of Apple's claims with the exception of its breach of contract and equitable estoppel claims and its declaratory judgment claims premised on a breach of

45

**A104**

contract or estoppel theory.

With respect to the breach of contract claims, Apple has shown that Motorola's membership in ETSI and IEEE and the intellectual property declarations it made established a contractual relationship that required Motorola to license its essential patents to third parties on fair, reasonable and nondiscriminatory terms. Additionally, Apple has shown that it is a third-party beneficiary of those contracts and has a right to enforce them. Apple has proven that Motorola's membership in ETSI required Motorola to make reasonable efforts to disclose any intellectual property rights that might have become essential to standards being considered by ETSI before those standards were adopted, including Motorola's unpublished patent applications that became the '898, '559 and '697 patents. Finally, Apple has shown that Motorola disclosed its '898, '559 and '697 patents to ETSI after Motorola made technical proposals using technology from those patents and after ETSI adopted standards to which Motorola contends those patents are essential.

However, there are still several unresolved issues related to Apple's breach of contract claims. To succeed on its claims, Apple must prove that Motorola breached a contract by failing to make bona fide efforts to disclose its patents to ETSI in a timely manner and by failing to offer a license to its essential patents to Apple on fair, reasonable and nondiscriminatory terms. As to the licensing offer, Apple must prove that Motorola's initial offer of a 2.25% royalty rate and attempts to negotiate were unfair, unreasonable or discriminatory and violated Motorola's commitments to ETSI and IEEE.

Additionally, Apple must prove that it suffered damages that are clearly connected to

46

**A105**

Motorola's breach.  At this point, it is not clear how Apple intends to prove that it was

damaged by Motorola's failure to disclose patents to ETSI in a timely manner.  Additionally,

Apple must prove that any litigation damages it seeks to recover are directly attributable to

Motorola's breach.

## ORDER

IT IS ORDERED that

1.  Defendant Motorola Mobility, Inc.'s motion for partial summary judgment, dkt.

#150, is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED with respect to plaintiff Apple Inc.'s claims that Motorola

violated § 2 of the Sherman Act (count 5), that it violated Cal. Bus. & Prof. Code § 17200

(count 6), and that it tortiously interfered with contract (count 13), and with respect to

Apple's requests for declaratory relief in conjunction with these claims.

The motion is DENIED in all other respects.

2.   Plaintiff Apple Inc.'s motion for partial summary judgment, dkt. #143, is

GRANTED.  The court finds as a matter of law that

a.  Motorola entered into binding contractual obligations with ETSI and IEEE to
license its declared essential patents on fair, reasonable and nondiscriminatory terms.

b.  Apple is a third-party beneficiary of Motorola's contractual obligations to ETSI
and IEEE.

c.  In submitting technical proposals to ETSI for inclusion of Motorola technology
in ETSI standards, Motorola was obligated by ETSI policy to make a bona fide effort
to identify essential intellectual property rights that might be required by the
technical proposal before the adoption of the technical proposal into the standard.

d. Motorola was obligated to make a bona fide effort to disclose the applications leading to the issuance of its United States patents 6,175,559, 6,359,898 and 6,246,697 to ETSI before the adoption of Motorola's technical proposals, even when those patent applications were unpublished.

e. Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after the adoption of the standards to which Motorola contends those patents are essential.

Entered this 10th day of August, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

48

**A107**

# OPINION AND ORDER

# DATED NOVEMBER 28, 2012

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE INC.,

                                                     OPINION AND ORDER

                  Plaintiff,

                                               11-cv-178-bbc

      v.

MOTOROLA MOBILITY, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In a statement from the bench on November 5, 2012, I dismissed plaintiff Apple's

Inc.'s remaining claims against defendant Motorola Mobility, Inc.  In an order dated

November 8, 2012, I explained in more detail the reasons for the dismissal, but I reserved

a decision on the form of the dismissal and gave the parties an opportunity to brief the issue.

Both parties have responded, with Apple arguing that its claims should be dismissed without

prejudice and Motorola arguing the opposite.

I conclude that Apple's claims that were dismissed at the summary judgment stage

must be dismissed with prejudice.  Those include Apple's claims that Motorola violated § 2

of the Sherman Act (count 5), violated Cal. Bus. & Prof. Code § 17200 (count 6), and

tortiously interfered with contracts (count 13).  Order, dkt. #194 at 47. Those claims were

dismissed on the merits and Apple has made no argument about why they should not be

dismissed with prejudice.  Turek v. General Mills, Inc., 662 F.3d 423, 425 (7th Cir. 2011)

1

**A190**

(claim dismissed on merits should be dismissed with prejudice).

This leaves Apple's claims for equitable estoppel (count 1); breach of contract (counts 2, 3, 4); and declaratory judgment (counts 7, 11, 12). As relief for those claims, Apple was seeking a declaration that Motorola had breached contracts with standards setting organizations and a determination by the court of a specific FRAND rate for Motorola's standards-essential patents. Additionally, Apple had requested that the court declare Motorola's '898 patent invalid and unenforceable as a result of Motorola's failure to timely disclose it to standards setting organizations. I dismissed those claims because Apple had failed to show that its requests for extraordinary injunctive relief and discretionary declaratory relief were warranted under the circumstances. After reviewing the parties' arguments on the issue, I conclude that Apple's declaratory judgment, equitable estoppel and breach of contract claims must be dismissed without prejudice.

Generally, when a court dismisses a claim without reaching the merits, it should dismiss the claim without prejudice. Murray v. Conseco, Inc., 467 F.3d 602, 605 (7th Cir. 2006) (vacating district court's dismissal with prejudice for lack of subject matter jurisdiction and remanding with instructions to dismiss complaint without prejudice because "[a] dismissal for lack of subject matter jurisdiction is not on the merits"). Thus, when courts decline to exercise discretionary jurisdiction or reach the merits of a declaratory judgment claim, they usually dismiss the claim without prejudice. E.g., International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1218 (7th Cir. 1980) (explaining that claim for declaratory relief should have been dismissed without prejudice because court lacked subject matter

2

jurisdiction over claim, and even if jurisdiction existed, requested declaratory relief was not appropriate "at [the] time"). See also Ven-Fuel, Inc. v. Department of the Treasury, 673 F.2d 1194, 1195 (11th Cir. 1982) (modifying district court's dismissal with prejudice of declaratory judgment action to dismissal without prejudice because district court declined to reach merits); Continental Casualty Co. v. Duckson, 826 F. Supp. 2d 1086, 1103 (N.D. Ill. 2011) (dismissing declaratory judgment claim without prejudice because claim was premature); Hickman v. Wells Fargo Bank N.A., 683 F. Supp. 2d 779, 790 (N.D. Ill. 2010) (dismissing declaratory judgment claim without prejudice because plaintiff failed to explain why declaration was necessary or appropriate).

As I explained in the orders entered November 2, dkt. #487, and November 8, dkt. #503, I dismissed Apple's claims for declaratory relief because the decision whether to grant declaratory relief is discretionary, 28 U.S.C. § 2201(a), and it is inappropriate to issue declaratory judgment if "such a judgment would have no practical effect." Dkt. #487 at 5 (citing Apple, Inc. v. Motorola, Inc., Case No. 1:11-CV-08540, 2012 WL 2376664, *23 (N.D. Ill. June 22, 2012). See also International Harvester Co., 623 F.2d at 1218 ("A declaratory judgment should issue only when it will serve a useful purpose."). With respect to Apple's request for declaratory relief related to Motorola's '898 patent, Apple had not shown that the declaration was necessary or appropriate, in light of Judge Posner's dismissal of Motorola's patent infringement claims and Apple's alleged harm. With respect to Apple's declaratory judgment claim regarding licensing, I concluded that Apple had failed to show that its requested declaration would serve any purpose other than providing Apple a ceiling

3

**A192**

on the potential license rate that it could use for negotiating purposes. Apple was requesting that the court declare that Motorola breached its contracts and "declare" a FRAND rate for Motorola's patents, but Apple had refused to be bound by the rate chosen by the court. Instead, the rate simply would clarify whether Motorola's license offers to Apple had been FRAND and if not, what the rate should have been. Thus, if Apple succeeded in establishing that Motorola breached its contracts but then refused to accept the rate chosen by the court, further litigation likely would be necessary to resolve the parties' licensing and infringement disputes. Even under Apple's modified trial proposals in which Apple agreed to be bound by a FRAND rate chosen by the court, there would be numerous issues remaining related to the parties' licensing disputes. Thus, Apple's requested declarations were unlikely to "serve a useful purpose."

Under different circumstances, it may be appropriate for a court to entertain Apple's requests for declaratory relief and consider the merits of Apple's claims. International Harvester Co., 623 F.2d at 1218 (explaining that because dismissal was without prejudice, plaintiff was "free to seek a declaratory judgment in the future . . . when its need for relief is more compelling"). For example, it may be appropriate for a court to consider Apple's arguments in the context of a patent infringement suit. However, under the circumstances presented, it was inappropriate to reach the merits of Apple's claims for declaratory judgment, so I exercised the court's discretion in dismissing the claims. Because I did not reach the merits of Apple's declaratory judgment claims, I will dismiss them without prejudice.

4

**A193**

With respect to Apple's claims for which it sought injunctive relief, I dismissed those claims because Apple failed to show that the court should order the extraordinary relief of specific performance. As I explained in the November 2 and November 8 orders, Apple's request for injunctive relief required it to satisfy the standards set forth in <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006). Apple failed to satisfy the <u>eBay</u> standards because it did not show that it had suffered irreparable harm, that money damages would be inadequate or that the public interest favored granting an injunction. Dkt. #487 at 4-5.

Although the legal basis for dismissing Apple's claims for injunctive relief was slightly different from the legal basis for dismissing the claims for declaratory judgment (Apple was not required to satisfy the <u>eBay</u> standards on its declaratory judgment claims), I dismissed the claims for injunctive relief for many of the reasons I dismissed the declaratory judgment claims. In particular, Apple failed to show that its requested injunction would serve any purpose other than providing Apple a bargaining chip in future negotiations or litigation. <u>Kartman v. State Farm Mutual Automobile Insurance Co.</u>, 634 F.3d 883, 893 (7th Cir. 2011) (considering "as a practical matter, . . . what purpose would be served by" proposed injunction). As explained above, I am dismissing Apple's claim for declaratory relief without prejudice. I conclude that because Apple's claims for declaratory and injunctive relief are based on the same facts and arguments, rely on the same underlying theories of liability (breach of contract and equitable estoppel), were dismissed for similar reasons, and ultimately, seek similar forms of relief, Apple's claims for which it sought injunctive relief should also be dismissed without prejudice.

5

**A194**

The parties suggest in their briefs that they are considering taking their disputes to arbitration, though they have disagreements about the scope and form of the arbitration. In addition to the explanations provided above, the possibility that this dispute can be resolved through binding arbitration is another reason why I conclude that Apple's breach of contract, equitable estoppel and declaratory judgment claims should be dismissed without prejudice. A dismissal with prejudice could inhibit the parties' efforts at resolving their disputes through binding arbitration.

ORDER

IT IS ORDERED that plaintiff Apple Inc.'s claims that defendant Motorola Mobility, Inc. violated § 2 of the Sherman Act (count 5), violated Cal. Bus. & Prof. Code § 17200 (count 6), and tortiously interfered with contracts (count 13) are DISMISSED WITH PREJUDICE. Apple's claims against Motorola for equitable estoppel (count 1), breach of contract (counts 2, 3, 4), and declaratory judgment (counts 7, 11, 12), are DISMISSED WITHOUT PREJUDICE. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 28th day of November, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

6

**A195**

# JUDGMENT

# DATED DECEMBER 5, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

APPLE INC.,

               Plaintiff,

    v.

MOTOROLA MOBILITY, INC.,

               Defendant.

JUDGMENT IN A CIVIL CASE

Case No. 11-cv-178-bbc

---

    This action came for consideration before the court with District Judge Barbara B. Crabb presiding. The issues have been considered and a decision has been rendered.

---

    IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendant Motorola Mobility, Inc. and against plaintiff Apple Inc. as follows:

1.  Granting defendant's motion to dismiss plaintiff's claim of waiver for failure to state a claim upon which relief may be granted;

2.  Granting defendant's motion for partial summary judgment and dismissing with prejudice plaintiff's claims that defendant violated § 2 of the Sherman Act (count 5), violated Cal. Bus. & Prof. Code § 17200 (count 6), and tortiously interfered with contracts (count 13); and

3.  Dismissing without prejudice plaintiff's claims against defendant for equitable estoppel (count 1), breach of contract (counts 2, 3 and 4), and declaratory judgment (counts 7, 11 and 12).

*Peter Oppeneer*
_____
Peter Oppeneer, Clerk of Court

*12/5/12*
_____
Date

**A196**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2013, I caused the nonconfidential version of the Opening Brief and Addendum of Appellee-Cross Appellant Motorola Mobility, LLC's to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to the following counsel of record:

E. Joshua Rosenkranz
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019

Mark S. Davies
Daniel Habib
Rachel M. McKenzie
Rachel Wainer Apter
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005

Matthew D. Powers
Tensegrity Law Group, LLP
Suite 360
555 Twin Dolphin Drive
Redwood City, CA 94065

*Counsel for Appellant-Cross
Appellee Apple Inc.*

*/s/ Kathleen M. Sullivan*

## CERTIFICATE OF COMPLIANCE WITH
## FED. R. APP. P. 32(a)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Appellee-Cross Appellant Motorola Mobility, LLC certify that the brief contained herein has a proportionally spaced 14-point typeface, and contains 14,306 words, based on the "Word Count" feature of Word 2007, including footnotes and endnotes. Pursuant to Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, and Statement of Related Cases.

Dated:   November 5, 2013                    Respectfully submitted,

    *s/   Kathleen   M.   Sullivan*
*Attorney for Appellee-Cross Appellant*