Nos. 2013-1150, 2013-1182

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Plaintiff-Appellant*,

v.

MOTOROLA MOBILITY, LLC,

*Defendant-Cross-Appellant*.

**On Appeal from the United States District Court for the Western District of Wisconsin, Case No. 11-CV-0178**
**Hon. Barbara B. Crabb**

## BRIEF OF *AMICUS CURIAE* QUALCOMM INCORPORATED
## IN SUPPORT OF NEITHER PARTY

Richard S. Taffet
richard.taffet@bingham.com
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

Patrick Strawbridge
patrick.strawbridge@bingham.com
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

David B. Salmons
david.salmons@bingham.com
Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006

*Attorneys for Amicus Curiae*
*Qualcomm Incorporated*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Circuit Rules 21(a)(2) and 47.4(a)(1), counsel for *amicus curiae* Qualcomm Incorporated certifies the following:

1.     The full name of every party represented by me is:

       Qualcomm Incorporated

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

       n/a

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

       none

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

       Richard S. Taffet, Bingham McCutchen LLP
       David B. Salmons, Bingham McCutchen LLP
       Patrick Strawbridge, Bingham McCutchen LLP

Dated:  November 12, 2013

By:  */s/ Richard S. Taffet*
          **Richard S. Taffet**

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST…………………………………………...……ii

TABLE OF AUTHORITIES…………………………………………………....iv

CORPORATE DISCLOSURE STATEMENT…………………………...…………vii

STATEMENT REQUIRED BY RULE 29(c)(5) OF
    THE FEDERAL RULES OF APPELLATE PROCEDURE…...……………vii

INTEREST OF *AMICUS CURIAE*………………………………………….………..1

SUMMARY OF THE ARGUMENT………………………………………...……..3

ARGUMENT…………………………………………………...…………………..6

I.    THE FRAND COMMITMENT EMBODIES A BALANCE OF
    INCENTIVES AND OBLIGATIONS, AND COURTS ARE URGED TO
    BE CAREFUL NOT TO UPSET THAT BALANCE…………………........6

II.    THE DISTRICT COURT'S DECISION DISMISSING PLAINTIFF'S
    BREACH OF CONTRACT CLAIMS IS CONSISTENT WITH
    MAINTAINING THE BALANCE OF COMPETING INTERESTS AND
    APPLICABLE LAW GOVERNING FRAND COMMITMENTS………..12

    A.    The District Court's Dismissal Of The Contract Claims Is Consistent
        With The Balance Inherent In The FRAND Commitment.................12

    B.    General Principles Of Contract Law And Specific Performance
        Support The District Court's Decision……………………………....16

CONCLUSION……………………………………………...…………………………19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**F**EDERAL **C**ASES

*Apple Inc. v. Motorola Mobility, Inc.*,
No. 11-cv-178, 2012 WL 5943791 (W.D. Wis. Nov. 28, 2012)………...…14

*Apple Inc. v. Motorola Mobility, Inc.*,
No. 11-cv-178, 2012 WL 7989412 (W.D. Wis. Nov. 8, 2012)……...…10, 14

*Apple, Inc. v. Motorola Mobility, Inc.*,
No. 11-cv-178, 2012 WL 5416931 (W.D. Wis. Nov. 2, 2012)….4, 13, 13, 14

*Apple, Inc. v. Motorola Mobility, Inc.*,
886 F. Supp. 2d 1061 (W.D. Wis. 2012)………………………...……..6

*Ericsson Inc. v. D-Link Sys., Inc.*,
No. 6:10-cv-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013)……...…9, 14

*In re Innovatio IP Ventures, LLC Patent Litig.*,
No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)…………...…8

*Microsoft Corp. v. Motorola, Inc.*,
--- F. Supp. 2d ---, 2013 WL 4053225 (W.D. Wash. Aug. 12, 2013)……...12

*Microsoft Corp. v. Motorola, Inc.*,
No. C10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013)……..…7, 18

*Microsoft Corp. v. Motorola, Inc.*,
864 F. Supp. 2d 1023 (W.D. Wash. 2012)…………………...…9, 15, 18

**S**TATE **C**ASES

*Ash Park, LLC v. Alexander & Bishop Ltd.*,
783 N.W.2d 294 (Wis. 2010)……………………………………………16

*Gaugert v. Duve*,
628 N.W.2d 861 (Wis. 2001)……………………………………………16

*Kurth v. Hauser*,
    55 N.W.2d 367 (Wis. 1952)……………………..…………………………16

*Ricchio v. Oberst*,
    251 N.W.2d 781 (Wis. 1977)……………………...…………………….16

*State v. Conway*,
    148 N.W.2d 721 (Wis. 1967)……………………….…………………..16

*Steinmann v. Steinmann*,
    749 N.W.2d 145 (Wis. 2008)………………………….………………6

## OTHER AUTHORITIES

13 Richard A. Lord, Williston on Contracts § 37:23-24 (4th ed. 2008)…………..17

81A C.J.S. SPECIFIC PERFORMANCE § 79……………………………………….16

Br. of *Amicus Curiae* Qualcomm Incorporated, *Apple Inc. v. Motorola*, Nos. 12-1548, 12-1549 (Fed. Cir. Mar. 20, 2013)……………………….………...…12

Comments of Microsoft Corp., FTC Patent Standards Workshop, Project No. P11-1204 (June 14, 2011)………………………………......................................8, 18

ETSI IPR Policy……………………………………………………………………6

IEEE Presentation, *IEEE Standards Ass'n Patent Policy* (July 2008)…..………...6

IEEE-SA Standards Board Bylaws (Dec. 2012)…………………………...…8

*Guidelines for Implementation of the ANSI Patent Policy* (Oct. 2012)…………7, 8

Mark A. Lemley & Carl Shapiro, *A Simple Approach to Setting Reasonable Royalties For Standard-Essential Patents* (Mar. 30, 2013)…………..……….…16

Nat'l Research Council of the Nat'l Acads., *Patent Challenges for Standard-Setting in the Global Economy* (2013)....……………………………………..…9

Remarks of Joshua D. Wright, Commissioner, Fed. Trade Comm'n, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts* (Sept. 12, 2013)……………………………………………………………………....11

RESTATEMENT (SECOND) OF CONTRACTS § 205……………………………………9

RESTATEMENT (SECOND) OF CONTRACTS § 309…………………………………...17

Richard A. Epstein, *et al.*, *The FTC, IP, and SSOs: Government Hold-Up Replacing Private Coordination*, 8 J. COMPETITION L. & ECON. 1 (2012)….……11

Roger G. Brooks & Damien Geradin, *Taking Contracts Seriously: The Meaning of the Voluntary Commitment to License Essential Patents on "Fair and Reasonable" Terms*, INTELLECTUAL PROPERTY & COMPETITION LAW: NEW FRONTIERS (2011)...7

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Qualcomm Incorporated does not have any parent corporations, and no publicly held corporation owns 10% or more of its stock.

## <u>STATEMENT REQUIRED BY RULE 29(c)(5)</u><br><u>OF THE FEDERAL RULES OF APPELLATE PROCEDURE</u>

No party's counsel authored this brief in whole or in part.  No party, a party's counsel, or other person (other than *amicus curiae* Qualcomm Incorporated) contributed money that was intended to fund preparation or submission of this brief.

# INTEREST OF *AMICUS CURIAE*

Qualcomm Incorporated ("Qualcomm") submits this *amicus curiae* brief on behalf of neither party because it has a significant business interest in the important question presented by this appeal, regarding the obligations of potential licensees who seek licenses from holders of standards-essential patents ("SEPs") that commit to license such patents under fair, reasonable and non-discriminatory ("FRAND") terms. That question is whether a prospective licensee should be able to ask a court to engage in the complex process of adjudicating a SEP owner's compliance with its commitment to offer a license on FRAND terms, seek specific performance compelling an offer on terms adjudicated to be FRAND, and yet retain the right to refuse to be bound by the outcome.[1]

Qualcomm is an extensive licensor of technology and a major supplier of chipsets for use in equipment that implements standardized technologies. Its business success depends upon its ability to monetize its own patented inventions and to access others' patents. Soon after its founding in 1985, Qualcomm introduced the idea that a digital communications technique called Code Division Multiple Access ("CDMA") could form the basis of a commercial cellular network and would achieve spectrum efficiencies superior to the alternative being standardized at that time. Qualcomm was the principal early developer of the core

---

[1] All parties have consented to Qualcomm's filing of this brief as *amicus curiae*.

CDMA technology that is widely deployed in successive generations of standardized wireless products and services.

As the pioneer of CDMA, and as an early and extensive contributor to the development of 3G (CDMA-based), 4G and other wireless standards, Qualcomm has developed a significant portfolio of technologies that are protected by both essential and non-essential patents. Qualcomm has obtained approximately 36,000 patents worldwide, and it has approximately 50,000 patent applications pending. This portfolio represents decades of research and development and billions of dollars in investment. Qualcomm has widely licensed its patents, many of which are SEPs subject to FRAND commitments; it now has more than 250 3G licensees and more than 90 4G licensees. Qualcomm also has obtained licenses to other parties' SEPs, in order to provide operating freedom for its multi-billion dollar semiconductor chip business.

Given its substantial investment in and licensing of technology, Qualcomm relies on a sound patent system that incentivizes research and development and enables a return on the substantial risks and costs associated with those efforts. And because of the importance of standards in the development and production of communications products and infrastructure equipment, Qualcomm has long participated in numerous standards-setting organizations ("SSOs"), including the European Telecommunications Standards Institute ("ETSI"); the Institute of

Electrical and Electronics Engineers ("IEEE"); the Telecommunications Industry Association ("TIA"); the Alliance for Telecommunications Industry Solutions ("ATIS"); and others.  Qualcomm has actively participated in the deliberations and development of SSO policies regarding FRAND licensing commitments and the licensing of standards-essential patents, and has a direct interest in the interpretation and enforcement of the mutual obligations stemming from FRAND commitments.

## SUMMARY OF THE ARGUMENT

Pursuant to their Intellectual Property Rights ("IPR") policies, standards-setting organizations often seek and obtain FRAND commitments from SEP holders.  The FRAND commitment is a contractual obligation between the SEP holder and the SSO, which affords parties seeking to make and sell standards-compliant products and services the opportunity to negotiate FRAND licenses. Fundamental to such negotiations is that both SEP holders and potential FRAND licensees will engage in good-faith, bilateral negotiations.  These negotiations, and resulting FRAND license terms, can encompass a wide range of variables depending on timing of negotiations and the strategic objectives of each party, including: uncertainty over the applicability of patents to the standard, validity, reciprocal licenses, the value of a portfolio license, etc.  As a means to encourage these negotiations, and as a safeguard in the event negotiations are unsuccessful,

the parties may enforce their rights through litigation.

In this case, the parties sought but failed to negotiate a license covering all of the Defendant's SEPs, and litigation ensued. The prospective licensee sought adjudication of the FRAND terms of a license while purporting to retain the right to refuse to be bound by the outcome.[2] The District Court refused to undertake the burden of that adjudication where the resulting order "may be used solely as a negotiating tool between the parties." *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2012 WL 5416931, at *1 (W.D. Wis. Nov. 2, 2012).[3]

The District Court's decision was reasonable as both a matter of contract law and sound policy. Where a potential licensee seeks an adjudication of a SEP owner's compliance with its FRAND commitment through specific performance, a district court may properly require the potential licensee to agree to be bound by the terms affirmatively adjudicated as complying with that commitment.

---

[2] In connection with its contract claims that are subject to this appeal, Plaintiff sought specific performance of Defendant's FRAND commitment and declaratory relief. Qualcomm takes no position with regard to the exercise of declaratory judgment jurisdiction in this matter. This brief is limited to the policy and contract law issues underlying the District Court's decision.

[3] SSO IPR policies generally refer to FRAND terms, and not simply the royalty that a SEP owner may request for a license. The District Court did not reach the merits of the dispute, and Qualcomm expresses no opinion herein as to whether it is appropriate to adjudicate in isolation whether any specific term of a license offer, such as the royalty rate, is consistent with a SEP owner's FRAND commitment. That is a separate topic and an extensive discussion beyond the scope of the issue here.

Any other result would frustrate the broader purpose served by the FRAND commitment and the SSO IPR polices that inform its purpose. The FRAND commitment is part of a careful balance that seeks to ensure that (1) innovators (*i.e.*, SEP owners) will be adequately and fairly rewarded for their efforts, to incentivize them to develop and contribute their technology to the standards development process, and (2) suppliers of standards-compliant products and services (*i.e.*, potential licensees) have access to the intellectual property necessary to implement the standard on fair, reasonable, and non-discriminatory terms. Of course this means that a potential licensee seeking a license must actually be willing to enter into a license on FRAND terms. And this in turn means that the potential licensee, like the SEP owner, must be willing to negotiate the terms of a license in good faith. If those negotiations fail and there is a justiciable controversy, the potential licensee may ask a court to determine whether the SEP holder has offered a license on FRAND terms and seek specific performance of the FRAND commitment. But, in doing so, the potential licensee must be willing to accept the relief it requested. Establishing a contrary rule could frustrate the objectives of SSO IPR policies to ensure balance of interests and could waste judicial resources, as it would create disincentives to negotiate and lead to continued litigation.

## ARGUMENT

### I.    THE FRAND COMMITMENT EMBODIES A BALANCE OF INCENTIVES AND OBLIGATIONS, AND COURTS ARE URGED TO BE CAREFUL NOT TO UPSET THAT BALANCE.

The FRAND commitment is not imposed by any statute or regulation. Rather, it is a contractual commitment voluntarily made by SEP owners to the SSO(s) of which they are members, informed by the underlying SSO IPR policies.[4] *See Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1084 (W.D. Wis. 2012) ("Motorola . . . agreed to be bound by these [IPR] policies when it joined ETSI and IEEE.").  FRAND commitments must therefore be interpreted to give effect to the intent of the parties, *i.e.*, the SEP owner giving a FRAND commitment and the SSO to which it is given.  *See, e.g.*, *Steinmann v. Steinmann*, 749 N.W.2d 145, 153 (Wis. 2008) ("The primary goal in interpreting a contract is to determine and give effect to the parties' intent.") (citation omitted).

ETSI's IPR Policy reflects this intent by providing that it "seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."  ETSI IPR Policy § 3.1; *see also* IEEE Presentation, *IEEE Standards Ass'n Patent Policy* (July 2008)

---

[4] Here, the IPR policies at issue are those of ETSI and IEEE, the terms of which will inform the parameters of any contractual obligations.  These policies, however, reflect common principles, and the discussion here may have broader application to other SSO IPR policies.

(explaining that IEEE amended its IPR Policy in May 2007 in order to "improve balance of all stakeholders" and "[e]nsure a fair and balanced environment for all participants"), *available at* http://www.itu.int/dms_pub/itu-t/oth/06/14/T06140000030002PDFE.pdf.[5]

Under this framework, all participants in the standards-setting process have carefully balanced and complementary incentives, and the FRAND commitment is drafted with these complementary goals in mind:

> the rationale behind the FRAND commitment – and the 'fair and reasonable' terms that are part of it – is twofold: (i) to ensure dissemination of the essential IPR contained in a standard, thereby allowing it to remain available for adoption by members of the industry, whilst at the same time (ii) making certain that holders of those IPR are able to reap adequate rewards from their innovations.[6]

Courts likewise have emphasized that "[t]o induce the creation of valuable standards, the [F]RAND commitment must guarantee that holders of valuable intellectual property will receive reasonable royalties on that property." *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at *12 (W.D. Wash.

---

[5] *See also, e.g.*, *Guidelines for Implementation of the ANSI Patent Policy*, at 6-7 (Oct. 2012) ("ANSI Guidelines").

[6] Roger G. Brooks & Damien Geradin, *Taking Contracts Seriously: The Meaning of the Voluntary Commitment to License Essential Patents on "Fair and Reasonable" Terms*, INTELLECTUAL PROPERTY & COMPETITION LAW: NEW FRONTIERS (2011).

Apr. 25, 2013).[7]

Notably, SSOs leave the actual negotiation of FRAND terms to the parties. *See, e.g.*, ETSI IPR Policy § 6.1 (including FRAND commitment but not defining FRAND terms); ANSI Guidelines, at 7 ("[T]he determination of specific license terms and conditions, and the evaluation of whether such license terms and conditions are reasonable and demonstrably free of unfair discrimination . . . should be determined only by the prospective parties to each license . . . .").[8]  This purposeful deference to the negotiation process establishes the preferred means for establishing license terms.

As is now widely recognized, this complementary framework further imposes a mutuality of obligation on SEP owners and potential licensees in connection with their FRAND license negotiations.  At its core, and consistent

---

[7] *Accord In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *11 (N.D. Ill. Oct. 3, 2013) ("[A] RAND rate must be set high enough to ensure that innovators in the future have an appropriate incentive to invest in future developments and to contribute their inventions to the standard-setting process.").

[8] *See also* IEEE-SA Standards Board Bylaws § 6.2 (Dec. 2012) ("The IEEE is not responsible for . . . determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or any licensing agreements are reasonable or non-discriminatory."); Comments of Microsoft Corp., FTC Patent Standards Workshop, Project No. P11-1204, at 12 (June 14, 2011) ("Microsoft Comments") ("Proposals to somehow reduce RAND to some uniform formula could undermine the value of current practices and restrict some of the flexibility that helps to enable current licensing practices and protect the defensive value of contributed patent technology.").

with general contract law principles, FRAND requires the good faith of *both* SEP owners *and* potential licensees in negotiating FRAND licenses. *See, e.g.*, *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-473, 2013 WL 4046225, at *25 (E.D. Tex. Aug. 6, 2013) (holding that both parties to a FRAND negotiation must negotiate in good faith); *see also Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) (holding that "the implied duty of good faith and fair dealing inherent in every contract" applies to FRAND negotiations) (citation omitted);[9] RESTATEMENT (SECOND) OF CONTRACTS § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").[10]   In other words, a fundamental underpinning of the FRAND commitment is the understanding that a licensor and a licensee will engage in good-faith negotiations toward a FRAND license.

---

[9] Although the *Microsoft* court ultimately held that the licensee's obligation to negotiate in good faith was not a condition precedent to the patentee's obligation to make a FRAND offer, *see* 864 F. Supp. 2d at 1034, it never disputed that the licensee owed a contractual duty to negotiate in good faith.

Moreover, because the FRAND commitment contemplates reciprocal good-faith efforts to negotiate FRAND terms, the *Microsoft* court held that a SEP-holder's first offer to a potential licensee need not be FRAND, so long as it is made in good faith. *Id.* at 1037-38.

[10] *See also* Nat'l Research Council of the Nat'l Acads., *Patent Challenges for Standard-Setting in the Global Economy*, at 5 (2013) (describing a FRAND commitment as mutual in the sense that "[b]oth the SEP holder and any prospective licensee are expected to *negotiate in good faith* towards a license on reasonable terms and conditions that reflect the economic value of the patented technology") (emphasis added).

To be sure, the mutual obligations resulting from FRAND commitments do not mean the parties will always reach a negotiated agreement.  Parties may have a good-faith dispute over whether particular terms offered by the SEP owner are fair, reasonable and non-discriminatory.   Where, however, the potential licensee contends that the patent holder has breached its contractual obligations and seeks specific performance compelling an offer on terms adjudicated to be FRAND,[11] good faith requires the potential licensee to be bound by that determination and enter into a license agreement on those terms.  Otherwise, not only are judicial resources wasted for no purpose, but the balance between the SEP holder and the prospective licensee is disrupted in favor of the prospective licensee.  The litigation becomes, even if unintentionally, a mechanism for cost and delay that clearly disfavors the SEP owner.  This circumstance does not advance the interests of the

---

[11] Having dismissed Plaintiff's contract claim before trial, the District Court did not consider the form that a specific performance order might take.  However, because license agreements relating to SEPs may involve many terms that are all interrelated, *see infra*, n.15, any such order would unlikely be properly focused on just a so-called FRAND royalty rate.  Whether a royalty rate is FRAND cannot be determined in isolation, but rather depends on many other factors including, for example, whether other provisions require the payment of an upfront fee, the extent of any reciprocal cross-grants by the licensee, the licensing history of the SEP owner, and even non-monetary factors that may have value to the parties.  Thus, as the District Court recognized, an order of specific performance focusing solely on the royalty rate would be inappropriate.  *See Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2012 WL 7989412, at \*4 (W.D. Wis. Nov. 8, 2012) (stating that "it makes no sense for [Plaintiff] to ask for this relief when it is obvious that there can be no real performance by either side until all of the terms of the contract are negotiated").

standards-setting process or the desire to reach FRAND agreements in the given industry.

Maintaining and reinforcing FRAND's mutuality of obligations and balance of interests, especially when a prospective licensee may seek a FRAND adjudication, is also important because this drives standardization toward its ultimate goals of affording consumers with the benefits of rapidly evolving technology, increased competition among implementers of standardized products and services, and enhanced performance and features at lowered costs. *See, e.g.*, Remarks of Joshua D. Wright, Commissioner, Fed. Trade Comm'n, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts*, at 5-6 (Sept. 12, 2013) ("Wright Remarks"). Upsetting this balance, or diluting the interdependent obligations of licensors and licensees in the standards context, would frustrate these vital goals. It is thus critical, when interpreting the FRAND obligation, that "the incentives facing all participants must be taken into account, rather than merely some of the incentives facing some of the participants at some points in time." Richard A. Epstein, *et al.*, *The FTC, IP, and SSOs: Government Hold-Up Replacing Private Coordination*, 8 J. COMPETITION L. & ECON. 1, 8 (2012).

These goals of the standards-setting process, however, may not be realized if potential licensees do not negotiate FRAND license terms in good faith and are

then permitted to seek specific performance of FRAND commitments in court without being bound to accept the determinations adjudicated by the court. If such conduct were permitted, not only would SEP holders be denied the adequate compensation to which they are entitled as consideration for the contribution of their patented technologies to the standard, but the competitive environment throughout the standards ecosystem would be disrupted by unlicensed standards implementers unfairly gaining a monetary competitive advantage over other licensees who have entered into FRAND licenses.[12]

## II.   THE DISTRICT COURT'S DECISION DISMISSING PLAINTIFF'S BREACH OF CONTRACT CLAIMS IS CONSISTENT WITH MAINTAINING THE BALANCE OF COMPETING INTERESTS AND APPLICABLE LAW GOVERNING FRAND COMMITMENTS.

### A.   The District Court's Dismissal Of The Contract Claims Is Consistent With The Balance Inherent In The FRAND Commitment.

The District Court below dismissed Plaintiff's breach of contract action because it determined that Plaintiff could not satisfy the standards for the

---

[12] This is especially true if injunctive relief is not available, and weighs in favor of preserving that traditional remedy where circumstances require. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, --- F. Supp. 2d ---, 2013 WL 4053225, at *8 & n.6 (W.D. Wash. Aug. 12, 2013) (recognizing that "there are certain circumstances under which a SEP owner rightfully seeks injunctive relief," which commentators generally find turns "on whether the implementer is a willing or unwilling licensee") (citations omitted); Br. of *Amicus Curiae* Qualcomm Incorporated, *Apple Inc. v. Motorola*, Nos. 12-1548, 12-1549 (Fed. Cir. Mar. 20, 2013) (arguing the need for injunctive relief to remain a viable remedy pursuant to Supreme Court precedent).

"exceptional remedy" of specific performance or declaratory relief where Plaintiff was seeking a non-binding court determination that "would likely be used simply as a starting point for future negotiations . . . ." *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2012 WL 5416931, at *1-3 (W.D. Wis. Nov. 2, 2012). Among other things, the Court expressed skepticism that specific performance would resolve any of the litigation if Plaintiff "refuses to be bound by the rate determined by the court[.]" *Id.* at *2. Moreover, the District Court held that specific performance was not in the public interest because of the time and complexity involved in determining "a FRAND rate for a portfolio consisting of hundreds of patents that would be used later in licensing negotiations between two highly sophisticated parties." *Id.* at *3. The District Court thus rejected Plaintiff's request for it to spend "enormous resources to determine a FRAND rate that may ultimately lead only to additional litigation and would set a troubling precedent for future cases involving FRAND commitments." *Id.*[13]

The District Court's dismissal of Plaintiff's contract and declaratory judgment claims was consistent with the purposes and mutual obligations implicit in the FRAND obligation, which are necessary to preserve the balance of interests governed by the larger standards-setting process. The District Court exercised its

---

[13] The Court rejected Plaintiff's bid for declaratory relief for essentially the same reasons, stating that it was "inappropriate to issue declaratory relief if such a judgment would have no practical effect." *Id.* (citation and internal quotation marks omitted).

discretion in dismissing the contract and declaratory judgment claims only after having concluded that it was being asked to render an opinion that would only improve one party's negotiating position. *See Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2012 WL 5943791, at *2 (W.D. Wis. Nov. 28, 2012); *see also Apple Inc.*, 2012 WL 7989412, at *3 (noting that Plaintiff was asking the court "to assist it in negotiating, not in putting the parties' dispute to rest").

Plaintiff makes little effort to contest this finding, arguing instead that it is immaterial because "[h]igh stakes litigation often proceeds in stages or shifts to other forums [sic] after an important legal issue is resolved." Pl. Br. at 56. Although that is true in the abstract, it avoids the District Court's essential point: that the use of the courts to merely improve a licensee's bargaining position directly threatens the balance of interests that underlay the FRAND commitment. *See Apple Inc.*, 2012 WL 5416931, at *3 (warning that Plaintiff's approach would set "troubling precedent" for SSOs and their participants).

Recent decisions involving FRAND issues support the District Court's decision. In *Ericsson*, for example, Judge Davis rejected an attempt by prospective licensees to leverage the FRAND obligation into a one-way negotiating tool. The *Ericsson* court noted that the obligation to negotiate in good faith was "a two-way street" and that "Defendants cannot ask the Court to determine a RAND rate but refuse to be bound by it." *Ericsson*, 2013 WL 4046225, at *22, 25; *see also*

*Microsoft Corp.*, 864 F. Supp. 2d at 1035 (emphasizing that plaintiff seeking court-determination of FRAND obligation was "ready and willing to accept a license on [F]RAND terms").

These decisions correctly recognize the need to maintain a proper balance of interests under the FRAND commitment as between the rights of the SEP owner and the prospective licensee as a third-party beneficiary under the FRAND contract between a SEP holder and a SSO.  While a FRAND commitment does not compel a third party to seek a license on FRAND terms, it does have the legal obligation to negotiate in good faith once it does seek a license.  That obligation, in turn, does not compel agreement, but where a potential licensee eschews further negotiation and *asks* an adjudicative body to order a SEP owner to comply with its FRAND commitment, the potential licensee must be willing to accept the FRAND license offer it seeks, or else the balance of interests embodied in FRAND will be undermined.  Whether during negotiations or while seeking adjudication of whether a SEP owner has complied with its FRAND commitment, the essence of the potential licensee's good-faith obligation is a willingness to actually enter into a license on FRAND terms.  Even commentators who favor a strong FRAND enforcement regime have recognized that "[a] commitment to license on reasonable terms is not a commitment to be whipsawed by a potential licensee," and "[a]n implementer who agrees to participate only if it gets a result it likes is no

different than a patentee who agrees to license on reasonable terms only if it gets to decide what is reasonable. Neither party is acting in good faith." Mark A. Lemley & Carl Shapiro, *A Simple Approach to Setting Reasonable Royalties For Standard-Essential Patents*, at 14 & n.55 (Mar. 30, 2013).

**B.    General Principles Of Contract Law And Specific Performance Support The District Court's Decision.**

The District Court's dismissal of the contract claims is also consistent with bedrock principles governing the law of contracts and specific performance. A party is not entitled to specific performance if it is not ready, willing, and able to perform under the contract. *See* 81A C.J.S. SPECIFIC PERFORMANCE § 79. Wisconsin courts are in accord. *See, e.g.*, *Ricchio v. Oberst*, 251 N.W.2d 781, 787 (Wis. 1977) (party must be able to show that he is "ready, willing and able to perform his part of the contract at all material times"); *accord Ash Park, LLC v. Alexander & Bishop Ltd.*, 783 N.W.2d 294, 311 (Wis. 2010).[14]

---

[14] The cases Plaintiff cites all involved claims for specific performance in which the parties were, in fact, ready and willing to proceed with the underlying transaction and gain the benefit of the bargain. For example, in *Gaugert v. Duve*, 628 N.W.2d 861 (Wis. 2001), the plaintiff was seeking specific performance not to simply learn the price, but to acquire the property. *Id.* at 864-65; *see also Kurth v. Hauser*, 55 N.W.2d 367, 368 (Wis. 1952) (plaintiff sought specific performance so it could acquire the stock); *State v. Conway*, 148 N.W.2d 721, 722 (Wis. 1967) (state sued for specific performance on option contract in order to compel sale of property on option's terms).

Plaintiff contends that no express language in the SSOs' IPR policies imposes an obligation on potential licensees to negotiate in good faith. Pl. Br. at 53-54. But that argument misses the point. A potential licensee is not a ***party*** to the contractual arrangement between the SSO and a patent holder. It is instead a third-party beneficiary of that contact, and the law is settled that third-party beneficiaries "must take their contracts as they find them — the good with the bad." 13 Richard A. Lord, Williston on Contracts § 37:23-24 (4th ed. 2008). This means that a third-party beneficiary "is subject to limitations inherent in the contract, and to supervening defenses arising by virtue of its terms." RESTATEMENT (SECOND) OF CONTRACTS § 309, cmt. c.; *see also id.* at § 309(4) ("A beneficiary's right against the promisor is subject to any claim or defense arising from his own conduct or agreement."). With respect to a FRAND commitment, this means that third-party beneficiary potential licensees must abide by the contractual obligation to negotiate in good faith.

Thus, as in this case, where a potential licensee plaintiff seeks specific performance of a SEP owner's contractual commitment to offer a license on FRAND terms, the fundamental question it asks the court to decide is whether that obligation was fulfilled. If the court determines that the license terms offered

during negotiations by the SEP holder were within the range of FRAND,[15] the

potential licensee plaintiff must be prepared to accept that decision and its

consequences. In other words, a potential licensee plaintiff cannot seek to enforce

its rights as a third-party beneficiary to the defendant SEP holder's FRAND

contractual commitment through specific performance without being bound by the

court's decision.

This distinguishes a FRAND contract from contracts "in the nature of option

contracts." Pl. Br. at 55. A typical option contract exists between an optionor and

optionee and spells out the terms of the option (*e.g.*, when and how it can be

exercised, what happens if it is exercised or if it is not). The optionee provides

consideration for the future right to exercise the option, and if it declines to

exercise its option, it foregoes that consideration, and the option expires, with all

---

[15] Because negotiation or adjudication of FRAND terms can include a wide range of variables — including the value of a portfolio rather than single patent, concerns about patent validity or essentiality, and the nature of the licensed products, among many others — there is a range of different license terms that may be considered fair, reasonable and non-discriminatory. Moreover, an initial offer by a SEP holder need not be within the range of FRAND terms; good faith negotiation is what is required. *See Microsoft Corp.*, 2013 WL 2111217, at *3 ("[M]ore than one rate could conceivably be [F]RAND."); *Microsoft Corp*, 864 F. Supp. 2d at 1038 ("Because the [SSO IPR policies] . . . anticipate that the parties will negotiate towards a [F]RAND license, it logically does not follow that initial offers must be on [F]RAND terms."); Microsoft Comments, at 12 (June 14, 2011) ("The negotiation associated with a standards-related patent license typically is no different from any general patent licensing discussion and will involve trade-offs on all of the terms and conditions.").

potential rights of the optionee terminating.  In contrast, a potential licensee's rights arise *not* as a party to a FRAND contract, which is between the SEP holder and the relevant SSO, but as a third party.  As such, its right to a license is subject to the underlying contract, which provides that licenses will be offered on FRAND terms and contemplates that both the licensor and the potential licensee will act in good faith to arrive at those terms.  Asking a court to compel specific performance of the FRAND commitment while simultaneously refusing to be bound by the outcome of that adjudication cannot be reconciled with the potential licensee's good faith obligation.

## CONCLUSION

FRAND licensing is designed as an *alternative* to costly patent litigation. To permit a supplier of standards-compliant products to ask a court to order specific performance of a commitment to offer a license on FRAND terms, but refuse to be bound by the results of the court's decision, would be antithetical to the balance of interests fundamental to the FRAND commitment and IPR policies more broadly, would deprive the SEP holder of the consideration it is entitled to receive in return for its FRAND commitment, and would undermine effective and efficient standard-setting.  Qualcomm respectfully requests that this Court affirm the decision below in light of the nature and purpose of the FRAND commitment

at issue, and emphasize the importance of the mutual good-faith obligations of licensors and licensees that underlay a FRAND commitment.

Dated:        November 12, 2013        Respectfully submitted,

BINGHAM McCUTCHEN LLP


By: */s/ Richard S. Taffet*
    Richard S. Taffet
    richard.taffet@bingham.com
    399 Park Avenue
    New York, NY 10022
    Telephone: (212) 705-7000
    Facsimile: (212) 752-5378

    David B. Salmons
    david.salmons@bingham.com
    2020 K Street NW
    Washington, DC 20005
    Telephone: (202) 373-6000
    Facsimile: (202) 373-6001

    Patrick Strawbridge
    patrick.strawbridge@bingham.com
    One Federal Street
    Boston, MA 02110
    Telephone: (617) 951-8000
    Facsimile: (617) 951-8736

    *Attorneys for Amicus Curiae*
    *Qualcomm Incorporated*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2013, I electronically filed a copy of the Brief of *Amicus Curiae* Qualcomm Incorporated with the Clerk of the Court using the Court's CM/ECF system, which will automatically send email notification of such filing to the following counsel of record:

E. Joshua Rosenkranz
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019

Mark S. Davies
Daniel Habib
Rachel M. McKenzie
Rachel Wainer Apter
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005

Matthew D. Powers
Tensegrity Law Group, LLC
555 Twin Dolphin Drive
Suite 360
Redwood City, CA 94065

*Counsel for Plaintiff-Appellant*

David A. Nelson
Stephen A. Swedlow
Quinn, Emanuel, Urquhart
  & Sullivan, LLP
500 West Madison Street
Chicago, IL 60661

Brian Cosmo Cannon
Quinn, Emanuel, Urquhart
  & Sullivan, LLP
555 Twin Dolphin Drive
5th Floor
Redwood Shores, CA 94065

Kathleen M. Sullivan
Edward J. DeFranco
David Morad Elihu
Quinn, Emanuel, Urquhart
  & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010

*Counsel for Defendant-Cross-Appellant*

By:  */s/ Richard S. Taffet*
      **Richard S. Taffet**

- 21 -

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I hereby certify:

1. this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate procedure in that this brief contains 4,836 words, excluding those parts of the brief exempted from the type-volume calculation by Federal Rule 32(a)(7)(B)(iii) and Circuit Rule 32(b); and

2. this brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure in that this brief is formatted in Microsoft Word 2010 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  November 12, 2013

By:  */s/ Richard S. Taffet*
**Richard S. Taffet**