**2013-1150, -1182**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Plaintiff-Appellant*,

v.

MOTOROLA MOBILITY LLC,

*Defendant-Cross Appellant*,

Appeals from the United States District Court for the Western District of
Wisconsin in case no. 11-CV-0178, Senior Judge Barbara B. Crabb

## BRIEF OF *AMICUS CURIAE* ERICSSON INC. IN SUPPORT OF
## AFFIRMANCE FOR DEFENDANT-CROSS APPELLANT
## MOTOROLA MOBILITY LLC

Mike McKool, Jr.
*Principal Attorney*
Theodore Stevenson III
McKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4974

John B. Campbell
Joel L. Thollander
McKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
(512) 692-8700

*Attorneys for* Amicus Curiae
*Ericsson Inc.*

December 3, 2013

# CERTIFICATE OF INTEREST

Counsel for Amicus Curiae Ericsson Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Ericsson Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Ericsson Inc. is wholly-owned by Ericsson Holding II Inc., which in turn is wholly-owned by Telefonaktiebolaget LM Ericsson. Telefonaktiebolaget LM Ericsson is publicly held and trades in the United States through American Depository Receipts under the name LM Ericsson Telephone Company.

4.    The names of all law firms and the partners or associates that are expected to appear in this court for the amicus now represented by me are:

**MCKOOL SMITH P.C.:** Mike McKool, Jr.; Theodore Stevenson III; John B. Campbell; Joel L. Thollander.


Date: December 3, 2013

/s/ Joel L. Thollander

ii

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ ii

TABLE OF CONTENTS ....................................................................... iii

CORPORATE DISCLOSURE STATEMENT ..................................... viii

STATEMENT REGARDING AUTHORSHIP AND
FUNDING ................................................................................. viii

INTEREST OF *AMICUS CURIAE* ..........................................................1

INTRODUCTION AND ARGUMENT SUMMARY ...............................3

ARGUMENT .......................................................................................7

I.    GIVEN APPLE'S REFUSAL TO "PRE-COMMIT" TO
ENTER INTO A LICENSE ON THE ADJUDICATED
FAIR, REASONABLE, AND NONDISCRIMINATORY
TERMS, THE DISTRICT COURT REASONABLY
EXERCISED ITS DISCRETION IN DISMISSING
APPLE'S CLAIMS FOR EQUITABLE RELIEF. .......................7

    A.    Apple's FRAND-Related Claims Sought Equitable
Relief Entrusted to the Discretion of the District
Court. ...............................................................................7

    B.    Apple's Refusal to Be Bound by the District
Court's Determination of What Was Fair,
Reasonable, and Nondiscriminatory Justified the
Court's Discretionary Decision to Dismiss Apple's
Claims for Equitable Relief. ...............................................10

        1.    Equitable principles justify the district
court's discretionary decision to deny relief
on these FRAND-related claims. .............................11

        2.    Contractual principles further justify the
district court's discretionary decision to
deny relief on these claims. .....................................13

II.    ANY OTHER RULE COULD HARMFULLY INCENTIVIZE USE OF LITIGATION TO LEVERAGE SUB-FRAND LICENSING TERMS. ........................................................16

    A.    The FRAND Regime Has Ensured the Success of Open Standards....................................................................17

        1.    Open standards increase choice, improve performance, and reduce cost. ..................................18

        2.    FRAND licensing is critical to the standardization process. ...........................................20

    B.    A Rule Requiring District Courts to Provide Prospective Licensees With Equitable Determinations That Could Be Used to Leverage Sub-FRAND Licensing Terms Would Be Unwise. ...........................22

        1.    FRAND-related litigation is increasing. ...................................22

        2.    To ensure that this increasing litigation does not undermine the FRAND regime, district courts must have discretion to deny claims for equitable relief where the prospective licensee will not agree to FRAND terms. ................................23

CONCLUSION .....................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A. Copeland Enters. v. Pickett & Meador, Inc.*,
   422 So. 2d 752 (Miss. 1982)............................................................15

*Anderson v. Carkins*,
   135 U.S. 483 (1890).......................................................................8

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   920 F. Supp. 2d 1116 (N.D. Cal. 2013)..........................................22

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997) ......................................................9

*Blanton v. Kentucky Distilleries & Warehouse Co.*,
   120 F. 318 (C.C.E.D. Ky. 1902)......................................................8

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998) ......................................................9

*Doynow Sales Assocs. v. Rocheux Int'l of N.J., Inc.*,
   647 F. Supp. 2d 296 (S.D.N.Y. 2009) ...........................................15

*EMC Corp. v. Norand Corp.*,
   89 F.3d 807 (Fed. Cir. 1996) ........................................................12

*Ericsson Inc. v. D-Link Sys.*, No. 6:10-CV-473,
   2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013)..........12, 22

*Haffner v. Dobrinski*,
   215 U.S. 446 (1910)..............................................................7, 8, 12

*Hennessy v. Woolworth*,
   128 U.S. 438 (1888).......................................................................8

*Hermelink v. Dynamex Operations East, Inc.*,
   109 F. Supp. 2d 1299 (D. Kan. 2000)............................................15

*In re Innovatio IP Ventures, LLC Patent Litig.*,
   921 F. Supp. 2d 903 (N.D. Ill. 2013)..............................................21

v

*In re Innovatio IP Ventures*, No. 11-CV-9308,
    2013 U.S. Dist. LEXIS 144061 (N.D. Ill. Sept. 27, 2013) ................................ 21

*Jamison Coal & Coke Co. v. Goltra*,
    143 F.2d 889 (8th Cir. 1944) ................................................................. 8, 11, 13

*McNeil v. Magee*,
    16 F. Cas. 326 (C.C.D. Mass. 1829) ............................................................ 8, 12

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) .......................................................................................... 9

*Microsoft Corp. v. Motorola, Inc.*, No. 10-CV-1823,
    2013 U.S. Dist. LEXIS 109905 (W.D. Wash. Aug. 5, 2013) ........................... 22

*Microsoft Corp. v. Motorola, Inc.*, No. 10-CV-1823,
    2013 U.S. Dist. LEXIS 60233 (W.D. Wash. Apr. 25, 2013) ........................... 21

*Minnesota Mining & Mfg. Co. v. Norton Co.*,
    929 F.2d 670 (Fed. Cir. 1991) ...................................................................... 10

*Multimedia Patent Trust v. LG Elecs., Inc.*, No. 12-CV-2731,
    2013 U.S. Dist. LEXIS 156686 (S.D. Cal. Aug. 1, 2013) ................................ 22

*Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618,
    2012 U.S. Dist. LEXIS 167479 (S.D. Cal. Nov. 9, 2012) ................................ 22

*Myriad Group A.G. v. Oracle Am., Inc.*, No. 10-CV-1087,
    2011 U.S. Dist. LEXIS 11072 (D. Del. Feb. 4, 2011) ..................................... 22

*Nokia Corp. v. Apple Inc.*, No. 09-CV-791,
    2011 U.S. Dist. LEXIS 58773 (D. Del. June 1, 2011) ..................................... 22

*Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-CV-495,
    2013 U.S. Dist. LEXIS 129817 (E.D. Tex. July 16, 2013) ............................... 22

*Patterson v. Red Lobster*,
    81 F. Supp. 2d 681 (S.D. Miss. 1999) .......................................................... 15

*Qualcomm Inc. v. Broadcom Corp.*,
    548 F.3d 1004 (Fed. Cir. 2008) ................................................................. 9, 12

*Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-CV-03451,
2012 U.S. Dist. LEXIS 146565 (N.D. Cal. Oct. 10, 2012) ...............................22

*Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-CV-03451,
2013 U.S. Dist. LEXIS 71311 (N.D. Cal. May 20, 2013)..................................22

*SK Hynix Inc. v. Rambus Inc.*, No. 00-CV-20905,
2013 U.S. Dist. LEXIS 66554 (N.D. Cal. May 8, 2013)....................................22

*TAS Distrib. Co. v. Cummins Engine Co.*,
491 F.3d 625 (7th Cir. 2006) ..............................................................................7

*Teva Pharms. USA, Inc. v. Eisai Co.*,
620 F.3d 1341 (Fed. Cir. 2010) ...................................................................10, 12

*United States v. Georgia-Pacific Co.*,
421 F.2d 92 (9th Cir. 1970) ...................................................................8, 11, 13

*Vizio, Inc. v. Funai Elec. Co.*, No. 09-CV-0174,
2010 U.S. Dist. LEXIS 30850 (C.D. Cal. Feb. 3, 2010) ...................................22

*Wi-Lan Inc. v. Research in Motion Corp.*, No. 10-CV-859,
2010 U.S. Dist. LEXIS 77776 (S.D. Cal. July 28, 2010) ..................................23

*Zenol, Inc. v. Carblox, Ltd.*,
334 F. Supp. 866 (W.D. Pa. 1971)...............................................................14, 15

## Statutes

28 U.S.C. § 2201(a) .............................................................................................9

## Other Authorities

Motorola Mobility LLC and Google Inc.: Analysis of Proposed Consent Order to
Aid Public Comment, File No. 121-0120 (FTC Jan. 10, 2013) .........................21

DOJ &PTO, *Policy Statement on Remedies for Standards-Essential Patents
Subject to Voluntary F/RAND Commitments* at 5 (Jan. 8, 2013) ................17, 19

Ericsson Traffic and Market Report, http://www.ericsson.com/res/docs/2012/
traffic_and_market_report_update_august_2012.pdf.........................................19

National Research Council, *Patent Challenges for Standard-Setting in the Global
Economy* at 17 (2013) .............................................................................3, 13, 17

## CORPORATE DISCLOSURE STATEMENT

Ericsson Inc. is wholly-owned by Ericsson Holding II Inc., which in turn is wholly-owned by Telefonaktiebolaget LM Ericsson. Telefonaktiebolaget LM Ericsson is publicly held and trades in the United States through American Depository Receipts under the name LM Ericsson Telephone Company.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

No party or party's counsel authored this brief in whole or in part. No party, party's counsel, or other person (aside from *amicus curiae* Ericsson Inc.) contributed money intended to fund the preparation or submission of this brief.

## INTEREST OF *AMICUS CURIAE*

Ericsson Inc. ("Ericsson") is a leading supplier of wireless network equipment, a leading contributor to standardized technologies, a leading member of standard-setting organizations ("SSOs"), and both a licensor and licensee of many standard-essential patents ("SEPs"). With more than 100,000 employees, Ericsson is a pioneer of the modern cellular network. Over 1,000 networks in more than 180 countries use Ericsson equipment, and a significant portion of the world's mobile traffic passes through its networks. Ericsson employs more than 10,000 people in the United States and supplies network equipment and/or services to every major U.S. telecommunications operator from offices in California, Colorado, Georgia, Illinois, Kansas, New Jersey, New York, Texas, and Washington, among others.

Looking to the future, Ericsson sees an ever more connected world—over fifty billion connected devices, all of which will require better networks and greater capacity. To meet that need, Ericsson currently devotes more than 20,000 employees and almost 15% of its net sales to research and development, much of which is focused on creating open standards for telecommunications. For example, Ericsson has been a major contributor to the development of global standards for mobile telecommunications over the last 25 years, and has invested tens of billions of dollars in this effort. Ericsson's contributions to open standards and SSOs are

widely recognized, including awards in 2010 and 2011 for its contributions to the 4G LTE standards by Informa Telecoms & Media.

Ericsson's innovations have been rewarded with 33,000 issued patents worldwide. Ericsson has successfully licensed its patent portfolio, with more than 100 patent license agreements in place primarily involving SEPs, and the associated royalties assist Ericsson's continued contribution to the development of tomorrow's telecommunications standards. As both a licensor and a licensee of SEPs, Ericsson places great value on the FRAND regime, pursuant to which holders of SEPs commit to license such patents on terms that are Fair, Reasonable, and NonDiscriminatory. This regime ensures that those implementing a standard are able to secure access at a fair cost, while those providing innovative technology for the standard are able to secure a fair return on their investments.

Given the significance of the FRAND regime to Ericsson's investment in the standard-setting process, Ericsson has a substantial interest in one of the principal questions presented by this appeal—whether the district court reasonably exercised its discretion in dismissing FRAND-related claims for equitable relief brought by an implementer and prospective licensee of SEPs where that implementer refused to "pre-commit" to licensing terms adjudicated to be fair, reasonable, and nondiscriminatory. AppleBr.27. Ericsson believes the dismissals were justified. All parties have consented to Ericsson's filing of this brief as *amicus curiae*.

## INTRODUCTION AND ARGUMENT SUMMARY

Open standards in the telecommunications industry have reduced barriers to entry, increased consumer choice, improved technological performance and interoperability, and reduced costs. Innovating members of SSOs invest significant time and resources conceptualizing, modeling, and testing the solutions that they offer to contribute to the standard. This process results in a state-of-the-art systems specification, with only the best technical solutions incorporated into the standard. SSOs typically require that innovators contributing proprietary technology to the standard make a commitment to license their patents covering incorporated technology—SEPs—to any interested implementer on a FRAND basis.

This FRAND licensing regime balances two primary goals: 1) providing implementers with access to standardized technology at reasonable cost; while 2) providing innovators with sufficient incentive to continue contributing their proprietary technology to this pro-competitive process. The "importance of [this] balance is especially pronounced where there is a critical need for seamless interoperability among software, components and other technologies embedded in microelectronic devices, such as cellular telephones." National Research Council, *Patent Challenges for Standard-Setting in the Global Economy* at 17 (2013).

Significantly, FRAND terms can vary depending on the circumstances— negotiations over SEP licenses are legitimately impacted by, for example, the value

3

of any cross-license granted by the licensee, the nature of the products sold by the licensee, the standards incorporated into the licensee's products, the extent of the technology's use by the licensee, or the geographic distribution of the sales of the licensee, among other factors. Not surprisingly, therefore, disputes sometimes arise between innovating holders of SEPs and implementers seeking a license to those patents on FRAND terms. Ericsson acknowledges that in some cases it will be necessary for those disputes to be resolved through litigation.

It is one thing, however, for a district court to resolve a FRAND-related licensing dispute between two parties that have consented to be bound by the court's determination of what is fair, reasonable, and nondiscriminatory. It is another thing entirely for a prospective licensee to ask a district court to exercise its discretionary and equitable powers to determine FRAND licensing terms—all the while refusing to be bound by the court's determination. That is what happened here: Apple brought equitable claims for specific performance and declaratory judgment, asking the district court to set FRAND terms for a license to Motorola's SEPs, but Apple refused to "pre-commit" to the licensing terms adjudicated by the court as fair, reasonable, and nondiscriminatory.

The district court dismissed Apple's claims, finding *inter alia* that Apple's refusal to be bound by the court's FRAND determination would effectively render the requested judgment an advisory opinion. A186-89. Motorola, and Qualcomm

4

as *amicus curiae*, offer further analysis supporting these dismissals. Ericsson submits this additional ground for affirmance: Apple's FRAND-related claims for specific performance and declaratory judgment sounded in equity—their resolution was thus entrusted to the district court's discretion. And given Apple's refusal to be bound by the court's determination of what was fair, reasonable, and nondiscriminatory, principles of equity and contract justified the district court's reasonable exercise of discretion in dismissing Apple's claims for equitable relief.

First, equitable principles support the court's discretionary dismissals. Courts have long refused to order specific performance where there is any threat that this extraordinary equitable remedy could lead to an unfair result. Here Apple asked for an order specifically setting out the terms on which a FRAND license had to be offered, but it refused to "pre-commit" to enter into a license on those FRAND terms following the adjudication. Instead, Apple reserved the right—if it found the fair, reasonable, and nondiscriminatory terms unfavorable—to use the court's FRAND determination as an advisory ruling that would set "a ceiling on the potential license rate" for subsequent "negotiating purposes." A181. But if the FRAND terms set the ceiling, Apple would necessarily be seeking a sub-FRAND license: one that could have unfair, unreasonable, or discriminatory terms. Such a sub-FRAND license would fail to meet the fundamental FRAND-regime goal of providing the innovator with sufficient incentive to contribute its proprietary

technology to the standard-setting process. While Apple may be free to negotiate in good faith with Motorola for a license on any terms that Apple finds favorable, the district court was under no obligation to lend its equitable powers in aid of Apple's bargaining strategy to subsequently secure a sub-FRAND license.

Second, contractual principles support the court's discretionary dismissals. Contracts are made by parties, not by courts, and courts will not draft provisions— such as the potentially complex terms of a FRAND license—unless the party seeking relief has established mutual assent to those provisions. Here Apple asked the district court to draft the terms of a FRAND license, but frankly asserted that it would not "pre-commit" to those terms. Again, the district court was under no obligation to go through the lengthy and resource-consuming process of drafting the provisions for a FRAND license when—by Apple's own admission—there was no mutual assent to those contractual provisions.

This Court thus can and should affirm the judgment as reflecting a reasonable exercise of the district court's discretion under longstanding principles of equity and contract. Ericsson further encourages the Court to do so in light of strong policy considerations: a contrary ruling could harmfully incentivize the use of litigation to set a "ceiling" for subsequent license negotiations designed to leverage sub-FRAND licensing terms. This could upset the balance between implementers and innovators that the FRAND regime navigates so effectively.

6

# ARGUMENT

## I. GIVEN APPLE'S REFUSAL TO "PRE-COMMIT" TO ENTER INTO A LICENSE ON THE ADJUDICATED FAIR, REASONABLE, AND NONDISCRIMINATORY TERMS, THE DISTRICT COURT REASONABLY EXERCISED ITS DISCRETION IN DISMISSING APPLE'S CLAIMS FOR EQUITABLE RELIEF.

### A. Apple's FRAND-Related Claims Sought Equitable Relief Entrusted to the Discretion of the District Court.

The district court dismissed two types of claims brought by Apple in this litigation: 1) a contract-based claim for specific performance of a FRAND licensing obligation; and 2) declaratory judgment claims addressing the same FRAND licensing obligation and asserting unenforceability due to alleged FRAND-related patent misuse. AppleBr.23-24; A171-87. These claims sounded in equity and their resolution was entrusted to the district court's discretion.

**1) The claim for specific performance.** For more than a century the "doctrine [has been] well settled that specific performance is never demandable as a matter of absolute right, but as one which rests entirely in judicial discretion." *Haffner v. Dobrinski*, 215 U.S. 446, 450 (1910). Ordering the specific performance of a contractual obligation constitutes "an extraordinary remedy," *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2006), and the "question in cases of specific performance … is not what the court *must* do, but what, under the circumstances, it *may* do, in the exercise of its discretion to grant or withhold relief

of that character." *Hennessy v. Woolworth*, 128 U.S. 438, 442 (1888) (emphasis added); *see also Anderson v. Carkins*, 135 U.S. 483, 488-89 (1890).

The extraordinary remedy of specific performance lies in equity, and the district court exercises its discretion in accordance with longstanding equitable principles. *Haffner*, 215 U.S. at 450; *Hennessy*, 128 U.S. at 442. These principles include the requirements that the plaintiff requesting specific performance "come into court with clean hands" and show that it is not "guilty of unfair conduct" or of seeking "any inequitable advantage" on its part. *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 103-04 (9th Cir. 1970). Indeed, courts "have long refused to decree specific performance where the result" might itself give rise to inequity, *id.* at 104, or otherwise threaten "any unfairness." *Haffner*, 215 U.S. at 450; *see also McNeil v. Magee*, 16 F. Cas. 326, 330 (C.C.D. Mass. 1829) ("[i]t may be refused, whenever there are circumstances, which show it to be inequitable"); *Blanton v. Kentucky Distilleries & Warehouse Co.*, 120 F. 318, 361 (C.C.E.D. Ky. 1902) ("it will be withheld when … it appears that it will produce hardship or injustice to either of the parties"). As the Eighth Circuit has explained,

> [o]ne of the cardinal rules for the guidance of a court of equity in the exercise of its discretion in granting or denying an application for enforcement is that it must appear that specific performance will result in no injustice.

*Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889, 894 (8th Cir. 1944).

8

**2) The claims for declaratory judgment.** Apple's declaratory judgment claims—seeking declarations that Motorola's licensing offer was unfair and that this alleged misuse rendered Motorola's patent temporarily unenforceable, AppleBr.24—likewise sounded in equity. The patent misuse doctrine is in fact simply "an extension of the equitable doctrine of clean hands." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1427 (Fed. Cir. 1997); *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) ("[p]atent misuse arises in equity"). As with specific performance, this equitable "unenforceability remedy" is never "automatic, but should be fashioned to give a fair, just, and equitable response reflective of the offending conduct." *Qualcomm*, 548 F.3d at 1026.

The district court was further vested with another layer of discretion regarding the declaratory judgment claims—for the "Declaratory Judgment Act provides that a court '*may* declare the rights and other legal relations of any interested party,' 28 U.S.C. § 2201(a) (emphasis added), not that it must do so." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007). This "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* And this substantial discretion is vested in the district court "because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [its] grasp." *Id.* This

9

discretion thus "enable[s] the court to make a reasoned judgment whether the investment of judicial time and resources in a declaratory action will prove worthwhile in resolving a justiciable dispute." *Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672-73 (Fed. Cir. 1991). A district court properly exercises its discretion in declining to hear a declaratory judgment claim that was brought to "enhance [the plaintiff's] bargaining power in negotiations." *Teva Pharms. USA, Inc. v. Eisai Co.*, 620 F.3d 1341, 1348-49 (Fed. Cir. 2010).

### B. Apple's Refusal to Be Bound by the District Court's Determination of What Was Fair, Reasonable, and Nondiscriminatory Justified the Court's Discretionary Decision to Dismiss Apple's Claims for Equitable Relief.

Apple argues that Motorola's contracts "required it to offer implementers like Apple a FRAND license," but placed "no corresponding obligation on Apple to accept that offer." AppleBr.27. Therefore, Apple suggests, it had an absolute right to specific performance and declaratory relief setting FRAND license terms even "after Apple declined to pre-commit to accepting" a license on those fair and reasonable terms. AppleBr.27. Apple's approach, however, fails to appreciate the district court's substantial discretion in determining whether and when it is appropriate to award the extraordinary and equitable remedies that Apple sought.

10

**1.    Equitable principles justify the district court's discretionary decision to deny relief on these FRAND-related claims.**

In refusing to be bound by the district court's determination of FRAND licensing terms, Apple took the position that it would not "pre-commit" itself to terms that were found by the court to be fair, reasonable, and nondiscriminatory. AppleBr.27. Instead Apple sought to keep the option—if the ruling was not to its liking—to decline to enter into a license and try to bargain down from that point to obtain a deal on what would necessarily be sub-FRAND terms. As the district court found, "Apple was," in effect, "seeking only a ceiling on the potential license rate that it could use for negotiating purposes." A181. Apple thus asked the district court to exercise its discretionary and equitable powers to determine fair, reasonable, and nondiscriminatory terms—while reserving the right to use those FRAND terms as "a ceiling" in subsequent efforts to secure terms that, in light of the court's determination, could be unfair, unreasonable, or discriminatory.

A district court has the power to require, as a condition of invoking its equitable powers to make a FRAND adjudication, that its substantial time and effort not merely be used to give one side of the dispute a bargaining lever. Apple's approach conflicts with longstanding equitable principles, which indicate that specific performance is rightly denied when it appears that the plaintiff may seek to use this equitable remedy in subsequent efforts to secure an inequitable result. *Jamison Coal*, 143 F.2d at 894; *Georgia-Pacific*, 421 F.2d at 103-04;

11

*McNeil*, 16 F. Cas. at 330; *Haffner*, 215 U.S. at 450. A plaintiff may negotiate for a license on any terms it desires, but it has no absolute right to enlist the aid of a court sitting in equity to enhance the plaintiff's ability to secure a license on inequitable terms. If a plaintiff asks a district court to exercise discretionary and equitable powers to determine what is fair, reasonable, and nondiscriminatory, the plaintiff should be willing to abide by such terms. *See*, *e.g.*, *Ericsson Inc. v. D-Link Sys.*, No. 6:10-CV-473, 2013 U.S. Dist. LEXIS 110585, at *75 (E.D. Tex. Aug. 6, 2013) ("[A party] cannot ask the Court to determine a RAND rate but refuse to be bound by it."). A court justifiably dismisses a claim for FRAND-related equitable relief, on the other hand, where the plaintiff reserves the right to leverage that relief in subsequent efforts to secure a sub-FRAND result.

This analysis applies with equal force to the equity-based claims for declaratory judgment. *Qualcomm*, 548 F.3d at 1026. In addition, this Court has made clear that using declaratory judgments "as a tactical measure … in order to improve [the plaintiff's] posture in the ongoing negotiations" is "not a purpose that the Declaratory Judgment Act was designed to serve." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 815 (Fed. Cir. 1996); *Teva Pharms.*, 620 F.3d at 1348-49. This is especially so in these circumstances, where the plaintiff may seek to improve its bargaining posture in hopes of securing terms that—in view of the FRAND-related declaratory judgments—could be unfair, unreasonable, or discriminatory.

12

In light of Apple's refusal to be bound by the district court's determination of what was fair, reasonable, and nondiscriminatory, the court reasonably exercised its discretion in denying Apple's claims for equitable relief. *Jamison Coal*, 143 F.2d at 894; *Georgia-Pacific*, 421 F.2d at 103-04; *EMC*, 89 F.3d at 815.

### 2. Contractual principles further justify the district court's discretionary decision to deny relief on these claims.

In addition to these equitable considerations, contractual principles further justify the district court's discretionary decision to deny FRAND-related specific performance and declaratory relief. While Apple focuses on its request that the district court set a "FRAND rate," *see* AppleBr.27, a FRAND license invariably involves many terms in addition to the agreed royalty rate:

> Licenses typically include many terms negotiated between the parties. In addition to fixed and per unit royalties, the license may have a royalty cap, payments that are conditioned on the licensees' sales, and discounts for prompt payment. The royalties comprise only one component of licensing terms. The license may be worldwide or restricted to a country or region. The license may be for a particular field of use or for any economic activity by the licensee. Royalty terms may differ depending on the products made using the licensed technology.

National Research Council, *Patent Challenges for Standard-Setting in the Global Economy* at 66-67 (2013). Indeed, in any particular license negotiation, multiple factors affect the ultimate terms and conditions of a license agreement even though the same patent portfolio of SEPs is being licensed. Those factors may include the value of any cross-license granted by the licensee, the nature of the products sold

by the licensee, the standards incorporated into the licensee's products, the geographic distribution of the sales of the licensee, and the accounting and financial reporting practices of the licensee, among others. Throughout the negotiation, the licensor and licensee agree on pricing and other terms and conditions of a license that account for these unique circumstances that are FRAND, but nevertheless vary from past and future licenses to the same portfolio. The FRAND commitment must allow licenses to be tailored to the individual circumstances of a particular license, and all of the terms and conditions—not just the royalty terms—must be considered in determining whether an owner of SEPs has offered to license its portfolio on a non-discriminatory basis.

When Apple asked the district court to determine the terms of a FRAND license with Motorola, therefore, it effectively asked the court to draft the provisions of a complex agreement. A186. Of course courts are traditionally hesitant to draft contractual provisions that have yet to be negotiated in detail. *See* A135-36 ("a court's role in contract interpretation … is not to make contracts or reform them"); *see also*, *e.g.*, *Zenol, Inc. v. Carblox, Ltd.*, 334 F. Supp. 866, 869 (W.D. Pa. 1971) ("The plaintiff must realize that the courts do not write contracts, but merely enforce those made by the parties.").

But that hesitation becomes a full stop when one party asks a court to draft provisions for which the party itself withholds agreement until it decides whether it

14

likes what the court has drafted. Courts "will not draft a contract between two parties where they have not manifested a mutual assent to be bound." *A. Copeland Enters. v. Pickett & Meador, Inc.*, 422 So. 2d 752, 754 (Miss. 1982); *Patterson v. Red Lobster*, 81 F. Supp. 2d 681, 686 (S.D. Miss. 1999). That is, while courts may sometimes draft contractual provisions reflecting the parties' agreement, courts will not "make a new contract or supply terms upon which the minds of the parties have not met." *Hermelink v. Dynamex Operations East, Inc.*, 109 F. Supp. 2d 1299, 1304 (D. Kan. 2000); *see also Doynow Sales Assocs. v. Rocheux Int'l of N.J., Inc.*, 647 F. Supp. 2d 296, 307 (S.D.N.Y. 2009) ("It is not the court's function to … supply terms that have not been agreed upon.").

Apple asked the district court to draft the terms of FRAND license, but frankly asserted that it did not "pre-commit" to the FRAND terms. This put Apple "in the untenable position of relying on the contract when it works to its advantage and repudiating it when it works to [its] disadvantage." *Zenol*, 334 F. Supp. at 869. Courts must have discretion to deny relief in these circumstances. *A. Copeland Enters.*, 422 So. 2d at 754. They should not be required to go through the resource-consuming process of drafting complex FRAND licensing terms when—by the plaintiff's frank admission—there is no mutual assent to those contractual terms.

Again, therefore, in light of Apple's refusal to be bound by the district court's determination of licensing terms that would be fair, reasonable, and

nondiscriminatory, the court reasonably exercised its discretion in denying Apple's request for extraordinary and equitable relief in drafting those terms.

## II. ANY OTHER RULE COULD HARMFULLY INCENTIVIZE USE OF LITIGATION TO LEVERAGE SUB-FRAND LICENSING TERMS.

Traditional rules of equity and contract thus confirm that the district court reasonably exercised its discretion in dismissing Apple's claims for extraordinary and equitable relief. Ericsson further notes that strong policy considerations support this result. Open standards benefit consumers and have a positive effect on the economy, and the FRAND regime is critical to the continued success of open standards: by ensuring that innovators receive a fair return on their investment in standardization, FRAND licensing discourages a shift toward investment in proprietary technologies—which would impair interoperability and reduce competition. By definition, sub-FRAND terms do not provide innovators a fair return on their investment, and thus may encourage such an undesirable shifting of investment away from interoperability-enhancing standardization.

A contrary holding in this case—requiring district courts to set FRAND terms even where prospective licensees refuse to commit to them—could harmfully incentivize the use of litigation to leverage sub-FRAND licensing terms. That is, prospective licensees could force district courts to set FRAND licensing terms, which could then be used to set the "ceiling" in subsequent negotiations.

16

And facing costly litigation that might only set an upper bound for subsequent negotiations, innovating holders of SEPs might be motivated to settle on sub-FRAND licensing terms. This could upset the delicate balance between implementers and innovators that the FRAND regime navigates so effectively.

### A. The FRAND Regime Has Ensured the Success of Open Standards.

Open standards ensure worldwide interoperability between networks, devices, and network operators. The telecommunications standards to which Ericsson heavily contributes—such as the 2G, 3G, and 4G LTE cellular standards—also continuously enhance end-to-end performance. FRAND licensing, as required by the intellectual property policies of various standard-setting organizations ("SSOs"), enables the success of the standards by ensuring open access to the standards while providing a reasonable reward to the companies that contribute intellectual property during the formation of the standards. Under this FRAND regime, the ecosystem around cellular standards has grown tremendously over the last 25 years to embrace ever new markets and industries, offering new products and services to the benefit of all customers. *Patent Challenges* at 17, 68; DOJ &PTO, *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* at 5 (Jan. 8, 2013).

1.     **Open standards increase choice, improve performance, and reduce cost.**

Open standards within the telecommunications industry comprise a set of specifications that specify "blueprints" for commercial networks and products. Here, standardization does not involve an SSO merely adopting an existing standard. Instead industry players collaborate to find the best solutions to the technical challenges underlying the standards, such as increased data rates, faster response times, reliability, and security. SSO participants invest significant time and resources in conceptualizing, modeling, and testing the solutions that they offer to contribute to the standard. In a typical situation, Ericsson and other innovating companies make competing technical proposals, each protected by the contributor's patent filings, to overcome the challenges. This is a risky investment of precious research and development resources; the expenditures must occur years, even decades, before any products are actually manufactured or sold, and without any guarantee that the solutions will be incorporated into the standard or that the standard will become commercially successful. This process results in a state-of-the-art systems specification for commercial networks and end user devices, with only the very best technical solutions incorporated into the standard.

The open standards that result from this process hugely benefit consumers and competitive conditions in the United States. The continuous development of cellular standards has enabled new product types to become mobile. With the

18

evolution of 3G and 4G, it has become possible to connect devices with larger screens while offering high quality end-user services, such as video, online gaming and other media services. Open standards create wider choices for consumers, reduce prices, and improve product quality. More choices are available to consumers because the FRAND commitment applies outside of the relevant SSO's membership; anyone who wishes to implement a standard can rely on innovators' FRAND commitments for access at a fair cost. Therefore, the market is accessible for new players to launch competitive products without any investment in the multi-year process to develop the enabling standards. And many new vendors have taken advantage of the system and emerged as market leaders, even though they had not previously invested in the sector. DOJ &PTO, *Policy Statement* at 5.

As a result of the increased choices, consumers pay less for better products and services. The telecommunications sector has enjoyed remarkable growth in the last two decades, providing affordable communication to approximately 6.3 billion users worldwide. Ericsson Traffic and Market Report, http://www.ericsson.com/ res/docs/2012/traffic_and_market_report_update_august_2012.pdf. As the sector has moved from domestic to global standards, prices have fallen and, at the same time, products and services have continuously improved—with new standardization technologies generating enhanced performance and new features

for consumers, such as mobile broadband Internet access, music and video streaming, social networking, location-based services, and online gaming.

### 2.    FRAND licensing is critical to the standardization process.

FRAND licensing facilitates the standardization process and is a critical element of future standards development. As explained above, the standardization process requires major and early investments in collaborative, rather than proprietary, research and development. The early investment, although risky and costly to the participants in the standard-setting process, must be maintained to continue development of open global standards in the future. *See*, *e.g.*, Comments of Microsoft Corp., FTC Patent Standards Workshop, Project No. P11-1204 at 5 (June 14, 2011) ("Standards will not fulfill their salutary purpose if standards policies deter innovators from contributing patented technologies or investing in further innovation related to standardized technology.").

FRAND licensing has provided the necessary incentives for innovators to direct research and development resources to standardization efforts. It is a prerequisite for the underlying business models of participants in standard-setting, as recognized by key standard-setting organizations:

> IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

20

*E.g.*, ETSI IPR Policy at 3.2. Limitations on the promise of a fair return would undermine incentives for innovators to invest in open, standardized technology and instead encourage a shift toward proprietary technologies. Eventually, this could threaten interoperability between equipment from different vendors, leading to consumer lock-in, reduced consumer choice and higher costs. As the FTC has recognized, "[i]f firms forego participation in the standard-setting process, consumers will no longer enjoy the benefits of interoperability that arise from standard setting, manufacturers have less incentive to innovate and differentiate products offerings, and new manufacturers will be deterred from entering the market." Motorola Mobility LLC and Google Inc.: Analysis of Proposed Consent Order to Aid Public Comment, File No. 121-0120 (FTC Jan. 10, 2013).

In short, as the district courts have recognized, "[t]o induce the creation of valuable standards, the [F]RAND commitment must guarantee that holders of valuable intellectual property will receive reasonable royalties on that property." *In re Innovatio IP Ventures*, No. 11-CV-9308, 2013 U.S. Dist. LEXIS 144061, at *70 (N.D. Ill. Sept. 27, 2013); *Microsoft Corp. v. Motorola, Inc.*, No. 10-CV-1823, 2013 U.S. Dist. LEXIS 60233, at *12 (W.D. Wash. Apr. 25, 2013).

**B.    A Rule Requiring District Courts to Provide Prospective Licensees With Equitable Determinations That Could Be Used to Leverage Sub-FRAND Licensing Terms Would Be Unwise.**

**1.    FRAND-related litigation is increasing.**

While Ericsson acknowledges that in some cases it will be necessary for FRAND-related licensing disputes to be resolved through litigation, the FRAND regime necessarily functions most efficiently when expensive and resource-consuming litigation over FRAND terms can be avoided. The Court should thus be wary of promulgating rules that might incentivize such litigation. This concern is only heightened by the fact that FRAND-related litigation appears to be increasing—more than a dozen written opinions addressing FRAND-related disputes have been issued by U.S. district courts in the last few years.[1]

---

[1] *Microsoft Corp. v. Motorola, Inc.*, No. 10-CV-1823, 2013 U.S. Dist. LEXIS 109905, at *15-16 (W.D. Wash. Aug. 5, 2013); *Multimedia Patent Trust v. LG Elecs., Inc.*, No. 12-CV-2731, 2013 U.S. Dist. LEXIS 156686, at *14 (S.D. Cal. Aug. 1, 2013); *Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, No. 6:11-CV-495, 2013 U.S. Dist. LEXIS 129817, at *7-8 (E.D. Tex. July 16, 2013); *Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-CV-03451, 2013 U.S. Dist. LEXIS 71311, at *14 (N.D. Cal. May 20, 2013); *SK Hynix Inc. v. Rambus Inc.*, No. 00-CV-20905, 2013 U.S. Dist. LEXIS 66554, at *67-68 (N.D. Cal. May 8, 2013); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 915 (N.D. Ill. 2013); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 920 F. Supp. 2d 1116, 1140 (N.D. Cal. 2013); *Ericsson Inc. v. D-Link Sys.*, 2013 U.S. Dist. LEXIS 110585, at *74; *Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-CV-03451, 2012 U.S. Dist. LEXIS 146565, at *6 (N.D. Cal. Oct. 10, 2012); *Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618, 2012 U.S. Dist. LEXIS 167479, at *73 (S.D. Cal. Nov. 9, 2012); *Nokia Corp. v. Apple Inc.*, No. 09-CV-791, 2011 U.S. Dist. LEXIS 58773, at *3 (D. Del. June 1, 2011); *Myriad Group A.G. v. Oracle Am., Inc.*, No. 10-CV-1087, 2011 U.S. Dist. LEXIS 11072, at *3 (D. Del. Feb. 4, 2011); *Vizio, Inc. v.*

2. **To ensure that this increasing litigation does not undermine the FRAND regime, district courts must have discretion to deny claims for equitable relief where the prospective licensee will not agree to FRAND terms.**

A holding that the district court abused its discretion in this case—and that courts are required to determine FRAND licensing terms even where prospective licensees refuse to be bound by them—could harmfully incentivize the use of litigation by prospective licensees to leverage sub-FRAND licenses.

Rather than simply negotiating for FRAND terms, implementers seeking additional bargaining power could bring equitable claims for specific performance and declaratory judgment, secure FRAND determinations to which they would not be bound, and then use those determinations to set the ceiling in subsequent negotiations with the innovating SEP holders. And facing the prospect of protracted and expensive litigation that would only promise to set an upper boundary for subsequent license negotiations, those SEP holders could be pressured to settle with the implementers on sub-FRAND terms. This could upset the balance maintained by the FRAND regime—and unwisely discriminate against those who have chosen to invest in open standards in favor of those who have chosen to invest in proprietary technologies, or who have chosen not to invest at all. In order to avoid undermining the incentive for future investments in open

---

*Funai Elec. Co.*, No. 09-CV-0174, 2010 U.S. Dist. LEXIS 30850, at *5 (C.D. Cal. Feb. 3, 2010); *Wi-Lan Inc. v. Research in Motion Corp.*, No. 10-CV-859, 2010 U.S. Dist. LEXIS 77776, at *4 (S.D. Cal. July 28, 2010).

standards, therefore, this Court should hold that the district court reasonably exercised its discretion in declining to hear Apple's claims for equitable relief.

## CONCLUSION

For all of these reasons, Ericsson respectfully requests that this Court affirm the judgment of the district court.


Date: December 3, 2013                    Respectfully submitted,

                                          /s/ Joel L. Thollander

                                          Mike McKool, Jr.
                                          Theodore Stevenson III
                                          McKOOL SMITH, P.C.
                                          300 Crescent Court, Suite 1500
                                          Dallas, TX 75201
                                          (214) 978-4974

                                          John B. Campbell
                                          Joel L. Thollander
                                          McKOOL SMITH, P.C.
                                          300 W. 6th Street, Suite 1700
                                          Austin, Texas  78701
                                          (512) 692-8700

                                          *Counsel for* Amicus Curiae *Ericsson Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing BRIEF OF *AMICUS CURIAE* ERICSSON INC. IN SUPPORT OF AFFIRMANCE FOR DEFENDANT-CROSS APPELLANT MOTOROLA MOBILITY LLC was served through the Court's ECF system to counsel of record as follows:

E. Joshua Rosenkranz
jrosenkranz@orrick.com
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019

Rachel Wainer Apter
rwainerapter@orrick.com
Mark S. Davies
mark.davies@orrick.com
Daniel Habib
dhabib@orrick.com
Rachel M. McKenzie
rmckenzie@orrick.com
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005

Matthew D. Powers
matthew.powers@tensegritylawgroup.com
Tensegrity Law Group, LLP
Suite 360
555 Twin Dolphin Drive
Redwood City, CA 94065

*Counsel for Plaintiff-Appellant Apple Inc.*

25

David A. Nelson
davenelson@quinnemanuel.com
Stephen A. Swedlow
stephenswedlow@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
500 West Madison Street
Chicago, IL 60661

Brian Cosmo Cannon
briancannon@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive
Redwood Shores, CA 94065

Edward J. DeFranco
eddefranco@quinnemanuel.com
David Morad Elihu
davidelihu@quinnemanuel.com
Kathleen M. Sullivan
kathleensullivan@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010-1601

*Counsel for Defendant-Cross Appellant Motorola Mobility LLC*

Richard S. Taffet
richard.taffet@bingham.com
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

David B. Salmons
david.salmons@bingham.com
Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20005

Patrick Strawbridge
patrick.strawbridge@bingham.com
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

*Counsel for* Amicus Curiae *Qualcomm Inc.*

Date: December 3, 2013

/s/ Joel L. Thollander
Joel L. Thollander

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing BRIEF OF *AMICUS CURIAE* ERICSSON INC.
IN SUPPORT OF AFFIRMANCE FOR DEFENDANT-CROSS APPELLANT
MOTOROLA MOBILITY LLC:

1.      complies with the type-volume limitation of FED. R. APP. P. 29(d) and
32(a)(7)(B). This brief contains 5,463 words, excluding the parts of the brief
exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b). Microsoft
Word 2010 was used to calculate the word count.

2.      complies with the typeface requirements of FED. R. APP. P. 32(a)(5)
and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been
prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-
point Times New Roman type style.

Date: December 3, 2013

/s/ Joel L. Thollander
Joel L. Thollander